**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| TROYCE MANASSA, AUSTIN DASENT, and J'TA FREEMAN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | No.  1:20-cv-3172 |
| v. | JURY TRIAL DEMANDED |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; THE BOARD OF GOVERNORS OF THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; and THE DIVISION I BOARD OF DIRECTORS OF THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendants. | |

**<u>CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 2

II.    JURISDICTION AND VENUE ...................................................................... 4

III.   PARTIES ......................................................................................................... 5

       A.    Plaintiffs ............................................................................................. 5

       B.    Defendants ......................................................................................... 8

IV.    FACTS ........................................................................................................... 13

       A.    For nearly 200 years, HBCUs have served as institutions of higher
             education with the intention of primarily serving the Black community. .......... 13

             1.    The role of HBCUs in education. ............................................. 13

             2.    The history of HBCUs in NCAA athletics ............................... 16

       B.    The NCAA's Academic Performance Program discriminates against
             HBCUs based on race. ..................................................................... 20

             1.    The NCAA requires student-athletes to comply with regulations
                   governing all aspects of their lives.......................................... 20

             2.    The NCAA's serial academic requirements have historically
                   discriminated against Black student-athletes at HBCUs. ....... 22

             3.    The NCAA discriminated against Black Student-Athletes at
                   HBCUs when it considered race in the design and implementation
                   of the APP. .............................................................................. 26

             4.    HBCU teams are 43 times more likely to receive a postseason ban
                   than a PWI team. ..................................................................... 36

             5.    The NCAA uses the APP to reward PWIs................................ 38

       C.    Plaintiffs and the Class have been injured by or are at risk of injury
             because of the APP. .......................................................................... 39

             1.    The NCAA's conduct interferes with student-athletes' ability to
                   make and enforce contracts—their NLIs. ................................ 39

             2.    The NCAA's conduct creates an increased risk that Black student-
                   athletes at Division I HBCUs will suffer irreparable harm..................... 41

V.     TOLLING OF STATUTE OF LIMITATIONS ............................................ 42

VI.    CLASS ALLEGATIONS ............................................................................... 43

VII.   CAUSES OF ACTION .................................................................................. 46

VIII.  PRAYER FOR RELIEF ................................................................................ 55

Plaintiffs Troyce Manassa, Austin Dasent, and J'TA Freeman on behalf of themselves and all others similarly situated and by and through their attorneys, for their Complaint against Defendants the National Collegiate Athletic Association ("NCAA"), the Board of Governors of the National Collegiate Athletic Association, and the Division I Board of Directors of the National Collegiate Athletic Association, allege as follows:

## I.    INTRODUCTION

1.    The NCAA proclaims in its Constitution:

> The Association shall promote an atmosphere of respect for and sensitivity to the dignity of every person. It is the policy of the Association to refrain from discrimination with respect to its governance policies, educational programs, activities and employment policies including on the basis of age, color, disability, gender, national origin, race, religion, creed or sexual orientation.

NCAA Const., Art. 2.6.

2.    Such a creed should allow Historically Black Colleges and Universities ("HBCUs"[1]), defined as "any historically black college or university that was established prior to 1964, whose principal mission was, and is, the education of black Americans," and their students to thrive in the NCAA. Focused on a community that has been historically left behind, HBCUs largely enroll low-income, first-generation, and historically-disadvantaged Black[2] students.

3.    However, despite the NCAA's fundamental promise to "refrain" from discriminating based on race in educational programs, the NCAA has a long history of discriminating against Black student-athletes and teams at HBCUs through implementation of its so-called academic reforms.

---

[1]  20 U.S.C. §§ 1060, 1061(2).
[2]  We use the term "Black" throughout this Complaint to represent African Americans, individuals of African descent, and/or Black people.

4.      Most recently, the NCAA designed and implemented the Academic Performance Program ("APP"), which penalizes a team if it does not meet or exceeds a threshold number of points based on the team members' academic performance and other indicators. Highest tier penalties include banning a team from postseason competition.

5.      The formula on which the APP is based includes metrics that the NCAA knew would discriminate against Black student-athletes at HBCUs.

6.      The NCAA's design and implementation of the APP perpetuates a system that punishes Black student-athletes at HBCUs because of the HBCUs' unique and historical role in the education of Blacks within the systemic vestiges of discrimination. In fact, the NCAA has admitted that "a higher proportion of HBCU teams have been subject to APP penalties" than Predominantly White Institutions ("PWI").

7.      An HBCU team is 43 times more likely to receive a postseason competition ban than a PWI team.  While just 6.5% of NCAA Division I schools are HBCUs (23 out of 350), 72% of the teams that have been banned from postseason competition since 2010 are from HBCUs (114 of 159).

8.      This substantial impact is more than a random or indirect consequence of the NCAA's well-intentioned policies. One commentator called the APP "polite racism."  We call it illegal.

9.      The NCCA's adoption and continued enforcement of the APP, including its penalty structure and postseason access bans, together with the NCAA's prior academic propositions and reforms, represent a pattern or practice of intentional discrimination against Black student-athletes at HBCUs on the basis of race.

10.     Plaintiffs are Blacks who were or are NCAA student-athletes at HBCUs on teams that were or are at risk of being banned from postseason competition because of the APP. They bring this action on behalf of themselves and all other current and former Black student-athletes at HBCUs for racial discrimination in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1985, and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.*

## II.     JURISDICTION AND VENUE

11.     Plaintiffs bring claims pursuant to 42 U.S.C. §§ 1981, 1985. This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

12.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one Defendant; and (d) members of the class, including Plaintiffs, are citizens of a state and at least one of the Defendants is a citizen or subject of a foreign state.

13.     The Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over the NCAA as an unincorporated association residing and conducting operations in this District.  For these same reasons, this Court has personal jurisdiction over the Board of Governors of the NCAA.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the NCAA and its Board of Governors reside in this District.

### III.   PARTIES

####   A.   Plaintiffs

16.   Mr. Troyce Manassa is a resident of Charlotte, North Carolina and citizen of the United States.

17.   He is a former NCAA Black student-athlete who played basketball at HBCU Savannah State University ("SSU"), located in Savannah, Georgia, during the 2015/2016 and 2016/2017 seasons, his junior and senior years, respectively.

18.   Mr. Manassa was a guard on the SSU men's basketball team.

19.   Prior to playing basketball at SSU, he signed a National Letter of Intent. He received a full athletic scholarship from SSU.

20.   Mr. Manassa was unaware of SSU's NCAA penalties, including ban from postseason play until, after he committed to and arrived at SSU.

21.   SSU finished in fifth place in the MEAC in 2015/16. They advanced to the semifinals in the postseason MEAC tournament.

22.   During the 2016/17 season, Mr. Manassa's senior year, SSU's men's basketball team was banned from postseason play by the NCAA's APP rules.

23.   At the end of SSU's regular 2016/17 basketball season, SSU finished fifth in the Mid-Eastern Athletic Conference ("MEAC").

24.   Because of the NCAA postseason ban against SSU, the team was unable to participate in postseason competition, including the MEAC tournament.

25.   The winner of the MEAC postseason championship during the 2016/17 season was North Carolina Central.

26.   SSU defeated North Carolina Central in regular season play.

27.     During the last game of SSU's regular season, Mr. Mannasa scored 42 points and he was one of the leading scorers in the conference.

28.     Mr. Manassa was named to the preseason All-MEAC third team.

29.     Mr. Manassa was just shy of a 1000-point career before the postseason ban was imposed.

30.     Mr. Manassa intends to continue his basketball career overseas in 2021.

31.     Mr. Austin Dasent is a resident of Charlotte, North Carolina and citizen of the United States.

32.     He is a former NCAA Black student-athlete who played basketball at HBCU SSU, located in Savannah, Georgia, during the 2016/17 and 2017/2018 seasons, his junior and senior years, respectively.

33.     Mr. Dasent was a point guard and shooting guard on the SSU men's basketball team.

34.     Prior to playing basketball at SSU, he signed a National Letter of Intent. He received a full athletic scholarship from SSU.

35.     Mr. Dasent transferred to SSU from a junior college in 2016.

36.     Mr. Dasent was unaware of SSU's NCAA penalties, including ban from postseason play until after he committed to and arrived at SSU.

37.     During the 2016/17 season, Mr. Dasent's junior year and first year at SSU, SSU's men's basketball team was banned from postseason play by the NCAA's APP rules.

38.     At the end of SSU's regular 2016/17 basketball season, SSU finished fifth in the MEAC.

39.     Because of the NCAA postseason ban against SSU, the team was unable to participate in postseason competition, including the MEAC tournament.

40.     The winner of the MEAC postseason championship during the 2016-17 season was North Carolina Central.

41.     SSU defeated North Carolina Central in regular season play.

42.     Mr. Dasent played in the 2017-18 basketball season. At the end of the regular season, SSU finished in first place in a three-way tie and won the MEAC regular season championship.

43.     Entering the MEAC postseason tournament, SSU was seeded third and lost in the quarterfinals.

44.     SSU dropped from Division I to Division II in 2019, citing financial reasons and NCAA penalties.

45.     After graduating from SSU, Mr. Dasent played basketball overseas for a brief period of time.

46.     Mr. Dasent is currently providing private basketball coaching and training to youth basketball teams and players.

47.     Ms. J'TA Freeman is a resident of the District of Columbia and a citizen of the United States.

48.     Ms. Freeman received a full athletic scholarship to HBCU Howard University in Washington, DC.

49.     Ms. Freeman enrolled at Howard University as a freshman in the Fall of 2019.

50.     Ms. Freeman is an NCAA Black student-athlete for Howard University women's lacrosse team. She played during the 2019/2020 season and intends to play during the 2021/2022 season.

51.     Ms. Freeman declined other college scholarship offers to play for Howard University.

52.     Ms. Freeman was unaware that Howard University's womens' lacrosse team has been banned from post season play in the past by NCAA.

53.     Ms. Freeman and her lacrosse team are at risk of being banned from postseason play by the NCAA's current rules.

### B.     Defendants

54.     Defendant NCAA is an unincorporated association that acts as the governing body of college sports. Its principal office is in Indianapolis, Indiana. According to its 2018 IRS Form 990, the most recent one publicly available, its gross receipts were $1,222,405,932 and net assets were $425,995,451.

55.     In 1952, the NCAA imposed rulemaking and enforcement authority over its members.[3] Today, its Constitution, Bylaws, and regulations dictate member institution and student-athlete conduct, ethics, and eligibility.  NCAA staff are empowered to issue binding interpretations of NCAA rules.

