**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

TROYCE MANASSA, AUSTIN DASENT,
and J'TA FREEMAN, individually and on
behalf of all others similarly situated,

          Plaintiffs,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, *et al.*,

          Defendants.

No. 1:20-cv-03172-JRS-MJD

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

I.     INTRODUCTION AND BACKGROUND ........................................................ 1

       A.     The NCAA intentionally discriminates against Black student-
       athletes at HBCUs on the basis of race. .............................................................. 2

       B.     The NCAA's discriminatory treatment interferes with Plaintiffs'
       ability to make, enforce, and enjoy the privileges and benefits of their NLI
       contracts. .............................................................................................................. 4

II.    LEGAL STANDARD ................................................................................... 5

III.   ARGUMENT ............................................................................................. 5

       A.     Plaintiffs have standing to assert their claims. ........................................ 5

              1.   Plaintiffs Manassa and Dasent plausibly allege that the NCAA
              discriminated against them, interfering with their ability to make,
              enforce, and enjoy the privileges and benefits of their NLI
              contracts. .......................................................................................... 6

              2.   Plaintiffs Manassa and Dasent plausibly allege that their
              injuries are redressable. ........................................................................ 9

              3.   Plaintiff Freeman has standing to seek injunctive relief. .............................. 11

       B.     Plaintiffs' Section 1985 Claim is not barred by the statute of
       limitations. .............................................................................................................. 16

              1.   The Complaint does not "unambiguously establish" that
              Plaintiffs' Section 1985 claim accrued in 2017. .................................................. 16

              2.   The Complaint does not "unambiguously" foreclose tolling. ........................ 18

       C.     The NCAA Board of Governors and NCAA Division I Board of
       Directors are entities with the capacity to be sued. ............................................... 20

       D.     Plaintiffs plausibly allege a claim under 42 U.S.C. § 1981. ................................. 22

              1.   Plaintiffs plausibly allege that Defendants intentionally
              discriminated on the basis of race. ........................................................ 22

              2.   Plaintiffs plausibly allege that Defendants' intentional
              discrimination interferes with the benefits and privileges to which
              Plaintiffs are entitled pursuant to their NLIs. ......................................... 28

              3.   Plaintiffs plausibly allege that but for their race, the NCAA
              would not have deprived Plaintiffs of their rights under Section

1981.................................................................................................................... 31

E.      Plaintiffs' Complaint plausibly alleges a claim under 42 U.S.C. §
1985(3)............................................................................................................... 32

F.      Plaintiffs' Complaint plausibly alleges a claim under the D.C.
Human Rights Act............................................................................................... 34

IV.    CONCLUSION........................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Agron, Inc. v. Chien-Lu Lin*,
  2004 U.S. Dist. LEXIS 26605 (C.D. Cal. Mar. 15, 2004) ..................................... 34

*Allen v. Wright*,
  468 U.S. 737 (1984) ............................................................................................. 10

*Anderson v. Sybron Corp.*,
  165 Ga. App. 566 (Ga. Ct. App. 1983) ................................................................ 19

*Askin v. Quaker Oats Co.*,
  818 F. Supp. 2d 1081 (N.D. Ill. 2011) ................................................................. 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 5, 27, 31

*Bauer v. Veneman*,
  352 F.3d 625 (2d Cir. 2003) ........................................................................... 13, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 5

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................. 14

*Bowen v. Rubin*,
  2002 U.S. Dist. LEXIS 25283 (E.D.N.Y. May 17, 2002) .................................... 26

*Bratton v. Roadway Package Sys.*,
  77 F.3d 168 (7th Cir. 1996) ................................................................................. 26

*Cada v. Baxter Healthcare Corp.*,
  920 F.2d 446 (7th Cir. 1990) ............................................................................... 19

*Carroll v. BMW of N. Am., LLC*,
  2019 U.S. Dist. LEXIS 151994 (S.D. Ind. Sept. 6, 2019) .................................... 20

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*,
  770 F.3d 610 (7th Cir. 2014) ............................................................................... 16

*Clark v. City of Braidwood*,
  318 F.3d 764 (7th Cir. 2003) ............................................................... 5, 16, 18, 19

*Comcast v. Nat'l Ass'n of African Am.-Owned Media*,
  589 U.S. ___, 140 S. Ct. 1009 (2020) ................................................................. 31

*Daniels v. Pipefitters' Ass'n Local Union No. 597*,
  945 F.2d 906 (7th Cir. 1991) ........................................................ 29

*DeBoard v. Comfort Inn*,
  2013 U.S. Dist. LEXIS 146400 (S.D. Ind. Oct. 9, 2013) ................... 15

*Doe v. Holcomb*,
  883 F.3d 971 (7th Cir. 2018) ........................................................ 11

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...................................................................... 5

*Equal Emp't Opportunity Comm'n v. Concentra Health Servs.*,
  496 F.3d 773 (7th Cir. 2007) .......................................................... 5

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
  749 A.2d 724 (D.C. 2000) ......................................................... 7, 35

*Family & Children's Ctr. v. School City*,
  13 F.3d 1052 (7th Cir. 1994) ........................................................ 12

*Feinberg v. Eckelmeyer*,
  2009 U.S. Dist. LEXIS 117900 (E.D. Pa. Dec. 16, 2009) ................... 33

*Fields v. Bd. of Educ.*,
  923 F.3d 622 (7th Cir. 2016) ........................................................ 27

*Freeman v. Metro. Water Reclamation Dist. of Greater Chicago*,
  927 F.3d 961 (7th Cir. 2019) .......................................... 5, 22, 23, 31

*Gautreaux v. Romney*,
  448 F.2d 731 (7th Cir. 1971) ........................................................ 27

*Gomez v. West Chicago*,
  506 F. Supp. 1241 (N.D. Ill. 1981) ................................................ 34

*Gracia v. Sigmatron Int'l, Inc.*,
  2021 U.S. App. LEXIS 3024 (7th Cir. Feb. 3, 2021) ........................... 9

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) .................................................................. 7, 9

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971) ........................................................................ 7

*Gross v. FBL Financial Services, Inc.*,
  557 U.S. 167 (2009) .................................................................... 31

*Hampton v. Hanrahan*,
  600 F.2d 600 (7th Cir. 1979) ................................................................ 34

*Hartman v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*,
  4 F.3d 465 (7th Cir. 1993) .................................................................... 33

*Heslep v. Ams. For African Adoption, Inc.*,
  890 F. Supp. 2d 671 (N.D. W. Va. 2012) ............................................. 21

*Hollander v. Brown*,
  457 F.3d 688 (7th Cir. 2006) ................................................................ 18

*Hunt v. Pers Staffing Grp., LLC*,
  2018 U.S. Dist. LEXIS 28146 (N.D. Ill. Feb. 22, 2018) ..................... 29

*Hyson USA, Inc. v. Hyson 2U, Ltd.*,
  821 F.3d 935 (7th Cir. 2016) ........................................................ 16, 18

*In re Bridgestone/Firestone Inc., Tire Prod. Liab. Litig.*,
  155 F. Supp. 2d 1069 (S.D. Ind. 2001) ................................................ 20

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litigation*,
  1992 WL 220753 (C.D. Cal. Jul. 16, 1992) ......................................... 34

*In re Jackson Lockdown/MCO Cases*,
  568 F. Supp. 869 (E.D. Mich. 1983) .................................................... 33

*Johnson v. United States OPM*,
  783 F.3d 655 (7th Cir. 2014) .................................................... 7-8, 8, 9

*Kelly v. City of Chi.*,
  4 F.3d 509 (7th Cir. 1993) .................................................................... 19

*Kyles v. J.K. Guardian Sec. Servs., Inc.*,
  222 F.3d 289 (7th Cir. 2000) .................................................................. 9

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
  422 F.3d 490 (7th Cir. 2005) ...................................................... *passim*

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................... 5-6, 6, 14, 15

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ...................................................................... 23, 26

*Molovinsky v. Fair Emp't Council of Greater Washington*,
  683 A.2d 142 (D.C. 1996) ............................................................. 7, 4

*Nahas v. Shore Med. Ctr.*,
  2018 U.S. Dist. LEXIS 70785 (D.N.J. Apr. 27, 2018) ........................................................ 21

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ........................................................................................... 7, 8, 9

*Novak v. State Parkway Condo. Ass'n*,
  2015 U.S. Dist. LEXIS 28021 (N.D. Ill. March 6, 2015) .................................................... 21

*Ortiz v. Werner Enters., Inc.*,
  834 F. 3d 760 (7th Cir. 2016) ................................................................................ 23

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ........................................................................................... 14

*People by Abrams v. 11 Cornwell Co.*,
  695 F.2d 34 (2d Cir. 1982) ................................................................................... 33

*Petrovic v. Enter. Leasing Co. of Chicago, LLC*,
  513 Fed. App'x 609 (7th Cir. 2013) ......................................................................... 31

*Pisciotta v. Old Nat'l Bancorp*,
  499 F.3d 629 (7th Cir. 2007) ................................................................................ 13

*Pourghoraishi v. Flying J, Inc.*,
  449 F.3d 751 (7th Cir. 2006) ................................................................................ 22

*Powell v. Illinois*,
  2019 U.S. Dist. LEXIS 168209 (N.D. Ill. Sept. 30, 2019) .................................................. 15

*Pritchett-Evans v. State Farm Ins. Co.*,
  2003 U.S. Dist. LEXIS 2870 (W.D. Mich. Feb. 27, 2003) ................................................... 29

*Pryor v. NCAA*,
  288 F. 3d 548 (3d Cir. 2002) ................................................................................ 30

*Randle v. Bentsen*,
  19 F.3d 371 (7th Cir. 1994) ................................................................................. 28

*Remijas v. Neiman Marcus Grp. LLC*,
  794 F.3d 688 (7th Cir. 2015) ................................................................................ 13

*Robertson v. Allied Sols., LLC*,
  902 F.3d 690 (7th Cir. 2018) ............................................................................. 6, 7

*Siegler v. Sorrento Therapeutics, Inc.*,
  2019 U.S. Dist. LEXIS 62813 (S.D. Cal. Feb. 13, 2019) .................................................... 21

vii

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ......................................................................................... 10

