UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TROYCE MANASSA, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, <br><br> Defendant. | <br><br><br><br> Case No. 1:20-cv-03172-RLY-MJD |

**THE NCAA'S BRIEF IN SUPPORT OF ITS MOTION TO
DISQUALIFY FEGANSCOTT LLC AS COUNSEL FOR PLAINTIFF**

Pursuant to Local Rule 7-1(g), the National Collegiate Athletic Association ("NCAA") respectfully files this brief supporting its Motion requesting the disqualification of Fegan Scott LLC, ("FeganScott") as counsel for Plaintiff Troyce Manassa ("Manassa" or "Plaintiff") and the proposed class in this lawsuit. FeganScott has an irreconcilable conflict of interest that at a minimum, violates Rules 1.7, 1.9, and 1.10 of the Indiana Rules of Professional Conduct ("RPC"). FeganScott lawyers have been on both sides of this case, and the firm's continued representation of Plaintiff and the proposed class violates the RPC, and is highly prejudicial to NCAA.

## I.     Summary of Argument

The Rules of Professional Conduct are intended to protect clients like the NCAA from having its lawyers represent the Plaintiff and Defendant on both sides of the "v." in an active litigation. When such a conflict of interest occurs in the same legal dispute, it violates the duty of loyalty owed to clients, and also causes a substantial risk that confidential factual information that would have been obtained from a client can be used by a client's adversary.

Here, a full-time FeganScott attorney named Ravi Sakthivel, worked under the direct supervision of Plaintiff's lead co-counsel Elizabeth Fegan ("Fegan"), while simultaneously working as an attorney for the Defendant the NCAA in this lawsuit. While never disclosing to the NCAA his concurrent FeganScott employment, let alone that Plaintiff's lead co-counsel was his supervisor, Mr. Sakthivel billed 183.7 hours to the NCAA's e-discovery vendor for work reviewing, analyzing, and coding 6,622 NCAA documents as a contracted NCAA document review attorney. In fact, the work Mr. Sakthivel performed for the NCAA informed the NCAA's production of the NCAA's documents to Mr. Sakthivel's employer, FeganScott, because this document review project responded to the requests for production that Plaintiff served on the NCAA via Ms. Fegan. Of particular concern, while a full-time FeganScott attorney, Mr. Sakthivel reviewed and coded at least 640 NCAA documents as responsive that were produced to FeganScott, including to his direct supervisor Ms. Fegan.

The NCAA does not make this request lightly. While Plaintiff is generally entitled to counsel of its choice, allowing FeganScott's attorneys to simultaneously represent the Plaintiff and Defendant in this lawsuit, and make strategy decisions regarding what documents Defendant selects to produce to Plaintiff in response to Plaintiff's discovery requests, undermines both the legal duty of loyalty and fidelity to a client, and the assurances the RPC is meant to grant clients. The Rules of Professional Conduct impute attorney violations like this to their firm of employment. For the reasons set forth herein, FeganScott must be disqualified as counsel in this litigation. Any contrary result would indicate that the Rules of Professional Conduct lack the client protections the Rules are meant to safeguard.

## II.  Factual Background

### A. FeganScott's clients file this lawsuit against the NCAA, shortly after Ravi Sakthivel joins FeganScott as a staff attorney under Elizabeth Fegan's direct supervision.

On September 7, 2020, FeganScott hired Ravi Sakthivel ("Sakthivel") to work as a "full-time" staff attorney staffed to "report directly to Elizabeth Fegan." (*See,* Ex. A, Declaration of Brian E. Casey, at Ex. 4 p. 1).[1] According to FeganScott's website, Mr. Sakthivel has "over a decade of experience" and a "wealth of experience" in, among other things, "document review." (*Id.* at Ex. 3 and its Ex. A attachment).  Two months after Mr. Sakthivel joined FeganScott, his supervisor, Ms. Fegan, filed the instant lawsuit against the NCAA, on behalf of the then Plaintiffs and proposed class. (Dkt. No. 1 at p. 57, signature block).

FeganScott has widely publicized its role as Plaintiff's counsel in this lawsuit, as well as its serial history of suing the NCAA on behalf of other clients in other litigations, including on the firm's own website. (*See,* Ex. A, Casey Decl., at ¶ 10).  In addition to this lawsuit, under Ms. Fegan's counsel, FeganScott is actively litigating another lawsuit against the NCAA styled *John Doe v. the NCAA, the University of San Francisco et al.,* Case No. 22-1559, pending in the U.S. District Court for the Northern District of California San Francisco Division. (*Id.* at ¶ 11). FeganScott while also under Ms. Fegan's counsel, litigated the formerly pending case *Erin Aldrich v. The NCAA*, Case No. 5:20-cv-01733-EJD in the Southern District of Indiana, Indianapolis Division. (*Id.*). Ms. Fegan also served as co-lead counsel in concussion related ligations filed against the NCAA. (*Id. at* ¶¶10-11).

## B. Plaintiff serves comprehensive discovery on the NCAA that necessitates the engagement of document review attorneys.

