**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

TROYCE MANASSA, *et al.*,

     Plaintiffs,

     v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

     Defendant.

No.:  1:20-cv-03172-RLY-MJD

**OPPOSITION TO MOTION TO DISQUALIFY**
**FEGAN SCOTT LLC AS PLAINTIFFS' COUNSEL**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTS ............................................................................................................................ 2

        A.      The incontrovertible facts demonstrate that Fegan Scott should not
                be disqualified. ................................................................................................... 2

                1.      As a Staff Attorney at Fegan Scott from October 2020 to
                        April 2022, Ravi Sakthivel worked full-time on document
                        review in the *Zantac* litigation. .............................................................. 2

                2.      Sakthivel never accessed Fegan Scott's *Manassa* litigation
                        files........................................................................................................... 4

                3.      Sakthivel never disclosed any information relating to the
                        *Manassa* litigation or the NCAA to Fegan Scott. ................................... 5

                4.      Fegan Scott immediately put Sakthivel on administrative
                        leave, and terminated him, upon notification of a conflict. ...................... 6

                5.      Fegan Scott has never represented the NCAA. .......................................... 9

                6.      Sakthivel claims he disclosed Fegan Scott as his employer
                        to the NCAA's vendor prior to his hiring in 2022. ................................... 9

        B.      Professional responsibility expert Mary Robinson opines that
                Sakthivel's conflict of interest should not be imputed to Fegan
                Scott. ................................................................................................................. 10

III.    ARGUMENT ................................................................................................................ 12

        A.      This Court has broad discretion to determine whether the drastic
                measure of disqualification is warranted. ........................................................ 12

        B.      Sakthivel's "taint" should not be imputed to Fegan Scott and its
                attorneys. ......................................................................................................... 13

                1.      The NCAA has never been Fegan Scott's client. ..................................... 13

                2.      The Firm's standard practices prevented the sharing of
                        confidences, and no confidences were shared. ....................................... 17

                3.      Plaintiff and the putative class would be prejudiced by
                        Fegan Scott's disqualification................................................................... 22

        C.      The policy reasons behind disqualification do not support the
                drastic remedy in this case. ............................................................................. 23

IV.     CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Allen v. Comm'r,*
  No. IP 99-558-C-T/G, 1999 U.S. Dist. LEXIS 15543 (S.D. Ind. Sept. 15,
  1999) ........................................................................................................ 12, 13

*Analytica, Inc. v. NPD Rsch., Inc.,*
  708 F.2d 1263 (7th Cir. 1983) ............................................................... 1, 3, 4, 19

*Arista Records LLC v. Lime Group LLC,*
  No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 17434, 2011 WL 672254
  (S.D.N.Y. Feb. 18, 2011) ....................................................................... 19, 20

*Barnett v. Clark,*
  889 N.E.2d 281 (Ind. 2008) ........................................................................ 13

*Closure Sys. Int'l v. Novembal U.S.,*
  No. 1:19-cv-03944-JMS-MJD, 2020 U.S. Dist. LEXIS 247063, 2020 WL
  4726735 (S.D. Ind. May 13, 2020) ........................................................ 13, 14

*Cromley v. Bd. of Educ.,*
  17 F.3d 1059 (7th Cir. 1994) ....................................................................... 16

*Exterior Sys. v. Noble Composites, Inc.,*
  210 F. Supp. 2d 1062 (N.D. Ind. 2002) .................................................... 14

*Freeman v. Chi. Musical Instrument Co.,*
  689 F.2d 715 (7th Cir. 1982) ................................................................. 13, 18

*Fund of Funds, Ltd. v. Arthur Andersen & Co.,*
  567 F.2d 225 (2d Cir. 1977) ....................................................................... 17

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream,*
  409 F.3d 127 (2d Cir. 2005) ................................................................... 17, 18

*In re Curare Lab. LLC,*
  2022 Bankr. LEXIS 1413 (Bankr. W.D. Ky. May 18, 2022) ................................. 23

*In re Sandahl,*
  980 F.2d 1118 (7th Cir. 1992) ..................................................................... 14

*McClain v. T P Orthodontics,*
  No. 3:07-CV-113, 2008 U.S. Dist. LEXIS 3869, 2008 WL 181292 (N.D. Ind.
  Jan. 17, 2008) ........................................................................................... 16

*Metro. Life Ins. Co. v. Guardian Life Ins. Co. of Am.,*
  2009 U.S. Dist. LEXIS 42475 (N.D. Ill. May 18, 2009) ..................................... 23

*Mills v. Hausmann-McNally,*
    992 F. Supp. 2d 885 (S.D. Ind. 2014) ................................................................. 13

*Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs., Inc.*,
    607 F.2d 186 (7th Cir. 1979) ............................................................................. 18

*Nuwave, LLC v. Cincinnati Specialty Underwriters Ins. Co.*,
    No. 16 C 4504, 2017 U.S. Dist. LEXIS 233122, 2017 WL 11569209 (N.D. Ill.
    Jan. 25, 2017) .................................................................................................... 21

*Paloian v. Greenfield (In re Rest. Dev. Grp., Inc.)*,
    402 B.R. 282 (Bankr. N.D. Ill. 2009) ................................................................. 23

# I.    INTRODUCTION

> [A]n attorney's and/or a law firm's most valuable asset is their professional reputation for competence, and above all honesty and integrity…. As court proceedings are matters of public record, a news media report concerning a summary disqualification order…can do irreparable harm to an attorney's or law firm's professional reputation. We must recognize that the great majority of lawyers, as officers of the court, do conduct themselves well within the bounds of the Code of Professional Responsibility.[1]

Fegan Scott LLC ("Fegan Scott" or the "Firm") has conducted itself in this litigation with honesty and integrity at all times. Here, both the Firm and the NCAA were taken advantage of by a duplicitous lawyer who was hiring himself out for multiple document reviews at once.

Since December 2020, the Firm has openly listed its representation of NCAA student-athletes in this litigation on the Firm's website. Moreover, from September 2020 to April 2022, the Firm listed Ravi Sakthivel ("Sakthivel") as a Staff Attorney on its website, and Sakthivel held out Fegan Scott as his employer on his LinkedIn profile. Despite Sakthivel's submission of his LinkedIn profile to the NCAA's e-discovery vendor (Proteus) in January 2022, the NCAA's vendor hired Sakthivel to perform document review for the NCAA without performing an employment verification and without disclosure to the Firm. Sakthivel's serious breach of the rules of professional conduct, facilitated by Proteus, should not be cause for the Firm's disqualification as counsel for Plaintiff and the putative class.

