# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TROYCE MANASSA, *et al*.,
        Plaintiffs,
        v.
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,
        Defendant.

No.: 1:20-cv-03172-RLY-MJD

## DECLARATION OF MARY ROBINSON

I, Mary Robinson, under oath, declare and state as follows:

**A.**     **Professional Background**

1.     I have been licensed to practice law in Illinois and California since 1975. I presently practice as a member of Robinson, Stewart, Montgomery & Doppke, LLC. Since 2007, my practice has been concentrated in matters involving lawyer ethics and professional responsibility, including defending lawyers and judges in disciplinary investigations and prosecutions, advising lawyers and law firms on ethical issues and obligations, and providing expert consultation and testimony. Since 2007, I have been retained and identified as an expert witness on legal ethics and professional responsibility issues in over 50 cases.

2.     I served as the Administrator of the Illinois Attorney Registration and Disciplinary Commission ("ARDC") for fifteen years, from 1992 to 2007, having previously served as a Commissioner of the ARDC by appointment of the Illinois Supreme Court from 1989 to 1992. While at the ARDC, I was responsible for developing and implementing policies for enforcement of the Illinois Rules of Professional Conduct. During the 15 years I served as Administrator, I

1

directed the investigations of over 6000 grievances each year, as well as the prosecution of formal disciplinary actions in about 1800 cases.

3.      Related bar association activities in which I have engaged include service on the following committees:   ABA Standing Committee on Ethics and Professional Responsibility (2007–2010); ABA Standing Committee on Professional Discipline (1995–1997); ABA National Conference on Professional Responsibility, Planning Committee (2007– 2011, Chair 2008–2010); Illinois Judicial Ethics Committee (2015-present); Chicago Bar Association/ Chicago Bar Foundation Task Force on the Sustainable Practice of Law and Innovation, Regulating Technology-Based Products and Services Committee Chair (2019-present); Illinois State Bar Association Task Force on the Future of Legal Services (2015-2017); Illinois Supreme Court Special Committee on Professionalism (2001–2004); and Illinois Supreme Court Commission on Professionalism (2004–2007).

4.      I taught the Professional Responsibility course at both Northwestern University Law School and Northern Illinois University College of Law, and I have presented as a lecturer and panelist on professional responsibility issues for the ABA National Conference on Professional Responsibility; ABA Conference on the Role of the Court in Improving Lawyer Conduct and Professionalism; ABA Symposium on Teaching Professional Responsibility; CoLAP National Conference for Lawyers Assistance Programs; National Organization of Bar Counsel; Federal Bar Association; Association of Professional Responsibility Lawyers; International Association of Defense Counsel; Illinois State Bar Association; Chicago Bar Association; Illinois Trial Lawyers Association; IICLE; PLI; ALI-ABA; Chicago Law Bulletin and various Inns of Court and county bar associations.

2

5.      A copy of my curriculum vitae is attached as Ex. A, and includes a list of all publications authored in the previous 10 years and list of all other cases in which, during the previous 4 years, I testified as an expert at trial or by deposition.

6.      I am being compensated $500an hour for my time and testimony in this matter.

7.      A list of the facts or data I considered in forming my opinions is attached as Ex. B.

**B.    Issue Addressed**

8.      I have been retained by Fegan Scott LLC to provide an opinion on the following issue:

> Whether Fegan Scott should be deemed to have a disqualifying conflict of interest for purposes of continuing its representation of the Plaintiff class in this matter because a lawyer/former-employee of the firm, in violation of his employment agreement and firm policy, covertly accepted employment through Proteus Discovery Group, LLC, to perform document review on behalf of Defendant NCAA relating to discovery in this case?

**C.    Facts Considered**

9.      Fegan Scott LLC (the Firm) filed this matter on behalf of the Plaintiff putative class (the Manassa Class) in December 2020. The Firm began investigating this matter as early as May 2020.