56.     An "NCAA 101" fact sheet published by the NCAA explains that "[t]he National Collegiate Athletic Association is a member-led organization dedicated to the well-being and lifelong success of college athletes."[4] "The 500 employees at the NCAA's Indianapolis

---

[3] "Joint Stipulation of Facts Concerning the NCAA," *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litig.,* Case No. 4:14-md-02541-CW, Dkt. 1098 at ¶ 23 (N.D. Cal. October 15, 2018).
[4] NCAA, What is the NCAA?, NCAA, http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited November 22, 2020).

headquarters interpret and support member legislation, run all championships and manage programs that benefit student-athletes."[5]

57.     Defendant NCAA Board of Governors is currently comprised of the following voting members: Philip DiStefano, Chancellor University of Colorado at Boulder; Randy Woodson, Chancellor North Carolina State University; Burns Hargis, President Oklahoma State University; Denise Trauth, President Texas State University; Jere Morehead, President University of Georgia; Renu Khator, President University of Houston; Satish Tripathi, President the State University of New York at Buffalo; M. Grace Calhoun, Athletic Director University of Pennsylvania; David Wilson, President Morgan State University; Rita Hartung Cheng, President Northern Arizona University; James Harris, President University of San Diego; John DeGioia, President Georgetown University; Rebecca Blank, Chancellor University of Wisconsin-Madison; Christopher Graham, Commissioner Rocky Mountain Athletic Conference; Allison Garrett, President Emporia State University; Sandra Jordan, President University of South Carolina at Aiken; Heather Benning, Commissioner Midwest Conference; Fayneese Miller President Hamline University; Tori Murden McClure, President Spalding University; Vivek Murthy, 19th Surgeon General of the United States; Ken Chenault, General Catalyst; Mary Sue Coleman, President Association of American Universities; Grant Hill, Atlanta Hawks; and Robert Gates, Former Secretary of Defense. NCAA President, Mark Emmert, is permitted to vote in the case of a tie among the voting members present and voting.[6] Hereinafter, unless otherwise specified, NCAA and its Board of Governors are collectively referred to as "NCAA."

---

[5] *Id*.
[6] NCAA, Board of Governors, NCAA,
http://web1.ncaa.org/committees/committees_roster.jsp?CommitteeName=EXEC (last visited November 22, 2020).

58.     Defendant NCAA Board of Governors is the highest governance body in the NCAA and is composed of institutional chief executive officers that oversee association-wide issues. The Board is charged with ensuring that each division of the NCAA "operates consistently with the basic purposes, fundamental policies and general principles of the Association."[7]

59.     The NCAA Board of Governors, "the highest-ranking committee in the Association, can implement policies by which all three divisions must abide," and "acts on behalf of the Association by adopting and implementing policies to resolve core issues and other Association wide rules."[8]

60.     The NCAA website explains the Board of Governor's ability to implement rules as follows:  "Each division governs its day-to-day needs, but on broad issues that affect college athletics as a whole, the NCAA Board of Governors and a collection of committees set the course for the Association."[9]  It continues:

> While each NCAA division is empowered with setting its own rules and operating guidelines, some topics rise to a level affecting college sports as a whole and need a coordinated voice to guide the Association in a unified direction…. The NCAA Board of Governors, the highest-ranking committee in the Association, can implement policies by which all three divisions must abide. When the NCAA stopped allowing schools to host championships if their state governments displayed the Confederate flag, it was through a Board of Governors policy change.[10]

61.     Defendant NCAA Division I Board of Directors ("Board") is currently comprised of the following members: Philip DiStefano, Chancellor of University of Colorado at Boulder; Randy Woodson, Chancellor of North Carolina State University; Rebecca Blank, Chancellor of

---

[7] NCAA, NCAA Board of Governors, NCAA, http://www.ncaa.org/governance/committees/ncaa-board-governors (last visited November 22, 2020).
[8] Amy Winner Schwarb, How the NCAA works, NCAA, http://www.ncaa.org/champion/how-ncaa-works (last visited November 22, 2020).
[9] Id.
[10] Id.

University of Wisconsin-Madison; Burns Hargis, President of Oklahoma State University; Denise Trauth, President of Texas State University; Jere Morehead, President of University of Georgian; Mary Papzian, President of San Jose University; Renu Khator, President of University of Houston; Satish Tripathi, President of University at Buffalo, the State University of New York; M. Grace Calhoun, Athletic Director of University of Pennsylvania; Christina H. Paxon, President of Brown University; David Wilson, President of Morgan State University; Philip Oldham, President of Tennessee Technological University; Rita Hartung Cheng, President of Northern Arizona University; W. Taylor Reveley IV, President of Longwood University; Adrianne Swinney, Senior Woman Administrator and Chief Operating Officer of University of Connecticut; Jeri Beggs, FAR of Illinois State University; Dean Bresciani, President of North Dakota State University; Guy Bailey, President of The University of Texas Rio Grande Valley; James Harris, President of University of San Diego; John DeGioia, President of Georgetown University; Harlan Sands, President of Cleveland State University; and Neal Smatresk, President of University of North Texas.

62.     Since 1973, the NCAA's member schools have been organized into three divisions—Division I, Division II, and Division III.  Each Division has a particular set of rules and guidelines governing athletics.[11]

63.     Division I ("DI"), the most prestigious division, contains approximately 350 of the NCAA's 1200 member schools.  It is governed by a Division I Council (comprised of DI sports practitioners) and a Board of Directors (comprised of 12 presidents and chancellors from each conference) and includes numerous committees. The DI Committee on Academics has the "primary academic authority for Division I, managing eligibility standards and the Academic

---

[11] Schwarb, *supra,* n. 8.

performance Program," reports to the DI Board of Directors, and can recommend legislation to the DI Council.[12]  The Board is responsible for enacting policy and legislation that governs DI.

64.     DI includes two levels of football: the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS").  Within DI there are 32 conferences, each of which may enact and enforce conference-specific rules, as long as they are consistent with the NCAA Constitution and bylaws.

65.     The most prestigious level of DI football competition—FBS—contains ten athletic conferences and seven independent schools.  The five top FBS conferences: the Atlantic Coast conference ("ACC"), Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference ("SAC") are known by the moniker: the "Power Five."  The remaining DI-FBS schools are referred to as the "Group of Five."

66.     At all relevant times, each Defendant acted in all aspects as the agent and alter ego of the other, Defendants carried out a joint scheme, business plan, or policy in all respects pertinent thereto, and the acts of each Defendant are legally attributable to the other Defendant(s).  Accordingly, Plaintiffs collectively refer to the Defendants (including the Board of Governors and Division I Board of Directors) as "NCAA."

---

[12] *Id.*; NCAA Bylaws, 4.4, NCAA Division I Manual 2020-2021, *available at* https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited November 22, 2020).

## IV.    FACTS

**A.    For nearly 200 years, HBCUs have served as institutions of higher education with the intention of primarily serving the Black community.**

### 1.  The role of HBCUs in education.

67.    Historically, education of Blacks in the United States, including enslaved persons, was prohibited.[13]

68.    The Civil War ended slavery but did not provide Blacks access to white institutions or white educational systems.  HBCUs thus developed as a way to educate formerly enslaved persons and all Blacks, becoming the primary avenue for providing postsecondary education to Black students.[14]

69.    These efforts persisted despite Ku Klux Klan violence towards and intimidation of Black educators, schools, and students.  In response, Congress passed the Ku Klux Clan Act of 1871,[15] outlawing conspiracies to deprive citizens of their constitutional rights (including the right to equal protection).

70.    The development of HBCUs was aided by the Second Morrill Act of 1890 which required that, when states with racially segregated public higher education systems provided a land grant to benefit white students, they also had to provide a land grant for the benefit of Black

---

[13] A History of Historically Black Colleges and Universities, HBCU First, https://hbcufirst.com/hbcu-history-timeline (last visited November 22, 2020); U.S. Dept. of Educ., Office of Civil Rights, Historically Black Colleges and Universities and Higher Education Desegregation, U.S. Dept. of Educ. (March 1991), https://www2.ed.gov/about/offices/list/ocr/docs/hq9511.html.
[14] U.S. Dept. of Educ., Office of Civil Rights, *supra,* n. 13.
[15] 42 U.S.C. § 1985.

students.[16]   As a result, additional institutions dedicated to Black students – now referred to as HBCUs – received land and were established across the South.

71.     "Despite the narrow scope of their intended function, HBCUs grew into significant institutions in the production of research, particularly on the African diaspora.  [HBCUs] became the primary teachers of the previously under and uneducated populace, central repositories of cultural heritage, and stalwart beacons for community uplift."[17] HBCUs accepted students "as they were," including educating those who were underprepared or had "minimal skills."[18]

72.     HBCUs thus comprised the backbone of the educational system for Black students, educating future teachers, doctors, lawyers, and ministers who would serve the Black community in what was still a racially segregated society. Almost all Black college students during this period enrolled at HBCUs.[19]

73.     The Supreme Court's decision in *Plessy v. Ferguson,* 163 U.S. 537 (1896), reinforced America's segregated educational system.  Although it required that Black and white schools be "separate but equal," they were not.

74.     Black schools, including HBCUs, had fewer resources, poorer facilities, inadequate libraries, and smaller budgets than white institutions, and they received less support from state and federal governments.[20]

---

[16] U.S. Dept. of Educ., Office of Civil Rights, *supra,* n. 13. *See* Louis B. "Skip" Perkins, Jr., An Examination of Historically Black Colleges and Universities' (HBCU) Intercollegiate Athletic Directors' Utilization and Effectiveness of Resources to Foster Student-Athlete Academic Success: A Comparative Case Study Analysis (May 2018) (Ph.D. dissertation, Delaware State University) (*available at* https://desu.dspacedirect.org/bitstream/handle/20.500.12090/283/Perkins_desu_1824E_10084.pdf?isAllowed=y&sequence=1).

[17] M. Christopher Brown II and Ronyelle Bertrand Ricard, *The Honorable Past and Uncertain Future of the Nation's HBCUs,* THE NEA HIGHER EDUCATION JOURNAL, Fall 2007, at 120.

[18] *Id.*

[19] U.S. Dept. of Educ., Office of Civil Rights, *supra,* n. 13.

[20] *Id.*; Autumn A. Arnett, Funding at HBCUs Continues to be Separate and Unequal, Diverse Issues in Higher Education (May 31, 2015), https://diverseeducation.com/article/73463/.

75.     Although the Supreme Court overruled *Plessy* in *Brown v. Board of Education,* 347 U.S. 483 (1954), many state and local governments were extremely slow to comply with desegregation and the vestiges of discrimination were deeply engrained in society, not the least of which was in higher education.

76.     Today there are 101 HBCUs in 19 states that enroll almost 300,000 students, approximately 80% of whom are Black, 70% of whom are from low-income families, and many of whom are first-generation students.[21]   Although HBCUs represent only 3% of all four-year nonprofit colleges and universities, they enroll 10% of all Black students nationally.

77.     HBCUs have awarded 17% of all bachelor's degrees earned by Black students and nearly a quarter of all bachelor's degrees earned by Black students in science, technology, and engineering since the early 2000s.[22]   HBCUs have produced 80% of the Black judges, 50% of the Black lawyers, 50% of the Black doctors, 40% of the Black engineers, 40% of the Black members of Congress, and 13% of the Black CEOs in America today.[23]

78.     Prominent HBCU graduates include Vice President-Elect Kamala Harris, Jesse Jackson, Martin Luther King, Jr., Thurgood Marshall, and Toni Morrison, as well as NFL stars such as Jackson State's Walter Payton, Mississippi Valley State's Jerry Rice, and Alcorn State's Steve McNair, who finished third in Heisman voting in 1994. Doug Williams, a Grambling alumnus, became the first Black quarterback to win a Super Bowl in 1988.