*Sirajullah v. Illinois State Medical Inter-Insurance Exchange*,
  1988 U.S. Dist. LEXIS 4695 (N.D. Ill. May 13, 1988) ................................ 33

*Smith v. Henderson*,
  982 F. Supp. 2d 32 (D.D.C. 2013) ................................................................ 35

*State of New York v. Feldman*,
  2003 WL 21576518 (S.D.N.Y. Jul. 10, 2003) ............................................. 34

*Stuart v. Local 727, Int'l Bhd. Of Teamsters*,
  771 F.3d 1014 (7th Cir. 2014) ...................................................................... 16

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014) .................................................................................. 13

*Swanson v. Citibank, N.A.*,
  614 F.3d 400 (7th Cir. 2010) ........................................................ 22, 23, 28, 31

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) ...................................................................................... 23

*Szuszkiewicz v. JPMorgan Chase Bank*,
  12 F. Supp. 3d 330 (E.D.N.Y. 2014) ........................................................... 28

*Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*,
  212 F. Supp. 3d 816 (N.D. Cal. 2016) .......................................................... 21

*Travis v. Gary Community Mental Health Ctr., Inc.*,
  921 F.2d 108 (7th Cir. 1990) ........................................................................ 32

*Tsau v. United States*,
  805 Fed. App'x 434 (7th Cir. 2020) ............................................................... 9

*United States. And in Johnson v. Allsteel, Inc.*,
  259 F.3d 885 (7th Cir. 2001) ........................................................................ 13

*United States v. Funds in the Amount of $574,840,719*,
  719 F. 3d 648 (7th Cir. 2013) ......................................................................... 6

*United States v. Schuylkill Township*,
  1990 U.S. Dist. LEXIS 15555 (E.D. Pa. Nov. 16, 1990) ............................. 26

*Uzuegbunam v. Preczewski*,
  __ U.S. __, 2021 U.S. LEXIS 1372 (2021) .................................................. 10

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ................................................................. 5

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) ................................................................. 23, 24

*Volk v. Coler*,
   845 F.2d 1422 (7th Cir. 1988) ................................................................. 33

*Walters v. Edgar*,
   163 F.3d 430 (7th Cir. 1998) ................................................................. 14

*Willmschen v. Trinity Lakes Improvement Ass'n*,
   840 N.E.2d 1275 (Ill. Ct. App. 2005) ................................................................. 21

*Wilson v. Giesen*,
   956 F.2d 738 (7th Cir. 1997) ................................................................. 17

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ................................................................. 24

**Statutes**

42 U.S.C. § 1981 ................................................................. *passim*

42 U.S.C. § 1985 ................................................................. *passim*

D.C. Code §§ 1-2501 et seq. ................................................................. 1

D.C. Code § 2-1402.01 ................................................................. 7

D.C. Code § 2-1403.16 ................................................................. 35

O.C.G.A. § 9-3-96 ................................................................. 19

**Rules**

Fed. R. Civ. P. 8 ................................................................. 23, 31

Fed. R. Civ. P. 9 ................................................................. 20

Fed. R. Civ. P. 12 ................................................................. 5

**Other**

Alan S. Gutterman, Business Transactions Solutions § 73-18 ................................................................. 21

13A Fed. Prac. & Proc. Juris. § 3531.6 (3d ed.) ................................................................. 11

Plaintiffs Troyce Manassa, Austin Dasent, and J'TA Freeman ("Plaintiffs") respectfully submit this Opposition to Defendants'[1] motion to dismiss (Dkts. 31, 32).

## I.   INTRODUCTION AND BACKGROUND

The NCAA purports to "promote an atmosphere of respect for and sensitivity to the dignity of every person," to "refrain from discrimination" on the basis of race, and to "recognize[] and support[] the primacy of the academic mission of its member institutions." But for over a decade, the NCAA has intentionally discriminated against Black student-athletes at Division I ("DI") Historically Black Colleges and Universities ("HBCUs") through its Academic Performance Program ("APP"), which is imposed upon all DI student-athletes by virtue of their contractual agreements. HBCUs were created to serve the Black community and to preserve Black history, racial pride, ethnic traditions, and Black consciousness. Their student bodies and their student-athletes are predominantly Black. When the NCAA enacted the APP, it knew that Black student-athletes at HBCUs would be disproportionately affected by the program. In the intervening decades, it has collected a plethora of data indicating that to be so. Nonetheless, the NCAA continues to enforce the APP such that Plaintiffs, who are or were Black student-athletes at DI HBCUs, are subject to discriminatory treatment and denied the privileges and benefits attendant to their contracts (including bans on postseason play), in violation of 42 U.S.C. §§ 1981, 1985 and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 1-2501 *et seq.*

Each of Defendants' arguments in favor of dismissal is predicated on a misunderstanding of the applicable legal standard. When viewed through the correct lens, it is clear that Plaintiffs allege a plausible and redressable injury-in-fact—discriminatory treatment—sufficient to confer

---

[1] "Defendants" or "NCAA" refers to National Collegiate Athletic Association, Board of Governors of the National Collegiate Athletic Association ("NCAA Board"), and Division I Board of Directors of the National Collegiate Athletic Association ("DI Board").

standing; Plaintiffs' claims are timely on their face; Plaintiffs plausibly allege intentional discrimination, unlawful interference with their contractual rights, and "but for" causation far in excess of the detail required at the pleadings stage; and Plaintiffs plausibly plead claims under 42 U.S.C. § 1985 and the DCHRA. Defendants' motion should be denied.

### A. The NCAA intentionally discriminates against Black student-athletes at HBCUs on the basis of race.

Student-athletes execute national letters of intent ("NLIs") that allow them to receive athletic scholarships and compete in NCAA DI sports. ¶102.[2] NLIs are valid, binding contracts that subject the student-athlete to NCAA bylaws and academic requirements, including the APP. ¶¶103-107, 131. Pursuant to the NLIs, student-athletes participate in DI sports and, provided their team's athletic performance is sufficient, compete in postseason play such as basketball March Madness and football bowl games. ¶¶102-104, 132, 189, 2002. These tournaments provide significant exposure to student-athletes on a national stage, further their career prospects, and allow them to compete at the highest NCAA level. ¶¶189-192, 200-202.

The NCAA first enacted academic performance standards at the time of racial desegregation and nearly every iteration of these standards has discriminated against Black student-athletes.[3] ¶¶109-128. The APP is complex and governed by a 246-page manual. ¶¶133. The NCAA calculates each team's Academic Progress Rate ("APR") on both a single-year and multi-year basis,[4] and levies penalties and provides financial incentives to teams based on each team's score. ¶¶130-135, 149, 184-188. One of the penalties assessed under the program is loss of

---

[2] Citations to the Complaint (Dkt. 1) will be identified by paragraph number.
[3] In fact, the NCAA admitted that Proposition 16, the APP's precursor, was discriminatory and that initial eligibility standards "disproportionately impact" "ethnic minorities" like Black student-athletes. ¶¶126-127.
[4] Multi-year APRs include data from previous team participants, meaning that a student-athlete's ability to compete in postseason is determined in large part based on data that likely pre-dated their team membership, as was the case for Plaintiffs Manassa and Dasent. *See, e.g.*, ¶¶130, 251, 259.

postseason play, which excludes the team from postseason competition even if they performed well enough during the regular season to qualify for a postseason appearance. ¶189.

The NCAA says that the APR is a proxy for the Graduation Success Rate ("GSR"), which represents student-athlete graduation rates. ¶136. At the time it created the APP, the NCAA knew that GSRs for Black student-athletes were 20-30 percentage points lower than those of their white counterparts and it knew that HBCUs are comprised of primarily, if not exclusively, Black student-athletes. ¶¶140-146. It also knew that HBCUs are driven by a unique, historically-based mission to educate historically-disadvantaged Black students. ¶¶150-156. The NCAA explicitly considered race when designing the APP and knew that the program would discriminate against Black student-athletes at HBCUs: the Chair of NCAA's Committee on Academic Performance admitted as much. ¶¶129-188. The organization's own data indicates that HBCU teams are 43 times more likely to receive postseason play bans than predominantly white institution ("PWI") teams and 6-8 times more likely to receive postseason play bans than teams from similarly-resourced institutions. ¶¶173-183. Although HBCUs constitute 6.1% of DI schools, their teams comprise 72% of those that have been banned. ¶174. In 2012, the NCAA's Principal Research Scientist proposed that, to resolve the disparity in APRs between HBCU and PWI teams, HBCUs simply abandon their historically-based missions and "cap" the number of "high-risk student-athletes admitted at any given time." ¶¶153-155.

At the same time, the NCAA ignores the 30-50 percentage point disparity in GSR between Black student-athletes and white student-athletes at PWIs because the PWI teams as a whole exhibit a "passing" APR. ¶¶168-172. It financially incentivizes teams that consistently achieve

high APRs—largely PWIs and Power Five teams.[5] ¶¶184-188. And it has permitted carve outs to its rules and policies for Power Five (PWI) schools, permitting them to change and create their own rules in certain areas, including financial aid and academic support. ¶¶98-10. The same rules are not granted to HBCUs. ¶101.

## B. The NCAA's discriminatory treatment interferes with Plaintiffs' ability to make, enforce, and enjoy the privileges and benefits of their NLI contracts.

Plaintiffs are Black student-athletes at DI HBCUs who executed NLIs with the NCAA and are (or were) subject to the APP, a racially discriminatory program, thus violating their right to be free from racial discrimination in the making and enforcing of contracts. Plaintiffs Manassa and Dasent played men's basketball for Savannah State University ("SSU") in and around 2016-2017. ¶¶16-46. Although the team qualified for postseason competition that year, the NCAA banned SSU from postseason play as a penalty for failing to meet the APP cut-off. *Id.* Manassa and Dasent were excluded from postseason competition, denied the attendant exposure and athletic opportunity, including the ability to further their careers, and thus lost employment and other opportunities. *Id.*; ¶¶189-202. Plaintiff Freeman was a student-athlete on Howard University's ("HU") women's lacrosse team in 2019-2020 and intends to play again in 2021-2022. ¶50. The NCAA's racially discriminatory APP is a provision of her NLI, subjecting her to discriminatory treatment. ¶204. She is also at an increased risk of receiving a postseason play ban and seeks injunctive relief to prevent this (and further) violation of her civil rights. ¶¶204-206, 253.