Plaintiff, acting through FeganScott counsel including Ms. Fegan, served sixty (60) comprehensive requests for production on the NCAA without, among other things, an applicable

---

[1] The NCAA incorporates by reference as if set forth fully herein the Declarations attached as Exhibits A and B to this Motion and their accompanying exhibits.

date range specified in the requests. (*See,* Ex. A, Casey Decl., at Ex. 1 at p. 13). Mr. Sakthivel was a FeganScott attorney when his supervisor served these document requests on the NCAA. (*See,* Ex. A, Casey Decl., at Ex. 4 p. 1 and 3).

The NCAA retained Proteus Discovery Group, LLC ("Proteus") to assist the NCAA with e-discovery needs in this lawsuit, including items related to producing non-privileged documents responsive to the requests for production Plaintiff served on the NCAA (the "Manassa Project"). (*See,* Ex. A, Casey Decl., at ¶ 4).   Proteus has a longstanding relationship with the NCAA, and has assisted the NCAA with a variety of e-discovery related needs since 2017, including in connection with roughly fifty (50) other lawsuits. (*See,* Ex. B, Declaration of Raymond J. Biederman, at Ex. ¶¶ 2-4).

In order to respond to the discovery served by Plaintiff, the NCAA collected a voluminous universe of data exceeding 250 GB, much of which includes non-public material, and sensitive material related to academics and student-athletes, and their personally identifiable information. (*See,* Ex. A, Casey Decl., at ¶ 5).  Given the volume of collected documents, the NCAA required the assistance of document review attorneys to analyze and review the universe of collected documents for considerations related to document responsiveness, confidentiality, privilege, and issue coding. (*Id*. at ¶ 6). Proteus, as the NCAA's e-discovery vendor in this lawsuit, retained attorneys to assist in the above review, analysis, and coding of NCAA documents. (*Id*. at ¶ 7).

Proteus has handled (and is currently handling) the NCAA's e-discovery needs in additional lawsuits aside from the Manassa Project that also include FeganScott as Plaintiff's counsel. (*See,* Ex. B, Biederman Decl., at ¶ 32). Those lawsuits include the *Doe* case currently pending in the Northern District of California and the *Aldrich* case which was venued in the Southern District of Indiana, Indianapolis Division. (*Id*.). As a result of the numerous matters in

which Proteus has assisted the NCAA, and the varying scope of those matters, Proteus' databases contain substantial amounts of NCAA data, much of which is non-public. (*Id*. at ¶¶4, 24, 32). Proteus document reviewers are given permissions based access to this material. (*Id*. at ¶ 32).

### C. Mr. Sakthivel applied for two Proteus document review positions while a full-time FeganScott attorney.

While a "full-time" FeganScott attorney, Mr. Sakthivel submitted two applications to Proteus for an independent contractor position as a document review attorney for Proteus' clients on two separate projects. (*See,* Ex. B, Biederman Decl., at ¶¶ 7-8); (Ex. A, Casey Decl., at Ex. 4 p. 1 and 3).   The second application that Mr. Sakthivel submitted to Proteus was for a document review attorney position to assist in the review, analysis, and coding of the NCAA's documents in the Manassa Project. (*See,* Ex. B, Biederman Decl., at ¶ 9). After performing due diligence, Proteus hired Mr. Sakthivel as a document review attorney for the NCAA in the Manassa Project, on or about March 2, 2022. (*Id*. at ¶¶ 10-17). Notably, all of the application materials that Mr. Sakthivel submitted to Proteus, including the current copy of his resume, omitted any reference whatsoever to FeganScott. (*Id*. at ¶ 10). In fact, he affirmatively represented in his resume that he was currently employed by Robbins Geller Rudman & Dowd LLP. (*Id*.).

Prior to starting work as a document review attorney for the NCAA on the Manassa Project, Mr. Sakthivel responded to a conflict of interest form that conspicuously disclosed that the NCAA was Proteus' client for this engagement. (*Id*. at ¶¶ 16-17). Mr. Sakthivel confirmed in writing that no actual or potential conflict of interest existed in any manner that would preclude his review, analysis, or coding of documents provided by the NCAA (*Id*. at ¶ 17).

### D. Mr. Sakthivel worked as an NCAA document review attorney, responding to the discovery requests that FeganScott served on the NCAA all while employed as a FeganScott attorney working under Ms. Fegan's supervision.

Mr. Sakthivel began work for the NCAA on the Manassa Project on or about March 2,

2022 (*See,* Ex. B, Biederman Decl., at ¶ 11). At that time, he remained a full-time FeganScott attorney, a fact unknown to the NCAA, Proteus, and the undersigned counsel. (Ex. A, Casey Decl., at Ex. 4 p. 1 and 3); (Ex. A, Casey Decl., at ¶¶ 9, 13).

As an attorney working on the Manassa Project, Mr. Sakthivel was provided a comprehensive document review protocol to review prior to reviewing the NCAA's documents. (*See,* Ex. B, Biederman Decl., at ¶ 18). This protocol is privileged attorney-work product developed with the NCAA's counsel at Barnes & Thornburg LLP (the "NCAA's Lead Counsel"). (*Id.*). Among other things, the protocol contains the mental impressions of the NCAA's Lead Counsel regarding issue codes that the reviewers are instructed to use, which are associated with case themes and legal issues specific to the NCAA's legal strategy and defense in this lawsuit. (*Id.*). The protocol provided to Mr. Sakthivel contained exhibits which included, among other things, a copy of the Complaint in this lawsuit, and Plaintiff's requests for production served on the NCAA. (*Id.* at ¶ 19). Both of these documents prominently indicate in their respective signature blocks that FeganScott, including Ms. Fegan, serves as Plaintiff's counsel in this lawsuit. (*Id.*).