When analyzing whether an attorney's conflict of interest should be imputed to a law firm, the Indiana Rules of Professional Conduct and precedent discuss a migrating lawyer and whether the conflict of interest should be imputed to the new firm. Here, Sakthivel is the emigrating lawyer who migrated *to* the NCAA's team *away from* Fegan Scott. Accordingly,

---

[1] *Analytica, Inc. v. NPD Rsch., Inc.*, 708 F.2d 1263, 1275 (7th Cir. 1983) (Coffey, J., dissenting).

precedent dictates that any conflict be imputed to the NCAA and its counsel at Barnes & Thornberg LLP ("B&T"), not vice versa.[2]

To be clear, Fegan Scott unequivocally condemns Sakthivel's actions. However, as shown below and discussed in the opinion of professional responsibility expert Mary Robinson, Sakthivel's conflict of interest should not be imputed to the Firm because (i) the NCAA was never Fegan Scott's client and thus Fegan Scott has never owed a duty of loyalty to the NCAA; (ii) the Firm's standard practices prevented the sharing of confidences, and Sakthivel never shared any information regarding the NCAA with Fegan Scott; and (iii) Plaintiff and the putative class would be prejudiced by the disqualification of their counsel. As further discussed below, Fegan Scott respectfully requests that the motion be denied.

## II.    FACTS

### A.  The incontrovertible facts demonstrate that Fegan Scott should not be disqualified.

#### 1.  As a Staff Attorney at Fegan Scott from October 2020 to April 2022, Ravi Sakthivel worked full-time on document review in the *Zantac* litigation.

The Firm hired Sakthivel as a staff attorney to start on September 7, 2020.  Declaration of Elizabeth A. Fegan ("Fegan Decl."), ¶ 14, attached as Ex. 1; Declaration of Ravi Sakthivel ("Sakthivel Decl."), ¶ 1, attached as Ex. 2. Sakthivel was hired to work full time and fully remotely from his home in California.  Fegan Decl., ¶¶ 16-18; Sakthivel Decl., ¶¶ 2-3. Since his hiring, he has worked exclusively (except for four hours) reviewing documents in the Zantac

---

[2] Two years into this litigation, B&T added Sakthivel to its document review team despite Sakthivel's existing employment relationship with Fegan Scott. Sakthivel's work for the NCAA was directly adverse to Fegan Scott's client, Plaintiff Troy Manassa. Sakthivel's violation of the ethical rules could just as easily be imputed to the party and its counsel which knew or should have known of the facts that would give rise to a conflict *before* it occurred, *i.e.* the NCAA and B&T.

litigation, which documents are maintained by an e-discovery vendor retained by lead counsel in that litigation. Fegan Decl., ¶¶ 26, 29, 41; Sakthivel Decl., ¶ 2.

At the time he was hired, Sakthivel signed an offer letter. Fegan Decl., ¶ 17. The signed offer letter provides in pertinent part: "You will start in a full-time position of Staff Attorney with responsibility for document review. You will report directly to Elizabeth Fegan. You agree to devote your full business time, attention, and best efforts to the performance of your duties for the Firm." *Id.* ¶ 17.  In November 2021, the Firm introduced an Employee Handbook and Confidentiality Agreement. The Confidentiality Agreement provides in pertinent part:

> During Employee's employment, Employee will not engage in any business activities, which are competitive with [the] Firm or otherwise in conflict with Employee's duties on behalf of the Firm, unless the Firm has provided its consent in writing. These obligations include after hours, on weekends, and during vacation time, even if only organizational assistance or limited consultation is involved, whether or not Employee receives compensation from the competing or conflicting entity or person.

Fegan Decl., ¶ 22.  The Employee Handbook provides in pertinent part:

> Situations that involve an actual or potential conflict of interest between an employee's interests and the interests of the Firm must be discussed with management in order to protect the interests of both parties. It is the policy of the Firm that all employees disclose any situation, which does or may involve a conflict of interest between their personal interests and the interests of the Firm. While it is impossible to list every circumstance that may create possible conflicts of interest, the following should serve as a guide to the types of activities, which may cause conflicts: * * * Outside employment anywhere, directly or through an intermediary, which can or will adversely affect the employee's productivity or availability, including employment by competitor.

*Id.* ¶ 21.

Sakthivel never disclosed to the Firm that he was employed by anyone other than Fegan Scott. Fegan Decl., ¶ 31; Sakthivel Decl., ¶ 17. Sakthivel never disclosed to the Firm that he was

conducting document review outside of the Firm or working on any cases other than as assigned by Fegan Scott. Fegan Decl., ¶ 32; Sakthivel Decl., ¶ 17.

Moreover, the Firm openly held out Sakthivel as a staff attorney on its website and Sakthivel held himself out as an employee of the Firm on his LinkedIn profile. Fegan Decl., ¶¶ 23-24; Sakthivel Decl., ¶ 10. Similarly, the Firm openly lists its cases on its website, including this litigation. Fegan Decl., ¶ 25. Notwithstanding, no e-discovery vendor ever contacted the Firm regarding Sakthivel or to run a conflict check relating to his work. Fegan Decl., ¶ 33. *See also generally* Proteus Decl. [DE 101-2].

### 2. Sakthivel never accessed Fegan Scott's *Manassa* litigation files.

Fegan Scott uses a document management and billing system called Clio. Fegan Decl., ¶ 34.  Within Clio, the Firm can track every employee's activity and access to each client file. *Id.* ¶ 35. The Firm's file for the *Manassa v. NCAA* litigation is matter number 2025. *Id.* ¶ 36. The Firm has pulled the report reflecting all activity in matter number 2025; the report reflects that Sakthivel never accessed the files in matter number 2025. Fegan Decl., ¶ 37. *See also* Sakthivel Decl., ¶ 5.

Further, all employees are required to record their billable time contemporaneously with their work. Fegan Decl., ¶ 40.  Save for four hours billed to two unrelated matters, Sakthivel worked full-time on the Zantac litigation; Sakthivel never worked on the Manassa litigation and thus never billed any time to this matter. Fegan Decl., ¶ 41.  *See also* Sakthivel Decl., ¶ 4.

In its brief, the NCAA questioned Elizabeth Fegan's oversight of Sakthivel. *See* NCAA Br. [DE 101], n. 2.  As reflected in her declaration, Ms. Fegan tracked Mr. Sakthivel's work through (i) Zantac-specific meetings, (ii) Sakthivel's contemporaneously billed time which reflects exactly how many documents he coded per day (and the bates range thereof), (iii) the

4

periodic comparison of his time against the Zantac e-discovery vendor's reports reflecting Sakthivel's time in the document review software (as circulated periodically by Zantac lead counsel), (iv) feedback from the Plaintiffs' attorneys in the Zantac MDL as to the quantity and quality of his work, and (v) feedback from the Fegan Scott Zantac team. Fegan Decl., ¶ 30. *See also* Declaration of Brooke Achua, ¶ 4 ("Achua Decl.") (discussing her oversight of Sakthivel's review of documents in the Zantac litigation), attached as Ex. 5.