10.     In September 2020, the Firm hired Ravi Sakthivel as a staff attorney to work full time and fully remotely from his home in California. Thereafter, Sakthivel worked exclusively reviewing documents in the Zantac litigation, which documents were maintained by an e-discovery vendor retained by lead counsel in that litigation. In November 2021, the Firm introduced an Employee Handbook which, *inter alia,* required employees to notify the Firm and secure the Firm's consent to any outside activity that might involve a conflict of interest. A Confidentiality Agreement which employees were required to execute included a commitment that the employee

3

would not engage in any business activities that would conflict with the employee's duties on behalf of the Firm.

11.     The Firm uses a document management and billing system that allows the Firm to track every employee's access to all client files. The software verifies that Sakthivel never accessed any records pertaining to the Manassa matter and never billed any time to that matter.

12.     Since inception, the Firm's attorneys (other than Elizabeth Fegan and Timothy Scott) have worked fully remotely and Sakthivel worked exclusively from his home in California. Due to COVID, no one from the Firm ever met Sakthivel in person. The Firm held weekly meetings via Zoom. One monthly meeting was for the entire firm, the other meetings in the month were case specific and only staff attorney working on cases scheduled for discussion were invited to attend the case-specific meetings. Sakthivel did not attend case-specific firm meetings unless the Zantac matter was on the agenda, and the Firm's agendas for the case-specific meetings reflect that the Manassa litigation was never discussed during the same meeting as Zantac.

13.     Fegan was identified as Mr. Sakthivel's direct supervisor. Sakthivel never communicated with her regarding the Manassa litigation or the NCAA. The only communication with Sakthivel by anyone in the Firm concerning the Manassa litigation occurred on April 22, 2022 when Melissa Clark emailed him to inquire whether he was available to temporarily move off the Zantac matter to work on document review in Manassa. She asked if he was available on April 26, 2022 for a call and he replied that he was interested in moving off Zantac and was available for the call. Sakthivel did not disclose to Clark at that time that he had conducted document review for the NCAA or that he had any information or knowledge concerning the NCAA.

14.     On April 26, 2022, Fegan received a letter via email from Brian Casey, a lawyer for the NCAA, stating that his firm had learned that Ravi Sakthivel, who had performed document

4

review under the auspices of the vendor handling document management for the NCAA (Proteus Discovery Group, LLC) in the Manassa case, was employed by Fegan Scott. Immediately upon reading the letter, Fegan instructed Tim Scott to coordinate with the firm's IT support to remove Sakthivel's access to all Fegan Scott systems, instructed Melissa Clark to ensure that Sakthivel did not have access to the firm's document hosting site for Manassa, and instructed Lynn Ellenberger to coordinate removal of his access to the Zantac document hosting site. Clark also cancelled the document review call in which Sakthivel had been invited to participate, scheduled for later that day. Fegan gave further instructions for preserving communications with Sakthivel and directed all Fegan Scott employees to have no communications with him. Fegan replied to Brian Casey's letter asserting that the Firm had no knowledge of Sakthivel's work for the NCAA, assuring that steps were being taken to cut off his access to all firm systems, and indicating that she would communicate further about the matter once the Firm had investigated.

15.     The Firm terminated Sakthivel the following day.

**D.     Opinion**

Summary

16.     Fegan Scott did not assume an attorney-client relationship with or otherwise assume responsibilities to the NCAA as a result of Ravi Sakthivel's unauthorized employment with Proteus to perform document review on behalf of the NCAA. Sakthivel did not have authority to commit Fegan Scott to any relationship with the NCAA, and neither Fegan Scott nor the NCAA intended to enter into any such relationship. As a result, Sakthivel's conflict which arose because of his unauthorized work for the NCAA cannot be imputed to Fegan Scott so as to warrant disqualification of the firm from its representation of the Manassa Class. Additionally, all

5

circumstances of Sakthivel's work for the Firm rebut any concern that he shared any confidential NCAA information with Fegan Scott.

### Principles

17.     Under the Rules of Professional Conduct, lawyers are prohibited from taking on representation of a client whose interests are directly adverse to those of another client. Indiana Rule of Professional Conduct 1.7(a). Rule 1.7 governs the conduct of individual lawyers, not firms. See ABA Formal Opinion 88-356 (December 1988) at p. 1. The significance of an individual lawyer's conflict vis-à-vis that lawyer's firm is determined under Rule 1.10(a), which provides:

**Rule 1.10. Imputation of Conflicts of Interest: General Rule**

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2 unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

18.     Comment [2] to Rule 1.10 explains that the imputation imposed under Rule 1.10(a): ". . . gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated."