---

[21] United Negro College Fund, HBCUs Make American Strong: The Positive Economic Impact of Historically Black Colleges and Universities, UNCF, https://cdn.uncf.org/wp-content/uploads/HBCU_Consumer_Brochure_FINAL_APPROVED.pdf?_ga=2.73503766.523917533.1603817862-147757049.1603817862 (last visited November 22, 2020);  Krystal L. Williams and BreAnna L. Davis, "Public and Private Investments and Divestments in Historically Black Colleges and Universities," ACE AND UNCF ISSUE BRIEF, January 2019 at 1 (available at https://www.acenet.edu/Documents/Public-and-Private-Investments-and-Divestments-in-HBCUs.pdf).

[22] The UNCF Fact Sheet, https://cdn.uncf.org/wp-content/uploads/2019-UNCF-Fact-Sheet.pdf?_ga=2.149633458.523917533.1603817862-147757049.1603817862 (last visited November 22, 2020).

[23] Jemele Hill, *It's Time for Black Athletes to Leave White Colleges*, The Atlantic, October 2019, https://www.theatlantic.com/magazine/archive/2019/10/black-athletes-should-leave-white-colleges/596629/

79.     HBCUs have been and continue to be committed to "the preservation of Black history, racial pride, ethnic traditions, and Black consciousness."[24] A recent Gallup study concluded that HBCUs "are successfully providing black graduates with a better college experience than they would get at non-HBCUs."[25]

## 2. The history of HBCUs in NCAA athletics

80.     The NCAA was established in 1906 by all white leaders at schools in the Ivy League as a non-profit, "voluntary" association, which is now comprised of nearly 1,200 member colleges and universities.  Today, it controls the governance and regulation of college sports.

81.     That same year, unwelcome by the NCAA, a group of HBCU leaders created the first Black athletic conference: the Inter-Scholastic Athletic Association of the Middle Atlantic States ("ISSA").[26]

82.     In subsequent years, several additional HBCU athletic conferences emerged, including the Central Intercollegiate Athletic Association ("CIAA," 1912), Southern Intercollegiate Athletic Conference ("SIAC," 1913), Southwestern Athletic Conference ("SWAC," 1920), and Mid-Eastern Athletic Conference ("MEAC," 1970).[27]

83.     Prior to desegregation, many of the country's best Black student-athletes attended HBCUs, which enjoyed national attention for their success on the field or court.

---

[24]  Brown and Ricard, *supra* n. 17, at 121.
[25] 2015 Gallup-USA Funds Minority College Graduates Report at 7, https://www.gallup.com/services/186359/gallup-usa-funds-minority-college-graduates-report-pdf.aspx (last visited November 22, 2020).
[26] Joseph N. Cooper, J. Kenyatta Cavil, Geremy Cheeks, *The State of Intercollegiate Athletics at Historically Black Colleges and Universities (HBCUs): Past, Present & Persistence,* J. ISSUES IN INTERCOLLEGIATE SPORTS, 2014, No. 7, at 308 (available at http://csri-jiia.org/old/documents/publications/research_articles/2014/JIIA_2014_7_15_307_332_The_Case_of_HBSU.pdf).
[27] Steven J. Gaither, Despite Great Strides, HBCUs and NCAA-Recognized Athletic Conferences Face Challenges, Diverse Issues in Higher Education (Jan. 22, 2013), https://diverseeducation.com/article/50844/.

84.    For example, Hall of Fame coach Eddie Robinson started coaching at Grambling State University in 1941, when it was called Louisiana Negro Normal and Industrial Institute.[28] Under his coaching, Grambling won nine Black college football national championships and sent 200 football players to professional teams.

85.    Despite the inherent inequalities brought about by segregation, HBCU football programs thrived in the middle part of the 20th century. Morgan State won four conference titles in seven years from 1943 to 1949, losing only eight games in that span. Southern University won three conference titles with a 32-0-2 record from 1948 to 1950. Florida A&M lost just four times in 58 games from 1957 to 1962 and produced several AFL and NFL professional athletes.

86.    From 1905 through the 1970s, major NCAA college basketball and football programs were predominantly white; and the southern PWIs were almost exclusively white.[29] During this period when white players predominated collegiate athletics and before all colleges and universities fully complied with desegregation and other civil rights laws, the NCAA's academic standards were either non-existent or very low and Black student-athletes were largely attending HBCUs.

87.    However, as Southern PWIs suffered numerous failed attempts to avoid desegregation in the 1960s and 1970s, coupled with the increasing success of HBCU athletic programs, the economic value of the Black student-athletes' skills and abilities came into sharper focus for  the PWIs and they began recruiting Black student-athletes to their institutions.

---

[28] Shira Springer, *HBCUs and Their Role in Disrupting the College Sports 'Cartel,'* WBUR, Oct. 13, 2017, https://www.wbur.org/onlyagame/2017/10/13/hbcus-grambling-ncaa-cartel.

[29] *See* Delgreco K. Wilson, <u>Black Athletes, Race and the Rise of NCAA Eligibility Requirements,</u> The Black Cager (Sept. 18, 2014), http://delgrecowilson.com/2014/09/18/black-athletes-race-andthe-rise-of-ncaa-eligibility-requirements/.

88.     At the same time, high dollar television contracts were transforming college sports teams into a lucrative business. Because PWIs were bigger and had more money, they began to siphon the best Black talent from attending HBCUs.

89.     And, despite the success of HBCU athletic teams, mainstream media did not focus on HBCUs, but instead on the PWIs.

90.     PWIs' newfound focus on and interest in recruiting Black student-athletes was based on the commodification of the Black student-athletes' skills and abilities, rather than nurturing each Black student-athlete's whole self, success, and inclusion—the mission of the HBCUs.

91.     In 1984, the Supreme Court ruled in *NCAA v. Board of Regents,* 468 U.S. 85 (1984), that schools should be free to pursue their own TV deals. With millions of dollars at stake, television revenue for football and basketball games became the biggest source of revenue for big-time college athletics departments.

92.     By that time, PWIs dominated the recruitment of the top Black student-athletes and thus were able to capitalize on lucrative television deals in the hundreds of millions of dollars, and further expanding the economic divide between PWIs and HBCUs.

93.     Today the conferences referred to as the CIAA, SIAC, SWAC, and MEAC are NCAA-recognized conferences that are still comprised completely or predominantly of HBCUs. SWAC and MEAC play Division I sports.   Only two HBCUs—Hampton University and Tennessee State—play in different conferences (Big South and Ohio Valley, respectively).   All HBCUs play in the FCS, as opposed to the FBS. None generate the television or sports-related revenue of PWIs.

94.     In comparison, the Power Five generate significant revenue each year, dwarfing that generated by the MEAC and SWAC.  The Power Five's financial largess is due in large part to television contracts tied to their participation in the postseason bowl games and the men's basketball tournament.

95.     As recently as 2010, the NCAA's broadcasting rights for the NCAA men's basketball tournament were worth just under $550 million per year. In 2011, the NCAA reached a new 14-year, $10.8 billion deal that was worth just north of $770 million annually for the NCAA (with a subsequent extension increasing it to $1.1 billion in 2032). At the same time, the revenue the networks were generating from national TV ad sales during NCAA events more than doubled from $598 million in 2009 to $1.24 billion in 2016.[30]

96.     The television revenue benefits the PWIs and not the HBCUs.  For example, in 2018, the conferences in the Power Five reported the following revenue from television contracts, bowl games, and the men's basketball tournament:

Big Ten members:      $54 million

SEC members:         $43.7 million

Big 12 members:      $34.7 million

ACC members:         $29.5 million

PAC 12 members:      $29.5 million

97.     That same year, schools in the MEAC and SWAC generated only approximately $1.9 million in revenue from the men's basketball tournament.

98.     In 2014, the NCAA permitted exceptions and carve outs to its rules and policies to the Power Five, permitting them to change and create their own rules in certain areas, including

---

[30] Cork Gaines and Diana Ykari, *The NCAA Tournament is an enormous cash cow as revenue keeps skyrocketing,* Business Insider, March 17, 2017, https://www.businessinsider.com/ncaa-tournament-makes-a-lot-of-money-2017-3.

financial aid; awards, benefits, and expenses; and academic support.[31]  The Power Five is now also known as the Autonomy Five.  The same rules are not granted to SWAC, MEAC, or the other DI conferences or members.

99.     That same year, the Power Five voted to expand the amount of money they could provide to student-athletes in financial support to include incidental expenses such as transportation costs and personal expenses.  .

100.     The net result is that PWI's autonomous structure allows them to continue to generate significantly more revenue in sports, which translates to more resources to recruit top athletic talent and provide state-of-the art educational resources and academic support than their HBCU counterparts; and all the while are subjected to different rules, that they created for themselves.

101.     At the same time, Black student-athletes at HBCUs are placed into an overwhelming cycle of NCAA rules and regulations, punishments, and banned postseason play, thereby resulting in rapidly decreasing amounts of already-underfunded resources.

### B.     The NCAA's Academic Performance Program discriminates against HBCUs based on race.

#### 1.  The NCAA requires student-athletes to comply with regulations governing all aspects of their lives.

102.     Once a student-athlete has selected which DI school they will attend, they sign a National Letter of Intent ("NLI")—a valid, binding contract.  An student-athlete trades their athletic contributions for an education: he or she agrees to attend a particular NCAA institution

---

[31] Michelle Brutlag Hosick, Board adopts new Division I Structure, NCAA, (August 7, 2014), http://www.ncaa.org/about/resources/media-center/news/board-adopts-new-division-i-structure. *See also* NCAA Bylaws, *supra,* n. 12, at 5.3.2.1.2.

full-time as a student-athlete, receiving in return athletics financial aid for a particular number of years and the ability to participate and compete in NCAA athletics.

103.    The NCAA controls the entirety of the NLI program: it hosts the NLI website, prepares the standardized NLI form; dictates when the NLI may be signed and who may be present when it is; determines when the NLI may be released, declared invalid, or voided; establishes an appeal process for NLI releases; requires all members of the NLI program to offer athletics scholarships (which are funded in part or whole by the NCAA and must be consistent with NCAA rules); and prohibits other institutions from recruiting that student-athlete once the NLI is signed. Following execution, the NLI must be filed with the relevant DI Conference.[32]

104.    Once a student-athlete signs the NLI, they are bound by NCAA bylaws and regulations, which dictate NCAA student-athlete behavior.[33]

105.    For example, student-athletes must meet eligibility requirements established by the NCAA, their institution, and the applicable athletic conference (DI Bylaws 3.1.2.4, 12.7); act with honesty and sportsmanship (DI Bylaw 10.01); act ethically (examples of which are provided in DI Bylaw 10.1); comply with drug provisions (DI Bylaw 10.2); not violate the principle of amateurism (DI Bylaw 12.1); comply with recruiting requirements (DI Bylaw 13.01); not receive any "extra benefit" (as defined by the NCAA) for their athletic contributions (DI Bylaw 16.01); and comply with disciplinary action for failures to comply (DI Bylaw 10.4).[34]

106.    The NCAA dictates how and when student-athletes may use a recruiting agency or professional sports agent, prohibits a student-athlete from receiving compensation from a

---

[32] *See, e.g.,* National Letter of Intent, http://www.nationalletter.org; Quick Reference Guide to the NLI, http://www.nationalletter.org/documentLibrary/nli-guide.pdf (last visited November 22, 2020).
[33] *See* NCAA Division I Bylaws, *supra,* n. 12.
[34] Citations are to NCAA Division I Bylaws, *supra,* n. 12. *See also* NCAA, *Summary of NCAA Regulations—Division I*, Academic Year 2020-2021, http://fs.ncaa.org/Docs/AMA/compliance_forms/DI/DI%20Summary%20of%20NCAA%20Regulations.pdf (last visited December 2, 2020).

professional team or promoting a commercial product,  and specifies when and how much prize money  a student-athlete may receive from a sports competition.[35]

107.    The NCAA has also promulgated academic requirements that dictate when and how a team and its student-athletes may participate in NCAA athletics and postseason play and when and how they may not. Student-athletes are bound by these academic requirements pursuant to the NLI and relevant NCAA bylaws.