Plaintiffs deliberately chose to attend HBCUs as student-athletes and Defendants' discriminatory conduct has caused them mental and emotional distress. ¶¶ 202, 253. Plaintiffs did

---

[5] The "Power Five" or "Autonomous Five" are comprised of the top five Football Bowl Subdivision conferences: the Atlantic Coast Conference, Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference. ¶65.

not and could not have known at the time they signed their NLIs that the APP is a discriminatory program which violates their rights, or that their team would receive, or was at a significantly increased risk of receiving, a postseason ban. ¶¶20, 36, 52, 195-196, 199, 209-212.

## II.   LEGAL STANDARD

To state a claim upon which relief may be granted, a complaint must plead "the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests," *Equal Emp't Opportunity Comm'n v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007), and set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," accepting all allegations as true and construing them in the light most favorable to plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020); Fed. R. Civ. P. 12(b)(6). However, "[a] plaintiff alleging race discrimination need not allege each evidentiary element of a legal theory to survive a motion to dismiss." *Freeman v. Metro. Water Reclamation Dist. of Greater Chicago,* 927 F.3d 961, 965 (7th Cir. 2019) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002)). Neither are plaintiffs required to plead around affirmative defenses such as the statute of limitations. *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003). The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), and a claim can survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## III.   ARGUMENT

### A.  Plaintiffs have standing to assert their claims.

Constitutional standing requires a plaintiff to have (1) suffered an "injury in fact," (2) that is "fairly traceable to the challenged conduct of the defendant," and (3) that is likely to be "redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992). Defendants challenge the first and third elements—injury-in-fact and redressability. But Article III standing is "undemanding" and "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to confer standing], for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. 555 (1992); *see also Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005). Stated differently, as long as a plaintiff pleads facts "showing a plausible injury, she receives the benefit of the imagination, so long as the hypotheses are consistent with the complaint." *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 695 (7th Cir. 2018) (cleaned up). *See also Lac Du Flambeau*, 422 F. 3d at 496 ("[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"); *United States v. Funds in the Amount of $574,840,719*, 719 F. 3d 648, 651 (7th Cir. 2013) ("At the pleading stage, Article III standing is something to be alleged, not proved. All that must be alleged is an injury, personal to the person seeking judicial relief, that the court can redress…."). Plaintiffs' allegations that Defendants' discriminatory treatment interfered with their ability to make, enforce, and enjoy the privileges and benefits of their NLI contracts constitute an injury-in-fact. A favorable judicial ruling would compensate Plaintiffs Manassa and Dasent for their civil rights violations and ensure Plaintiff Freeman is protected from harm. Plaintiffs therefore plead facts sufficient to demonstrate injury-in-fact, redressability, and traceability and Defendants' Motion should be denied.

    1. **Plaintiffs Manassa and Dasent plausibly allege that the NCAA discriminated against them, interfering with their ability to make, enforce, and enjoy the privileges and benefits of their NLI contracts.**

The NCAA's discriminatory treatment of Plaintiffs through its APP constitutes an injury-in-fact that is sufficient to confer standing pursuant to Supreme Court and Seventh Circuit

precedent. In arguing otherwise, Defendants misconstrue and misapply applicable standing law.

42 U.S.C. § 1981 ("Section 1981"), subtitled "Equal rights under the law," is an equal protection statute that prohibits interference with the making, enforcing, and performance of contracts on the basis of race.[6] The Supreme Court has held that an "injury-in-fact" in equal protection cases, including Section 1981 cases, "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *See also Robertson,* 902 F.3d 690, 697 (7th Cir. 2018) ("Article III's strictures are met not only when a plaintiff complains of being deprived of some benefit, but also when a plaintiff complains that she was deprived of a chance to obtain a benefit"); *Gratz v. Bollinger*, 539 U.S. 244 (2003) (applying analysis in a Section 1981 case); *Lac Du Flambeau*, 422 F.3d at 497-98  ("[t]his analysis, moreover, is not limited to cases alleging a violation of the Equal Protection Clause … [w]hether to apply this analysis depends on the nature of the alleged injury, not the source of the asserted right," applying in Administrative Procedures Act case).

In other words, to have standing in an equal protection case like this one, a plaintiff need not allege or prove that but for the defendant's conduct, he or she would have received the *benefit* at issue—*e.g.*, the job, the benefit, or the contract. Rather, the discriminatory *treatment*, which created a barrier to the benefit, is what constitutes the injury-in-fact. *Lac Du Flambeau*, 422 F.3d at 498; *Johnson v. United States OPM*, 783 F.3d 655, 655-666 (7th Cir. 2014) (discriminatory treatment that creates a "barrier that makes it more difficult for members of one group to obtain a benefit" is sufficient for standing). For example, in *Lac Du Flambeau*, plaintiff LDF (a federally

---

[6] 42 U.S.C. § 1985 ("Section 1985") and DCHRA are also equal protection statutes. *See, e.g., Griffin v. Breckenridge*, 403 U.S. 88, 96-97 (1971); D.C. Code § 2-1402.01; *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 731-732 (D.C. 2000). Standing under the DCHRA is co-extensive with Article III standing. *Molovinsky v. Fair Emp't Council of Greater Washington*, 683 A.2d 142, 146 (D.C. 1996).

recognized Native American tribe) alleged that the Secretary of the Interior breached its fiduciary duty to treat all Native American tribes equally by allowing a compact to take effect between another tribe and the State of Wisconsin, conferring that tribe favored status in the siting of future casinos. Defendant argued that LDF lacked standing because, even absent the Secretary's conduct, there were several contingencies that could render LDF's desired casino impossible. LDF nonetheless had standing:

> [t]he harm is not LDF's 'inability to obtain the benefit,' here, approval of its off-reservation gaming application. Rather, the harm lies in 'the denial of equal treatment,' in this case, being forced to seek approval under the cloud created by the amended compact. The possibility that Wisconsin might reject LDF's application for legitimate reasons is therefore irrelevant to the standing analysis.

*Id.* at 498 (emphasis added). *See also Jacksonville*, 508 U.S. at 665-66 (plaintiffs were not required to show that they would have received a contract absent the ordinance, merely that they had been denied the opportunity to compete fairly, absent discriminatory treatment).

Thus, Plaintiffs here need not show that they would have received the benefit alleged— greater career opportunities, professional play, etc.—in order to demonstrate standing or injury. Plaintiffs need only allege discriminatory treatment interfering with the making and enforcement of their NLIs because of their race. And they do. Plaintiffs allege that application of the APP was a requirement of Manassa's and Dasent's NLI contracts and that the APP discriminates on the basis of race and set forth numerous facts in support. They further allege that, when Manassa and Dasent were members of the [HBCU] SSU men's basketball team, the team's performance during the regular season qualified them to play in the men's championship basketball tournament but it was prohibited from competition because the NCAA imposed a postseason play ban under the APP. ¶¶22-24. Manassa and Dasent thus plead that they were discriminated against, excluded from the benefit and privilege of postseason competition, and thus deprived of the full benefits and

privileges of their NLI contracts—all because of their race. *See, e.g.*, ¶¶225-254. Pursuant to *Jacksonville*, 508 U.S. 656, *Gratz*, 539 U.S. 244, and *Lac Du Flambeau*, 422 F.3d 490, these allegations are sufficient to constitute injury-in-fact and confer standing.

Defendants' arguments to the contrary misconstrue the law and are therefore unavailing. Plaintiffs need not describe Manassa's and Dasent's lost opportunities with greater particularity. Nor must Plaintiffs prove that Manassa's performance at the tournament games from which the NCAA excluded SSU was a certainty. These issues improperly focus on Plaintiffs' deprived benefits when it is the discriminatory treatment of Plaintiffs that is relevant for standing.[7]

Finally, Defendants ignore that Plaintiffs also allege other injuries: mental anguish, emotional distress, embarrassment, humiliation, and degradation. ¶253. These injuries are themselves sufficient to confer standing. *See, e.g., Gracia v. Sigmatron Int'l, Inc*., No. 19-1526, 2021 U.S. App. LEXIS 3024, at *10, *12 (7th Cir. Feb. 3, 2021) ("humiliation, embarrassment, and like injuries" are sufficient to confer standing as to Section 1981 claims). *See also Kyles v. J.K. Guardian Sec. Servs., Inc*., 222 F.3d 289, 300 (7th Cir. 2000) ("[w]e have long recognized that humiliation, embarrassment, and like injuries … constitute cognizable and compensable harms stemming from discrimination"); *Johnson*, 783 F.3d at 665-66 ("non-economic injuries" sufficient to confer standing). Defendants do not assert otherwise. Manassa and Dasent have stated an injury-in-fact sufficient to confer standing for their asserted claims.

### 2. Plaintiffs Manassa and Dasent plausibly allege that their injuries are redressable.

The injuries sustained by Plaintiffs Manassa and Dasent are likely to be addressed by a

---

[7] *Tsau v. United States*, 805 Fed. App'x 434 (7th Cir. 2020), does not alter this analysis. In a one-page unreported opinion, the Court held that "bald assertions" of lost "credit, fame, and fortune" are too conjectural to confer standing. Plaintiffs' allegations of harm extend far beyond "bald assertions," as described above, and describe in detail the NCAA conduct that caused these deprivations. Moreover, *Tsau* was not an equal protection case, and here the focus is on discriminatory treatment, not Plaintiffs' deprived benefits. It is therefore inapposite.

favorable judicial ruling. Redressability "examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). It "depends upon the relief requested, not the relief [the plaintiff] could prove it was entitled to on the merits." *Lac Du Flambeau*, 422 F.3d at 502. "[T]he relevant inquiry is whether … the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). Here, as compensation for, *inter alia*, discrimination, interference with their NLIs, lost employment opportunities, and related mental and emotional harm, Plaintiffs seek, among other things, compensatory damages, statutory damages, and equitable relief. ¶274, Prayer for Relief. These damages would compensate Plaintiffs monetarily for the harm they sustained, including redress for the discrimination itself, as well as lost employment opportunities.