Mr. Sakthivel attended at least four substantive meetings regarding case strategy in the Manassa Project, and instructions regarding how to code the NCAA's documents. (*Id.* at ¶ 21). One of these meetings included the training session for independent contract attorneys working on the Manassa Project. (*Id.*). The NCAA's Lead Counsel participated in this recorded meeting, and shared among other things, their view of the lawsuit, mental impressions about the case, and general case strategy. (*Id.*). Proteus's general practice is to record its Manassa Project strategy meetings and make those recordings available to project document reviewers, as a team resource to assist with questions that may arise during the Manassa Project. (*See,* Ex. B, Biederman Decl., at ¶ 22). Mr. Sakthivel had access to the Manassa Project recorded meetings. (*Id.*).

Mr. Sakthivel was given access to the Relativity database that houses all documents collected for the NCAA in the Manassa Project, including those documents not yet reviewed for responsiveness or privilege. (*Id*. at ¶ 24). The documents collected include custodial Exchange and OneDrive data and non-custodial SharePoint data. (*Id*.). These documents are not publicly available and were collected based on NCAA's Lead Counsel's work product. (*Id*.). These documents are used in a wide variety of NCAA cases, including other NCAA cases involving FeganScott. (*Id*.). By way of example, documents collected in the Manassa Project included privileged legal hold memoranda and custodian interview information for the *Erin Aldrich v. The NCAA* case (in which FeganScott was lead counsel). (Ex. B, Biederman Decl., at ¶ 24).

Further, as an attorney on the Manassa Project, Mr. Sakthivel was also given access to the Manassa Project's Microsoft Teams discussion board. (*Id*., at ¶ 23.)  Proteus uses this interactive discussion board to notify document review attorneys about various items concerning this lawsuit's legal strategy, including, without limitation, to: (a) summarize meetings with the NCAA Lead Counsel regarding various case strategy items, (b) provide information to attorneys regarding how to code documents using various issue codes, (c) respond to attorney inquiries regarding privilege, confidentiality, and responsiveness considerations for documents, and (d) to touch base regarding status and general questions among all document review attorneys. (*Id.*).

Proteus provided Mr. Sakthivel with Proteus specific credentials to use for all work related to the Manassa Project that had specific privacy protections. (*Id*. at ¶ 25). That said, Proteus cannot confirm what screenshots, recordings, or copies that Mr. Sakthivel took of any documents or material made available to him as an attorney working on the Manassa Project for the NCAA, or shared with others. (*Id*.).

On April 4, 2022, Proteus terminated Mr. Sakthivel as an independent contractor on the

Manassa Project tellingly, due to "the severity and quantity of issues" seen by Proteus during document review quality control of documents tagged by Mr. Sakthivel that continued to occur, even after Proteus provided him with feedback. (*Id.,* at ¶ 26 and Ex. 4).  From March 2022 through his April 4, 2022, termination, Mr. Sakthivel billed 183.7 hours for his review, analysis, and coding NCAA documents in the Manassa Project. (*Id*. at ¶ 27).  In that time, Mr. Sakthivel reviewed and coded 6,622 NCAA documents, some of which were voluminous documents exceeding 100 pages, and some of which contained confidential information. (Ex. B, Biederman Decl., at ¶ 27). Further, Mr. Sakthivel had access to and ran numerous queries over the document population.  (*Id.*). These searches included viewing a search of all of the documents identified as important on initial review. (*Id*.). At least 640 NCAA documents that Mr. Sakthivel reviewed and marked as responsive were produced to his full-time employer FeganScott. (*Id*. ¶ 28).

It is unknown the extent to which Mr. Sakthivel's FeganScott employment influenced the way he reviewed and coded the NCAA's documents. In an abundance of caution, the NCAA must expend reasonable attorneys' fees, expenses, and time that attorneys on this file are not working on other aspects of this case on damage control, including investigating implications of a breach of confidentiality as to matters discussed herein, and review and quality checking each document reviewed or tagged by Mr. Sakthivel. (*See,* Ex. A, Casey Decl., at ¶ 18).

**E.  The NCAA never consented to FeganScott's conflict of interest.**

On or about April 22, 2022, Proteus informed the NCAA's Lead Counsel that it learned that day that Mr. Sakthivel appeared to be an attorney employed by Plaintiff's counsel FeganScott. (*See,* Ex. A, Casey Decl., at ¶ 9). Upon receipt of this news, the NCAA's Lead Counsel began to promptly investigate this matter, and its conflict of interest implications. (*Id*.).  Prior to this date, the NCAA's Lead Counsel, the NCAA, and Proteus had no knowledge of Mr. Sakthivel's

affiliation with FeganScott. (*Id*.); (Ex. B, Biederman Decl., at ¶ 29). The NCAA's Lead Counsel's investigation revealed that, as of April 26, 2022, FeganScott publicly held Mr. Sakthivel out as an experienced attorney employed by its firm, and that Mr. Sakthivel's LinkedIn profile listed him as a FeganScott employed attorney. (Ex. A, Casey Decl., at ¶ 12). The NCAA has no knowledge of Mr. Sakthivel or anyone else on behalf of FeganScott ever requesting that the NCAA waive any conflict of interest. (*Id*. at ¶ 13). Further, the NCAA never consented in writing (or otherwise) to any FeganScott attorney performing work for the NCAA in any capacity in this lawsuit, or any other matter. (*Id*.).