### 3. Sakthivel never disclosed any information relating to the *Manassa* litigation or the NCAA to Fegan Scott.

Since inception, the Firm's attorneys (other than Ms. Fegan and Timothy Scott) have worked fully remotely. Fegan Decl., ¶ 8. Since his hiring, Sakthivel has worked fully remotely from his home in California. Fegan Decl., ¶ 16; Sakthivel Decl., ¶ 3. In fact, due to COVID, no one from the Firm has met Sakthivel in person. Fegan Decl., ¶ 15; Sakthivel Decl., ¶ 6.

It is the Firm's regular practice to hold Firm meetings via Zoom every Friday. Fegan Decl., ¶ 42; Declaration of Tory Bergeson ("Bergeson Decl."), ¶ 2, attached as Ex. 3. One Friday per month is an all-firm meeting. Fegan Decl., ¶ 43; Bergeson Decl., ¶ 3. The other Friday meetings are case specific. Fegan Decl., ¶ 44; Bergeson Decl., ¶ 3. Staff attorneys are only invited to and attend the all-firm meeting and the meetings in which the cases they are working on are scheduled for discussion. Fegan Decl., ¶ 45; Bergeson Decl., ¶ 4.

The focus of the all-firm meeting is administrative in nature. Sakthivel did not attend case-specific Firm meetings unless the Zantac matter was on the agenda. Fegan Decl., ¶ 46; Bergeson Decl., ¶ 8; Sakthivel Decl., ¶¶ 4, 6, 15, 16.  The Firm's agendas for the case-specific

meetings reflect that the *Manassa* litigation was never discussed during the same meeting as Zantac. Bergeson Decl., ¶ 6.

Sakthivel never communicated with Ms. Fegan regarding the Manassa litigation or the NCAA.  Sakthivel Decl., ¶¶ 16, 17; Fegan Decl., ¶¶ 49-54. Moreover, no other attorney has ever discussed this matter with Sakthivel, other than to invite him to a telephonic meeting which never happened. Declaration of Melissa Clark ("Clark Decl."), ¶¶ 6-17, attached as Ex. 4; Achua Decl., ¶¶ 7-9; Sakthivel Decl., ¶¶ 15-16.

On April 22, 2022, Melissa Clark emailed Sakthivel to inquire whether he was available to temporarily move off of Zantac to work on document review in this litigation. She asked if he was available on April 26, 2022 for a call about the document review. Clark Decl., ¶ 7. Sakthivel replied that he was interested in moving off Zantac and was available for the call. Clark Decl., ¶ 8.  During these administrative scheduling communications, no one discussed any substantive information concerning this case or the NCAA, nor did Sakthivel disclose that he had conducted document review for the NCAA or have any information or knowledge concerning the NCAA. Clark Decl., ¶ 12.

### 4. Fegan Scott immediately put Sakthivel on administrative leave, and terminated him, upon notification of a conflict.

On April 26, 2022, at 12:12 p.m. central, Ms. Fegan received a letter via email from Brian Casey, a lawyer for the NCAA. Fegan Decl., ¶ 56.  Immediately upon reading the letter at 12:32 p.m. central, Ms. Fegan instructed Timothy Scott to coordinate with the Firm's IT support to remove Sakthivel's access to all Fegan Scott systems (including Clio), instructed Melissa Clark to ensure that he did not have access to the Firm's document hosting site for *Manassa*, and instructed Lynn Ellenberger to coordinate removal of his access from the Zantac document hosting site. Fegan Decl., ¶¶ 58-60; Declaration of Timothy A. Scott ("Scott Decl."), ¶ 3,

attached as Ex. 6. Ms. Clark also cancelled the document review call in which Sakthivel was

invited to participate. Clark Decl., ¶ 11.

At 12:34 p.m. central, Ms. Fegan responded to Mr. Casey as follows:

> Brian,
>
> We have no knowledge of any of this but are working to
> immediately cut Ravi's access to all Fegan Scott systems.
>
> We will be back in touch with a full response once our
> investigation is complete.
>
> Thank you for bringing this to our attention.
>
> Sincerely,
> Beth

Fegan Decl., ¶ 61.

Ms. Fegan also directed Melissa Clark and Brooke Achua to preserve and send to her any

communications that they had with Sakthivel concerning this litigation. Fegan Decl., ¶ 62. And

Mr. Scott instructed all Fegan Scott employees to refrain from any communications with

Sakthivel while an investigation was conducted. Scott Decl., ¶ 5.

The Firm terminated Sakthivel's employment on April 27, 2022. Scott Decl., ¶ 6. The

Firm requested that Sakthivel preserve and not delete any information on his Firm laptop, and to

return the Firm laptop. Scott Decl., ¶¶ 4, 7. Sakthivel's laptop has been returned and is being

preserved by the Firm's third-party IT vendor pending resolution of these issues. Scott Decl., ¶ 8.

On April 27, 2022, pursuant to Timothy Scott's request to Sakthivel, Sakthivel identified

four document review vendors with which he worked during his employment at Fegan Scott.

Scott Decl., ¶¶ 9-10. Ms. Fegan sent a letter to each vendor via email and certified mail on April

29, 2022, seeking certain information regarding Sakthivel's activities and stating in pertinent

part:

> Ravi Sakthivel was a full-time employee of Fegan Scott LLC from September 7, 2020, to April 27, 2022. He was listed on the Firm's website. His LinkedIn profile also reflects his role as a Staff Attorney at Fegan Scott. A quick Google search would verify his employment at our Firm.
>
> It has come to our attention that Sakthivel performed document review services on projects through your agency during this same time period. Not only were these activities a violation of multiple Firm policies, neither you nor Sakthivel ran any conflict checks through our Firm.

Fegan Decl., ¶ 66. One of those firms was Proteus. *Id.*

On May 6, 2022, Ms. Fegan received a response from Proteus, which was the document

review vendor used by the NCAA. *Id.*, ¶ 68. Proteus disclosed as follows: (i) Fegan Scott is not

nor had ever been a client of Proteus; (ii) Sakthivel had applied to Proteus with a resume that

"did not mention any association with Fegan"; and (iii) Sakthivel never disclosed any conflict to

Proteus. Fegan Decl., Ex. L (Proteus letter). Proteus was silent as to Sakthivel's submission of

his LinkedIn profile disclosing Fegan Scott as his employer to the vendor.  *Compare* Fegan

Decl., Ex. L (Proteus letter) with Sakthivel Decl., ¶ 10 ("However, as part of my application I

also included my LinkedIn profile which accurately listed Fegan Scott as my employer since

September 2020. (See Exhibit A)").

Moreover, Proteus did not refute Ms. Fegan's contentions that:  (i) Sakthivel was listed

on the Firm's website; (ii) his LinkedIn profile reflected his role as a Staff Attorney at Fegan

Scott; (iii) a Google search would have verified his employment at our Firm; (iv) neither

Sakthivel nor Proteus ran any conflict checks through the Firm. *Compare* Fegan Decl., Ex. J (Fegan letter) with Fegan Decl., Ex. L (Proteus letter).