19.     Imputation is intended to address a trio of concerns: 1) that lawyers in a firm ordinarily share each other's interests so that the loyalty of any one lawyer to that lawyer's client should be shared by all firm lawyers; 2) that the lawyers in a firm ordinarily have access to files

6

and confidential information about each other's clients and that sharing of information might compromise the representation of clients whose interests are in conflict; and 3) that it would be unfair to impose upon clients the difficult burden of proving on a case-by-case basis that an adverse representation by an affiliated lawyer resulted in prejudice to their interests. *Restatement (Third) of the Law Governing Lawyers,* §123 cmt. b (2000). Imputation assures that the shared interests of firm lawyers will be molded by shared dedication to the interests of each client and that confidential information of all clients can be shared among firm lawyers without jeopardizing the interests of any client. Application of the doctrine of imputation places the burden of rebutting the assumption of shared confidences upon the firm rather than the client. *Cromley v. Bd. of Educ. of Lockport Twnshp. High Sch.*, 17 F.3d 1059, 1064 (7th Cir. 1994).

Analysis

20.     Under those principles, there can be no doubt that Ravi Sakthivel engaged in a conflict of interest when he undertook the Proteus engagement to perform document review on behalf of the NCAA in connection with this case. At the time he did so, Fegan Scott attorneys were representing the Manassa Class and as a lawyer associated with Fegan Scott, Sakthivel was vicariously bound to the firm's obligation of loyalty to the Manassa Class. RPC 1.10(a). He was thus precluded from representing the NCAA because it was directly adverse to the Manassa Class. RPC 1.7(a)(1).

21.     The issue presented here is whether representation of the NCAA by Sakthivel can be imputed to Fegan Scott. Defendant assumes that as a result of Sakthivel's work for the NCAA, the NCAA should be deemed to have become a client of Fegan Scott so that Fegan Scott's representation of the Manassa Class was prohibited by Rule 1.10(a). (The NCAA's Brief in Support of Its Motion to Disqualify Fegan Scott LLC as Counsel for Plaintiff, at 17 – 18) As

7

support, Defendant points to the law of agency and the proposition that an agent's knowledge and actions are imputed to the principal. (*Id*, at 18, citing to *United States v. Dish Network, LLC*, 954 F.3d 970, 978 (7th Cir. 2020); *Hamilton v. Hamilton*, 132 N.E.3d 428, 433 (Ind. Ct. App. 2019)).

22.    However, as discussed by the Court in *Dish Network*, agency law also holds that acts outside an agent's authority do not generate liability for the principal and that principals are not liable for acts that gratify an agent's desires at the principals' expense. *Dish Network*, 954 F.3d at 977; *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938-39 (7th Cir. 2016). There appears to be no dispute that Sakthivel was not authorized to assume representation of the NCAA. Fegan Scott policy explicitly prohibited outside work that involved a conflict with the firm's obligations. Sakthivel's defiance of that prohibition for his own benefit and to the detriment of Fegan Scott was an act outside his authority that could not bind the firm.

23.    There is the additional factor that Sakthivel did not purport to Proteus or the NCAA that he was taking on the NCAA work as an agent of Fegan Scott. The NCAA was not misled to believe that it was accepting representation from Fegan Scott or that Fegan Scott had assumed any duty of loyalty to the NCAA. An attorney client relationship must be consensual. *In re Kinney*, 670 N.E.2d 1294, 1297 (Ind. 1996) (an attorney-client "relationship is consensual, existing only after both attorney and client have consented to its formation."). *See also Monica Smith v. Crews*, No. 1:07-cv-1074-WTL-DML, 2009 U.S. Dist. LEXIS 147597, *8-9 (S.D. Ind. Aug. 6, 2009) (noting that an attorney-client relationship must be mutual and consensual, and stating "The relationship cannot be created by the attorney alone or by a third party who has no authority to act on behalf of the purported client; an attorney-client relationship cannot be imposed on individuals unilaterally.")  Neither Fegan Scott nor the NCAA had any intention of entering into such a relationship and no logic supports an assertion that the NCAA became a client of that firm.