### 2. The NCAA's serial academic requirements have historically discriminated against Black student-athletes at HBCUs.

108.    Pursuant to its Principle of Amateurism, the NCAA maintains that student-athletes are amateurs, not professionals, and claims that participation "should be motivated primarily by education and by the physical, mental and social benefits to be derived."[36]

109.    Until 1965—the time of desegregation—the NCAA imposed little to no academic requirements on student-athletes at all.  Instead, academic eligibility was left to the conferences and member institutions.

110.    In 1965—during a tumultuous time in our country's civil rights battle for equal housing, voting, public accommodations, and education—the NCAA established an academic requirement for the first time. The requirement was known as the "1.6" rule, which determined a student-athlete's initial eligibility (*i.e.* freshman eligibility) by using a combination of GPA and SAT scores to predict the first year GPA, which was required to meet or exceed 1.6.[37]

---

[35] <u>Amateurism,</u> NCAA, http://www.ncaa.org/student-athletes/future/amateurism (last visited November 22, 2020).
[36] NCAA Division I Bylaws, *supra,* n. 12, at 2.9, The Principle of Amateurism.
[37] *See* Michael J. Mondello, *An Historical Overview of Student-Athlete Academic Eligibility and the Future Implications of Cureton v. NCAA,* 7 JEFFREY S. MOORAD SPORTS L.J. 127, 130 (2000) (available at https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=1189&context=mslj).

111.    In 1973, the NCAA abandoned the "1.6 rule" and required that student-athletes have a 2.0 high school GPA to be first-year eligible.[38]  But Division I student-athletes exhibited poor academic performance and there were several high-profile admissions and academic fraud scandals.  A study performed in the early 1980s indicated that over one-third of the DI basketball programs had graduation rates below 20%, and similar numbers were exhibited in the football programs.[39]

112.    There was also significant criticism that Black student-athletes were being exploited for their athletic abilities, but seriously underserved in the classroom.[40]

113.    In 1983, the NCAA once again changed course and enacted an initial eligibility rule known as Proposition 48.[41]   Reportedly, this change was an attempt to "bolster sagging student-athlete academic performance."[42]

114.    Proposition 48 required that incoming student-athletes have a high school GPA of 2.0 in eleven core (required) courses and an SAT score of 700+ (or 15+ on the ACT).[43]  The rule allowed "partial qualifier" status for students who met the 2.0 GPA minimum but failed to satisfy the standardized test score: they could receive their athletic scholarship for one year but would be athletically ineligible and therefore lose one year of athletic participation.

115.    The NCAA explained its intent as twofold: to increase graduation rates of men's football and basketball players, and to ensure schools were not counseling players into courses

---

[38] *See* Douglas Lederman, College Athletes Graduate at Higher Rate Than Other Students, But Men's Basketball Players Lag Far Behind, a Survey Finds, CHRON. OF HIGHER EDUC., Mar. 27, 1991, at A1.

[39] *See* Mondello, *supra,* n. 37 (citing Lederman, *supra,* n. 38).

[40] Mondello, *supra,* n. 37, at 129; *See also Ross v. Creighton University,* 957 F.2d 410 (7th Cir. 1992) (former basketball player sues university for failure to educate him, noting he had overall language skills of a fourth grader and seventh grade reading skills when he completed his athletic eligibility).

[41] Gary Brown, NCAA Graduation Rates: A Quarter-Century of Tracking Academic Success, NCAA, Oct. 24, 2014, http://www.ncaa.org/about/resources/research/ncaa-graduation-rates-quarter-century-tracking-academic-success.

[42] *Id.*

[43] Brown, *supra,* n. 41.

"primarily designed to safeguard their eligibility with little or no concern for their progress toward graduation."[44]

116.    At the time, there was significant data and numerous vocal objections indicating that Proposition 48 would have a disparate impact on Black student-athletes.[45]  Although the rule theoretically pressured high schools to better prepare student-athletes for the rigors of the college classrooms, critics asserted that the use of standardized test scores meant the rule was inherently biased, and one HBCU president called it "patently racist."[46]

117.    Even the president of the College Board, which created and administers the SAT, stated that the use of SAT scores in Proposition 48 rendered the rule "patently discriminatory and racist in its effects. Its use is a disservice to minority athletes."[47]

118.    Notwithstanding the data and allegations of systemic discrimination, Proposition 48 became effective in 1986.[48]

119.    The NCAA's own subsequent study confirmed that Proposition 48 had a disproportionate impact on Black student-athletes.[49] The study showed that, in 1988, over 80% of ineligible student-athletes were Black.[50]

---

[44] Mondello, *supra,* n. 37, at 131.  (citing Letter from Robert H. Atwell, Vice President of ACE on behalf of the President's Committee on Collegiate Athletics, to Chief Executive Officers of ACE Member Institutions 4 (Dec. 22, 1982)).

[45] *See* Mondello, *supra,* n. 37.

[46] *Id.* at 133.

[47] *Id.* at 134 (citing Harold J. Vanderzwaag, *Athletics: Academic Standards for Freshman eligibility,* POL'Y DEV. IN SPORT MGMT., 1998, at 49).

[48] Brown, *supra,* n. 41.

[49] Todd A. Petr and John J. McArdle, *Academic Research and Reform: A History of the Empirical Basis for NCAA Academic Policy.*  J. OF INTERCOLLEGIATE SPORT, 2012, No. 5, 27-40 (available at https://www.ncaa.org/sites/default/files/2018RES_05_petr_JIS_0011_27-40_20180522.pdf).

[50] Associated Press, *Blacks Hit Hard by Proposition 48, Survey Shows.* The New York Times Sept. 9, 1988, A25 (available at https://www.nytimes.com/1988/09/09/sports/blacks-hit-hard-by-proposition-48-survey-shows.html).

120.    The data suggested that "a disproportionate number of Black student-athletes were kept on a non-graduation track, so by the time their eligibility expired, they seemed so far from graduating that they may have chosen to drop out because of lack of hope."[51]

121.    In 1990, the NCAA introduced yet another reform called Proposition 42 that removed any type of financial aid for student-athletes who did not meet the academic standards of Proposition 48. Proposition 42 was written and sponsored by the Southeastern Conference ("SEC")—the last major conference to desegregate and allow Black participation.[52]

122.    In 1992 the NCAA again adopted an "academic reform package" designated as Proposition 16, which added two additional core courses and established benchmarks as a minimum 2.5 GPA (in 13 core courses) and a minimum SAT score of 820, with certain exceptions.[53]

123.    But only half of Black college-bound high school seniors in 1992 met Proposition 16 requirements, compared to more than two-thirds of white students—an even greater disparity than experienced under Proposition 48.[54]

124.    In 1995, 2003, and 2012, the NCAA imposed additional and increasingly stricter reforms to the number of required core courses and sliding scales. For example, for each ten-point drop in SAT scores, the student-athlete had to have a corresponding .025 increase in GPA.[55]

---

[51] Douglas Lederman, *NCAA Study Compares Records of Black, White Athletes,* CHRON. OF HIGHER EDUC., July 10, 1991, at A30 (available at https://www.chronicle.com/article/ncaa-study-compares-records-of-black-white-athletes/?cid2=gen_login_refresh&cid=gen_sign_in).
[52] *See* Wilson, *supra,* n. 29.
[53] Mondello, *supra,* n. 37, at 135-136.
[54] *Id.* at 137-138 (citing Nat'l Ctr. For Educ. Stat., *Who can Play? An Examination of NCAA's Proposition 16,* CHRON. OF HIGHER EDUC., July 7, 1995*).
[55] Wilson, *supra,* n. 29.

125.     In 1997, more than 19% of Black student-athletes seeking DI initial eligibility were ineligible under Proposition 16, as compared to only 3.1% of white student-athletes.[56]

126.     In a 1998 memorandum, the NCAA conceded that

> the setting of *any* initial-eligibility standard leads to an essential tension between two conflicting goals: (1) raising of graduation rates, and (2) allowing more individuals access to the finite number of athletics opportunities available. …This tension is heightened by the fact that a disproportionate number of ethnic minorities are affected adversely by the imposition of these rules."[57]

127.     The NCAA further admitted: "African-American and low-income student-athletes have been disproportionately impacted by Proposition 16 standards."[58]

128.     Notwithstanding this clear knowledge and admission that Black student-athletes would be negatively affected, it made no changes to either Proposition 16 or its subsequent, increasingly-strict reforms.

### 3. The NCAA discriminated against Black Student-Athletes at HBCUs when it considered race in the design and implementation of the APP.

129.     The writing on the wall, the NCAA once again returned to the academic reform table and created the APP. The proverbial goal posts were moved yet again.

130.     The 2004 APP marked the first time that the NCAA subjected *teams* to sanctions for academic eligibility: previously, its academic requirements penalized and applied only to individual student-athletes.

131.     The APP's penalty structure includes a progressive, three-level penalty scheme and a separate postseason access penalty.  A level one penalty restricts a team's practice time, level

---

[56] NCAA, Memorandum from NCAA Division I Academics/Eligibility/Compliance/Cabinet Subcommittee on Initial-Eligibility Issues to Chief Executive Officers, Faculty Athletics Representatives, Directors of Athletics, Senior Woman Administrators, and Compliance Coordinators of NCAA Division I Institutions, July 27, 1998 (including attachments).
[57] *Id.* at Initial-Eligibility Standards attachment, page 3.
[58] *Id.* at Initial-Eligibility Model I attachment, page 2.

two results in a reduction of the season or contests, and level three provides a menu of potential penalties that may be imposed, including financial aid penalties and multiyear postseason competition bans.[59]

132.    The APP penalty structure also restricts postseason access, which encompasses all postseason events conducted after the last regular-season contest or end-of-conference tournament, including NCAA championships, football bowl games, and the men's and women's basketball tournaments.