Defendants' argument appears to be that Plaintiffs' injuries cannot be redressed because the Court cannot "turn back the hands of time." Br. at 9. It is often true that Courts cannot "undo" the harm suffered by a plaintiff, but were that the only way to compensate for a wrong, plaintiffs subjected to physical injury, discrimination, sexual abuse, and other egregious harms could never recover. Plaintiffs are aware of no cases holding that monetary damages paid directly to plaintiffs for a civil rights violation are insufficient to support redressability, and Defendants cite none.[8] In fact, Congress itself expected that violations of Section 1985 would be redressed by "recovery of damages occasioned by" the injury. 42 U.S.C. § 1985 (3).

Defendants' argument is in fact one on the merits: they dispute that Plaintiffs can adequately quantify the damages attendant to their lost opportunities. (Defendants never address

---

[8] In fact, earlier this month, the Supreme Court held that "because every violation of a right imports damages," "for the purpose of Article III standing, *nominal* damages provide the necessary redress for a completed violation of a legal right." *Uzuegbunam v. Preczewski*, __ U.S. __, 2021 U.S. LEXIS 1372, at *20, *21 (2021) (emphasis added).

the other harms Plaintiffs plausibly allege.) But that is not a question of standing or failure to state a claim—the latter an argument they do not even make—and is not ripe for adjudication. Discovery will bear out what Plaintiffs can and cannot prove. The purpose of redressability is to ensure that a plaintiff receives some personal benefit from the remedy, 13A Fed. Prac. & Proc. Juris. § 3531.6 (3d ed.), and Plaintiffs have demonstrated as much.

Finally, Defendants shoehorn in a traceability argument, claiming that even if Manassa's and Dasent's injuries are redressable, NCAA is not the correct party to provide relief. NCAA's legally-unsupported argument is premised upon manufactured facts that directly contradict the Complaint. At this juncture, the Court must take Plaintiffs' allegations as true and read them in the light most favorable to Plaintiffs. Plaintiffs allege, *inter alia*, that their NLI contracts were between NCAA and Plaintiffs, that NCAA determines penalties and postseason eligibility, that NCAA runs postseason tournaments, that Plaintiffs had no knowledge of postseason penalty bans or the likelihood of receiving them in the future prior to executing their NLIs, and that the information necessary for them to evaluate that likelihood was held by NCAA, not Plaintiffs. ¶¶95, 102-107, 130-132, 189-210. These facts are sufficient to allege that Plaintiffs' injuries are "fairly traceable" to NCAA's actions. And, in any event, "a defendant's actions need not be 'the very last step in the chain of causation'" for traceability to be found. *Doe v. Holcomb*, 883 F.3d 971, 978 (7th Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). Plaintiffs Manassa and Dasent have standing to seek relief in this case.

### 3.  Plaintiff Freeman has standing to seek injunctive relief.

The Seventh Circuit has held that "as long as the plaintiff has shown that [she] has 'an actual stake in the outcome that goes beyond intellectual or academic curiosity, even a minor or non-economic injury will satisfy the structures of Article III." *Askin v. Quaker Oats Co*., 818 F. Supp. 2d 1081, 1083 (N.D. Ill. 2011) (quoting *Family & Children's Ctr., Inc. v. School City of*

11

*Mishakaka*, 13 F.3d 1052, 1058 (7th Cir. 1994)). Here, Plaintiff Freeman alleges that she received a scholarship to play lacrosse at Howard University; executed an NLI, played on the team from 2019-2020, and intends to play again in 2021-2022; that HBCUs are significantly more likely to receive postseason play bans than are PWIs, even when controlling for differing resources; that HU's women's lacrosse team has been subjected to such bans in recent years (2012/13 and 2014/15); that the NCAA's APP discriminates against her; and that she and HU's lacrosse team are at an increased risk of receiving postseason play bans in the future. ¶¶48, 50, 174-176, 182, 199, 204, Appx. A. She has therefore set forth a set of facts sufficient to meet Article III's "undemanding" standard, demonstrate she has an "actual stake" in this case, and establish standing. *Family & Children's Ctr. v. School City*, 13 F.3d 1052, 1058 (7th Cir. 1994); *Lac Du Flambeau*, 422 F.3d at 498. Because Plaintiff Freeman alleges discriminatory treatment and the increased risk of future discriminatory treatment, she has stated an injury-in-fact.

*First*, as described *supra*, discriminatory treatment that prevents postseason competition itself is an injury-in-fact. Plaintiff Freeman alleges that by virtue of her participation as a Black student-athlete on an HBCU DI team, she is subject to the NCAA's discriminatory APP program— a condition of her NLI contract. ¶¶107, 231. She therefore plausibly alleges discriminatory treatment and injury-in-fact.[9]

*Second*, the "injury-in-fact" requirement is satisfied by "a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions," which Plaintiff Freeman also alleges. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007). *See also Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (allegations of future or threatened injury are sufficient

---

[9] Again, it is irrelevant that Plaintiff Freeman has not received a penalty or postseason play ban under the APP because it is the discriminatory treatment, not the lost benefit, which constitutes the injury. *See supra.*

to confer standing where there is a "'substantial risk' that the harm will occur.") (citation omitted). Thus, in *Remijas v. Neiman Marcus Grp. LLC*, a data breach case where hackers collected data associated with 350,000 Neiman Marcus customers, the Seventh Circuit held that plaintiffs should not have to wait until the hackers committed identity theft fraud to have standing, because there is "an 'objectively reasonable likelihood' that such an injury will occur." 794 F.3d 688, 693 (7th Cir. 2015) (citation omitted). In *Bauer v. Veneman*, 352 F.3d 625 (2d Cir. 2003), plaintiff's assertion that he was at an increased risk of contracting a food-borne illness from beef infected with "mad cow" disease ("BSE") was sufficiently concrete, actual, and imminent to confer standing, even though he did not allege that any BSE-contaminated beef had been detected or ever offered for sale in the United States. And in *Johnson v. Allsteel*, *Inc.,* 259 F.3d 885 (7th Cir. 2001), the increased amount of discretion afforded to an ERISA plan administrator increased the risk to plan participants, constituting an injury-in-fact, even though the administrator had not yet employed that discretion.

Plaintiff Freeman alleges that because of the NCAA's discriminatory treatment through application of the APP, she is at an increased risk of receiving a postseason play ban, thereby denying her the benefits and privileges of her contract. ¶¶198-204. She further alleges that, pursuant to the NCAA's own statistics, HBCU teams are 43 times more likely than PWI teams to receive postseason play bans under the APP and 6-8 times more likely to be banned than teams from similarly-resourced schools. ¶¶143, 176, 181-182. HBCU teams constitute 72% of teams banned since 2010, even though they comprise only 6.5% of all DI schools. ¶¶174-175. In fact, the NCAA banned the HU women's lacrosse team from postseason play in 2012-2013 and 2014-2015. Compl. at Appx. A. *See also O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."). This

type of statistical evidence far exceeds the degree of pleading necessary to demonstrate an increased risk of harm and plausibly state an injury-in-fact on that basis. *See Bauer*, 352 F.3d at 642 ("To survive a motion to dismiss, [plaintiff] need not present more specific scientific evidence or statistical verification to prove that the risk actually exists"); *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (at the pleading stage, standing will be upheld when a plaintiff provides some sort of support for his claim and it is possible to "presume facts under which [the plaintiff] will be injured"). "A probabilistic harm, if nontrivial, can support standing." *Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998). Violation of Plaintiffs' civil rights cannot be undone, and the NCAA itself admits that loss of postseason play is an irreparable harm. Br. at 9. Plaintiff further alleges mental anguish, emotional distress, embarrassment, humiliation, and degradation which, as discussed *supra,* are also injuries-in-fact. *See* ¶274.

In opposition, Defendants argue that because Ms. Freeman does not allege she is currently a member of HU's lacrosse team, any claimed injury is impermissibly conjectural.[10] But the intent to engage in future conduct that might subject one to harm can constitute injury-in-fact as long as the plaintiff alleges something more concrete than "some day" intentions. *Lujan*, 504 U.S. at 564. Plaintiff Freeman does so here.

In *Lujan*, plaintiffs alleged that the U.S. Department of the Interior's actions would threaten endangered species. The Supreme Court held that plaintiffs did not have standing to challenge those actions because they could not state an individual injury. While plaintiffs alleged a "some day" intent to return and visit endangered species' environments "in the future," where they "hoped" to see the endangered species, plaintiffs provided no "description of concrete plans, or indeed even any specification of *when* the some day will be." *Id.* at 564. As a result, they could

---

[10] Defendants do not dispute causation as to Plaintiff Freeman.

not demonstrate an "actual or imminent" injury as is required for Article III standing. *Id.* at 564.

In contrast, Plaintiff Freeman stated that she intends to play lacrosse in 2021-2022. She met the athletic and eligibility requirements necessary to obtain a full athletic scholarship to HU before her matriculation in 2019. She played a full season of HU lacrosse from 2019-2020, merely one, pre-COVID-19 year ago. She states a clear intent to play lacrosse for HU in 2021-2022—the upcoming school year and the "imminent future." These allegations describe much more than the "some day" intent that *Lujan* found insufficient and instead describe a likelihood in the imminent future. *See also DeBoard v. Comfort Inn*, No. 1:13-cv-00508-RLY-MJD, 2013 U.S. Dist. LEXIS 146400 (S.D. Ind. Oct. 9, 2013) (distinguishing between "some day" intent and an intent indicating a "likelihood...in the imminent future"); *Powell v. Illinois*, No. 18 CV 6675, 2019 U.S. Dist. LEXIS 168209 (N.D. Ill. Sept. 30, 2019) ("*some intent* to return to the place in which the harm will again occur" can establish standing for injunctive relief) (emphasis added).