On April 26, 2022, the NCAA's counsel sent Ms. Fegan a letter informing her of this conflict of interest, and requesting that FeganScott withdraw as counsel. (*Id*. at ¶ 12). On May 1, 2022, Ms. Fegan e-mailed a letter to Mr. Casey responding to the issues raised in the April 26, 2022 letter. (*Id*. at ¶ 14). Among other things, Ms. Fegan's response letter: (a) confirmed that Mr. Sakthivel was a full-time FeganScott staff attorney the entire time that he worked as an NCAA document review attorney at Proteus in the Manassa Project, (b) confirmed that Ms. Fegan was Mr. Sakthivel's direct supervisor, and (c) confirmed that as of April 2022, FeganScott was in the process of staffing Mr. Sakthivel on this lawsuit to work on Plaintiff's behalf. (*Id*.).

FeganScott had planned a summer meeting with Mr. Sakthivel regarding his assistance on behalf of Plaintiff in this case. (*See,* Ex. A, Casey Decl., at ¶ 14 Ex. 4 p. 3). Ms. Fegan placed Mr. Sakthivel on "administrative leave" from FeganScott on April 26, 2022. (*See,* Ex. A, Casey Decl., at Ex. 4 p. 3). Ms. Fegan acknowledged that Mr. Sakthivel's actions pose "potentially grave consequences to [FeganScott] and its clients." (*See,* Ex. B, Biederman Decl., at Ex. 5 p. 1). Despite this acknowledgement, FeganScott refused to withdraw as Plaintiff's counsel in this lawsuit. (*See,* Ex. A, Casey Decl., at ¶ 15).

### III.   Arguments & Authorities

**A.   Standard of law.**

The RPC govern attorneys who practice before this Court. L.R. 83-5(e). "Whether disqualification is appropriate in this case is governed by the Indiana Rules of Professional Conduct. Lawyers representing clients in federal courts must follow federal rules, but most 'federal courts use the ethical rules of the states in which they sit.'" *Watkins v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017) (citations omitted). "A trial court may disqualify an attorney for a violation of the Indiana Rules of Professional Conduct." *Reed v. Hoosier Health Sys., Inc*., 825 N.E.2d 408, 411 (Ind. Ct. App. 2005); *see also Robertson v. Wittenmyer*, 736 N.E.2d 806 (Ind. Ct. App. 2000) ("Our supreme court has held that a lawyer must be disqualified from a pending case if that case is substantially related to a matter in which the lawyer previously represented another client.")

"In interpreting the Rules of Professional Conduct, federal courts may rely on the specific guidance offered in the commentary." *Watkins,* 869 F.3d at 519; *Holmes v. Credit Prot. Ass'n L.P.*, No. 1:17-CV-3995-WTL-MPB, 2018 WL 5777324, at *2 (S.D. Ind. Nov. 2, 2018). Further, "the Seventh Circuit has instructed courts to resolve doubts in favor of disqualification." *Exterior Sys., Inc. v. Noble Composites, Inc.,* 175 F. Supp. 2d 1112, 1115 (N.D. Ind. 2001) (granting motion to disqualify counsel) (citing *Cromley v. Board of Educ*., 17 F.3d 1059, 1066 (7th Cir. 1994) and *United States v. Goot*, 894 F.2d 231, 235 (7th Cir. 1990)).

A primary purpose of the RPC is to protect the duty of loyalty in attorney-client relationships. *See e.g*., (RPC 1.7 Comment No. 1) ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."); (*id*. at Comment No. 9) ("In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited by responsibilities to former clients under Rule 1.9 or by the lawyer's

responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director.") Further, conflicts of interest can be imputed to an attorney's firm to give "effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm." RPC 1.10, Comment No. 2; *see also Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1170 (Ind. Ct. App. 1995) ("That the duty of loyalty to a client extends to all members of a firm, not merely those directly responsible for the client's representation, is beyond question.")

As discussed below, pursuant to RPC 1.10, Mr. Sakthivel's conflicts of interest must be imputed to FeganScott.

**B.    Mr. Sakthivel Violated Rule of Professional Conduct 1.7**

The entire time that Mr. Sakthivel worked as a document review attorney for the NCAA, he was a full-time FeganScott attorney working under the direct supervision of Plaintiff's co-lead counsel in this lawsuit. (Ex. A, Casey Decl., at Ex. 4 p. 1 and 3); (Ex. B, Biederman Decl., at ¶ 11). Thus, this conflict concerns the simultaneous representation of one client directly adverse to the other. *Folsom v. Menard, Inc.*, No. 3:09-CV-94-RLY-WGH, 2011 WL 1404875, at *2 (S.D. Ind. Apr. 13, 2011) (Young, J.) ("In this case, the facts clearly demonstrate that FBT represented Menard in the Patel matter. FBT also, during the same time period, represented and still represents NARSI in this matter. **Therefore, we are clearly and unequivocally dealing with a concurrent representation that implicates Rule 1.7**.") (emphasis added).[2] Worse, here, a lawyer

---

[2] Mr. Sakthivel's ability to bill 183.7 hours of work reviewing and analyzing the NCAA's documents, during the time that he was a full-time Fegan Scott employee under Ms. Fegan's direct supervision, casts serious doubt about the reasonableness of FeganScott's efforts to ensure that Mr. Sakthivel abided by the RPC. *See, e.,g.* RPC 5.1(b) ("A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.").

simultaneously represented both sides in the very same case.