### 5.  Fegan Scott has never represented the NCAA.

The NCAA has never contacted Fegan Scott to discuss potential representation. Fegan Decl., ¶ 5. Fegan Scott has never represented the NCAA. Fegan Decl., ¶ 6. The NCAA has never signed a retainer agreement with Fegan Scott. Fegan Decl., ¶ 7.

Rather, Ms. Fegan has a long career of representing student-athletes in class actions *against* the NCAA in this District and others nationwide. Fegan Decl., ¶ 4 (citing *John Doe 1 v. NCAA*, No. 3:22-cv-1559 (N.D. Cal.) (challenging the NCAA's failure to protect student athletes from sexual abuse by NCAA coaches); *Aldrich v. NCAA*, No. 1:20-cv-02310-JRS-MG (S.D. Ind.) (challenging the NCAA's failure to protect student athletes from sexual abuse by NCAA coaches); *In re NCAA Student-Athlete Concussion Injury Litig.*, MDL No. 2492; Master Docket No. 13 C 9116 (N.D. Ill.) (challenging the NCAA's failure to protect student-athletes through an appropriate concussion management protocol); *Deppe v. NCAA*, No. 1:16-cv-00528-TWP-DKL (S.D. Ind.) (challenging certain NCAA bylaws as anticompetitive under the antitrust laws); *Pugh v. NCAA*, No. 1:15-cv-01747-TWP-DKL (S.D. Ind.) (challenging certain NCAA bylaws as anticompetitive under the antitrust laws); *Rock v. NCAA*, No. 1:12-cv-1019-JMS-DKL (S.D. Ind.) (challenging certain NCAA bylaws as anticompetitive under the antitrust laws; Ms. Fegan filed an appearance on appeal in the 7th Circuit)).

### 6.  Sakthivel claims he disclosed Fegan Scott as his employer to the NCAA's vendor prior to his hiring in 2022.

In his declaration, Sakthivel states that, in January 2022, he applied for a position as an independent contractor with the NCAA's e-discovery vendor Proteus Discovery Group. Sakthivel Decl., ¶ 7. As part of his application, he states that he submitted his resume and his

LinkedIn profile to Proteus. *Id.*, ¶ 9. At that time, Sakthivel's LinkedIn profile accurately listed

Fegan Scott as his employer since September 2020. *Id.*, ¶ 10. Additionally, had the NCAA or

Proteus conducted a basic background check, including an employment verification, Sakthivel's

relationship with Fegan Scott would have been instantly disclosed.[3]  Proteus admits it did not do

so.[4] *See* Declaration of Raymond J. Biederman ("Biederman Decl.") [DE 101-2], ¶¶ 12-14.

### B. Professional responsibility expert Mary Robinson opines that Sakthivel's conflict of interest should not be imputed to Fegan Scott.

Licensed to practice law in Illinois and California since 1975, Mary Robinson served as

the Administrator of the Illinois Attorney Registration and Disciplinary Commission ("ARDC")

for 15 years, having previously served as a Commissioner of the ARDC by appointment of the

Illinois Supreme Court for three years.  *See* Declaration of Mary Robinson, § A. During the 15

years she served as Administrator of the ARDC, she directed the investigations of over 6,000

grievances per year, as well as the prosecution of formal disciplinary actions in approximately

1,800 cases.  Ms. Robinson has taught Professional Responsibility courses at both Northwestern

University Law School and Northern Illinois University College of Law, and presented as a

---

[3] *See e.g.*, THE WORK NUMBER® Pre-Employment Verifications, https://theworknumber.com/solutions/industries/pre-employment-verification (last accessed May 26, 2022) ("With instant 24/7 access to verified work history, you can improve your quality of hire, inform hiring decisions with accurate data, and deliver a more efficient hiring process."), used by the Department of Labor, https://www.dol.gov/agencies/oasam/centers-offices/human-resources-center/employment-verification (last accessed May 26, 2022) ("The U.S. Department of Labor (DOL) utilizes an automated employment verification service,…. THE WORK NUMBER® is a fast, secure service used for…anything that requires proof of employment.").

[4] Proteus claims that Sakthivel's resume stated his current employer was Robbins Geller. Biederman Decl., ¶ 10. However, that disclosure demonstrates that neither Proteus, the NCAA, nor its counsel was running any conflict checks given that Robbins Geller also has a history of representing student-athletes in class actions *against* the NCAA. *See, e.g., Keller v. NCAA*, No. C 09-1967 CW; No. C 09-3329 (N.D. Cal.); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW; No. C 10-632 CW; No. C 11-388 CW; No. C 11-4938 CW (N.D. Cal.); *O'Bannon v. NCAA*, No. 09-c-3329 (N.D. Cal.); *Hall v. NCAA* (*Restricted Earnings Coach Antitrust Litig.*), No. 94-2392 (D. Kan.).

lecturer and panelist on professional responsibility issues for the American Bar Association, Federal Bar Association, and multiple other organizations. Since 2007, she has worked in private practice, representing lawyers and judges in disciplinary investigations and prosecutions, advising lawyers and law firms on ethical issues and obligations, and providing expert testimony on legal ethics and professional responsibility issues in over 50 cases. *Id.*

Applying the Indiana Rules of Professional Conduct, Ms. Robinson opines that Fegan Scott did not assume an attorney-client relationship with or otherwise assume responsibilities to the NCAA as a result of Sakthivel's unauthorized employment with Proteus to perform document review on behalf of the NCAA. She explains that Sakthivel did not have authority to commit Fegan Scott to any relationship with the NCAA, and neither Fegan Scott nor the NCAA intended to enter into any such relationship. As a result, Sakthivel's conflict which arose because of his unauthorized work for the NCAA cannot be imputed to Fegan Scott so as to warrant disqualification of the Firm from its representation of Manassa and the putative class. Robinson Decl., ¶¶ 16, 22-27, 39.

Ms. Robinson opines "there can be no doubt that Ravi Sakthivel engaged in a conflict of interest when he undertook the Proteus engagement to perform document review on behalf of the NCAA in connection with this case." Robinson Decl., ¶ 20. However, she explains that, "[a]t the time he did so, Fegan Scott attorneys were representing the Manassa Class and as a lawyer associated with Fegan Scott, Sakthivel was vicariously bound to the Firm's obligation of loyalty to the Manassa Class. RPC 1.10(a). He was thus precluded from representing the NCAA because it was directly adverse to the Manassa Class. RPC 1.7(a)(1)." Robinson Decl., ¶¶ 20, 22, 24-28.