8

24.    Because Sakthivel did not have authority to bind Fegan Scott to obligations to the NCAA and because the NCAA never intended to be a client of Fegan Scott, there is no basis for imputing Sakthivel's representation of the NCAA to Fegan Scott. As a result, Fegan Scott was not prohibited from representing the Manassa Class under Rule 1.10(a).

25.    That result is also dictated by the plain terms of Rule 1.10(a). The Rule prohibits *knowingly* representing a client when another lawyer in the firm would be conflicted from doing so. It is clear that no Fegan Scott lawyer other than Sakthivel knew that Sakthivel was doing work for the NCAA so that no Fegan Scott lawyer engaged in the representation of the Manassa Class with any knowledge of Sakthivel's conflict.

26.    Sakthivel was quickly terminated when Defendant brought his work for the NCAA to the attention of Fegan Scott. Defendant suggests that Fegan Scott was then disqualified from representing the Manassa Class under Rule 1.10(b) which essentially frees a firm to undertake representation that is adverse to a former firm client when the lawyer responsible for the representation leaves the firm, unless the new representation is substantially related to the matter in which the departed lawyer represented the former client. There is no question that the matters are substantially related, but Fegan Scott's ability to represent the Manassa Class has nothing to do with the fact that Sakthivel has terminated his relationship with the Firm. The NCAA was not a client of the Fegan Scott firm during or after Sakthivel's tenure, and the Firm had no duty of loyalty to the NCAA that precludes its continuing representation of the Manassa Class.

27.    Because the NCAA was never a client of Fegan Scott, the Rules of Professional Conduct provide no basis for disqualification of Fegan Scott from its representation of the Manassa Class. Moreover, from a functional point of view, imputation is not warranted in this case because the concerns that support imputation are not present.

28.     The assumption that lawyers in a firm share interests so that their loyalties have to be aligned is pure fiction when a firm lawyer goes rogue. In this matter, Sakthivel pursued his own interests in derogation of his loyalty to the firm and to its other clients and in defiance of firm policy. Fegan Scott never undertook competing loyalties and remains single-mindedly dedicated to the interests of the Manassa Class.

29.     More importantly, all relevant circumstances negate the concern Sakthivel would have shared confidential NCAA information with other lawyers at Fegan Scott. Sakthivel was concealing his work for the NCAA from Fegan Scott. He was hardly likely to mention some NCAA information in casual conversation. Even a hint that he was doing any outside document review, much less for the opponent of a firm client, was likely to end his employment.

30.     Moreover, Sakthivel's interactions with other Fegan Scott lawyers were limited. He did not work in an office with any of the other lawyers, his role was limited to document review in a single matter (the Zantac litigation), he was not invited to meetings where only other litigation was discussed, and all of his communications with anyone in the firm were electronic.

31.     Sakthivel's working arrangements align very closely with those of a temporary or contract lawyer, where the uniquely limited involvement of the lawyer in firm cases and limited interaction with other firm lawyers warrant a functional case-by-case analysis of whether imputation is appropriate rather than rigid application of Rule 1.10(a). See ABA Formal Opinion 88-356, "Temporary Lawyers" (December 16, 1988).[1] That functional analysis focuses upon the temporary lawyer's access to client information in matters other than those he is working on and the nature and extent of the temporary lawyer's communication with other firm lawyers. Here

---

[1] It is only because of such a functional analysis that Sakthivel's duty of loyalty to the Manassa class as a result of his employment with Fegan Scott need not be imputed to Barnes & Thornburg, disqualifying that firm from representation of the NCAA in this case.

Fegan Scott records show that Sakthivel did not access firm records for the Manassa litigation and the declarations of firm lawyers show that he did not discuss that case with any lawyer who was assigned to the Manassa matter.