133.    The APP is complex, as evidenced by its 246-page manual.  Its stated purpose is:

> to ensure that the membership is dedicated to providing student-athletes with an exemplary educational and intercollegiate athletics experience in an environment that recognizes and supports the primacy of the academic mission of its member institutions, while enhancing the ability of student-athletes to earn a degree.
>
> The membership is committed to providing higher education for a diverse body of student-athletes within the context of an institution's academic and admissions standards for all student-athletes through a system that rewards those institutions and teams that demonstrate commitment toward the academic progress, retention and graduation of student-athletes and penalizes those that do not.[60]

134.    The key components of the APP are two metrics: the Academic Progress Rate ("APR") and the Graduation Success Rate ("GSR").  The GSR is the NCAA's calculation of student graduation rates, including transfer students. The APR is a team-based measurement of eligibility, retention, and graduation.

135.    Each student-athlete on a team who receives athletically related financial aid earns one point for continuing enrollment as a full-time student and one point for remaining

---

[59] NCAA, NCAA DIVISION I ACADEMIC PERFORMANCE PROGRAM MANUAL, Eff. June 1, 2014, at 97-98, 137 (available at https://www.ncaa.org/sites/default/files/2014-15%20APP%20Manual%20with%20Appendices%2011-17-14.pdf).
[60] Id. at 1.  See also NCAA Division I Bylaws, supra, n. 12, 14.8.

academically eligible pursuant to NCAA guidelines.  The team's total points are divided by points possible and multiplied by 1000, resulting in the APR.

136.    As explained by the NCAA's Principal Research Scientist, the Graduation Success Rate is supposed to be a "long term" assessment of student-athlete academic success, while the Academic Progress Rate is a "real-time" assessment of team academic progress.  The NCAA also represents that a 930 APR is a "proxy" for eventual graduation success, representing a projected 50% GSR.[61]

137.    The NCAA says that, with the APP, it sought to "create a system that will produce improved graduation performance, particularly in specific high-profile sports [football and men's basketball] without having a disparate impact on ethnic minorities."[62]

138.    While announcing the APP's creation in 2004, NCAA President Brand explicitly stated that the program was designed to respond to the allegations of discrimination against Black student-athletes.

139.    The APP has yielded the very results the NCAA stated it intended to correct and avoid. The formula on which the APP was based included metrics that the NCAA knew would directly and negatively affect Black student-athletes. The NCAA had clear knowledge, purpose, and intent to address the racial disparities through the newly reformed APP, fully recognized that the APP continued to perpetuate the disparities, and implemented it anyway.

140.    For example, in the 1998-1999 school year, the GSR for Black student-athletes was 59%, as compared to 82% for white student-athletes.[63]

---

[61] *See* Thomas Paskus, *A Summary and Commentary on the Quantitative Results of Current NCAA Academic Reforms,* J. OF INTERCOLLEGIATE SPORT, 2012, No. 5, 41-53 (available at https://www.ncaa.org/sites/default/files/2018RES_05_petr_JIS_0011_27-40_20180522.pdf).
[62] Walter Harrison, *NCAA Academic Performance Program (APP): Future Directions,* J. OF INTERCOLLEGIATE SPORT, 2012, No. 5, at 66.
[63] NCAA, *Division I Freshman-Cohort Graduation Rates 1998-1999,* NCAA, http://web1.ncaa.org/app_data/instAggr2005/1_0.pdf (last visited December 2, 2020).

141.    The NCAA knew that GSRs for Black student-athletes were 20-30 percentage points lower than for white student-athletes.[64]

142.    Nonetheless, the NCAA deliberately chose to rely upon the GSR in determining APR and administering the APP, even though there was little to no correlation between GSR and the measurement of a particular student's academic success.

143.    The NCAA had access to multiple years of data before and after the enactment of the APP that confirmed the GSRs disparate impact on Black student-athletes.

144.    For example, the following NCAA-created chart depicts year-by-year GSR rates for white and Black student-athletes in NCAA men's basketball, both pre- and post-dating the APP:[65]



145.    In another example, the following NCAA-created chart depicts year-by-year GSR rates for white and Black players in NCAA football:[66]

---

[64] Id.
[65] NCAA Research, Trends in Graduation-Success Rates and Federal Graduation Rates at NCAA Division I Institutions, October 16, 2013, http://web1.ncaa.org/app_data/GSR/qaahad13/GSR_Fed_Trends_2013_Final.pdf.
[66] Id.



146.     To establish the APR, the NCAA decided to collect two years of academic data before determining the "cut" APR at which teams would be rewarded or penalized.[67]

147.     It contemporaneously established the Division I Committee on Academic Performance, which it tasked with overseeing the APR.[68]

148.     In 2005, the cut APR was initially and arbitrarily set at 925; it was again arbitrarily reduced to 900 a year later in 2006.[69]

149.     The NCAA implemented a new penalty structure for the APP program in 2011. The APR cut score—required for teams to participate in any NCAA-sponsored championship game, football bowl game, or the basketball tournament—was increased from 900 to 930. For access to postseason competition in 2012-13 and 2013-14, teams were required to achieve a 900 multiyear APR or a 930 average over the most recent two years to be eligible.  A new penalty structure was

---

[67] NCAA, Academic Progress Rate Timeline, NCAA, http://www.ncaa.org/about/resources/research/academic-progress-rate-timeline (last visited November 22, 2020).
[68] Id.
[69] Id.

also approved for implementation in 2014-15 that would require teams to earn at least a 930 four-year, rolling APR in order to participate in postseason competition.

150.    Walter Harrison, the Chair of the NCAA's Committee on Academic Performance, admitted that at the time the 2011 APP changes were implemented, the NCAA knew (and possessed data confirming) that the revised program would more heavily impact low-resource institution ("LRIs") and HBCUs, than PWIs.[70] Nonetheless, the Board approved the program as proposed, creating the current penalty structure.

151.    Importantly, because the NCAA knew that its new penalties would have a direct impact on Black student-athletes at HBCUs, the NCAA Committee on Academic Performance recommended the Board establish an HBCU Academic Advisory group to "assist on issues that impact HBCU institutions" and serve in an advisory capacity to the Committee.[71]  It stated:

> *An in-depth examination of APR trends indicates that a higher proportion of HBCU teams have been subject to APP penalties.*  The NCAA staff has begun several initiatives to assist HBCU institutions and to provide additional services to meet the NCAA and the institution's objectives.  The formation of this advisory group would represent a collaborative and proactive effort between HBCU institutions and the NCAA to serve as a conduit to communicate issues and concerns that may impact HBCUs collectively within the Academic Performance Program.  HBCU institutions have played an important role in helping shape the traditions and public impression of the NCAA.  Therefore, it is of utmost importance to find ways to assist HBCUs as members of Division I.[72]

152.    The Board established the Historically Black Colleges and Universities and Low Resource Institution Academic Advisory Group ("HBCU-LRI Academic Advisory Group"). But the HBCU-LRI Academic Advisory Group was simply window-dressing. It was marginalized

---

[70] Harrison, *supra,* n. 62, at 71.
[71] NCAA Division I Committee on Academic Performance, Report of the NCAA Division I Committee on Academic Performance October 24-25, 2011, Meeting.
[72] *Id.* at 11. (emphasis added).

31

almost immediately and its recommendations--including that more funding be provided to HBCUs to support academic resource centers and that HBCUs and LRIs be provided a three year transition period to comply with and be subject to the APP were largely rejected.[73]

153.   In a 2012 article, Thomas Perkus, the NCAA's Principal Research Scientist, wrote that:

> [a] salient concern for CAP [Committee on Academic Progress] is APR trending at Historically Black Colleges and Universities (HBCUs), some of which have not shown improvement and in some cases have actually regressed in their APRs.  Various factors have been cited and discussed by CAP including resource, support services, admissions profiles, mission, contest scheduling, high rates of administrative turnover, and early exemption from APR penalties.[74]

154.   He further observed: "[a]cademic difficulties are multidimensional and cluster within certain sports or schools in a way that probably should lead to further discussion of tailored approaches to PTD [progress-toward degree]."[75]

155.   But rather than proposing a real solution—*i.e.,* developing a non-discriminatory program—Perkus instead suggested that schools consider "capping" the number of "high-risk student-athletes admitted at any given time."[76]   However, this proposed approach wholly contradicts the HBCU mission of providing education to low-income, first generation, and historically-disadvantaged Black students.

---

[73] Kevin Trahan, *The NCAA's Academic Progress Rate Punishes HBCUs More Than it Promotes Education,* Vice, April 29, 2016, https://www.vice.com/en/article/qky8qw/ncaa-apr-punishes-hbcus-more-than-it-promotes-education; *TSU President Dr. John Rudley Leading NCAA Committee,* Diverse Issues in Higher Education, February 28, 2013, https://diverseeducation.com/article/51633/; *see also* Allie Grasgreen, *Uphill Battle for HBCU Athletes*, Inside Higher Ed, June 17, 2013, https://www.insidehighered.com/news/2013/06/17/hbcus-get-some-help-still-struggle-meet-ncaa-academic-standards.
[74] Paskus, *supra,* n. 61 at 43.
[75] *Id.* at 45.
[76] *Id.* at 52.

156.    In 2013, Dr. John Rudley, then-president of HBCU Texas Southern University, former chairman of the SWAC Council of Presidents and Chancellors, and then-leader of the HBCU-LRI Academic Advisory Group, observed that:

> [within the NCAA,] the voices of the larger schools, the Bowl Championship Series Schools, the wealthier schools, seem to carry more weight than those of us designated as HBCUs… Our challenge, as we see it, is to express to the NCAA that one size does not fit all. *We contend that the NCAA APR standard conflicts with the mission of our universities. We emphatically state that we are fulfilling our mission.*[77]

157.    That same year, more than 80% of the teams that received postseason bans were from HBCUs.  Walter Harrison admitted that the NCAA's financial support for HBCUs was "certainly… not adequate."[78]

158.    A 2013 study in the Journal of Intercollegiate Sport compared APR trends among LRIs, HBCUs, and other institutions.[79]  It revealed that HBCUs continued to trend well below PWIs in terms of APR, eligibility, retention, the number of student-athletes who left school academically ineligible, and the percentage of teams with a less than 930 APR.