Moreover, as noted *supra*, that Plaintiff's threatened harm might be partly contingent on other forces does not render the harm "conjectural" or defeat standing. In *Remijas*, *Bauer*, and *Johnson*, whether plaintiffs would suffer identity theft, contract disease from contaminated beef, or experience a material and negative change in ERISA benefits was almost wholly contingent upon the conduct of other actors. Yet, all three plaintiffs had standing to seek injunctive relief for a threatened and/or increased risk of future harm. So too does Plaintiff Freeman. Further, the award of injunctive relief prohibiting the NCAA from applying academic requirements in a racially discriminatory manner would eliminate Plaintiff Freeman's harm—discriminatory treatment and the interference with the making, enforcing, and privileges and benefits of the NLI (including the threat of postseason bans). Plaintiff Freeman plausibly alleges that she has standing to seek injunctive relief.

**B. Plaintiffs' Section 1985 Claim is not barred by the statute of limitations.**

Defendants claim that Plaintiffs' Section 1985 statute of limitations has run, necessitating dismissal. But a plaintiff "is not required to negate an affirmative defense, such as the expiration of the statute of limitations, in the complaint." *Clark*, 318 F.3d at 767; *Stuart v. Local 727, Int'l Bhd. Of Teamsters*, 771 F.3d 1014, 1018 (7th Cir. 2014). "[A]ffirmative defenses frequently turn on facts not before the court at the pleading stage." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). Therefore, "dismissal is appropriate *only* when the factual allegations in the complaint unambiguously establish all the elements of the defense." *Id.* (cleaned up) (emphasis in original). "In other words, the plaintiff must affirmatively plead himself out of court; the complaint must plainly reveal that the action is untimely...." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) (cleaned up); *see also Clark*, 318 F.3d at 768 ("the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations...."). Plaintiffs' Complaint plausibly alleges facts sufficient to demonstrate that Manassa's and Dasent's Section 1985 claims either did not accrue and/or that the statute of limitations was tolled such that the claim is timely. Because Defendants cannot "unambiguously" establish all elements of their statute of limitations defense, and the Complaint does not "plainly reveal" Plaintiffs' claims as untimely, Defendants' Motion must be denied.

**1. The Complaint does not "unambiguously establish" that Plaintiffs' Section 1985 claim accrued in 2017.**

"Civil rights claims … accrue when the plaintiff knows or should know that his or her constitutional rights have been violated," and "[a] civil conspiracy claim accrues when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1997) (citations and quotations omitted). Plaintiff Manassa's and Dasent's Section 1985 claim is governed by Georgia's two-year statute of

16

limitations and turns on when Manassa and Dasent knew or should have known that the NCAA's APP program and/or SSU's 2016-2017 postseason ban were racially discriminatory, thus violating their constitutional rights and causing compensable harm.

Plaintiffs Manassa and Dasent allege that:

1. the APP is a complex program governed by a 246-page manual (¶133);

2. the NCAA determines penalties, including postseason play bans, pursuant to the manual (¶¶1130-132);

3. the NCAA has spent decades analyzing team data and for years has operated a department dedicated to collecting and analyzing APP metrics, including those related to HBCUs and postseason bans (¶¶143-147);

4. Plaintiffs were "unaware of SSU's NCAA penalties, including ban from postseason play" until some time after signing their NLIs (¶¶20, 36, 195-196);

5. At the time the NCAA levied the postseason ban upon their team, neither Plaintiff knew or had enough information to know that "the ban and their causally-related injuries were a result of intentional discrimination" (¶209);

6. The NCAA insists, and continues to insist, that the APP and its postseason bans "are applied fairly, do not discriminate against Black student-athletes or HBCUs, and are equitable" (¶210);

7. The NCAA "controls the data surrounding APR calculation, the identity of low resource institutions, and the discriminatory effects of its APP penalties" (¶210);

8. The NCAA "concealed from Plaintiffs and the Class members these facts and the true, racially discriminatory nature of the APP" (¶210); and

9. Plaintiffs "were unaware and could not have reasonably known or learned through reasonable diligence, that the NCAA and its APP discriminated against them." (¶211).

These facts, which must be accepted as true and read in the light most favorable to Plaintiffs, do not "unambiguously" demonstrate that Plaintiffs were aware that the NCAA had violated their constitutional rights when SSU received its postseason ban. Rather, they simply indicate that when SSU was banned, Plaintiffs knew they had been banned. They did not know the ban violated their civil rights or imposed a harm for which damages might be available; *i.e.,* they did not know they had been injured and thus their claim did not begin to accrue.

17

In arguing otherwise, Defendants conflate knowledge of the ban with knowledge of the injury. Br. at 13. In the context of this case, the ban was injurious *because* it was discriminatory. Plaintiffs' claim accrues only when they knew or should have known that their rights were violated, *e.g.,* when they knew that they had been discriminated against. But because Plaintiffs plead that they did not know and could not have known such at the time the ban was assessed, it is impossible to conclude on the pleadings that Manassa's and Dasent's Section 1985 claim accrued in 2017 and is untimely. *See, e.g., Hollander v. Brown*, 457 F.3d 688, 692 n.1 (7th Cir. 2006) ("a federal complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense"); *Clark*, 318 F.3d 764 (plaintiffs' failure to plead date of injury not fatal because the possibility existed that a potential set of facts, if proven, would establish defense to the statute of limitations). In fact, the date upon which Plaintiffs' claim accrued is fact-dependent and appropriately the subject of discovery. Because the Complaint does not unambiguously demonstrate that the statute has run, Defendants' argument fails.

### 2. The Complaint does not "unambiguously" foreclose tolling.

Plaintiffs have pled facts sufficient to support tolling, if necessary, and Defendants' argument to the contrary is unavailing. The Complaint pleads a set of facts under which tolling via the discovery rule, equitable tolling, or equitable estoppel may apply, necessitating denial of Defendants' motion. *See, e.g., Hyson USA, Inc.*, 821 F.3d at 939 ("dismissal is appropriate *only* when the factual allegations in the complaint unambiguously establish all the elements of the defense.").

*Discovery rule.* Whether a matter of accrual or tolling, both federal law and Georgia law[11] recognize that the statute of limitations does not begin to run until plaintiff discovers or should

---

[11] State law governs the tolling of Plaintiffs' claim. *Kelly v. City of Chi.*, 4 F.3d 509, 511 (7th Cir. 1993).

have discovered the injury. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Anderson v. Sybron Corp.*, 165 Ga. App. 566, 567 (Ga. Ct. App. 1983). As discussed *supra,* Plaintiffs plead that they did not and could not know that their civil rights were violated when the NCAA imposed its postseason ban upon SSU. Plaintiffs are not required to plead the specific date they became aware of their injury. *See Clark*, 318 F.3d 764.

*Equitable tolling.* Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada*, 920 F.2d at 451. The Complaint plausibly alleges that, even if Plaintiffs knew that the postseason ban constituted some type of harm, a reasonable person in Plaintiffs' position would not have known until some time afterwards that it was caused by the NCAA's violation of their civil rights. Plaintiffs plausibly allege, for example, that (a) they did not know, could not have known, and were not told that the APP and its penalty system are discriminatory and that HBCUs are disproportionately affected by the system, (b) the APP is complex and difficult (if not impossible) for a layperson to understand, and (c) the NCAA controls most of the data and information regarding the APP and its disproportionate effect upon HBCUs such that Plaintiffs could not ascertain this information. These allegations comprise a set of facts under which Plaintiffs' claims may be equitably tolled.

*Equitable estoppel (fraudulent concealment).* Under Georgia law, if a defendant fraudulently deters plaintiff from bringing an action, the statute of limitations runs "only from the time of the plaintiff's discovery of the fraud." O.C.G.A. § 9-3-96. *See also Cada*, 920 F.2d at 452 (applying equitable estoppel under federal law). Here, Plaintiffs allege that the NCAA intentionally concealed the discriminatory nature of its APP and postseason penalties, preventing Plaintiffs from discovering the facts necessary to bring their suit. For example, Plaintiffs allege

19

that the NCAA knew for decades its programs were discriminatory, intentionally discriminated against Plaintiffs via the APP and SSU's postseason bans, refused to disclose these facts when Plaintiffs signed their respective NLIs and every point thereafter, and concealed or deliberately made unavailable to Plaintiffs the information they would need to discover this wrongdoing. "Whether or not the facts contained in the [Complaint] would, by themselves, support a finding of fraudulent concealment is irrelevant; the relevant question is whether there is *any* set of facts consistent with the [Complaint] that will support such a finding if Plaintiffs ultimately can prove them." *In re Bridgestone/Firestone Inc., Tire Prod. Liab. Litig.*, 155 F. Supp. 2d 1069, 1111 (S.D. Ind. 2001) (plaintiffs were not required to plead fraudulent concealment with specificity or allege active concealment because "a complaint need only give the defendant at least minimal notice of the claim"), *rev'd in part on other grounds*, 288 F.3d 1012 (7th Cir. 2002) (emphasis added); *Carroll v. BMW of N. Am., LLC*, No. 1:19-cv-000224, 2019 U.S. Dist. LEXIS 151994, at *23 (S.D. Ind. Sept. 6, 2019) (holding same; denying defendant's motion to dismiss because "the Court cannot determine at this stage whether the limitations period was indeed tolled and cannot say for certain that there is no set of facts consistent with the Amended Complaint that would support a finding that it was").[12] Plaintiffs have met that requirement.