Mr. Sakthivel's conduct is a blatant violation of RPC 1.7, which prohibits an attorney from representing a client "if the representation involves a concurrent conflict of interest."  RPC 1.7 (a). "A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; **or** (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." RPC 1.7 (a) (emphasis added). RPC 1.7 (a)(1) and (a)(2) both apply here. The NCAA is directly adverse to Plaintiff and the proposed class in this lawsuit, and Mr. Sakthivel was simultaneously working as an attorney for the NCAA and for the firm representing Plaintiff and the proposed class in this lawsuit. (*Supra* at 5, 8-9). As explained by Judge Young, "[t]he *only* manner in which a concurrent conflict of interest under Rule 1.7 can be waived is in writing after informed consent." *Folsom*, 2011 WL 1404875, at n. 2 (emphasis in original) (citing *Van Kirk v. Miller*, 869 N.E.2d 534, 541 (Ind. Ct. App. 2007)). The NCAA never consented; thus this conflict cannot be waived.

At its core, Mr. Sakthivel's conduct violates the duties of loyalty that the RPC aims to safeguard. Pursuant to RPC 1.7 Comment No. 6, Mr. Sakthivel's conduct violated this rule's goal of preserving the duty of loyalty owed to clients. (RPC 1.7, Comment No. 6) ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated.") Comment No. 6 also makes abundantly clear that when a concurrent conflict of interest exists, like the one here, "the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client,

*i.e.* that the representation may be materially limited by the lawyer's interest in retaining the current client." *Id*. The conflicts of interest occurring under RPC 1.7 cannot be waived here because the NCAA did not consent in writing to any conflict of interest. (Ex. A. Casey Dec., at ¶ 13); (RPC 1.7 (b)(4)).

"Indiana provides that a conflict may be waived **only if** 'the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.'" *Malibu Media, LLC v. Tashiro*, No. 1:13-CV-00205-WTL, 2015 WL 3631712, at *5 (S.D. Ind. June 9, 2015) (Dinsmore, J.) (citing Ind. Rules of Prof'l Conduct R. 1.7(b)(3)) (emphasis added). Here, FeganScott attorneys have concurrently represented Plaintiff and Defendant in this lawsuit; thus this conflict cannot be waived. *See e.g.,* RPC 1.10 Comment No. 6.

"Furthermore, an attorney's withdrawal in one of the two conflicting matters does not remove the conflict; the Indiana Court of Appeals has explained that 'conflicts may not be avoided by withdrawal.'" *Folsom,* 2011 WL 1404875, at *2 (citing *Reed,* 825 N.E.2d at 412). Therefore, the applicable conflict of interest cannot be cured or waived by Proteus's termination of Mr. Sakthivel from the Manassa Project, or by Mr. Sakthivel being terminated from FeganScott, assuming he has been formally terminated instead of simply being placed on "administrative leave." (*See,* Ex. A, Casey Decl., at Ex. 4 p. 3).  Under Indiana law, "conflicts may not be avoided by withdrawal." *Folsom,* 2011 WL 1404875, at *2; *Reed,* 825 N.E.2d at 412 ("'It is ... established law that an attorney cannot avoid disqualification ... merely by 'firing' the disfavored client ... and transforming a continuing relationship to a former relationship by way of client abandonment'….") (citations omitted).

Courts in other districts have disqualified law firms based on similar conflicts of interest

applying virtually identical versions of RPC 1.7. *See e.g., Altova GmbH v. Syncro Soft SRL,* 320 F. Supp. 3d 314 (D. Mass. 2018); *Deere & Co. & John Deere Shared Services, Inc., Plaintiffs, v. Kinze Manufacturing, Inc. & Ag Leader Technology, Inc., Defendants*., No. 420CV00389RGESHL, 2021 WL 5334212, at *5 (S.D. Iowa Oct. 1, 2021) (disqualifying counsel under Iowa's parallel Rule 1.7 explaining that "The Court does find a concurrent conflict of interest existed as to Harty and Nyemaster's representation of Ag Leader and Deere. As such, the Court grants Defendants' motion to disqualify.") In *Altova GmbH*, the law firm Sunstein represented two clients simultaneously, Syncro Soft and Altova, and the Court held that the firm's termination of its representation of one client to continue representing the other did not resolve the conflict of interest. *Id*. at 318; *id*. at 314 ("To attempt to avoid the conflict of interest, Sunstein terminated its relationship with Syncro Soft.") Recognizing that "[p]articularly important in a case like this one is the duty of loyalty," the *Altova* court disqualified the law firm, based on Massachusetts' parallel Rule of Professional Conduct 1.7. *Id*. at 319.[3]