However, applying Rule 1.10 and the rules of agency, Ms. Robinson explains that Sakthivel's conduct should not be imputed to Fegan Scott because, *inter* alia: (i) Sakthivel was

not authorized to assume representation of the NCAA, and his "defiance of that prohibition for his own benefit and to the detriment of Fegan Scott was an act outside his authority that could not bind the firm," Robinson Decl., ¶ 22; (ii) the NCAA was not misled to believe that it was accepting representation from Fegan Scott or that Fegan Scott had assumed any duty of loyalty to the NCAA, Robinson Decl., ¶¶ 23; and (iii) Rule 1.10(a) prohibits *knowingly* representing a client when another lawyer in the firm would be conflicted from doing so, but no Fegan Scott lawyer other than Sakthivel knew that Sakthivel was doing work for the NCAA such that no Fegan Scott lawyer engaged in the representation of Manassa and the putative class with any knowledge of Sakthivel's conflict. Robinson Decl., ¶ 25.

Further, Ms. Robinson opines that the evidence negates the concern that Sakthivel shared confidential NCAA information with Fegan Scott. Robinson Decl., ¶¶ 29-32. She concludes that "the logistics of Sakthivel's work for Fegan Scott, the limited scope of [Sakthivel's] responsibilities and the verifiably limited opportunity for interaction with other Fegan Scott personnel, affirmatively rebut any concern that he shared confidential information with the Firm." Robinson Decl., ¶ 39.

## III.   ARGUMENT

### A.  This Court has broad discretion to determine whether the drastic measure of disqualification is warranted.

District courts possess broad discretion in determining whether disqualification is required in a particular case. *Watkins v. Trans Union, L.L.C.*, 869 F.3d 514, 518 (7th Cir. 2017). Southern District of Indiana Local Rule 83-6 provides for application of the Seventh Circuit Standards of Professional Conduct and the Local Rules of this District, including the Rules of Disciplinary Enforcement. Rule 1 of the Rules of Disciplinary Enforcement provides that the Rules of Professional Conduct adopted by the Indiana Supreme Court apply. However, "[w]ith

regard to the specific question of disqualification, Seventh Circuit precedent governs." *Walton v. Chase Home Fin. L.L.C.*, No. 1:11-cv-00417-JMS-MJD, 2012 U.S. Dist. LEXIS 87775, at *5, 2012 WL 1409609 (S.D. Ind. Apr. 23, 2012) (citing *Gen-Cor L.L.C. v. Buckeye Corrugated, Inc.*, 111 F. Supp. 2d 1049, 1052 (S.D. Ind. 2000)).

Disqualification of an attorney is a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Watkins*, 869 F.3d at 519 (quotations omitted). *See also Allen v. Comm'r*, No. IP 99-558-C-T/G, 1999 U.S. Dist. LEXIS 15543, at *1-2 (S.D. Ind. Sept. 15, 1999) (same) (citing *Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983)). "They are often tactically motivated; they cause delay and add expense; they disrupt attorney-client relationships sometimes of long standing; in short, they tend to derail the efficient progress of litigation." *Allen*, 1999 U.S. Dist. LEXIS 15543, *1-2. *See also Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982) (disqualification motions are "viewed with extreme caution for they can be misused as techniques of harassment."). Thus, "close judicial scrutiny of the facts of each case is 'required to prevent unjust results.'" *Allen*, 1999 U.S. Dist. LEXIS 15543, at *1-2.  *See also Closure Sys. Int'l v. Novembal U.S.*, No. 1:19-cv-03944-JMS-MJD, 2020 U.S. Dist. LEXIS 247063, at *5-7, 2020 WL 4726735 (S.D. Ind. May 13, 2020) (Dinsmore, J.) (same).

## B. Sakthivel's "taint" should not be imputed to Fegan Scott and its attorneys.

### 1. The NCAA has never been Fegan Scott's client.

Fegan Scott never represented the NCAA, never signed a retainer with the NCAA, and never met with the NCAA except as an adversary. To the extent that Sakthivel was hired by Proteus at the NCAA's request to review documents, he was not acting within the scope of his employment or as an agent for the Firm. *Barnett v. Clark*, 889 N.E.2d 281, 284 (Ind. 2008)

13

(granting summary judgment to employer on vicarious liability claim, explaining: "'An employee's act is not within the scope of employment when it occurs *within an independent course of conduct* not intended by the employee to *serve any purpose of the employer*.'") (quoting Restatement (Third) of Agency § 7.07(2) (2006)) (emphasis in original). *See also* Robinson Decl., ¶ 19.

Given that the NCAA has never been a client of Fegan Scott, the motion should be denied for lack of standing. *Mills v. Hausmann-McNally*, 992 F. Supp. 2d 885, 891 (S.D. Ind. 2014) ("The general rule accepted by most federal jurisdictions is that only a current or former client has standing to seek disqualification of an attorney from a matter pending before a court.") (citations omitted). *See also id.* at 894 (generally, "an adversary party lies outside the protective scope of the conflict rules, and thus lacks standing to bring a disqualification motion.") (citations omitted); *Rogers v. Ind. Supreme Court*, No. 1:16-cv-00364-TLS-SLC, 2017 U.S. Dist. LEXIS 31732, at *5-6, 2017 WL 894477 (N.D. Ind. Mar. 7, 2017) (finding that the movant was not a former or current client of the attorneys he sought to disqualify). "…[T]he interest Rule 1.7 is designed to protect is the client's interest in the loyalty of its counsel, and the Seventh Circuit has, albeit in dicta, rejected the notion that someone other than the client has standing to protect that interest." *Closure Sys. Int'l*, 2020 U.S. Dist. LEXIS 247063, *7 (citing *In re Sandahl*, 980 F.2d 1118, 1121 (7th Cir. 1992) ("The abandoned client, of course, was N-W. It has not objected to being abandoned. Glenayre has no standing to assert N-W's rights to Mayer Brown's 'absolute loyalty.'")). Here, the client abandoned by Sakthivel was Manassa; the NCAA was

14

never Fegan Scott's client and thus the NCAA "has no standing to assert [Manassa's] rights to [Fegan Scott's] 'absolute loyalty.'" *Sandahl*, 980 F.2d at 1121. *See also* Robinson Decl., ¶_19.

Even on the merits however, the motion should be denied.

The NCAA first contends that Fegan Scott should be disqualified pursuant to Rule 1.7 (duty of client loyalty). [5] *See* NCAA Br. at 15 (citing Ind. Professional Conduct Rule 1.7). Given that Fegan Scott has never represented the NCAA, the duty of loyalty does not apply. Robinson Decl., ¶¶ 18, 19, 20, 23, 26, 28.  The court in *Exterior Sys. v. Noble Composites, Inc.*, 210 F. Supp. 2d 1062 (N.D. Ind. 2002), explained that the Indiana Rules of Professional Conduct take a functional approach. *Id.* at 1072. Rule 1.7 and the duty of loyalty applies to the lawyer representing the client but does not involve imputation to a firm that never represented the client. *Id.* at 1072. Given the NCAA was never the Firm's client, Rule 1.7 does not apply.