32.     Finally, because of the nature of Sakthivel's work for Fegan Scott, advances in technology make it possible to identify with great precision the extent to which he was actually isolated from the Manassa Class representation. Firm software tracks access to client files by any firm employee and software reports verify that Sakthivel never accessed any Manassa records. Sakthivel (and most other firm attorneys) worked from remote locations; there were no opportunities for casual office conversations. Remote meetings occurred electronically and for meetings where particular matters were discussed, Sakthivel was invited only when the Zantac case was on the agenda. The Firm has records of the agendas and can verify that the Manassa case was never on the same agenda as Zantac while Sakthivel was employed with the firm. Finally, because of the working arrangements, the firm lawyers who were working on Manassa can be more certain about what interactions they had with Sakthivel. There was no opportunity for casual encounters. Their declarations that they had no conversations with Sakthivel about the Manassa case are especially reliable.

33.     Thus, regardless of whether Sakthivel's representation of the NCAA bound Fegan Scott to obligations to the NCAA, the concerns supporting the doctrine of imputation are not present here and the NCAA's interests can be protected without disqualification of Fegan Scott from its representation of Manassa.

34.     It is fortunate that situations like that presented here are generally unknown in the literature. Sakthivel's conduct was brazen and incomprehensible from any angle. To the extent that his conduct was preventable, Fegan Scott had in place policies that would have prevented it if

Sakthivel had honored those policies. Firms can rightly expect that their lawyers know and abide by ethical obligations, especially obligations as obvious as not taking on work for the opponent of a firm client. The extremity of Sakthivel's departure from norms made his conduct unforeseeable.

35.     For purposes of conflicts of interest, there is recognition that some can arise unexpectedly. Comment [5] to Rule 1.7 identifies changes in corporate affiliations or realignment of parties as two developments which are often unforeseeable and which occur through no fault of the lawyers involved. Sometimes referred to as "thrust-upon" conflicts, Comment [5] and caselaw recognize that withdrawal from representation of one of the clients is often the fairest and most practical solution when a conflict develops because of matters not within the control of the lawyers. See e.g., *Carlyle Towers Condominium Association, Inc. v. Crossland Savings, FSB*, 944 F. Supp. 341 (D.N.J. 1996).

36.     The issue in this case did not arise because of changes in corporate affiliation or the alignment of parties of parties, but it was not foreseeable and was not caused in any way by any lawyer for Fegan Scott acting within the scope of their authority. Disqualification of a lawyer is considered an extreme result, disfavored because it interferes with a client's choice of counsel and because motions to disqualify can be used as tactical ploys. *Watkins v. Trans Union, LLC*, 869 F.3d 514, 518 (7th Cir. 2017).

37.     The interests of the Manassa Class in continuing the properly initiated representation by Fegan Scott warrant consideration. To the extent that Sakthivel's work for the NCAA is deemed to create a conflict for Fegan Scott, that conflict was thrust upon the firm by conduct the Firm forbad, conduct which was concealed from the Firm and which arose well into the Firm's representation of the Manassa Class. Sakthivel's work for the NCAA ended some time ago, so that there is no relationship there that needs to be honored.

38.     Unquestionably, the NCAA has an interest in assuring that its confidential information is protected, but even assuming that Sakthivel's conflict could properly by imputed to Fegan Scott, there is no factual basis for a concern that Sakthivel shared any NCAA confidential information with Fegan Scott so as to warrant that Firm's disqualification. *Arista Records, LLC v. Lime Group LLC,* 2011 WL 672254 (S.D. N.Y. Feb 22, 2011).

Conclusion

39.     Sakthivel's unauthorized document review for the NCAA cannot be deemed to constitute a representation of the NCAA by Fegan Scott. Sakthivel undertook that work outside any authority he may have had as an attorney of the Firm and no one, including the NCAA, was misled to believe that Fegan Scott thereby assumed any responsibilities to the NCAA. Because it was important for Sakthivel to conceal the work from Fegan Scott, there is no cause to presume that he shared confidences with any other lawyers in the Firm. In any event, the logistics of Sakthivel's work for Fegan Scott, including the limited scope of his responsibilities and the verifiably limited opportunity for interaction with other Fegan Scott personnel, affirmatively rebut any concern that he shared confidential NCAA information with the Firm.