159.    For example, in 2010-2011, 33% of HBCU teams had APRs less than 930, compared to 7% of non-low-resource DI PWIs.

160.    A 2015 Washington Post article, published after the NCAA revealed that 15 of 21 teams receiving postseason bans that year were from HBCUs, asked: "Does the NCAA unfairly punish sports programs at historically black schools?"[80]

---

[77] Grasgreen, *supra,* n. 73 (emphasis added).
[78] *Id.*
[79] Melvin Norman Thomas.  *Financial and Related Issues at HBCUs.*  J. OF INTERCOLLEGIATE SPORT, 2013, No. 6, 65-75 (available at https://core.ac.uk/download/pdf/200288469.pdf).
[80] Isabelle Khurshudyan, *Does NCAA unfairly punish sports programs at historically black schools?* WASH. POST, July 7, 2015, https://www.washingtonpost.com/sports/colleges/hbcus-struggle-with-apr-standards-but-some-say-ncaa-measure-fails-them/2015/07/07/30d88b62-20de-11e5-bf41-c23f5d3face1_story.html

161.    In addressing the obvious and significant APR gap between HBCUs and other DI schools, the article noted that "[m]any HBCUs face the challenge of serving their core mission of educating poor and academically underserved communities with less funding than more powerful programs to provide academic oversight geared at keeping athletes eligible."   And it quoted Roderick McDavis, then-current chair of the NCAA Committee on Academics, as saying (of the HBCU APR gap): "I won't say it's giving me nightmares.  I'm very concerned about it."[81]

162.    In fact, critics have doubted whether the APR really has anything to do with the quality of education, instead likening it to a "game" more easily manipulated by high-resource DI schools than by HBCUs.[82]

163.    There is substantial doubt that the NCAA's repeated academic reform efforts have anything to do with an accurate measure of the quality of a student-athlete's education. For example, a recent published study, "Degree Attainment for Black Students at HBCUs and PWIs: A Propensity Score Matching Approach," measured how attending an HBCU impacts chances to persist and graduate when compared to PWIs. The study determined that HBCUs significantly outperform PWIs.[83]   Specifically, the study concluded that the average treatment effect of attending an HBCU to be within 6.0% to 16.1%, "indicating significantly higher chances of success for Black students at these institutions."[84]

164.    As the co-author of the study and senior director at the Education Trust stated, Black colleges are "very different" than most predominantly white institutions. "When you actually compare HBCUs to similar PWIs that enroll comparable percentages of low-income

---

[81] *Id.*
[82] *Id.*
[83]  Julian Wyllie, *How Are Black Colleges Doing? Better Than You Think, Study Finds*, The Chronicle of Higher Education, April 13, 2018, https://www.chronicle.com/article/how-are-black-colleges-doing-better-than-you-think-study-finds/
[84] *Id.*

students, our research suggests that HBCUs tend to have higher completion rates for black students."[85]

165.    Critiques of the APP program and its effect on Black student-athletes at HBCUs are published every spring when new APP penalties are announced that again disproportionately affect HBCUs.

166.    A 2016 Vice article asserted that the APR measures athletic eligibility, not actual learning, and therefore punishes Black student-athletes at HBCUs, which do not have the resources to capitalize on the APR's weaknesses.[86] It aptly noted: "[t]he NCAA can plainly see that the APR disproportionately hurts HBCUs and their athletes, and yet it keeps it regardless."[87]

167.    A 2017 article in The Undefeated characterized that year's postseason bans, again primarily affecting Black student-athletes at HBCUs, as "polite racism."[88]  And in 2020, it declared that the "NCAA must stop perpetuating academic and financial disparities for HBCUs."

168.    Although the NCAA claims to have made numerous "reforms" to its academic measurements throughout several decades, it is an intentional decision to consistently acknowledge reliable data that its "reforms" hobble and undermine the path of the Black student-athlete at HBCUs but nonetheless allow the discrimination to continue.

169.    The APP—the NCAA's latest flavor of the month—persists in disregarding these issues. And while the NCAA continues to penalize Black student-athletes at HBCUs for low APRs and GSRs, it both acknowledges and ignores egregious disparities between the graduation rates of Black and white student-athletes in NCAA teams with "passing" APRs at PWIs.

---

[85] *Id.*
[86] Trahan, *supra,* n. 73.
[87] *Id*.
[88] Derrick Z. Jackson, *HBCUs Unfairly Penalized by NCAA Academic and Graduation Standards,* The Undefeated, Sept. 13, 2016, https://theundefeated.com/features/hbcus-unfairly-penalized-by-ncaa-academic-and-graduation-standards/

170. For example, a 2016 article reported that, in the FCS and among FBS power schools like Iowa, Michigan State, North Carolina, Texas, California, and Southern California, GSRs for Black student-athletes range from 43-48% while GSRs for white student-athletes are between 73-94%.[89]

171. The disparity is even worse in men's basketball, where Illinois, Michigan State, Oklahoma State, Texas Christian, Washington State, LSU, Mississippi State, Texas A&M, Central Florida, Texas-San Antonio, Ohio, Fresno State, Hawaii, and Wyoming have a 100% GSR for white players but a GSR less than 50% for Black student-athletes.[90] But because these teams post overall GSR rates within NCAA parameters via the APR scores, they are not penalized.

172. Thus, the Black student-athlete's individual academic success is truly irrelevant to the NCAA, as long as there are sufficient numbers to dilute and mask the Black student-athlete's academic struggles at a PWI. Indeed, this dilution of Black student-athletes is commonplace at PWIs.

### 4. HBCU teams are 43 times more likely to receive a postseason ban than a PWI team.

173. APP penalties, including postseason bans, have been disproportionately levied against HBCUs for more than a decade.

174. Only 6.5% of DI schools are HBCUs (23 out of 350). But 72% of the 159 teams that have been banned from postseason competition since 2010 are from HBCUs (114 of 159).

175. Moreover, 62% of the teams banned from postseason competition come from the SWAC and MEAC, the two historically Black conferences.

---

[89] *Id.*
[90] *Id.*

176.    An HBCU team is **43 times** more likely to receive a postseason ban than a PWI team.

177.    Only one Power Five team has ever received a postseason access penalty.

178.    The following chart depicts the number of HBCU teams banned from postseason play under the APP since 2010[91]:

| Year | Number of HBCU Teams Receiving Postseason Bans | Total Number of Teams Receiving Postseason Bans | Percentage of Banned Teams that Were from HBCUs |
|------|------|------|------|
| 2010-2011 | 5 | 14 | 36% |
| 2011-2012 | 10 | 13 | 77% |
| 2012-2013 | 23 | 42 | 55% |
| 2013-2014 | 17 | 21 | 81% |
| 2014-2015 | 21 | 22 | 95% |
| 2015-2016 | 14 | 16 | 88% |
| 2016-2017 | 7 | 8 | 88% |
| 2017-2018 | 6 | 8 | 75% |
| 2018-2019 | 11 | 15 | 73% |
| 2019-2020 | 6 | 8 | 75% |
| 2020-2021 | 11 | 15 | 73% |

179.    While the NCAA frequently lumps HBCUs with low-resource institutions and directs its aid to LRIs, research has demonstrated that lower resources alone cannot account for the disparity in HBCU APRs and GSRs.

180.    A 2018 study evaluated which factor, race or low resources, leads to greater APP penalties.[92]

---

[91] Source: https://web3.ncaa.org/aprsearch/aprsearch (last visited December 2, 2020).
[92] Ryan J.R. Westman, Investigating Equity: An Evaluation of the Relationship of the NCAA's APR Metric on Similarly Resourced Historically Black and Predominately White NCAA Division-I Colleges and Universities (August 23, 2018) Seton Hall University Dissertations and Theses, https://scholarship.shu.edu/cgi/viewcontent.cgi?article=3664&context=dissertations.

181.    The study compared HBCUs to similarly resourced non-HBCUs (thus controlling for resources), analyzed NCAA and Knight Commission academics and athletics data, and employed a regression analysis.  Ultimately the study concluded that race—the mere fact that an institution is an HBCU—is a predictor of APP penalties.  Resources are not.

182.    According to the study, HBCUs are 6-8 times more likely to be penalized than similarly-resourced, non-HBCU institutions.[93]

183.    In discussing the study post-completion, the author was blunt: "It's a sin that the penalties are so skewed when HBCUs' mission is grounded in access to low-income and first-generation students… It screams inequity when HBCUs were once so woven into the fabric of American sports… It's like the system is turning its back on HBCUs when these schools need support."[94]

### 5.   The NCAA uses the APP to reward PWIs.

184.    The NCAA now rewards schools who consistently achieve high APRs.  The Public Recognition Program awards the top-performing teams in each sport (top 10%) based on their most recent multiyear APR.[95]

185.    Enacted in 2016 and beginning this year, the NCAA now provides *financial* awards to schools that achieve an APR of 985 or higher in the previous year (averaged across all teams), a GSR of 90% or more the previous year (averaged across all teams), or a graduation rate that is 13 or more points greater than the Federal Graduation Rate.[96]

---

[93] *Id.*
[94] Derrick Z. Jackson, *NCAA must stop perpetuating academic and financial disparities for HBCUs,* The Undefeated, May 27, 2020, https://theundefeated.com/features/ncaa-must-stop-perpetuating-academic-and-financial-disparities-for-hbcus/
[95] NCAA DIVISION I ACADEMIC PERFORMANCE PROGRAM MANUAL, *supra,* n. 59, at 146.
[96] NCAA, Academic Based Revenue Distribution, NCAA, http://www.ncaa.org/academic-based-revenue-distribution (last visited November 22, 2020).

186.     Projected distributions begin at $111,000 (2020-2021, reduced for COVID-19), and will reach $473,000 in 2025-2026.  This money will be distributed without restrictions and will increase annually.

187.     The NCAA projects that 66% of member schools will qualify each year.

188.     Yet, for academic year 2018-2019, no MEAC or SWAC school has a GSR above 90%.

**C.     Plaintiffs and the Class have been injured by or are at risk of injury because of the APP.**

**1.     The NCAA's conduct interferes with student-athletes' ability to make and enforce contracts—their NLIs.**

189.     Postseason bans exclude student-athletes from all postseason events conducted after the last regular-season contest or end-of-conference tournament, including NCAA championships, football bowl games, and the men's and women's basketball tournaments.

190.     These competitions are highly televised and provide student-athletes with publicity and exposure amongst their peers, scouts, corporate sponsors, and the public.

191.     The NCAA's postseason bans deny players the opportunity to further compete with their peers; further develop their athletic careers; receive greater media coverage and acclaim; improve and achieve meaningful play-based metrics, which affects subsequent career trajectory; and capture the attention of and access to recruiters and sponsors, including the lucrative post-college benefits they offer.  Further, players' confidence in their HBCUs, their teams, and themselves is affected.

192.     The full opportunity to compete also impacts student-athletes' opportunities for careers in coaching and the business of collegiate and professional sports.

193.     Mr. Manassa, for example, was unable to play in the conference championship his senior year in 2016-17. He was one of the leading scorers in the conference. The conference

championship is the ultimate prize for any collegiate athlete because it highlights the stars of the league and provides exposure that is unavailable during the regular season.

194. Mr. Manassa's hopes for significant career milestones, such as scoring 1,000 points over his college career, were thwarted because of NCAA's postseason ban. Such accolades and achievements would inevitably have assisted his post-college basketball career.

195. Mr. Manassa did not know (and could not have known) at the time of his commitment to SSU that the team would be banned from postseason play.

196. Similarly, Mr. Dasent transferred to SSU for his junior year to play basketball. He was unaware (and could not have known) that his team would be banned from postseason play that year.

197. The following season, 2017-18, SSU finished the regular season in first place and was league champion.

198. Ms. Freeman specifically chose an HBCU over full scholarship offers from PWIs because of the benefits and advantages of attending an HBCU, where she would not be the minority and still participate on a Division I athletic team.

199. Ms. Freeman and the other Plaintiffs were not provided full information about the potential consequences of the NCAA's discrimination against Black student-athletes at HBCUs. As a result, unbeknownst to them, they entered their NLI contracts with substantial disadvantages and effects.