### C. The NCAA Board of Governors and NCAA Division I Board of Directors are entities with the capacity to be sued.

The NCAA's argument that the Board does not exist separately from the NCAA and thus cannot be sued independently is inaccurate and belied by its own materials. Br. at 12-13. While a

---

[12] Defendants erroneously assert that Plaintiffs must plead fraudulent concealment for tolling purposes in accordance with Fed. R. Civ. P. 9(b). They cite no Seventh Circuit or Southern District of Indiana cases stating such, and *In re Bridgestone* and *Carroll* indicate otherwise.

suit against the board of an incorporated entity is "a suit against the corporation,"[13] the boards of unincorporated associations are subject to greater liability and have greater legal separation from the business organization. *See* Alan S. Gutterman, Business Transactions Solutions § 73:18. Although Indiana law is silent as to whether the NCAA Board and DI Board are entities with the capacity to be sued, cases from other jurisdictions with similar statutory schemes support this reading. *Nahas v. Shore Med. Ctr.*, No. 13-6537, 2018 U.S. Dist. LEXIS 70785, at *5 (D.N.J. Apr. 27, 2018) (analyzing cases and concluding that a hospital's medical executive committee "has the capacity to sue or be sued" as an entity independent of the hospital itself). The NCAA's website, for example, emphasizes that the NCAA Board and the DI Board each serve a different role than the organization at large, and each is responsible for only a subset of policy decisions. *See also* ¶¶54-66. The Board of Governors and the DI Board of Directors each is (1) recognized as a collective entity within the NCAA, (2) governed by a set of formal bylaws, (3) authorized to make rules and recommendations on behalf of the NCAA, and (4) present themselves as an entity distinct from other bodies within the NCAA. ¶¶54-66, 104-107.[14] "Those qualities ... suggest a legal capacity to sue or be sued." *Nahas*, 2018 U.S. Dist. LEXIS 70785, at *5.[15]

---

[13] *Siegler v. Sorrento Therapeutics, Inc.*, No. 18-01681, 2019 U.S. Dist. LEXIS 62813, at *14 (S.D. Cal. Feb. 13, 2019), *reconsideration denied*, No. 18-01681, 2019 WL 1574321 (S.D. Cal. Apr. 11, 2019).

[14] As described throughout the Complaint and on the NCAA's website, the DI Board created and oversees the APP and the DI Committee on Academics, as well as numerous other committees and initiatives. It operates under its own set of bylaws, using its own voting system, and has in turn granted additional autonomy to the Big Five schools. *See* https://www.ncaa.org/sites/default/files/2018DINCAA-HowTheNCAAWorks-DI_20180313.pdf (last accessed March 8, 2021).

[15] Defendants' citations are inapposite or uncompelling. *Heslep v. Ams. For African Adoption, Inc*., 890 F. Supp. 2d 671, 678 (N.D. W. Va. 2012), *Novak v. State Parkway Condo. Ass'n*, No. 13 C 08861, 2015 U.S. Dist. LEXIS 28021 (N.D. Ill. March 6, 2015), and *Willmschen v. Trinity Lakes Improvement Ass'n*, 840 N.E.2d 1275 (Ill. Ct. App. 2005), concern the board of a corporation rather than an unincorporated association, and *Novak* and *Willmschen* turn on Illinois statutory and homeowner association law that is irrelevant here. And *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816 (N.D. Cal. 2016) does not compel a different result. That decision provides a threadbare conclusion, with no reasoned analysis. By contrast, *Nahas* engages in lengthy and detailed analysis of the history and policy considerations at issue. It is entitled to greater weight.

### D.  Plaintiffs plausibly allege a claim under 42 U.S.C. § 1981.

To state a cause of action under Section 1981, Plaintiffs must plausibly allege that (1) they are members of a racial minority; (2) defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract. See, e.g., *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). Defendants do not dispute that Plaintiffs are members of a racial minority (element 1). *See also* ¶¶17, 32, 50. They instead claim that Plaintiffs do not plausibly allege intentional discrimination, interference with the making and enforcement of a contract, and but-for causation.

But at this stage of the proceedings, Plaintiffs must only "give enough details … to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010); *see also Freeman*, 927 F. 3d at 965 (a Section 1981 plaintiff need not plead facts demonstrating that she satisfies every element of a legal theory or framework to survive a motion to dismiss). Plaintiffs' Complaint alleges substantially more than what is required at this procedural stage and plausibly pleads facts sufficient to show that (a) the NCAA intentionally discriminated against Plaintiffs, (b) its discrimination interfered with the making and enforcement of Plaintiffs' NLI contracts, and (c) but for race, Plaintiffs' civil rights would not have been violated.

### 1.  Plaintiffs plausibly allege that Defendants intentionally discriminated on the basis of race.

Post *Twombly/Iqbal*, the Seventh Circuit has held that a plaintiff alleging intentional discrimination need only identify the type of discrimination, by whom it was effectuated, and when it occurred to prevail on a motion to dismiss. *See Swanson*, 614 F. 3d at 404-05; *Freeman,* 927 F. 3d at 965. Plaintiffs do so. Although Plaintiffs plead much more, Plaintiffs allege, at a minimum, the "what": the multiple explicit considerations of race in the APP design and implementation, as

well as racially discriminatory outcomes; the "who": the Defendants and their roles in the design and implementation of the APP; and the "when": the historical context in which the APP, including its predecessor programs, was designed and implemented. Plaintiffs provide more than enough detail "to present a story that holds together." *Swanson* at 404.

Plaintiffs' Complaint not only meets the minimum pleading requirements, it far exceeds them. Specifically, the Supreme Court has established at least two ways by which a plaintiff could prove intentional discrimination at the *summary judgment* stage: directly, using circumstantial evidence via the *Arlington Heights* factors, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977), and indirectly, via the *McDonnell Douglas* burden-shifting framework, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). These evidentiary frameworks are intact and consistent with the Seventh Circuit's declaration that "evidence is evidence" and that evidence must be placed in a "single pile" and "considered as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F. 3d 760, 764 (7th Cir. 2016).

Plaintiffs' complaint far exceeds Fed. R. Civ. P. 8 requirements by pleading facts sufficient to plausibly allege intentional discrimination pursuant to both *Arlington Heights* and *McDonnell Douglas*. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (plaintiffs need not prove a *prima facie* case to survive a motion to dismiss.) The non-exhaustive factors evidencing intentional discrimination that the Supreme Court outlined in *Arlington Heights* are: 1) impact; 2) historical background; 3) specific sequence of events leading up to the challenged decision; 4) departure from the normal procedural sequence; 5) substantive departures; and 6) the administrative history, especially where there are contemporary statements by members of the decision-making body. 429 U.S. at 268.

*Disparate Impact.* Defendants admit that the Complaint provides "great detail about"

disparate impact but erroneously discount those facts as incapable of meeting pleading requirements. Based on the NCAA's own data, HBCU teams are 43 times more likely to receive a postseason ban than a PWI team and, even controlling for resources, HBCUs are 6-8 times more likely to be penalized than similarly-resourced, non-HBCU institutions. ¶¶173-176, 181-182. This type of substantial statistical data alone may provide convincing and determinative evidence of intentional discrimination. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *see also EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339-40 n.20 (1977)) ("Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation . . . in many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer.")*; Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977). At a minimum, it provides a compelling piece of evidence in the holistic pile of evidence against Defendants. *Ortiz*, 834 F. 3d at 766 ("all evidence [of intentional discrimination] belongs in a single pile and must be evaluated as a whole").

*Historical Background; Specific Events; Procedural Departures.* Plaintiffs present numerous facts describing the relevant historical background and, notably, the serial, arbitrary, and procedurally suspect actions that Defendants have taken over the years with respect to their academic reforms. For example, the NCAA began its academic requirements in 1965, a critical historical point of desegregation. ¶109. From 1905 through the 1970s, major NCAA college basketball and football programs were predominantly white, the southern PWIs were almost exclusively white and, during this time—when white players predominated collegiate athletics, before colleges and universities fully complied with desegregation and other civil rights laws, and Black student-athletes were largely attending HBCUs—the NCAA's academic standards were

24

either very minimal or non-existent. ¶86. Prior to the APP, the NCAA made multiple arbitrary changes, with little to no justification or explanation, to its academic requirements throughout the years, frequently increasing disparities as to Black student-athletes. ¶¶110-128. Ultimately, the 2004 iteration of the APP was changed to subject *teams*, rather than individual student-athletes, to sanctions. ¶130. Thus, followed numerous additional iterations of the APP's APR cut score: it was moved up, then down, and then back up again ¶¶148-149, while the corresponding GSR evidences(/ed) disparities for Black student-athletes ¶¶140-145, 170 (GSRs at PWIs for Black student-athletes range from 43-48% while GSRs for white student-athletes are between 73-94%), 171 (some PWI men's basketball teams have a 100% GSR for white student-athletes and a 50% GSR for Black-student athletes, but they are not penalized). The NCAA created an HBCU Academic Advisory Group that was mere window dressing designed to distract from the APP's known discriminatory results. ¶¶151-152. And significantly, the NCAA formally placed its imprimatur upon substantive and procedural departures for the ultimate PWIs—the Power Five— granting them autonomy regarding key regulatory areas and thus giving them the ability to operate largely outside of the parameters of the NCAA's substantive and procedural requirements. ¶¶98-100, 248.

*Administrative History.* Plaintiffs also describe Defendants' administrative history, including contemporary statements providing the NCAA's consideration of race in the design and implementation of the APP. For example, in ¶137, Plaintiffs note that the NCAA, with the APP, sought to "create a system that will produce improved graduation performance, particularly in specific high-profile sports [football and men's basketball] without having a disparate impact on ethnic minorities." In ¶138, the Plaintiffs plead: "While announcing the APP's creation in 2004, NCAA President Brand explicitly stated that the program was designed to respond to the

25

allegations of discrimination against Black student-athletes." These direct statements from a decisionmaker—the NCAA president, show that Defendants were deliberately considering race and intentionally designing its program to respond to allegations of discrimination against Black student-athletes. *See, e.g., Bowen v. Rubin*, No. 1-CV-0070, 2002 U.S. Dist. LEXIS 25283, at *8 (E.D.N.Y. May 17, 2002) (animus can include "discrimination based upon paternalistic concerns for the class discriminated against") (cleaned up); *United States v. Schuylkill Township,* No. 90-2165, 1990 U.S. Dist. LEXIS 15555, at n. 12 (E.D. Pa. Nov. 16, 1990) (intentional discrimination is prohibited "regardless of whether the motive underlying the challenged [action] was paternalistic, benign, or hostile.") The fact that Defendants' purported intentions did not come to fruition provides no justification for their intentional discrimination, particularly when they further exacerbated the disparities they intended to rectify. Defendants were clearly aware of the racial disparities, took great steps to collect such data, analyzed that data, and, repeatedly made arbitrary changes to the APP while data continued to worsen for Black student-athletes.  ¶¶137-150.