Likewise, in *Deere,* the Court held that an attorney "did not take any of the actions required" under Iowa's parallel Rule 1.7 (*i.e.* get informed written consent from the conflicted client), when the attorney withdrew its representation of one client "in order to pursue an adverse" representation of the other client. 2021 WL 5334212, at *14. Courts regularly acknowledge this rule in connection with the analogous "hot potato doctrine" which prohibits an attorney from firing a current client to try to "cur[e] a simultaneous representation of adverse interests." *Lectric Limited, Inc. v. DGW, Inc.*, No. 15 C 7744, 2017 WL 1149335, at *3 (N.D. Ill. March 28, 2017) (internal citations omitted). In such situations, "the former client is treated as a current client for the client conflicts analysis." *Id.*

---

[3] Massachusetts Rule of Professional Conduct 1.7 is the same in all material respects to RPC 1.7.

It is clear that "courts look to the point in time at which the conflict arose, not when the litigation is filed" when assessing concurrent conflicts. *Troika Media Group, Inc. v. Stephensen*, No. 19 CIV. 145 (ER), 2019 WL 5587009, at *5 (S.D.N.Y. Oct. 30, 2019). Here, because all the conflicted conduct occurred entirely while Mr. Sakthivel worked for both FeganScott and the NCAA, this is a Rule 1.7 conflict of interest, regardless of Mr. Sakthivel's present relationship to the NCAA or to FeganScott. *See, e.g., Unified Sewerage Agency of Washington Cnty., Or. v. Jelco Inc.*, 646 F.2d 1339, 1345 n.4 (9th Cir. 1981) ("This standard continues even though the representation ceases prior to filing of the motion to disqualify. If this were not the case, the challenged attorney could always convert a present client into a 'former client' by choosing when to cease to represent the disfavored client."); *Ehrich v. Binhgamton City School Dist.*, 210 F.R.D. 17, 25 (N.D.N.Y. 2002) (internal quotations omitted).

There is no way to un-ring the bell here. Disqualification of FeganScott is the only remedy that can in any way rectify the fact that for at least 183.7 hours, FeganScott counsel worked on both sides of the v. in this ongoing litigation with respect to current clients.

## C.   Mr. Sakthivel Violated Rule of Professional Conduct 1.9

Any "attempt to turn a concurrent relationship into a former relationship by merely withdrawing from representation of one of the two parties will not suffice." *Folsom*, 2011 WL 1404875, at n 1. Accordingly, for the reasons set forth above, RPC 1.7 applies to this conflict of interest and is the most appropriate lens through which to view this dispute. That said, Mr. Sakthivel's conduct also violated RPC 1.9(a) and (b). The provisions in those rules "are for the protection of former clients and can be waived if the client gives informed consent, which consent must be confirmed in writing under paragraphs (a) and (b)." (*See* RPC 1.3 Comment No. 9). The NCAA did not provide (nor was it asked to provide) informed consent in writing. (Ex. A. Casey Dec., at ¶ 13).

Because the NCAA did not provide written informed consent, the conduct at issue violated RPC 1.9 (a), which provides that a "lawyer who has formerly represented a client [the NCAA] in a matter [this lawsuit] shall not thereafter represent another person [Plaintiff and the proposed class] in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client [the NCAA]." This conflict concerns "the same or a substantially related matter" because it involves the same dispute. (*See* RPC 1.10, Comment No. 3) (Matters are "substantially related" "if they involve the same transaction or dispute…")

The conduct at issue also violates RPC 1.9(b), which prohibits an attorney from knowingly representing a person "in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client (1) 'whose interests are materially adverse to that person; and (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.'" ***First***, this conflict concerns "the same or a substantially related matter in which a firm [FeganScott] with which the lawyer formerly was associated [Mr. Sakthivel] had previously represented a client [the NCAA]." (*Id*.). ***Second***, the NCAA's interests are materially adverse to Plaintiff and the proposed class members. ***Third***, Mr. Sakthivel "acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter." (RPC 1.9(b)). Such matter includes among other things: (a) the document review protocol that Mr. Sakthivel obtained while working for the NCAA which contains attorney-work product, (b) access to the NCAA's documents hosted on Relativity, which included documents not yet reviewed for responsiveness or privilege, (c) access to the recorded Manassa Project strategy meetings, (d) access to the Manassa Project's Microsoft Teams discussion board, and (e) access to the 6,622 NCAA documents that Mr. Sakthivel reviewed and coded while a full-time FeganScott attorney. (Ex. B.,

Biederman Decl., at ¶¶ 19-24, and 27).

Notably, Comment No. 6 to RPC 1.9 makes clear that "[a]pplication of paragraph b depends on a situation's particular facts, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together." In addition to the above, this comment's guidance makes clear that Mr. Sakthivel violated Rule 1.9(b). Here, Mr. Sakthivel worked under Ms. Fegan's direct supervision while she served as co-lead counsel for Plaintiff and the proposed class members in a lawsuit that her clients filed against the NCAA (Ex. A, Casey Decl., at Ex. 4 p. 1 and 3.) FeganScott's role as Plaintiff's counsel in this lawsuit is widely publicized, including, but not limited to on multiple pages within FeganScott's website. (*Supra* at 3.) Further, the protocol materials, along with the other documents (like the Complaint and Plaintiff's discovery requests) provided to Mr. Sakthivel as an NCAA document reviewer expressly state that FeganScott, including Ms. Fegan, act as Plaintiff's counsel in this lawsuit. (*See,* Ex. B, Biederman Decl., at ¶ 19.)