Next, the NCAA contends that Fegan Scott should be disqualified pursuant to Rule 1.9(a) (duty of loyalty to former clients).[6] *See* NCAA Br. at 17 (citing Ind. Professional Conduct Rule 1.9). However, the NCAA cannot invoke the duty of loyalty because it is not the former client of Fegan Scott. Robinson Decl., ¶¶ 18, 19, 20, 23, 26, 28.  The NCAA's insertion of its own moniker into Rule 1.9(a) shows why its analysis fails:

---

[5] Fegan Scott does not contest that Sakthivel violated Rule 1.7, violating his original duty of loyalty to Plaintiff and then secondarily to the NCAA. Plaintiff Manassa was first represented by Fegan Scott and Sakthivel migrated to the NCAA (not vice versa). The NCAA has turned the duty of loyalty on its head by contending that the firm from which Sakthivel migrated away from should be disqualified.

[6] Fegan Scott does not contest that Sakthivel violated Rule 1.9(a), violating his original duty of loyalty to Plaintiff and then secondarily to the NCAA.

| Ind. R. Prof. Conduct 1.9(a) | The NCAA's quote | The proper alignment of the parties |
|---|---|---|
| "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." | "[A] 'lawyer who has formerly represented a client [the NCAA] in a matter [this lawsuit] shall not thereafter represent another person [Plaintiff and the proposed class] in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client [the NCAA].'" NCAA Br. at 16 (brackets added by NCAA). | "A lawyer [Sakthivel, an employee at Fegan Scott since 2020] who has *formerly* represented a client [Plaintiff] in a matter shall not thereafter represent another person [the NCAA in 2022] in the same or a substantially related matter [this litigation] in which that person's [the NCAA's] interests are materially adverse to the interests of the former client [Plaintiff] unless the former client [Plaintiff] gives informed consent, confirmed in writing." (brackets and emphasis supplied by Fegan Scott). |

Accordingly, Rule 1.9 does not apply to Fegan Scott.

In the absence of a general duty of loyalty and when applying Rule 1.10 on imputation, the rules and the courts limit the duty to the maintenance of client confidences. And the duty to maintain client confidences is captured in the Seventh Circuit's three-part "substantial relationship," which is applied when determining whether an attorney should be disqualified. *See Cromley v. Bd. of Educ.*, 17 F.3d 1059, 1064 (7th Cir. 1994). The court must first determine "whether a substantial relationship exists between the subject matter of the prior and present representations." *Id.* If so, then it must determine "whether the presumption of shared confidences with respect to the prior representation has been rebutted." *Id.* If this presumption has not been rebutted, then the court must determine "whether the presumption of shared

confidences has been rebutted with respect to the present representation." *Cromley*, 17 F.3d at 1064.[7]

Here, as to the first question, Fegan Scott does not contest that a relationship exists between the Firm's representation of Plaintiff in this litigation since 2020 and the NCAA's retention of Sakthivel in 2022.  To that end, the Firm terminated Sakthivel less than 24 hours after receiving the NCAA's April 26, 2022 letter and Ms. Fegan filed a complaint with the State Bar of California that same day. However, as discussed below, the Firm has rebutted the presumption of shared confidences with extensive reliable evidence, and the NCAA has not and cannot demonstrate otherwise.

### 2.  The Firm's standard practices prevented the sharing of confidences, and no confidences were shared.

The NCAA seeks to impose a bright line rule that taints the Firm with Sakthivel's duplicity regardless of the facts. "A *per se* rule has the virtue of clarity, but in achieving clarity, it ignores the caution that when dealing with ethical principles, [] we cannot paint with broad strokes. The lines are fine and must be so marked." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 135 (2d Cir. 2005) (internal quotations omitted).  Moreover, "[g]iven the wide variation in the nature and substance of relationships lumped together under the title 'of counsel,' a per se approach is ill-equipped to respect appropriately 'both the individual's right to

---

[7] Even if Rules 1.7 and 1.9 apply to Fegan Scott, application of the Seventh Circuit's substantial relationship test is still appropriate. *See McClain v. T P Orthodontics*, No. 3:07-CV-113, 2008 U.S. Dist. LEXIS 3869, at *4-5, 2008 WL 181292 (N.D. Ind. Jan. 17, 2008) ("The reasoning for [applying the Seventh Circuit's substantial relationship test] is because the purpose behind preventing current conflicts, as encompassed in Indiana Rule of Professional Conduct Rule. 1.7, and potential conflicts, as encompassed in Indiana Rule of Professional Conduct 1.9, is the same: to protect confidences one client may have shared with an attorney and to safeguard loyalty as a feature of the attorney client-relationship. *Id.* The substantial evidence test is a means to ensure that both client confidences and loyalty are preserved, and therefore, it encompasses both Indiana Rules of Professional Conduct 1.7 and 1.9.").

be represented by counsel of his or her choice and the public's interest in maintaining the highest standards of professional conduct.'" *Id.* (quoting *Hull v. Celanese Corp.*, 513 F.2d 568, 569 (2d Cir. 1975)). *See also Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 235 (2d Cir. 1977) ("[W]e have never believed that labels alone—partner, clerk, co-counsel—should control our decisions in so sensitive an area.").

Further, the Seventh Circuit has recognized that the imputed disqualification of a law firm may be rebutted by implementation of "specific institutional mechanisms" which prevent the flow of confidences from a "tainted" attorney to his law firm. *Speedy v. Rexnord Corp.*, 54 F. Supp. 2d 867, 868-69 (S.D. Ind. 1999) (citing *Cromley v. Bd. of Educ.*, 17 F.3d 1059, 1065 (7th Cir. 1994)). A law firm can rebut the presumption through proof that "screening procedures were timely employed" in the new law firm to prevent the disclosure of information and secrets. *Speedy*, 54 F. Supp. 2d at 868-69 (citing *Cromley*, 17 F.3d at 1065). Thus, as the Second Circuit explained:

> We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from de facto separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint.

*Hempstead Video*, 409 F.3d at 138.

This analysis is consistent with that of state courts in Indiana. For example, in *XYZ, D.O. v. Sykes*, 20 N.E.3d 582 (Ind. Ct. App. 2014), the court explained: "the presumption of shared confidences could be rebutted by a demonstration that 'Fire Walls' were implemented to effectively insulate against any flow of confidential information from the 'infected attorney' to any member of her present law firm." *Id.* at 588 (citing *Gerald v. Turnock Plumbing, Heating & Cooling, L.L.C.*, 768 N.E.2d 498, 505 (Ind. Ct. App. 2002)). The court further explained that

18

disqualification should only be *per se* "where the personally disqualified lawyer had 'primary responsibility' for the prior 'matter that causes the disqualification.' Ind. Professional Conduct Rule 1.10(c)(1)." *Id.*

Here, Sakthivel had ***no*** responsibility, much less primary responsibility, for Plaintiffs in this litigation. Likewise, Sakthivel's work for the NCAA was on document review for one month; based on the submissions of the NCAA and the fact that Sakthivel does not even have an appearance on file in this matter, Sakthivel clearly had little responsibility, and certainly not primary responsibility, for the NCAA. Beyond responsibility, the incontrovertible evidence reflects that Sakthivel did not share any confidences with Fegan Scott; rather, he completely hid the fact that he was doing any work outside the Firm.