_____
Mary Robinson

Robinson, Stewart, Montgomery & Doppke, LLC
33 N. Dearborn, Suite 1420
Chicago, IL 60602
(312) 676-9875
mrobinson@rsmdlaw.com



**ROBINSON STEWART MONTGOMERY & DOPPKE** LLC

Mary Robinson *Partner*
Direct 312.676.9874

Stephanie Stewart *Partner*
Direct 312.782.5102

Sari W. Montgomery *Partner*
Direct 312.676.9872

James A. Doppke, Jr. *Partner*
Direct 312.676.9878

**EXHIBIT A**

**Curriculum Vitae**

**MARY ROBINSON**

## Current Position

### *Robinson, Stewart, Montgomery & Doppke, LLC*

Representation, consultation, and expert witness services in matters involving lawyer and judicial ethics and discipline, law office management, sanctions and lawyer malpractice since 2007.

## Professional Experience

### *Cook County Shakman Compliance Administrator* (March 2009 – October 2018)

By appointment of Federal District Court, in the case of *Michael Shakman, et al. v. The Democratice Organization of Cook County, et al,* U.S.Dist.Ct., N.D.Ill. No. 69 C 2145, responsible for overseeing compliance with decree prohibiting unlawful patronage employment practices in the Office of the President of the Cook County Board, the Cook County Health and Hospital System, and the Cook County Public Defender.

### *Administrator, Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois, Chicago, Illinois* ( March 1992 – March 2007)

Served as principal executive officer of the agency which operates under the authority of the Illinois Supreme Court and is responsible for the investigation and prosecution of disciplinary complaints against Illinois lawyers. Responsibilities included developing and implementing policies for the investigation of grievances against Illinois lawyers and for determination of when formal disciplinary charges should be pursued and what sanctions should be recommended in disciplinary cases; implementation of the Illinois Client Protection Program (which reimburses clients for losses caused by their attorneys' dishonesty) and the Ethics Inquiry Program (provides assistance to Illinois lawyers in solving ethical dilemmas); overseeing the annual registration of Illinois attorneys and maintenance and publication of registration data; presentations to Illinois and national audiences on

professional responsibility topics; and, from time to time, personally handling the hearing or appeal in particular matters.

***Robinson & Skelnik,*** *Elgin, Illinois* (1982 – 1992)

Practice, initially as solo, expanding to partnership in 1985, with concentration in civil and criminal appellate representation civil and criminal, with appearances before the Illinois Supreme Court, the Illinois Appellate Court for the First, Second, Third and Fifth Districts, and the United States Court of Appeals for the Seventh Circuit. Practice also included trial work in criminal and family law cases.

***Office of the State Appellate Defender***
*Ottawa, Illinois* (1974 – 1977)
*Elgin, Illinois* (1977 – 1982)

Began as law clerk and then assistant defender in agency's Third Appellate District office in Ottawa, Illinois, representing criminal defendants on appeal to the Illinois Appellate Court and Illinois Supreme Court from any of the twenty-one counties in the Third Appellate District. Appointed Deputy of Second Appellate District Office in Elgin, Illinois, in 1977, becoming responsible for supervising briefing and argument in over 800 appeals from the thirteen counties in the Second District to the Illinois Appellate Court and the Illinois Supreme Court, primarily from felony convictions, including some capital cases, as well as two cases heard by the United States Supreme Court.

## Professional Service

***American Bar Association***

ABA/BNA Lawyer's Manual on Professional Conduct Editorial Board, 2012 to 2015

ABA Standing Committee on Ethics and Professional Responsibility, Member 2007 – 2010

ABA National Conference on Professional Responsibility, Planning Committee, Member 2007 - 2011, Chair 2008 - 2010

ABA Standing Committee on Professional Discipline, Member 1995 – 1997

***Other Bar Association***

Chicago Bar Association Board of Governors (2017-2019)

Chicago Bar Association/Chicago Bar Foundation Task Force on the Sustainable Practice of Law and Innovation, Regulating Technology-Based Products and Services Committee Chair (2019 - present)

Illinois Judicial Ethics Committee (2015 - present)

Illinois State Bar Association Task Force on the Future of Legal Services (2015 - 2017)