200. In this manner, the NCAA's postseason bans interfere with student-athletes' NLI contracts. Players are prevented from receiving the full benefits and privileges of their contracts, including participation in the competitions for which their team's ranking qualifies them. Schools

cannot access the greater publicity, media coverage, and revenue attendant to highly-publicized events, such as championship tournaments.

201.    Student-athletes are less visible to recruiters, reducing their opportunities for professional play. Similarly, career opportunities as a coach, trainer, or other sports-related career pathways are hindered and limited without the full and complete opportunities that postseason play at the Division I level offer.

202.    And these losses ultimately affect institution prestige and recruitment, reducing the pool of potential future team members and staffing, encouraging student-athletes to transfer to non-banned teams, affecting the school's public standing, disincentivizing student-athletes from attending HBCUs, thereby foregoing the numerous tangible and intangible advantages that HBCUs offer Black students but that PWIs cannot; and thus further limiting the team's future success and opportunities for revenue-generation.

### 2. The NCAA's conduct creates an increased risk that Black student-athletes at Division I HBCUs will suffer irreparable harm.

203.    Ms. J'TA Freeman passed up other scholarships to play lacrosse for Howard University. She chose Howard, in large part, because it is an HBCU and would provide her with an inclusive and supportive environment that PWIs could not provide. However, Ms. Freeman is at an increased risk of being subjected to a postseason ban because of her choice to attend and play for an HBCU.

204.    All current student-athletes at Division I HBCUs, including Plaintiff J'TA Freeman, are currently at risk of irreparable harm, *i.e,* racially discriminatory interference with the making and enforcing of valid contracts (NLIs) and conspiracy to deprive them of their rights and privileges, , due to  the NCAA's enforcement of the APP and disproportionate levying of APR-related penalties upon HBCU teams.

205.     This harm, including lost postseason access, lost opportunities, and lost future revenue and career advancement, cannot be undone, reversed, or adequately remedied by monetary compensation.

206.     Proactive injunctive relief is necessary to eliminate the increased risk and protect Plaintiff J'TA Freeman and current student-athletes at Division I HBCUs. This common risk of irreparable harm is higher than the general societal risk of these harms and is directly traceable to the actions and inactions of Defendants.

## V.     TOLLING OF STATUTE OF LIMITATIONS

207.     The running of any applicable statute of limitations has been tolled by reason of the discovery rule, Defendants' fraudulent concealment, and/or Defendants' continuing violations.

208.     The NCAA's racial discrimination and tortious conduct has been continuous and ongoing since at least the inception of the APP until present.  Each penalty and postseason ban constitute a new injury; a new discriminatory interference with Plaintiffs' and the Class members' right to make and enforce contracts; and a new act of fraud.

209.     At the time that Plaintiffs Manassa's and Dasent's SSU basketball team received a postseason ban, Plaintiffs did not know, and did not have enough information as laypeople to know, that the ban and their causally-related injuries were a result of intentional discrimination.

210.     Moreover, the NCAA insisted—and continues to insist—that the APP and postseason bans are applied fairly, do not discriminate against Black student-athletes or HBCUs, and are equitable.  The NCAA controls the data surrounding APR calculation, the identity of LRIs, and the discriminatory effects of its APP penalties.  It concealed from Plaintiffs and the Class members these facts and the true, racially discriminatory nature of the APP.

211.    Plaintiffs and the Class members were unaware and could not have reasonably known or learned through reasonable diligence, that the NCAA and its APP discriminated against them.

212.    Moreover, the NCAA's discriminatory acts and decisions—a pattern made over time—made it difficult if not impossible for Plaintiffs to determine the actual date of discrimination.

## VI.    CLASS ALLEGATIONS

213.    Plaintiffs bring this action on behalf of the following "Nationwide Class" pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All Black student-athletes who participated in Division I HBCU athletic teams that were subjected to a postseason access ban from the 2010-11 school year through the date of class certification, including but not limited to those teams listed in Appendix A."

214.    Plaintiff J'TA Freeman also brings this action on behalf of the following "Current DI HBCU Subclass" pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All Black student-athletes who participated in Division I NCAA sports at Historically Black Colleges and Universities at any time during the 2020/21 school year through the date of class certification."

215.    Plaintiff J'TA Freeman also brings this action on behalf of the following "District of Columbia Subclass," pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All Black student-athletes who participated in Division I NCAA sports at Historically Black Colleges and Universities located in the District of Columbia during the 2010/11 school year through the date of class certification."

216.     Plaintiffs reserve the right to modify or amend the class definitions, including the addition of one or more subclasses, after they have the opportunity to conduct discovery.

217.     Excluded from the Classes are Defendants and any of their affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all persons who make a timely election to be excluded from the class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members.

218.     Numerosity: There are 23 Division I HBCUs, each of which has had hundreds (if not thousands) of Black student-athletes since 2010. As such, the members of the Class and Subclasses are so numerous that joinder is impractical.

219.     Typicality: Plaintiffs' claims are typical of the claims of each class member in that all Plaintiffs, like all class members, are and were NCAA student-athletes at Division I HBCUs. Plaintiffs and the Class and Subclass members were injured through NCAA's implementation and enforcement of the APP program, which purposefully discriminates on the basis of race and interferes with the student-athletes' ability to make and enforce contracts. Thus, Plaintiffs are advancing the same legal theories on behalf of themselves and the Class and their respective Subclasses.

220.     Adequacy: Plaintiffs will fairly and adequately protect the interest of the Class and Subclasses. Plaintiffs' interests and the interests of all other members of the Class and Subclasses are identical, and Plaintiffs are cognizant of their duty and responsibility to the Class and Subclasses. Accordingly, Plaintiffs can fairly and adequately represent the interests of the Classes. Moreover, Plaintiffs' counsel is competent and experienced in litigating class actions, including litigation of this kind. Plaintiffs and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

221.    Commonality and Predominance: There are numerous questions of law and fact common to the Class and Subclasses, and these common questions predominate over any issues affecting only individual class members.  Common questions include:

    a.    Whether the NCAA's APP program discriminates against HBCUs and their Black student-athletes, including Plaintiffs and the Class and Subclass members;

    b.    Whether that discrimination is intentional and race-based;

    c.    Whether the NCAA's discriminatory acts interfere with Plaintiffs' and the Class and Subclass members' ability to make and enforce contracts;

    d.    Whether the NCAA's conduct has caused Plaintiffs and the Class and Subclass members injury; and

    e.    The scope of the injunctive relief and damages to which the Plaintiffs and members of the Subclasses are entitled.

222.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of a class action is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Individual litigation by each class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. In sum, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

223.    Equitable Relief: Class certification is also appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Classes as a whole, such that final injunctive relief is appropriate with respect to the Class and Subclasses as a whole. Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent such conduct in the future as mentioned above.

224.    This action is also properly maintainable under Rule 23(c)(4) in that particular issues common to the Class and Subclasses, examples of which are set out *supra*, are most appropriately and efficiently resolved via class action, and would advance the disposition of this matter and the parties' interests therein.

## VII.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF CIVIL RIGHTS
### (42 U.S.C. § 1981)

225.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth in full herein.

226.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

227.    42 U.S.C. § 1981 ("Section 1981") provides for the equality of United States citizens and prohibits racial discrimination in, among other things, the making and enforcement of contracts. "Making and enforcement of contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

228.    Blacks are a protected class under Section 1981.

229.    HBCUs are, by their very definition, Historically Black Colleges and Universities, and their students and student-athletes are predominantly if not exclusively Black. HBCUs were

established in the times of slavery and Jim Crow segregation to serve the educational needs of Blacks. Today, HBCUs continue "to serve a vital component of American higher education" for Blacks.[97]

230.    HBCU DI athletic teams are comprised of primarily if not exclusively Black student-athletes.

231.    Plaintiffs and the Class are Black and members of a protected class.  Plaintiffs and the Class have been accepted as student-athletes by Division I HBCUs and have executed NLIs.

232.    NLIs are valid, binding contracts.

233.    The NCAA knows that Plaintiffs are Black.  The NCAA knows and has always known that HBCUs are Black institutions, which serve a unique, important, and historically-based mission not addressed by PWIs. The HBCU mission is to serve Black students who have been disadvantaged by systemic racism and discrimination and provide an educational environment and experience of inclusion and community—an aspect that many Black student-athletes at PWIs do not receive.

234.    The NCCA's adoption of the APP, including its penalty structure and postseason access bans, including the numerous preceding series of NCAA propositions and reforms, represent a pattern or practice of discrimination against Black student-athletes at HBCUs on the basis of race.

235.    The NCAA's continued enforcement of the APP, including its penalty structure and postseason access bans are intentionally discriminatory and were instituted because of race. As such, these acts violate Section 1981's prohibition against purposeful discrimination.

---

[97] U.S. Dept. Educ., Office of Civil Rights, *supra,* n. 13.

236.    The NCAA adopted and continues to enforce the APP and its postseason ban penalties to deny full participation and full NLI benefits to Black student-athletes at HBCUs, including Plaintiffs and the Class.  Moreover, Black student-athletes at HBCUs are not able to enjoy all of the benefits, privileges, terms, and conditions of their contractual relationships as compared to similarly situated white student-athletes at PWIs.

237.    The NCAA's academic requirement programs have consistently discriminated against Black student-athletes at HBCUs.  The NCAA claims that it created the APP in part to address the race-based discrimination alleged in previous civil litigation, as well as the low graduation rates of Black student-athletes as compared to white student-athletes. Accordingly, race was a but-for cause of the NCAA's establishment of the APP program.

238.    The NCAA claims that the APP's purpose is to "provid[e] student-athletes with an exemplary educational and intercollegiate athletics experience *in an environment that recognizes and supports the primacy of the academic mission of its member institutions,* while enhancing the ability of student-athletes to earn a degree."[98]

239.    However, the APP does not view HBCUs' academic missions the same as their PWI counterparts' academic missions.

240.    The very foundation of HBCUs is and has always been to provide educational opportunities for the underserved Black community. In the eyes of the NCAA and in its decision-making, development, and implementation of the APP, that core mission is not only devalued, but is a detriment to HBCUs, for which they are penalized.

241.    In short, the NCAA penalizes HBCUs for maintaining institutional missions that are unapologetically targeted towards addressing racial inequities and educating Black students

---

[98] NCAA DIVISION I ACADEMIC PERFORMANCE PROGRAM MANUAL, *supra,* n. 59, at 1 (emphasis added).

who are also athletes.  In contrast, PWIs are rewarded for their predominantly white student-athlete averages, oftentimes without regard to the true academic progress of their Black student-athletes.

242.    If the NCAA truly valued the educational success of its student-athletes and wanted to address the negative impacts of its APP on Black student-athletes, it would compare "apples to apples" and take into account systemic variables such as socioeconomic status, academic preparation, and other disparities such as generational gaps in college-education and wealth.

243.    HBCUs would be rewarded, rather than penalized, for taking the least advantaged Black student-athlete and providing him with a truly student-centered academic experience. The current NCAA APP system disincentivizes HBCUs from continuing their tradition and missions in exchange for negligible comparative resources. Indeed, the NCAA even suggested that a solution would be to "cap" the number of "high-risk student athletes at any given time." HBCUs are caught in a paradox where their resources are continually limited and reduced by the APP penalties unless they are able to lift themselves up by their proverbial bootstraps.