In sum, Plaintiffs provide significant evidence of intentional discrimination consistent with every factor identified in *Arlington Heights* and have plausibly alleged that Defendants intentionally discriminated against Plaintiffs. Relatedly, these same facts, along with Plaintiffs' alleged adverse contractual actions, *supra,* Sections III.A., D.2., and allegations that they performed their end of the bargain, *see, e.g.*, ¶¶17-50, also constitute a *prima facie* case of intentional discrimination under the *McDonnell Douglas* framework.[16] 411 U.S. at 802; *Bratton v. Roadway Package Sys*., 77 F.3d 168, 176 (7th Cir. 1996); *see also Fields v. Bd. of Educ*., 923 F.3d

---

[16] The elements of a *prima facie* case under the McDonnell Douglas burden-shifting framework are: (1) plaintiffs are in a protected class, (2) plaintiffs are performing according to legitimate expectations; (3) plaintiffs suffered an adverse contractual action; and (4) similarly situated white individuals were treated more favorably. *Bratton v. Roadway Package Sys*., 77 F.3d 168, 176 (7th Cir. 1996); *see also Fields v. Bd. of Educ.*, 923 F.3d 622, 625 (7th Cir. 2016) (framework applies to claims of racial discrimination, including Section 1981 claims).

622, 625 (7th Cir. 2016) (framework applies to claims of racial discrimination, including Section 1981 claims).

NCAA's argument that the facts as pled are "more compatible" with "lawful (indeed laudable)" purposes (and purportedly relying on *Iqbal* for these assertions[17]), is predicated upon a misunderstanding of the law and applicable pleading standards. *First*, "good intentions," as purported as they are, are not an excusable justification for intentional discrimination on the basis of race. *See Gautreaux v. Romney*, 448 F.2d 731, 738 (7th Cir. 1971) (allegations of "good faith" and "good intentions with which other laudable goals are pursued" are inapplicable as a defense to discrimination) (citations omitted). Defendants' concessions demonstrate that they impermissibly and intentionally used race in their decision-making processes. That Defendants achieved the opposite of what their allegedly "laudable" purposes intended further belies their stated intentions and provides additional evidence of pretext. ¶¶245, 248, 249. Thus, such failed pretextual assertions actually support Plaintiffs' allegations of discrimination.

*Second,* Defendants' argument misconstrues the pleading standards and misreads *Iqbal.* Iqbal's complaint was dismissed because it was conclusory, not because it was unlikely or unbelievable. *See id.* at 681. ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). Plaintiffs' Complaint is plausible, not conclusory, because it provides numerous facts supporting its allegations of intentional discrimination. Defendants' comparison between this case and *Iqbal* is inapt and predicated on a willful disregard of Plaintiffs' numerous factual allegations as pled.

*Third,* Defendants urge this Court do what the Seventh Circuit explicitly states it cannot: "stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences

---

[17] Defendants' reference to actions "compatible with" and "more likely explained by, lawful … behavior" actually cites the Court of Appeals' reasoning, not the Supreme Court's in *Iqbal*. Br. at 20; *Iqbal*, 556 U.S. at 680.

seem more compelling than the opposing inferences." *Swanson*, 614 F. 3d at 404 ("'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not.") This case must proceed because Plaintiffs' allegations of intentional discrimination are plausible: whether Defendants had a legitimate, non-discriminatory reason for their actions (and whether their assertions are more "believable" than Plaintiffs') is not an appropriate inquiry at this juncture. *See Randle v. Bentsen*, 19 F.3d 371, 374-75 (7th Cir. 1994) (reversing district court's dismissal for failing to accept pretextual allegations as true, as required by the motion to dismiss standards); *Szuszkiewicz v. JPMorgan Chase Bank*, 12 F. Supp. 3d 330, 343 (E.D.N.Y. 2014) (plaintiff "need not … rebut defendant's proffered non-discriminatory reason for his termination," as long as he gives the defendant "fair notice" of his claim and its grounds).

Because Plaintiffs' Complaint sets forth sufficient factual allegations of Defendants' intentional discrimination to present a story that "holds together," Defendants' motion should be denied.

### 2. Plaintiffs plausibly allege that Defendants' intentional discrimination interferes with the benefits and privileges to which Plaintiffs are entitled pursuant to their NLIs.

Section 1981(b) explicitly states that "making and enforcing contracts" includes "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Plaintiffs allege that they entered into NLIs; that equal treatment and postseason play are benefits, privileges, terms, and conditions of their NLIs; and that through the imposition of its racially discriminatory APP, to which they are bound by the NLIs, Defendants interfered with the making and enforcement of Plaintiffs' contracts. Defendants argue that Plaintiffs' claim fails because they did not attach their NLIs to the Complaint and because postseason play is not an intended benefit of the NLI. Both arguments are unavailing.

Each Plaintiff alleges that they signed an NLI with the NCAA and/or received a full

scholarship predicated upon an NLI and describes the control the NCAA exerts over the NLI. ¶¶19, 34, 48, 102-107. NCAA's contention that it is not a signatory to the NLI is not only substantively incorrect, it is also improper on a motion to dismiss and irrelevant. Notwithstanding numerous NLI provisions requiring compliance with NCAA bylaws, policies, and procedures, and even if the NCAA is not an explicit signator to the NLI, Plaintiffs plausibly allege that the NCAA is a third-party beneficiary. *See Hunt v. Pers Staffing Grp*., LLC, No. 16-CV-11086, 2018 U.S. Dist. LEXIS 28146, at *10-11 (N.D. Ill. Feb. 22, 2018). And even if the NCAA is not a third-party beneficiary, Plaintiffs' Section 1981 claim can nonetheless be founded upon Defendants' interference with Plaintiffs' contractual relationship with a third-party. *Cf. Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906, 915 (7th Cir. 1991) (local union's discriminatory job referral system violated Section 1981 because it impeded creation of employment contract between the contractor and African American members of the union). Further, Plaintiffs are not required to attach a copy of their NLIs to the Complaint in order to prevail on a motion to dismiss, and Defendants cite no authority supporting that assertion. *See* Br. at 17.

Plaintiffs also plausibly allege that postseason play is a benefit, privilege, term, or condition of the NLI. ¶¶107, 189-202, 250-252. That Defendants dispute Plaintiffs' well-pled allegations cannot be addressed at the pleading stage. *See Pritchett-Evans v. State Farm Ins. Co*., No. 4:01-cv-97, 2003 U.S. Dist. LEXIS 2870, at *10 (W.D. Mich. Feb. 27, 2003). Regardless, the NCAA itself recognizes that "[p]ostseason bowls have long been a tradition and a reward for a successful football season," and further acknowledges that "[b]owls benefit sponsoring communities, participating member institutions and student-athletes and must have oversight by the

NCAA….”[18] That a student-athlete may not be guaranteed a spot on a team or play time in a postseason tournament does not change this analysis. If the team performs well enough to advance to postseason competition and the student-athlete is a member of the team, then postseason participation (and its accoutrements) is an expected privilege and benefit of that student-athlete's NLI. In fact, one need only imagine the outcome if the NCAA were to eliminate the basketball postseason March Madness tournaments or football postseason bowl games because they are not intended benefits or privileges to NCAA participation. That the benefit is not accorded to everyone at all times does not mean it is not a benefit and privilege of the contract when certain conditions are met.

There is a second manner in which Plaintiffs plausibly allege contractual interference resulting from intentional discrimination. Plaintiffs allege that the NCAA intentionally discriminates against Black student-athletes at HBCUs through the APP. Plaintiffs' NLIs incorporate the APP as a contractual condition. ¶107. Because racially discriminatory contractual provisions are void and unenforceable, their imposition constitutes interference with the making and enforcement of a contract in violation of Section 1981. *Pryor v. NCAA*, 288 F. 3d 548, 569 (3d Cir. 2002) (where plaintiffs alleged that NCAA's Proposition 16 program, the APP precursor, was discriminatory and violated Section 1981, the court held that imposition of a racially discriminatory contractual provision constitutes interference with the making and enforcing of contract).[19]

Under either analysis, Plaintiffs plausibly allege that Defendants interfered with the

---

[18] 2020-21 NCAA Postseason Bowl Handbook at 1, available at
https://ncaaorg.s3.amazonaws.com/championships/sports/football/d1/PBA/2020-
21PBA_PostseasonBowlHandbook.pdf (last accessed March 15, 2021).
[19] For this reason, and for the reasons set forth *supra*, Section III.A, Defendants are wrong when they claim that because Plaintiff Freeman has not received a postseason play ban, she does not state interference with the making and enforcement of a contract.

making and enforcement of their contracts.

### 3. Plaintiffs plausibly allege that but for their race, the NCAA would not have deprived Plaintiffs of their rights under Section 1981.

Defendants make much ado of the Supreme Court's Opinion in *Comcast v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. ___, 140 S. Ct. 1009, 1019 (2020), requiring but-for causation in Section 1981 cases. Yet, but-for causation is not a new concept—it has long been a stalwart of the common law[20]—and *Comcast* did not change Rule 8 notice pleading standards. *See. Iqbal*, 556 U.S. at 678-79. In fact, shortly after *Comcast* was issued, the Supreme Court clarified that "[o]ften events have *multiple* but for causes," "a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision," and "[s]o long as the plaintiff's [race] was one but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton*, 140 S. Ct. 1731, 1739 (2020) (emphasis added). Again, at the pleading stage, Plaintiffs need only identify the type of discrimination, by whom it was effectuated, and when. *Swanson*, 614 F.3d at 404 (outlining pleading requirements in a Fair Housing Act case where prohibited action was taken "because of" race); *Freeman*, 927 F. 3d at 965 (holding same, in a "because of" (but-for) case). As discussed *supra*, Section III.D.1, Plaintiffs have done so.