**D.    Mr. Sakthivel's Violation of RPC 1.7 and 1.9 Must Be Imputed to FeganScott Pursuant to RPC 1.10**

Mr. Sakthivel's RPC violations are imputed to FeganScott,[4] in accordance with RPC Rule 1.10 which imputes a lawyer's conflicts of interest to the law firms that the attorney has been associated with in several contexts applicable here. In general, an attorney's conflict of interest is

---

[4] Authority supports the imputation of this conflict of interest to FeganScott's co-counsel as well, *see e.g., Leathermon v. Grandview Mem'l Gardens, Inc.,* No. 4:07-CV-137-SEB-WGH, 2010 WL 1381893, at 11-12 (S.D. Ind. Mar. 31, 2010) (granting motion to disqualify counsel applying RPC 1.9 and 1.10) (*see id.* at *12) ("The Wyatt firm is also disqualified from representing Plaintiffs in this matter by virtue of their status as co-counsel to Mr. Eckert… Even if the Wyatt firm were determined as a factual matter to be completely innocent lacking any knowledge of Mr. Eckert's prior representation of Mr. Mefford and Grandview LLC, as co-counsel, the Wyatt attorneys clearly had access, actual or potential, to whatever confidential information Mr. Eckert and, by extension, Mr. Goebel, obtained while representing Grandview LLC."). However, the NCAA has not moved to disqualify MayLightfoot PLLC at this point.

imputed to an attorney's firm because "[s]uch situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated." (RPC 1.10, Comment No. 2). This is nothing extraordinary; instead, it is simply the codification of the well-established principle that an agent's knowledge and actions are imputed to the agent's principal. *See United States v. Dish Network, LLC*, 954 F.3d 970, 978 (7th Cir. 2020) ("The knowledge of the agent is imputed to the principal."); *Hamilton v. Hamilton*, 132 N.E.3d 428, 433 (Ind. Ct. App. 2019) ("Under the rule of imputed knowledge, 'the law imputes the agent's knowledge to the principal.'") (citations omitted). For multiple reasons, Mr. Sakthivel's conflict of interest should be imputed to his employer at the time of the conflict, FeganScott.

***First***, FeganScott represented that Mr. Sakthivel was placed on administrative leave from the firm on April 26, 2022, a status which still associates him with FeganScott. (*See,* Ex. A, Casey Decl., at Ex. 4 p. 3). The facts therefore satisfy RPC 1.10(a), which provides:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2 unless the prohibition is based on a personal interest of the prohibited lawyer **and** does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm. RPC 1.10 (a) (emphasis added).

***Second***, even if Mr. Sakthivel's association with FeganScott has terminated, the circumstances still violate RPC 1.10(b). This rule provides:

> When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter[5] representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented

---

[5] Notably, the RPC contemplates a conflict of interest concerning an old and new matter; the circumstances here are even graver because they concern the very same lawsuit, *i.e.* the applicable matter is the same.

by the firm **unless**: (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter. (emphasis added).

The facts satisfy the above rule for several reasons. To begin, it is undisputed that the matter at issue is the "same" lawsuit. Further, FeganScott has possessed the information protected by RPC 1.6(a) and 1.9(c). RPC 1.6(a) protects "information relating to representation of a client." RPC 1.6's "confidentiality rule, for example, applies not only to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." *Id*. at Comment No. 3. RPC 1.9(c) prohibits use of "information relating to representation to the disadvantage of the former client." Among other things, 640 documents tagged by Mr. Sakthivel as responsive contain "information relating to the representation of" the NCAA. (Ex. B., Biederman Decl., at ¶ 28). Those documents have been produced to FeganScott in this lawsuit (*id*.), those documents are material to this matter, and are protected by RPC 1.6 and 1.9(c). These documents are material because Plaintiff's ability to prove its burden of proof in this lawsuit, and the NCAA's defensive strategy, depend on evidence contained in the content of documents produced, that support the parties' claims and defenses. In addition, Mr. Sakthivel had the ability to take screenshots, recordings, and make copies of the documents or material provided to him in the Manassa Project with others, as well as discuss and share the contents, including on phone calls or on Zoom or Microsoft Teams meetings with screen sharing capabilities; however, Proteus cannot confirm the extent to which that may have occurred. (*Id*., at ¶ 25). This material is protected by RPC 1.6 and 1.9(c) as well.

FeganScott can use the documents produced based on Mr. Sakthivel's responsiveness review and coding to the disadvantage of the NCAA (*see* RPC 1.9(c)). Among other things, FeganScott will undoubtedly attempt to use these documents to support the purported merits of

Plaintiff's claims. Further, no assurances can confirm that Mr. Sakthivel coded the 640 documents produced to FeganScott correctly for responsiveness, privilege, or confidentiality, especially because he breached the duty of loyalty owed to the NCAA by working for the NCAA while under the direct supervision of Plaintiff's co-lead counsel. FeganScott can use mistagged documents within this universe to the NCAA's disadvantage.