In determining whether a party has provided sufficient evidence to rebut the presumption of shared confidences, courts require clear, competent, and effective evidence. *See, e.g., Freeman*, 689 F.2d at 723 ("Accordingly, if an attorney can clearly and effectively show that he had no knowledge of the confidences and secrets of the client, disqualification is unnecessary.")[8] The court's analysis in *Arista Records L.L.C. v. Lime Grp. L.L.C.*, No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 17434, at *5-6, 2011 WL 672254 (S.D.N.Y. Feb. 18, 2011), is instructive on the types of evidence that meet this bar.

In *Arista Records*, Wilkie Farragher, the law firm whose disqualification was sought, submitted "a declaration from [the conflicted attorney] attesting to the fact that he has never disclosed Plaintiffs' confidential information to anyone" and "declarations from every member

---

[8] In addition, an absolute finding of no possible inadvertent sharing is not required to successfully rebut the presumption. *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1580 (Fed. Cir. 1984) (citing *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Labs., Inc.*, 607 F.2d 186, 197 (7th Cir. 1979) (applying Seventh Circuit law and stating: "[a]n absolute finding of no possible inadvertent sharing of confidences is not required to establish an effective rebuttal. The proof of a negative renders certainty virtually impossible.").

of Wilkie's LimeWire team who has billed 50 hours or more to the LimeWire matter attesting to the fact that [he] has not disclosed confidential information to them." *Id.* at *23-24. The court noted the evidence that led to its decision to deny disqualification: "Defendants are not relying solely on attorney affidavits, but are also relying on electronic audits showing that Korn has never accessed any Limewire documents. . . ." *Id.* at *27. The court found that disqualification of the law firm was not warranted because there was "no real risk that the trial will be tainted." *Id.* at *19.

Just as in *Arista Records*, Fegan Scott has submitted extensive evidence reflecting that Sakthivel never shared any confidences with the Firm. This evidence includes declarations from Sakthivel that he never told the Firm he was conducting document review for the NCAA, nor shared any confidences with anyone at the Firm, Ex. 2; declarations from the Firm's attorneys working on this litigation that Sakthivel never had any substantive discussions about the NCAA or this litigation with them, Ex. 1, 4, 5; and a declaration from the Firm's administrative assistant who attested that the Firm meetings attended by Sakthivel did not include discussion of this litigation, Ex. 2.[9]

Further, just as in *Arista*, Fegan Scott is "not relying solely on attorney affidavits, but [is] also relying on electronic audits showing that [Sakthivel] never accessed any [NCAA]

---

[9] This evidence rebuts the unfounded speculation in the NCAA's brief that Sakthivel could have shared information about the NCAA with Fegan Scott. NCAA Br. at 19. *See Reid v. Wrought Washer Mfg.*, No. 20-cv-1406, 2022 U.S. Dist. LEXIS 56411, at *32, 2022 WL 912129 (E.D. Wis. Mar. 29, 2022) ("Courts must use caution when dealing with an undeveloped record: '[C]ounsel . . . should not only be allowed to protect their relationship with their present client but also their good name and reputation for high ethical standards . . . a summary disqualification order, based on a scant record of this type, can do irreparable harm to an attorney's or law firm's professional reputation.'") (quoting *Analytica, Inc. v. NPD Rsch., Inc.*, 708 F.2d 1263, 1275 (7th Cir. 1983) (Coffey, J., dissenting)) (emphasis added by Reid court).

Moreover, the NCAA's formal production of 640 bates-stamped documents that Sakthivel reviewed does not constitute the type of confidential information that would constitute a violation of the rules as the NCAA contends (*id.*), given that the NCAA and Proteus aver that they were scrupulously quality checking Sakthivel's work as opposed to giving him authority to

documents" or files. *Arista Records*, 2011 U.S. Dist. LEXIS 17434, at *5-6. *See* Fegan Decl., ¶ 37. The audits of Fegan Scott's electronic files reflect that Sakthivel never accessed any NCAA-related file, did not have access to Fegan Scott's e-discovery vendor for this litigation, and billed 100% of his time (except for four hours on two unrelated matters) to the *Zantac* litigation.[10] Thus, just as in *Arista Records*, there is "no real risk that the trial will be tainted" or client confidences shared. 2011 WL 672254, at *5-6.

Similarly, in *Mendez v. Puerto Rican Int'l Cos*., No. 05-174, 2013 U.S. Dist. LEXIS 84024 (D.V.I. June 12, 2013), the court denied a motion to disqualify a law firm where the tainted attorney "performed only discrete research assignments on specific cases (not this case), worked remotely with no access to Rohn & Associates' case files, and did not communicate with any attorneys at the firm regarding this matter." *Id.* at *15. The court explained: "In essence, Ellison was a contract attorney who performed limited functions during his brief employment with Rohn & Associates. As such, the Court cannot say that Ellison was not effectively screened from the instant matter and that disqualification and the costs and delay that would inevitably result from disqualification are necessary at this time." *Id.*

The uncontroverted evidence reflects that Sakthivel was a document reviewer – either as a Staff Attorney at Fegan Scott or a contract attorney at Proteus. Sakthivel worked remotely, did not access Fegan Scott's case file for this litigation, and did not have any substantive

---

directly produce documents to Plaintiff. Biederman Decl., ¶ 26. Given that the production of these documents is known, and passed through B&T, there is no "'substantial risk of information exploitation….'" *See* NCAA Br., at 21 (quoting *Watkins*, 869 F.3d at 528).

[10] Fegan Scott does not maintain any physical class action case files. Fegan Decl., ¶ 38. And, even if individual attorneys maintain a physical work file in their home office, Sakthivel was never in a Fegan Scott office or any other attorney's remote workspace. Sakthivel Decl., ¶ 6.

communications with any attorneys at the Firm regarding this matter. He was effectively

screened on a *de facto* basis from this litigation at Fegan Scott. Disqualification is not warranted.