Illinois State Bar Association Standing Committee on Future of Legal Services (2017 - 2018)

Illinois Supreme Court Special Committee on Professionalism (2001 – 2004)

Illinois Supreme Court Commission on Professionalism, ex officio member (2004 – 2007)

Commissioner, Attorney Registration and Disciplinary Commission of the Illinois Supreme Court (1989 – 1992)

Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases, Member 1988–1991

Illinois State Bar Association: Special Committee on Ancillary Businesses, Task Force on Multi-Disciplinary Practice, Coordinating Committee for Conclave on Legal Education, Criminal Justice Section Council, Committee on Mental Health

Lecturer and panelist for IICLE and bar association courses on criminal law, search and seizure, and appellate practice; coordinator of appellate practice seminar cosponsored by Illinois Appellate Lawyers Association and John Marshall Law School; lecturer for Illinois Appellate Defender training conferences. (1980 – 1991)

**Presentations** 1992 – present

Lecturer and panelist on professional responsibility issues for, *inter alia*: ABA National Conference on Professional Responsibility; ABA Conference on the Role of the Court in Improving Lawyer Conduct and Professionalism; ABA Symposium on Teaching Professional Responsibility; CoLAP National Conference for Lawyers Assistance Programs; National Organization of Bar Counsel; Federal Bar Association; Association of Professional Responsibility Lawyers; International Association of Defense Counsel; National Association of Consumer Bankruptcy Attorneys; American Bankruptcy Instutute; Illinois Appellate Defender, Illinois

3

Attorney General and City of Chicago Law Department in-house training programs; Illinois State Bar Association, Chicago Bar Association, Illinois Trial Lawyers Association, IICLE, PLI, ALI-ABA, Chicago Law Bulletin and various Inns of Court and county bar associations.

### *Law School Teaching*

Northern Illinois University School of Law, Professional Responsibility Course, Spring Semester 1999 – 2004

Northwestern University Law School, Professional Responsibility Course, Spring Semester, 2005

### Education and Licensing

J.D., University of Southern California – 1974

Admitted to practice: Illinois (April 1975), California (January 1975)
Admitted to the bars of the: United States District Court, Northern and Central Districts, United States Court of Appeals for the Seventh Circuit, United States Supreme Court

### Awards

Oct 2006        Illinois Lawyers Assistance Program Carl H. Rolewick Award

June 2007       John Marshall Law School Corporate Law Association Francis D. Morrissey Lifetime Achievement Award

### Publications

Attorneys Legal Liability – 2022 Edition, Chapter 13, *"Disciplinary Liability,"* Illinois Institute of Continuing Legal Education

"*Mandating Civility: Wisdom or Folly?*" ABA The Professional Lawyer, Vol. 22, No. 2 (April 2014)

"*Discipline and Disability: When is Disease a Defense,*" ABA GP SOLO, p. 31 (October/November 2009)

*The Professional Cost of Untreated Addiction and Mental Illness in Practicing Attorneys*, The Professional Lawyer, 2009 Symposium Issue, p. 101 (ABA Center for Professional Responsibility 2009)

*"In The End, It's All About The Children: Chicago Attorneys Travel to Africa,"* CBA Record, p. 40 (September 2008).

*"Colleagues in Crisis. Collateral Damage: Careers and Families,"* The Judges' Journal, American Bar Association, p. 37 (Spring 2008).

*"A Lawyer's Duty To Report Another Lawyer's Misconduct: The Illinois Experience,"* The Professional Lawyer, 2007 Symposium Issue, p. 47 (ABA Center for Professional Responsibility 2007).

*"Abusive Tax Shelters: Ethical Pitfalls for Lawyers,"* The Professional Lawyer, 2007 Symposium Issue, p. 99 (ABA Center for Professional Responsibility 2007).

*"Avoiding ARDC Anxiety: A Disciplinary Primer,"* 84 Ill Bar J 452 (September 1996).

## Expert Testimony (Trial or Deposition) 2017 – Present

*E&M Investments v. Katten Muchin Rosenman LLP,* 09 L 3572, Circuit Court, Cook County, IL

*In Re Williams,* Nos. 15-71767 16-07024, U.S. Bankruptcy Court, Western Dist. Of Va.