244.    The NCAA knows that the APP directly conflicts with HBCUs' unique mission—created in response to hundreds of years of slavery, segregation, and discrimination—and yet persists in implementing and enforcing it in a racially-discriminatory manner.

245.    The NCAA's claims that the APP was developed to address the racially discriminatory impact on Black student-athletes at HBCUs are patronizing, at best, pretextual at worst, and discriminatory in violation of Section 1981 either way.

246.    HBCU teams are 43 times more likely than PWI teams to sustain postseason bans. This significant disparity may in and of itself show intentional discrimination, particularly given the increasing, persistent disparities over the years and throughout numerous reform cycles.

247.     In addition to the substantial and significant disparate impact on HBCUs, there are numerous additional pieces of circumstantial evidence of the NCAA's intentional discrimination against Black student-athletes at HBCUs. For example, the historical background of the NCAA's decision-making process regarding its "academic reforms" and the various and multiple versions that ultimately resulted in the APP provide strong evidence of the NCAA's knowledge, intent, and motive to implement the APP because of race and in violation of Section 1981.

248.     To further cement and secure relegation of Black student-athletes at HBCUs to second class status, the NCAA provided the ultimate PWIs—the Power Five—with autonomy regarding key regulatory areas.  Ironically, this very decision now gives the Power Five the ability to operate largely outside of the parameters of the NCAA's substantive and procedural requirements. Black student-athletes at HBCUs, on the other hand, will continue to be subjected to the NCAA's pretextual rules and procedures.

249.     Finally, the NCAA's intentional discrimination is further evidenced by the specific and direct statements and actions or inactions by NCAA's decisionmakers regarding their intentions and knowledge around the APP's purpose, impact, and history with respect to Black student-athletes at HBCUs. Regardless of whether the NCAA attributes its reform efforts to "helping" the Black student-athlete at HBCUs, its patronizing efforts are pretextual and made because of their race.

250.     The NCAA's purposeful discrimination directly and proximately caused Plaintiffs to be excluded from postseason access.  As a result of the NCAA's continued discriminatory acts, Plaintiffs and the Class thus have been denied the opportunity to make and perform contracts (the NLIs) and denied the benefits, privileges, terms, and conditions of that contractual relationship, including:

    a.   the ability to compete with their peers (and the benefits attendant thereto);

    b.   the ability to further develop their athletic and professional careers;

    c.   the ability to receive greater media exposure, coverage, and acclaim;

    d.   participating in the pinnacle of college athletic competition;

    e.   the ability to improve and achieve meaningful play-based metrics, which affects subsequent career trajectory; and

    f.   the ability to garner the attention of and access to recruiters and sponsors, including the lucrative post-college benefits they offer.

251.    In fact, Plaintiffs' ability to enjoy the full, intended benefits of their NLIs is contingent upon their team's APR and the penalties the NCAA elects to consistently levy against their HBCU team—neither of which the Black student-athlete knows at the time of contracting or can otherwise control.  And because the APP uses a 4-year rolling average in its calculation, student-athletes are impacted by conduct occurring before they even matriculated from high school.

252.    But for the NCAA's purposeful discrimination, Plaintiffs and the Class members would have received the full, intended benefits of their NLIs.  But for their race, they would not have suffered the loss of their legally-protected right to make and enforce contracts and to enjoy the benefits of those contracts.

253.    As a direct and proximate result of the NCAA's conduct, Plaintiffs and the Class have suffered and will continue to suffer injury, including lost opportunity, mental anguish, emotional distress, embarrassment, humiliation, and degradation.  Plaintiffs and the Class have incurred and are entitled to compensatory, economic, consequential, and special damages.

254.    Plaintiffs and the Class are also entitled to punitive damages against the NCAA, in that its actions were undertaken maliciously, willfully, and/or with reckless or wanton disregard for the civil rights of Plaintiffs and the Class members.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS**
**(42 U.S.C. § 1985(3))**

255.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth in full herein.

256.    Plaintiffs bring this Count II on behalf of themselves and the Nationwide Class.

257.    Defendants conspired for the purpose of depriving, either directly or indirectly, Black student-athletes at HBCUs from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the various states of the United States, including but not limited to their rights to freedom of movement and travel, association and assembly, and right to contract; and their rights not to be enslaved nor deprived of life and liberty other than by due process of law.

258.    Defendants intentionally discriminated against Black student-athletes at HBCUs to deprive them of the equal protection of, or equal privileges and immunities under, the law.

259.    Plaintiffs and the class members were deprived of due process when they were banned from postseason play through the NCAA's discriminatory creation and implementation of its APP, including its postseason access ban against teams, unrelated to the individual Black student-athlete's circumstances.

260.    Plaintiffs and the class members were deprived of their right to appeal their individual grievances as they had no knowledge of the impending team-wide penalties and bans when they signed their contractual NLI.

261.    Plaintiffs and the Class members were required to continue to stay, perform, and play for their NCAA banned schools under altered terms or lose educational scholarships, suffer potential further penalties regarding eligibility upon transfer to another school, and/or forego the freedom to attend an HBCU with all of its attendant advantages.

262.    Plaintiffs and the Class members executed NLIs based on limited information that the Defendants should have disclosed and that they knew would impact the Plaintiffs and Black student-athletes' decisions regarding their NLIs.

263.    Defendants have conducted multiple and serial acts in furtherance of their conspiracy to deprive Black student-athletes at HBCUs through the creation and implementation of the APP and its attendant and repeated penalties against Black student-athletes at HBCUs. For example, over several decades and since the beginning of the NCAA's introduction of its academic reform measures, Black student-athletes ta HBCUs have been banned from postseason play and subjected to multiple penalties.

264.    Defendants' actions were done with invidious discriminatory animus against Blacks and were effectuated through the implementation and imposition of programs that discriminated against Black student-athletes at HBCUs.

265.    As a result of Defendants' actions, Plaintiffs and the class members have suffered and will continue to suffer injury, including lost opportunity, mental anguish, emotional distress, embarrassment, humiliation, and degradation. Plaintiffs and the Class have incurred and are entitled to compensatory, economic, consequential, and special damages.

266.    Plaintiffs and the Class are also entitled to punitive damages against the NCAA, in that its actions were undertaken maliciously, willfully, and/or with reckless or wanton disregard for the civil rights of Plaintiffs and the Class members.

## COUNT III
## VIOLATION OF DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### (D.C. CODE §§ 2-1401.01 *et seq.*)

267.    Plaintiff J'TA Freeman incorporates by reference all preceding and subsequent paragraphs as if set forth in full herein.

268.    Plaintiff J'TA Freeman brings this claim on behalf of herself and the District of Columbia Subclass.

269.    Plaintiff Freeman and the members of the District of Columbia Subclass are Black and, as such, are members of a group protected under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*, against discrimination on the basis of race.

270.    Plaintiff and the members of the District of Columbia Subclass are Black student-athletes who matriculated from an HBCUs located in the District of Columbia, and as such are members of a group protected under the DCHRA, D.C. Code § 2-1401.01 *et seq.*

271.    Plaintiff and the members of the District of Columbia Subclass were discriminated against by the NCAA on the basis of race and without regard to their individual merit.

272.    The NCAA's APP penalties discriminated against Black student-athletes at HBCU Howard University because of the Black student-athletes' race and/or their matriculation at an HBCU, restricting and conditioning the use of and access to their institution's educational facilities, services and programs, including athletic programs; and depriving them of an equal opportunity to participate in collegiate athletics, including postseason play, or to receive the benefits attendant thereto.

273.    Plaintiff and other members of the District of Columbia Class suffered and will suffer injury as a result, including but not limited to loss of future earning potential, lost benefits, and emotional distress.

274.     As a result of Defendants' actions, Plaintiff and the District of Columbia Subclass members have suffered and will continue to suffer injury, including lost opportunity, mental anguish, emotional distress, embarrassment, humiliation, and degradation. Plaintiff and the District of Columbia Subclass members have incurred and are entitled to compensatory, economic, consequential, and special damages, as well as injunctive relief.

275.     Plaintiff and the District of Columbia Subclass are also entitled to punitive damages against the NCAA, in that its actions were undertaken maliciously, willfully, and/or with reckless or wanton disregard for the civil rights of Plaintiff and the District of Columbia Subclass.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully request that the Court enter a judgment on their behalf and against the NCAA, The Board of Governors of The National Collegiate Athletic Association, and The Division I Board Of Directors of The National Collegiate Athletic Association, and further grant the following relief:

A.     Certify the proposed Class and Subclasses pursuant to the Federal Rules of Civil Procedure Rule 23(a), (b)(2), (b)(3) and/or (c)(4);

B.     Designate Plaintiffs as representatives of the proposed Class and Subclasses, and Plaintiffs' counsel as Class counsel;

C.     Award injunctive relief;

D.     Award Plaintiffs and Class members compensatory damages, punitive damages, statutory damages, equitable relief, and any other relief to which they are entitled under the law;

E.     Award Plaintiffs and the Class members prejudgment interest, costs, and attorneys' fees; and

F.     Award to the Plaintiffs and Class members such other and further relief as the Court

deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of the proposed Class and Subclasses, respectfully

request a trial by jury as to all matters so triable.

Dated: December 10, 2020                          Respectfully submitted,

                                                  */s/ William N. Riley*
                                                  William N. Riley, Bar No.: 14941-49
                                                  Russell B. Cate, Bar No.: 27596-29
                                                  RILEYCATE, LLC
                                                  11 Municipal Drive, Suite 200
                                                  Fishers, IN  46038
                                                  Telephone: (317) 588-2866
                                                  Facsimile:  (317) 458-1785
                                                  wriley@rileycate.com
                                                  rcate@rileycate.com

                                                  Elizabeth A. Fegan *(pro hac vice forthcoming)*
                                                  FEGAN SCOTT LLC
                                                  150 S. Wacker Dr., 24th Floor
                                                  Chicago, IL 60606
                                                  Telephone: (312) 741-1019
                                                  Facsimile: (312) 264-0100
                                                  beth@feganscott.com

                                                  Jessica H. Meeder *(pro hac vice forthcoming)*
                                                  FEGAN SCOTT LLC
                                                  1200 G St., N.W., Suite 800
                                                  Washington, D.C.  20005
                                                  Telephone: (202) 921-6007
                                                  Facsimile: (312) 264-0100
                                                  jessica@feganscott.com

                                                  LaRuby May *(pro hac vice forthcoming)*
                                                  Je Yon Jung *(pro hac vice forthcoming)*
                                                  MAY LIGHTFOOT PLLC
                                                  3200 Martin Luther King Jr. Ave. S.E.
                                                  Third Floor
                                                  Washington, D.C.  20032
                                                  Telephone: (202) 918-1824
                                                  Facsimile: (202) 918-1010

lmay@maylightfootlaw.com
jjung@maylightfootlaw.com

*Attorneys for Plaintiffs and the Proposed Class*