In opposition, Defendants' sole argument is that even if Plaintiffs Manassa and Dasent were white, SSU would have received the same postseason play ban. Br. at 19. But this misstates the comparator. The correct question is: had Plaintiffs Manassa and Dasent been white student-athletes *at a PWI*, would they have been subjected to unequal treatment or received a postseason

---

[20] That was, in fact, the Court's point. *Comcast*, 140 S. Ct. at 362. *See also Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) (but-for causation standard applied in ADEA case); s*ee also, Petrovic v. Enter. Leasing Co. of Chicago, LLC*, 513 Fed. App'x 609, 610-11 (7th Cir. 2013) (plaintiff's allegations that defendant acted "because of" race stated a plausible claim under § 1981).

31

play ban?[21] The answer is no. We need not speculate, because NCAA's own data demonstrates that to be true. The NCAA heavily dilutes APR numbers for PWIs, PWIs almost always avoid postseason play bans, and this remains so even though PWI teams include substantially underperforming athletes. ¶¶98-100, 169-172, 248. Similarly, if Plaintiff Freeman was a white athlete at a PWI, she would not suffer the same risk of discriminatory postseason play ban as she experiences as a Black student-athlete at an HBCU, where that risk is *43 times* as great.

### E. Plaintiffs' Complaint plausibly alleges a claim under 42 U.S.C. § 1985(3).

Section 1985(3) requires Plaintiffs to plead, among other things, a conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." Defendants argue that Plaintiffs cannot plead a conspiracy because all Defendants are under the "umbrella" of the NCAA such that, pursuant to the intra-corporate conspiracy doctrine, they are incapable of conspiring amongst themselves. *See Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990) ("managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory"). Defendants further claim that Plaintiffs provide insufficient, bald allegations of intentional discrimination. Defendants misconstrue the law on the first point and misrepresent Plaintiffs' Complaint on the second: in both regards, their arguments fail.

The NCAA chose to designate itself as an unincorporated association, without a separate legal existence as a corporation. Because it is not a corporation, it cannot claim protection from

---

[21] Plaintiffs' allegation is that the NCAA intentionally discriminates against Black student-athletes at Historically *Black* College and Universities. Removing race from that scenario necessitates comparison to a white student-athlete at a white institution (a PWI). Defendants cannot pretend that HBCUs and Blackness are unrelated.

the intra-corporate conspiracy theory. *See, e.g., In re Jackson Lockdown/MCO Cases*, 568 F. Supp. 869, 880 (E.D. Mich. 1983) (rejecting intra-corporate exception for an unincorporated union); *Sirajullah v. Illinois State Medical Inter-Insurance Exchange*, No. 86-C-8668, 1988 U.S. Dist. LEXIS 4695, *15 (N.D. Ill. May 13, 1988) (finding that inter-insurance exchange is not an association or partnership, rather it is a single, legal entity similar to a corporation); *Feinberg v. Eckelmeyer*, No. 2:09-cv-1536, 2009 U.S. Dist. LEXIS 117900 *34-35 (E.D. Pa. Dec. 16, 2009) (noting intra-corporate conspiracy applies, by definition, to corporations because they are separate legal entities); *see also People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 41 (2d Cir. 1982), *modified on other grounds*, 718 F.2d 22 (2d Cir. 1983) (intra-corporate conspiracy doctrine does not apply to partnerships because "[a] corporation is a distinct and fictional legal entity; a partnership is not distinct from its members at all").

Furthermore, even if the intra-corporate conspiracy doctrine was applicable, the Seventh Circuit created an exception to the doctrine which permits recovery under Section 1985(3) when the "conspiracy [is] part of some broader discriminatory pattern" or "permeat[es] the ranks of the organization's employees." *Hartman v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 4 F.3d 465, 470-71 (7th Cir. 1993) ("not all discriminatory action taken within the scope of employment, and thus attributable to the corporation, is exempt from the operation of § 1985(3)."); *see also Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir. 1988) (the intra-corporate conspiracy doctrine was held not to apply where the plaintiff alleged "numerous acts undertaken by several corporate agents."). Plaintiffs plausibly allege facts that support application of this exception, including that the NCAA, the Board, and the DI Board deprived Plaintiffs of equal protection by subjecting them to discriminatory treatment and banning them (or increasing the risk of a ban) from postseason play pursuant to the APP. ¶259. *See also supra*, Sections III.A., III.D.1. Plaintiffs need not plead the

33

conspiracy with exact specificity, "but rather just enough 'circumstantial evidence [that] may provide adequate proof of conspiracy.'" *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979). They do so.

If not otherwise excepted from the intra-corporate conspiracy doctrine, Defendants are incorrect in presuming that the NCAA, the Board, and the DI Board are the only alleged conspirators. Plaintiffs are not required to name all co-conspirators as defendants,[22] and the Complaint plausibly alleges that Defendants conspired with multiple unnamed co-conspirators, including the PWIs and the Power Five. Facts outlining the rewards provided to the PWIs under the APP and the procedural and substantive exceptions provided to the Autonomy Five support these assertions. ¶¶98-100, 169-172, 184-188.

Finally, Defendants argue that Plaintiffs have not alleged discriminatory animus behind the conspirators' actions, relying instead on bald allegations. Defendants are wrong and their attempt to immunize their intentional discrimination as purported "benign" motives should be rejected. Plaintiffs have plausibly alleged intentional discrimination or discriminatory animus with a plethora of well-pled facts, as outlined *supra* Section III.D.1. Plaintiffs' Section 1985 claim must survive.

### F. Plaintiffs' Complaint plausibly alleges a claim under the D.C. Human Rights Act.

Plaintiff Freeman's claim under the DCHRA is similarly well-pled. Plaintiff Freeman has

---

[22] *See Gomez v. West Chicago*, 506 F. Supp. 1241, 1246 (N.D. Ill. 1981) (unnamed non-city participants included agents of the INS in the conspiracy). *See also Agron, Inc. v. Chien-Lu Lin*, No. CV 03-05872 MMM (JWJx), 2004 U.S. Dist. LEXIS 26605, at *39 n.78 (C.D. Cal. Mar. 15, 2004) (plaintiffs not required to name all alleged coconspirators); *State of New York v. Feldman*, No. 01 Civ. 6691 SAS, 2003 WL 21576518, *3 (S.D.N.Y. Jul. 10, 2003) ("a plaintiff [is] not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy") (citation omitted); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litigation*, No. MDL 150 AWT, 1992 WL 220753, at *5 (C.D. Cal. Jul. 16, 1992) ("a plaintiff need not name all members of a conspiracy in order to proceed against any conspirator," except where there is a risk of duplicative recovery).

alleged injury-in-fact, *supra* Section III.A., the DCHRA confers standing co-extensive with standing under Article III, and Plaintiff need only allege a "minima of injury in fact," which she does. *Molovinsky*, 683 A.2d at 146. Moreover, an action under the DCHRA is to be "generously construed" and not limited to only those persons who are the targets of discrimination. *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000). *See also* D.C. Code § 2-1403.16 ("*Any* person *claiming to be aggrieved* by an unlawful discriminatory practice shall have a cause of action….") (emphasis added). Indeed, the statute explicitly recognizes that "discrimination not only inflicts an injury on the individual who is targeted for discrimination but also exacts a social and economic toll from others." *Exec. Sandwich Shoppe, Inc.*, 749 A.2d at 732 (citations omitted). Defendants' assertions to the contrary are belied by the case law.

While Defendants acknowledge that disparate impact alone may violate DCHRA, Br. at 25, they then seek to heighten the pleading standard by claiming that their alleged neutral, nondiscriminatory reason for enacting and enforcing the APP should dismiss Plaintiffs' claims. Their own cited case holds that, at this stage, the Court cannot consider the evidence proffered by Defendants to counter Plaintiffs' claims of discrimination and must treat the Complaint's factual allegations as true. *Smith v. Henderson*, 982 F. Supp. 2d 32, 52 (D.D.C. 2013) (in a DCHRA case on a motion to dismiss, refusing to consider the defendant District's efforts "to show that, despite this disparate impact, its actions were 'independently justified for some nondiscriminatory reason'") (citations omitted). Accordingly, Defendants' counter-evidence is irrelevant.

## IV.   CONCLUSION

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and grant such other and further relief as this Court deems appropriate.

Dated: March 17, 2021                          Respectfully submitted,

                                               */s/ Jessica H. Meeder*
                                               Jessica H. Meeder *(pro hac vice)*
                                               FEGAN SCOTT LLC
                                               1200 G St., N.W., Suite 800
                                               Washington, D.C. 20005
                                               Telephone: (202) 921-6007
                                               Facsimile: (312) 264-0100
                                               jessica@feganscott.com

                                               Elizabeth A. Fegan *(pro hac vice)*
                                               FEGAN SCOTT LLC
                                               150 S. Wacker Dr., 24th Floor
                                               Chicago, IL 60606
                                               Telephone: (312) 741-1019
                                               Facsimile: (312) 264-0100
                                               beth@feganscott.com

                                               Je Yon Jung *(pro hac vice)*
                                               MAY LIGHTFOOT PLLC
                                               3200 Martin Luther King Jr. Ave. S.E.
                                               Third Floor
                                               Washington, D.C. 20032
                                               Telephone: (202) 918-1824
                                               Facsimile: (202) 918-1010
                                               jjung@maylightfootlaw.com

                                               LaRuby May *(pro hac vice)*
                                               MAY LIGHTFOOT PLLC
                                               3200 Martin Luther King Jr. Ave. S.E.
                                               Third Floor
                                               Washington, D.C. 20032
                                               Telephone: (202) 918-XXX
                                               Facsimile: (202) 918-1010
                                               lmay@maylightfootlaw.com

                                               William N. Riley, Bar No.: 14941-49
                                               Russell B. Cate, Bar No.: 27596-29
                                               RILEYCATE, LLC
                                               11 Municipal Drive, Suite 200
                                               Fishers, IN 46038
                                               Telephone: (317) 588-2866
                                               Facsimile: (317) 458-1875
                                               wriley@rileycate.com
                                               rcate@rileycate.com

                                               *Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Jessica H. Meeder, an attorney, affirm that the foregoing was filed on March 17, 2021

via ECF, which automatically served all counsel of record.

Dated: March 17, 2021                    By: */s/ Jessica H. Meeder*
                                              Jessica H. Meeder

37