Further, RPC 1.10 Comment 2 is instructive, and explains that, although RPC 1.10 (b) "operates to permit a law firm, under certain circumstances to represent a person with interests directly adverse to those of a client represented by a lawyer who formerly was associated with the firm," the factual scenario here prohibits the firm (FeganScott) from representing a client (Plaintiff and the proposed class) even after the departure of the attorney formerly associated with the firm (Mr. Sakthivel):

> However, the law firm may not represent a person with interests adverse to those of a present client of the firm, which would violate Rule 1.7. Moreover, the firm may not represent the person where the matter is the same or substantially related to that in which the formerly associated lawyer represented the client and any other lawyer currently in the firm has material information protected by Rules 1.6 and 1.9(c).

As set forth above, this conflict violates RPC 1.7, and therefore is automatically imputed to FeganScott (*supra* at 11-15). Further, there is substantial risk of NCAA confidential information being used to materially advance Plaintiff's and the proposed class members' interests, which the Seventh Circuit deems sufficient to warrant disqualification. *See e.g.*, *Watkins,* 869 F.3d at 525 ("The commentary to Rule 1.9 states plainly that to require disqualification of an attorney from a new representation against a former client, **either the old and new matters must be the same factual dispute or there must be a substantial risk of confidential information being used to materially advance the new client's interests**." (citing RPC 1.9 Comment No. 2) (emphasis added).

20

While the applicable facts in *Watkins* are distinguishable from this case, *Watkins*' analysis indicates that disqualification is warranted here. 869 F.3d at 525. For example, there was "no specific factual overlap" between the representations at issue in *Watkins*, whereas here, the representations at issue concern the exact same lawsuit. (*Id.*). Further RPC 1.9 and its comments:

> clarify that a lawyer who acquires confidential client information of a particular type (*e.g.*, a client's financial information or information about a client's environmental compliance) owes a continuing duty to the client after the relationship ends: He must keep that information confidential and may not represent a new client if there is a substantial risk that the information would materially advance the new client's position in the subsequent matter. **When a substantial risk of information exploitation exists, the duties owed to the old and new client are in conflict, and the new representation is prohibited** even if the subsequent matter is factually distinct.

*Watkins,* 869 F.3d at 528 (emphasis added).

Thus, disqualification under RPC 1.9(b) does not require actual evidence that FeganScott currently possesses material information protected by Rules 1.6 or 1.9(c). *See also Leathermon v. Grandview Mem'l Gardens, Inc.,* No. 4:07-CV-137-SEB-WGH, 2010 WL 1381893, at *8-10 (S.D. Ind. Mar. 31, 2010) (granting motion to disqualify counsel under current versions of RPC 1.9 and 1.10, based on presumption that the attorney received confidential information during prior representation because of the substantial relationship between the conflicted matters). "Also, the presumption of shared confidential information is particularly appropriate given that [Ms. Fegan] supervised [Mr. Sakthivel]." *Hobson v. Trans Union, LLC,* No. 1:13-CV-54, 2013 WL 12309518, at *5 (N.D. Ind. Nov. 21, 2013); *see also LaSalle Nat'l Bank v. Lake Cnty.*, 703 F.2d 252, 255-56 (7th Cir. 1983) (reasonable to infer that attorney had received client confidences given his supervisory authority); *see also Emmis Operating Co. v. CBS Radio, Inc.,* 480 F. Supp. 2d 1111, 1118-1119 (S.D. Ind. 2007) (granting motion to disqualify counsel under current version of RPC 1.9, and due to the existence of a substantial relationship, "it is unnecessary for the movant to

prove that the attorney in question actually received during the course of his former employment confidential information relevant to matters involved in the subsequent representation").

## IV.   <u>Conclusion and Prayer for Relief</u>

For the reasons set forth above, FeganScott's representation of Plaintiff and the proposed class members violates the RPC, which warrants FeganScott's immediate disqualification from this lawsuit.

In addition to disqualification, the NCAA respectfully requests that the Court enter an Order requiring FeganScott to pay the attorneys' fees and costs the NCAA incurred in connection with investigating the conflict of interest discussed herein, and in filing this Motion.

DATED: May 23, 2022                    Respectfully submitted,

*/s/ Brian E. Casey*
Victor D. Vital (Admitted *Pro Hac Vice*)[6]
victor.vital@btlaw.com
V. Chisara Ezie-Boncoeur
cezie@btlaw.com
Brian E. Casey
brian.casey@btlaw.com
Alicia Raines Barrs
Alicia.Rainesbarrs@btlaw.com
Ilana Zelener
Ilana.Zelener@btlaw.com
(Admitted *Pro Hac Vice*)
BARNES & THORNBURG LLP
201 S. Main Street
South Bend, IN  46204
Telephone: 574-233-1171
Facsimile: 574-237-1125
*Attorneys for Defendant the NCAA*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document

has been filed using this court's ECF system on all counsel of record .

                                        */s/ Brian E. Casey*
                                        Brian E. Casey

---

[6] Mr. Vital can be contacted at Barnes & Thornburg LLP's Dallas, Texas office.