### 3.   Plaintiff and the putative class would be prejudiced by Fegan Scott's disqualification.

"Even if an ethical violation occurred, courts disfavor disqualification when

'disqualification at this point in the proceedings would only delay the movement of this case,

increase the parties' costs and deprive [a party] of its choice of counsel,' a choice made here

before any potential conflict occurred." *Nuwave, LLC v. Cincinnati Specialty Underwriters Ins.*

*Co.*, No. 16 C 4504, 2017 U.S. Dist. LEXIS 233122, *6-7, 2017 WL 11569209 (N.D. Ill. Jan. 25,

2017) (quoting *Metro. Life Ins. Co. v. Guardian Life Ins. Co. of Am*., No. 06 C 5812, 2009 U.S.

Dist. LEXIS 42475, *15, 2009 WL 1439717 (N.D. Ill. May 18, 2009) (collecting cases)); *Sauer*

*Inc. v. Honeywell Bldg. Sols. SES Corp.*, No. 3:08-92, 2012 U.S. Dist. LEXIS 12881, *10, 2012

WL 364050 (W.D. Pa. Feb. 2, 2012) ("Plaintiff, the non-moving party, would be severely

prejudiced if the Court granted Defendant's motion and disqualified Cohen Seglias from further

representing Plaintiff in this matter. Cohen Seglias has represented Plaintiff in this case since its

inception nearly four years ago,….").

Here, Ms. Fegan began investigating this matter in May 2020 upon reading "NCAA must

stop perpetuating academic and financial disparities for HBCUs: Penalties highlight patterns of

inequities that cannot be ignored," ANDSCAPE (f/k/a The Undefeated) (May 27, 2020).[11] Fegan

Decl., ¶ 71. Before filing the Class Action Complaint in December 2020, the Firm invested

hundreds of hours in consulting with experts, researching the history of NCAA's academic

programs and their discriminatory impact on Black student-athletes, the potential causes of

---

[11] *See* https://andscape.com/features/ncaa-must-stop-perpetuating-academic-and-financial-disparities-for-hbcus/ (last accessed May 26, 2022).

action and complex issues of law, working with their clients, and establishing a litigation team. Fegan Decl., ¶ 73.  Since filing the case, the Firm has continued to work, successfully opposing the NCAA's motion to dismiss; working with consulting experts; engaging in discovery with the NCAA, including significant meet and confers on e-discovery, the NCAA's proposed document review protocol, and the NCAA's delay in productions; meeting and conferring with third-party HBCUs with respect to subpoenas *duces tecum*; and strategizing for class certification, summary judgment, and trial.  Fegan Decl., ¶ 74.  To date, the Firm has also invested tens of thousands of dollars in expert consultants and e-discovery-related fees. Fegan Decl., ¶ 78.

This case is novel and complex, and has required hundreds of hours to understand the NCAA's academic performance programs, their discriminatory impact, and the methods (and data needed) to prove Plaintiff's case. At the time Fegan Scott began its work in May 2020 through February 2022, no conflict existed. Sakthivel's migration to Proteus and the NCAA in March 2022 was not disclosed to Plaintiff or Fegan Scott. Disqualification at this stage, when no confidences have been or will be shared, "would only delay the movement of this case, increase the parties' costs and deprive [Plaintiff] of [his] choice of counsel," a choice made here before any potential conflict occurred. *Metro. Life Ins. Co.*, 2009 U.S. Dist. LEXIS 42475, at *15-16. Accordingly, the motion should be denied.

### C.  The policy reasons behind disqualification do not support the drastic remedy in this case.

"In recent precedent relating to Rule 1.7, courts have tended to eschew bright line rules requiring disqualification as the automatic outcome from a concurrent conflict of interest." *In re Curare Lab. LLC*, 2022 Bankr. LEXIS 1413, at *45 (W. Ky. Bkr. May 18, 2022) (collecting cases). "Given the costs imposed by disqualification and the theoretical availability of alternative means of enforcement of the disciplinary code, a court should look to the purposes behind the

rule violated in order to determine if disqualification is a desirable sanction." *SWS Fin. Fund A v. Salomon Bros.*, 790 F. Supp. 1392, 1401 (N.D. Ill. 1992).

Disqualification as a response to a violation of the rules of professional conduct can serve two separate and distinct functions. When there is a concern that the conflicted attorney would breach their duty of loyalty by disclosing confidential information in violation of the ethical rules, disqualification can serve a remedial function. *Paloian v. Greenfield* (*In re Rest. Dev. Grp., Inc.*), 402 B.R. 282, 289 (Bankr. N.D. Ill. 2009) (citing Bruce A. Green, *Conflicts of Interest in Litigation: The Judicial Role*, 65 Fordham L. Rev. 71, 72 (1996)) (additional citations omitted). It also can serve as a sanction in order to discourage future ethical violations by the attorney. *Id.* (citing Green, *supra*, at 72-73). In this case, disqualifying Fegan Scott would not be appropriate either as a remedy or a sanction.

First, there is no need for remedial action because Sakthivel did not share any information about the NCAA, much less confidential information, with Fegan Scott. Sakthivel never accessed Fegan Scott's NCAA files, nor shared any NCAA files or documents with Fegan Scott employees. Moreover, Fegan Scott terminated Sakthivel less than 24 hours after receiving the NCAA's April 26, 2022 letter and has implemented an internal litigation hold pending resolution of this motion. And, importantly, Fegan Scott's standard practices (remote work, audit trail for files, meeting organization and tracking) ensured that cross-contamination of information could not and did not occur.

Second, there is no need for a sanction in order to discourage future ethical violations, given that Fegan Scott did not commit an ethical violation. Fegan Scott conducts conflict checks when being retained, clearly instructs its employees that outside employment is not permitted, and requires disclosure to the Firm if outside interests have the potential to cause a conflict of

interest.  Here, it was Proteus that had, or could have had, the information that would have raised the potential for a conflict before Sakthivel was hired. The defense dropped the ball. Fegan Scott should not be disqualified as a sanction because its conduct was and has always been in accordance with the ethical rules.

## IV.    CONCLUSION

WHEREFORE, Fegan Scott LLC respectfully requests that this Court deny the motion to disqualify and grant such other and further relief as this Court deems appropriate.

DATED:  May 31, 2022                                    Respectfully submitted,

By:  */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan (admitted *pro hac vice*)
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone:    (312) 741-1019
Facsimile:      (312) 264-0100
beth@feganscott.com

Melissa Clark (admitted *pro hac vice*)
Brooke Achua (admitted *pro hac vice*)
**FEGAN SCOTT LLC**
140 Broadway, 46th Floor
New York, NY  10005
Phone: 347.353.1150
melissa@feganscott.com
brooke@feganscott.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Elizabeth A. Fegan, an attorney, confirm that, on May 31, 2022, I caused the foregoing to be filed on the Court's electronic case filing system, which will serve the pleading on all attorneys of record.

DATED:  May 31, 2022

By:  */s/ Elizabeth A. Fegan*

Elizabeth A. Fegan (admitted *pro hac vice*)
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone:     (312) 741-1019
Facsimile:      (312) 264-0100
beth@feganscott.com