*Devivo v. Fiumetto,* et al., No. 14 CH 16744, Circuit Court of Cook County, IL

*Ring v. Schenker,* No 2015 L 005404, Circuit Court of Cook County, IL

*Barnard Knox v. Berke et al.,* No. 13 CH 00914, Circuit Court of Cook County, IL

*Rabine POC, Inc. v. Lawrence Mishkin, et al.,* No. 2014 L 002765, Circuit Court of Cook County, IL

*Chicago Capital Management, LP v. Katten Muchin Rosenman LLP,* 2017 L 003321, Circuit Court of Cook County, IL

*Leydig, Voit & Mayer, Ltd. v. SL Pru, LLC, et al.,* 2016 CH 02697, Circuit Court of Cook County, IL

*Kormi v. Choate, et al.,* No. 1 :16-CV-09415, U.S. Dist. Ct., Northern District, Illinois

*Tadros v. Newland & Newland, LLP., et al.,* No. 16 L 1191, Circuit Court of Cook County, IL

*Paul Gremillion, et al. V. Nixon Peabody, LLP.,* No. 16 L 008792, Circuit Court of Cook County, IL

*Hermansen v. Riebandt, et al.,* No. 2016 L 7654, Circuit Court of Cook County, IL

*Michael C. Kim v. Hemingway House Condominium Association,* No. 13 M1 131645, Circuit Court of Cook County, IL

*GoGo LLC v. Squire Patton*, No. 2016 L 007789, Circuit Court of Cook County, IL

*Newmark Group, Inc. et al. v. Avison Young (Canada), Inc. et al.* No. 2015 L 2186, Circuit Court of Cook County, IL

*A. Clay Cox, as Trustee for the Estate of Central Illinois Energy Cooperative v. Michael E. Evans, et al.,* No. 1:18-cv-01105, U.S. District Court, Central District of Illinois, Peoria Division

*Jorie, LP et al. v. Roberts McGivney Zagotta,* No. 17 L 000728, Circuit Court of DuPage County, IL

*Wiczer & Sheldon, LLC, et al. v. Eriem Surgical, et al.,* No. 17 M2 3772, Circuit Court of Cook County, IL

*Newman v. Katten Muchin Rosenman LLP,* JAMS No. 1340017794

*Signal Financial Holdings, et al., v. Looking Glass Financial LLC*, et al., No. 1:17-cv-8816, U.S. District Court, Northern District, IL

*Karahalios v. Markos*, No. 2019 L 002092, Circuit Court of Cook County, IL

*TorHoermann Law, LLC v. Thomas, Keel & Laird, LLC,* No. 17-L-142, Circuit Court of Madison County, IL

*Michel v. Thomas, et al.,* 2017 L 010934, Circuit Court of Cook County, IL

## EXHIBIT B

1. *Manassa* Class Action Complaint

2. Ravi Sakthivel LinkedIn Profile

3. Fegan Scott website (www.feganscott.com)

4. Sakthivel's profile from Fegan Scott website (as of February 2022)

5. August 24, 2020 Offer Letter to Sakthivel, signed by Sakthivel on August 25, 2020

6. Firm Confidentiality Policy signed by Sakthivel August 25, 2020

7. Fegan Scott Employee Handbook (eff. November 2021), with Employee Acknowledgement signed by Sakthivel on November 9, 2021)

8. Fegan Scott Confidentiality Agreement signed by Sakthivel on November 9, 2021

9. February 18, 2022 Email from Brian Casey to Elizabeth Fegan, attaching Document Review Protocol

10. April 26, 2022 Email from Brian Casey to Elizabeth Fegan

11. April 26, 2022 Email from Elizabeth Fegan to Brian Casey

12. May 2, 2022 Letter from Elizabeth Fegan to Brian Casey

13. May 6, 2022 Letter from Proteus to Elizabeth Fegan

14. Declaration of Brooke Achua

15. Declaration of Melissa Clark

16. Declaration of Elizabeth Fegan

17. Declaration of Timothy Scott

18. Declaration of Ravi Sakthivel