UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TROYCE MANASSA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20-cv-03172-RLY-MJD |
| | ) |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION TO DISQUALIFY**

This matter is before the Court on Defendant's Motion to Disqualify FeganScott LLC as Counsel for Plaintiff, [Dkt. 100]. For the reasons set forth below, the Court **DENIES** Defendant's motion.

**I. Background**

Plaintiff Troyce Manassa, who appears on behalf of all others similarly situated, is represented in this case, in part, by Elizabeth Fegan, Brooke Achua, and Melissa Clark of Fegan Scott LLC ("FeganScott"), a "fully-remote" law firm. [Dkt. 104-1 at 4.] Defendant, the National Collegiate Athletic Association ("NCAA"), is represented by Alicia Barrs, Brian Casey, Ilana Zelener, Chisara Ezie-Boncoeur, and Victor Vital of Barnes & Thornburg LLP. Upon learning that a FeganScott staff attorney moonlighted as a document reviewer for the NCAA in this case, the NCAA has moved to disqualify FeganScott from representing Plaintiff and the putative class. [Dkt. 100.] Due to the unique situation presented, resolution of the instant motion demands a fastidious sifting of the facts.

Elizabeth Fegan, managing partner and co-founder of FeganScott, began investigating Plaintiff's case against the NCAA in May 2020. [Dkt. 104-1 at 12.] On September 7, 2020,

FeganScott hired Ravi Sakthivel as a full-time staff attorney to conduct document review remotely from his home in California. *Id.* at 5. Mr. Sakthivel's employment was governed by his signed offer letter, *id.* at 15, two confidentiality policies, *id.* at 19, 25, and an employee handbook, *id.* at 21, which, *inter alia*, prohibited Mr. Sakthivel from engaging in any activities that might conflict with his duties to FeganScott, including outside employment. Mr. Sakthivel was to report directly to Ms. Fegan, and was assigned to the matter *In re Zantac (Ranitidine) Products Liability Litigation*, No. 20-MD-2924 (S.D. Fla.) (the "Zantac litigation"). *Id.* at 6. With the exception of four hours,[1] Mr. Sakthivel worked exclusively on document review for the Zantac Litigation as an employee of FeganScott. *Id.* at 8. At no point during his employment did Mr. Sakthivel inform FeganScott that he was working for anyone else or on any other matters. *Id.* at 7.

On December 10, 2020, FeganScott filed this case on behalf of several Plaintiffs and putative classes. At some point thereafter, the NCAA's e-discovery vendor, Proteus Discovery Group, LLC, ("Proteus") began retaining independently contracted attorneys to review, analyze, and code NCAA documents responsive to the discovery requests in this case.[2] [Dkt. 101-1 at 3; Dkt. 101-2 at 3.] Unbeknownst to FeganScott, Mr. Sakthivel applied to Proteus for a document review position around January 31, 2022.[3] [Dkt. 101-2 at 3.] Mr. Sakthivel provided his resume as part of his application materials, but his resume apparently omitted any mention of his

---

[1] The four hours that were not billed to the Zantac litigation were billed to a potential sexual abuse case and a pending property damage case, neither of which are related to the NCAA or this case. [Dkt. 104-1 at 8.]
[2] The NCAA first retained Proteus around 2017. Since then, Proteus has served as the NCAA's e-discovery vendor in approximately 50 lawsuits. [Dkt. 101-2 at 2.]
[3] Mr. Sakthivel twice applied for a document review position with Proteus. The first application was submitted on October 11, 2021. Proteus contacted Mr. Sakthivel to work on a then-pending NCAA project on October 26 and 27, 2021, but Mr. Sakthivel did not respond. [Dkt. 101-2 at 3.]

employment with FeganScott.[4] *Id.* After engaging in what it describes as "due diligence,"[5] Proteus hired Mr. Sakthivel as an independent contractor on March 2, 2022. *Id.* at 4. Mr. Sakthivel was to provide document review services for the NCAA for approximately two-to-three weeks.[6] *Id.* at 17. Upon hiring, Mr. Sakthivel signed a conflict of interest form, in which he attested to the following:

> After conducting an independent analysis of past and current clients, Contractor represented and warrants that Contractor has no business, professional, personal or other interest, including, but not limited to, the representation of other clients, that would conflict in any manner with the performance of Contractor's obligations under this agreement. If any actual or potential conflict of interest arises under this Agreement, Contractor shall immediately notify Proteus of such conflict in writing.

*Id.* at 17-18. At no point did Mr. Sakthivel ever relay a potential or actual conflict of interest to Proteus. *Id.* at 8.

Working for Proteus, Mr. Sakthivel was given access to several resources and databases relating to this case, and he attended at least four meetings regarding the NCAA's litigation

---

[4] Mr. Sakthivel asserts as follows: "[D]ue to my inadvertence, I accidentally submitted an older resume which was not current and did not list my then current employer Fegan Scott's information. Instead[,] my resume was at the time outdated and only listed my previous employer Robbins Geller Rudman Dowd LLP." [Dkt. 104-2 at 3.] However, he maintains that, "as part of my application I also included my LinkedIn profile which accurately listed Fegan Scott as my employer since September 2020." *Id.* Raymond Biederman, CEO and co-founder of Proteus, contests this, asserting that "Proteus has no record of Sakthivel ever providing Proteus a copy of his LinkedIn profile at any point in time." [Dkt. 108-1 at 2.]

[5] According to Mr. Biederman, Proteus' due diligence involves (1) reviewing and analyzing a candidate's application materials; (2) interviewing the candidate; (3) confirming the candidate is a licensed attorney in good standing; and (4) confirming the candidate does not have any attorney disciplinary history. [Dkt. 101-2 at 4.] Proteus "does not generally perform an internet search of information related to independent contractor candidates" on the grounds that "the prospective employer is less likely to obtain information about whether a candidate falls within any protected status under anti-discrimination laws, which helps facilitate a prospective employer to make neutral employment decisions." *Id.*

[6] Proteus' contract with Mr. Sakthivel did not state a specific matter he would be working on, but listed the services to be performed as the "[r]eview, analysis, and coding of documents provided to Proteus by Proteus' Client, The National Collegiate Athletic Association ("NCAA")." [Dkt. 101-2 at 17.]

strategy. *Id.* at 6-7. From March 3, 2022, through April 4, 2022, Mr. Sakthivel billed 183.7 hours for his review, analysis, and coding of 6,622 NCAA documents relating to this case. *Id.* at 8. This work resulted in at least 640 documents that were reviewed and tagged as responsive by Mr. Sakthivel being produced to FeganScott. *Id.* On April 4, 2022, Proteus terminated Mr. Sakthivel as an independent contractor due to "the severity and quantity of issues" with his work. *Id.* at 22.

On April 22, 2022, Proteus learned, and promptly informed the NCAA's lawyers at Barnes & Thornburg, that Mr. Sakthivel had been contemporaneously employed as a staff attorney by FeganScott throughout the duration of his employment with Proteus.[7] *Id.* at 8. Barnes & Thornburg subsequently relayed this information to Ms. Fegan on April 26, 2022, and demanded FeganScott withdraw as counsel in this case. [Dkt. 101-1 at 74.] Ms. Fegan immediately placed Mr. Sakthivel on administrative leave and suspended his access to all FeganScott systems. [Dkt. 104-6 at 5.] FeganScott then terminated Mr. Sakthivel on April 27, 2022, and Ms. Fegan personally filed an Attorney Misconduct Complaint with the State Bar of California that same day. [Dkt. 104-1 at 77.] On May 2, 2022, Ms. Fegan informed Barnes & Thornburg that disqualification was not warranted since no FeganScott attorneys "have received or had access to any information regarding the NCAA from Ravi, nor did Ravi access, or have access to, [FeganScott's] files relating to the NCAA in this or any other litigation." *Id.* The NCAA filed the instant motion to disqualify on May 23, 2022. [Dkt. 100.]

## II. Legal Standard

In the Southern District of Indiana, the Indiana Rules of Professional Conduct ("IRPC") govern questions of alleged ethical violations. S.D. Ind. Local R. 83-5(e); *see Watkins v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017) ("Lawyers representing clients in federal courts

---

[7] It is unclear how Proteus learned of Mr. Sakthivel's employment with FeganScott.

must follow federal rules, but most 'federal courts use the ethical rules of the states in which they sit.'") (quoting *Huusko v. Jenkins*, 556 F.3d 633, 636 (7th Cir. 2009)). However, district courts possess broad discretion in ruling on motions to disqualify. *Watkins*, 869 F.3d at 518 (citing *Whiting Corp. v. White Machinery Corp.*, 567 F.2d 713, 715 (7th Cir. 1977)). Indeed, "[t]he Rules of Professional Conduct are rules of reason" and "should be interpreted with reference to the purposes of legal representation and of the law itself." IRPC Scope § 14.

"The disqualification of an attorney is a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Mills v. Hausmann-McNally, S.C.*, 992 F. Supp. 2d 885, 890 (S.D. Ind. 2014) (quoting *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993)). This is because the consequences of granting a motion to disqualify are "immediate, severe, and often irreparable." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 719 (7th Cir. 1982). For example, disqualifying a lawyer from a case "deprives the losing party from the 'representation of his choice' and disrupts the litigation." *Watkins*, 869 F.3d at 519 (quoting *Freeman*, 689 F.2d at 721). Motions to disqualify therefore necessitate proceeding with "extreme caution." *Freeman*, 689 F.2d at 722. Most importantly, however, the "violation of a Rule does not necessarily warrant . . . disqualification of a lawyer in pending litigation." IRPC Scope § 20. Rather, when faced with a motion to disqualify, "courts are directed to follow a two-step analysis, considering: (1) whether an ethical violation has occurred, and (2) if so, whether disqualification is the appropriate remedy for the violation." *Mills*, 992 F. Supp. 2d at 890 (citing *Guillen v. City of Chicago*, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997)).

### III.  Discussion

The NCAA moves to disqualify FeganScott as Plaintiff's counsel on the grounds that Mr. Sakthivel has caused "an irreconcilable conflict of interest under Rules 1.7, 1.9, and 1.10 of the

Indiana Rules of Professional Conduct that can only realistically be solved through disqualification" of FeganScott.[8] [Dkt. 100 at 1.] In response, FeganScott unequivocally condemns the actions of Mr. Sakthivel, but argues that his conflict of interest should not be imputed to FeganScott, and thus disqualification is inappropriate, for several reasons. [Dkt. 104 at 6.] As explained below, the Court, in undertaking the requisite two-part inquiry, finds that (1) Mr. Sakthivel violated, at the very least, IRPC 1.7(a), and that violation is imputable to FeganScott; and (2) numerous other considerations negate the need for FeganScott's disqualification in this matter.

### A. Mr. Sakthivel Violated IRPC 1.7(a) and His Ethical Violation is Imputable to FeganScott

The first step in the Court's inquiry is to determine whether Mr. Sakthivel committed an ethical violation and, if so, whether his violation is imputable to FeganScott. *Mills*, 992 F. Supp. 2d at 890 (citing *Guillen*, 956 F. Supp. at 1421).

In order to protect the duties of loyalty and independent judgment owed to a client, the Indiana Rules of Professional Conduct prohibit attorneys from engaging in concurrent conflicts of interest. IRPC 1.7, comment 1.

> [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
> 1. the representation of one client will be directly adverse to another client; or
> 2. there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another

---

[8] IRPC 1.9 governs conflicts of interest with **former** clients, which is not the core issue here. Rather, the question of a conflict arose when Mr. Sakthivel was employed concurrently by FeganScott and Proteus/NCAA. *See* IRPC Scope § 19 ("[D]isciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances as they existed at the time of the conduct in question."). As such, the Court will not analyze the present situation under IRPC 1.9. Nonetheless, FeganScott does not contest that Mr. Sakthivel violated IRPC 1.9 as well as IRPC 1.7.

>  client, a former client, or a third person or by a personal interest of the lawyer.

IRPC 1.7(a). "Notwithstanding the existence of a concurrent conflict of interest," a lawyer may still represent a client if certain conditions are met, including the written informed consent of each affected client. IRPC 1.7(b).

Here, there is no dispute whatsoever that Mr. Sakthivel committed serious ethical violations in derogation of, at the very least, IRPC 1.7(a)—as well as numerous FeganScott and Proteus policies—and that neither party consented to his concurrent representation. Indeed, as a FeganScott staff attorney since September 2020, Mr. Sakthivel was precluded from representing the NCAA—or any other client outside of his employment with FeganScott—in any capacity. Mr. Sakthivel's covert employment as a document review attorney for Proteus/NCAA therefore constitutes a concurrent conflict of interest directly adverse to Plaintiff and the putative class pursuant to IRPC 1.7(a).

Having found that Mr. Sakthivel violated IRPC 1.7(a), the Court must now determine whether his violation is imputable to FeganScott. Whether an individual lawyer's conflict can be imputed to that lawyer's firm is determined by IRPC 1.10, which provides:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2 unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

IRPC 1.10(a). This rule of imputed disqualification "gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm." IRPC 1.10, comment 2.

The plain text of IRPC 1.10(a), which prohibits **knowingly** representing a client when another lawyer in the firm would be conflicted from doing so, is fundamentally instructive. In this context, the term "knowingly . . . denotes actual knowledge of the fact in question," but "[a]

7

person's knowledge may be inferred from circumstances." IRPC 1.0(f). Thus, if Mr. Sakthivel knew, or reasonably should have known based on the circumstances, that he was prohibited from accepting outside employment—especially with the NCAA—then that knowledge is imputable to FeganScott.

Here, it is irrefutable that Mr. Sakthivel knew or should have known that his Proteus employment would cause a conflict of interest.[9] First, FeganScott's employment materials expressly prohibit Mr. Sakthivel from accepting any outside employment: Mr. Sakthivel's offer letter required him to "agree to devote your full business time, attention, and best efforts to the performance of your duties for [FeganScott]," [Dkt. 104-1 at 15], and FeganScott's employee handbook states, in relevant part, as follows:

> Situations that involve an actual or potential conflict of interest between an employee's interests and the interests of the Firm must be discussed with management in order to protect the interests of both parties. It is the policy of the Firm that all employees disclose any situation, which does or may involve a conflict of interest between their personal interests and the interests of the Firm.

*Id.* at 22. Examples of activities which may cause conflicts include "[r]endering of directive, managerial, or consultant services to any outside entity, which does business with, or is a competitor of, the Firm, except with the Firm's knowledge and consent," and "[o]utside employment anywhere, directly or through an intermediary, which can or will adversely affect the employee's productivity or availability, including employment by competitor." *Id.* Mr. Sakthivel signed "in acknowledgement of, and agreement with, the above provisions" on

---

[9] In his affidavit, Mr. Sakthivel avers that he was "unaware of any other legal matter Fegan Scott was involved in besides Zantac" and, further, "was never aware that Fegan Scott was involved in any capacity with the Manessa [sic] v. NCAA litigation." [Dkt. 104-2 at 3.] This is unconvincing for the multitude of reasons discussed.

November 9, 2021. *Id.* at 23. That same day, Mr. Sakthivel also signed FeganScott's updated confidentiality agreement, which provides, in part:

> During Employee's employment, Employee will not engage in any business activities, which are competitive with the Firm or otherwise in conflict with Employee's duties on behalf of the Firm, unless the Firm has provided its consent in writing. These obligations include after hours, on weekends, and during vacation time, even if only organizational assistance or limited consultation is involved, whether or not Employee receives compensation from the competing or conflicting entity or person.

*Id.* at 27, 29. Mr. Sakthivel is therefore deemed to have known that his outside employment with Proteus was prohibited.

Moreover, once Mr. Sakthivel began working for Proteus, he was provided with "a copy of the Complaint in this lawsuit, and Plaintiff's requests for production served on the NCAA," both of which "prominently indicate in their respective signature blocks that FeganScott, including Elizabeth Fegan, serves as Plaintiff's counsel in this lawsuit." [Dkt. 101-2 at 5.] Thus, the circumstances clearly indicate that Mr. Sakthivel knew or should have known that his employment with Proteus was directly adverse to his employment with FeganScott. As such, Mr. Sakthivel's violation is imputable to FeganScott under IRPC 1.10(a).

### B. The Imputed Disqualification of FeganScott is Unwarranted

Upon finding that an ethical violation has occurred that is imputable to FeganScott, the latter part of the Court's bifurcated inquiry requires determining "whether disqualification is the appropriate remedy for the violation." *Mills*, 992 F. Supp. 2d at 890 (citing *Guillen*, 956 F. Supp. at 1421). As detailed below, numerous additional considerations underscore that disqualification of FeganScott as Plaintiff's counsel in this matter is unwarranted.

To begin, the primary concerns that support imputed disqualification[10] are simply not present. The rules of conflict imputation are intended to safeguard two primary concerns:

> First, lawyers in a law firm or other affiliation described in this Section ordinarily share each other's interests. A fee for one lawyer in a partnership, for example, normally benefits all lawyers in the partnership. Where a lawyer's relationship with a client creates an incentive to violate an obligation to another client, an affiliated lawyer will often have similar incentive to favor one client over the other.
>
> Second, lawyers affiliated as described in this Section ordinarily have access to files and other confidential information about each other's clients. Indeed, clients might assume that their confidential information will be shared among affiliated lawyers (compare § 60, Comment *f*). Sharing confidential client information among affiliated lawyers might compromise the representation of one or both clients if the representations conflict.

RESTATEMENT (3D) OF THE LAW GOVERNING LAWYERS, § 123 comment b (2000).

First, it is clear that FeganScott did not share Mr. Sakthivel's interests. FeganScott has remained single-mindedly dedicated to the interests of its clients, including Plaintiff. Conversely, Mr. Sakthivel objectively violated his loyalty to FeganScott by furthering his own interests in pursuing outside employment. As such, FeganScott had no "similar incentive to favor one client over the other" because it did not even attempt to do so.

Second, FeganScott has demonstrated that Mr. Sakthivel did not have access to any of its litigation files or other information relating to this case. As the Seventh Circuit has recognized, "the imputed disqualification of a law firm may be rebutted by implementation of 'specific institutional mechanisms' which prevent the flow of confidences from a 'tainted' attorney." *Speedy v. Rexnord Corp.*, 54 F. Supp. 2d 867, 868-69 (S.D. Ind. 1999) (quoting *Cromley v. Board of Educ. of Lockport Township High Sch.*, 17 F.3d 1059, 1065 (7th Cir. 1994)). Indeed,

---

[10] The concept of imputation is better labeled as that of "imputed disqualification," since "[t]he remedies for violating the conflict-of-interest rules extend . . . beyond disqualification." RESTATEMENT (3D) OF THE LAW GOVERNING LAWYERS, § 123 reporter's note to comment b (2000).

Mr. Sakthivel's role with FeganScott was circumscribed: he worked remotely from California and, in fact, never met a FeganScott employee in person; his employment was almost exclusively limited to document review in the Zantac litigation, and the only other matters he worked on were unrelated to this case; he did not have access to any of the files relating to this case; and he was not invited to meetings where this litigation was discussed. *See Hempstead Video, Inc. v. Inc. Village of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005) ("[A]ttorneys with limited links to a firm are not always considered to be 'associated' with the firm for purposes of conflict imputation."). In fact, the only knowledge Mr. Sakthivel gained regarding this case came from his work with Proteus and, regardless, he did not share any of that information with anyone from FeganScott. *See* [Dkt. 104 at 24]. Mr. Sakthivel was the only FeganScott lawyer who knew of his moonlighting for Proteus/NCAA. There is no evidence to suggest that he shared any information he learned from the NCAA with FeganScott. As Ms. Fegan attests, Mr. Sakthivel "completely hid the fact that he was doing any work outside the firm." *Id.* at 23.

      Moreover, FeganScott's firm software tracks employee access to client files, and software reports verify that Mr. Sakthivel was entirely isolated from this case. *See id.* at 25 ("[A]udits of Fegan Scott's electronic files reflect that Sakthivel never accessed any NCAA-related file, did not have access to Fegan Scott's e-discovery vendor for this litigation, and billed 100% of his time (except for four hours on two unrelated matters) to the Zantac litigation."). As the Second Circuit acknowledged, "[w]e see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from *de facto* separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint." *Hempstead Video*, 409 F.3d at 138; *see also XYZ, D.O. v. Sykes*, 20 N.E.3d 582, 588 (Ind. Ct. App. 2014). That is the case here.

11

This analysis is further supported by agency law principles. While the NCAA asserts that "an agent's knowledge and actions are imputed to the agent's principal," [Dkt. 101 at 18], it is paramount to understand that "acts *outside* of an agent's authority do not generate liability for the principal." *United States v. Dish Network LLC*, 954 F.3d 970, 977 (7th Cir. 2020) (emphasis in original). Here, FeganScott, the principal, is not liable for the unethical conduct of Mr. Sakthivel, the agent, because FeganScott did not give Mr. Sakthivel authority to accept outside employment, *see* [Dkt. 104-1 at 22], and, as already noted, lacked any knowledge of his unauthorized conflict as a document reviewer for Proteus/NCAA. Indeed, when Mr. Sakthivel was hired by Proteus to conduct document review for the NCAA, he was not acting within the scope of his employment, nor as an agent for FeganScott. Simply put, because "[p]rincipals are not liable for acts that gratify an agent's desires at the principals' expense," *Dish Network*, 954 F.3d at 977, Mr. Sakthivel's self-gratifying secret employment with Proteus should not be used to punish FeganScott via imputed disqualification.

Additionally, to the extent that Mr. Sakthivel's conduct was preventable, FeganScott had appropriate policies in place that explicitly forbade him from undertaking outside employment or any other acts that could constitute a conflict of interest. Mr. Sakthivel thus represented the NCAA, via his contract with Proteus, in express contravention of his contract with FeganScott. It would be entirely unreasonable to expect FeganScott to regularly ask employees whether they were upholding its policies, as the NCAA seems to suggest. *See* [Dkt. 101 at 11] n.2]. Rather, Proteus had the last/best chance to prevent the situation that unfolded. To be perfectly clear, the fault lies at Mr. Sakthivel's feet—he is the one who acted unethically and covertly accepted conflicting employment. However, Proteus had several opportunities that could have uncovered Mr. Sakthivel's employment with FeganScott before his hiring. For example, although Mr.

Sakthivel provided an outdated resume that omitted his FeganScott employment, his LinkedIn profile conspicuously identified him as a FeganScott staff attorney. *See* [Dkt. 104-1 at 35]. A routine internet search of Mr. Sakthivel would have populated that LinkedIn profile, as well as the FeganScott website wherein he was listed as a staff attorney since his hiring in September 2020. *See id.* at 31. Moreover, so far as Proteus asserts that internet searches are not part of their hiring practices, *see* [Dkt. 101-2 at 4], it certainly seems strange that Mr. Sakthivel's current employment did not come up during his interview. Indeed, Mr. Sakthivel's outdated resume nonetheless listed his "present" employer as Robbins Geller Rudman & Dowd LLP—another law firm. *See id.* at 11. Surely, this should have been a red flag to Proteus, since standard practice typically prohibits employees of a firm from accepting outside employment.[11] Furthermore, an inquiry to, or a simple internet search of, Robbins Geller Rudman & Dowd LLP would have revealed that Mr. Sakthivel was not actually employed there, a fact which should have raised further questions for Proteus.[12] The Court in no way suggests that Proteus hired Mr. Sakthivel in order to create this conflict. However, it would be fundamentally unfair to Plaintiff to deprive him of his counsel of choice when greater diligence in the hiring of Mr. Sakthivel by Proteus could have avoided this situation entirely.

    In light of the fact that there is no evidence whatsoever that any of the NCAA's client confidences were actually shared with any FeganScott employee by Mr. Sakthivel, the Court must exercise its discretion to deny the NCAA's motion to disqualify.

---

[11] The Court also notes that the NCAA failed to articulate how Proteus became aware of Mr. Sakthivel's connection to FeganScott two and a half months after his termination.

[12] Given the standard prohibitions on law firm employees performing outside work, and the possibilities for the creation of conflicts resulting therefrom, one would expect such an inquiry to be a standard aspect of any "due diligence" regarding the employment of an attorney to perform legal work.

## IV. Conclusion

There is no dispute that Mr. Sakthivel acted unethically and violated, at the very least, IRPC 1.7(a). Pursuant to IRPC 1.10(a), that ethical violation is imputable to FeganScott. However, for the myriad reasons set forth above, the imputed disqualification of FeganScott in this matter is substantially unwarranted. Accordingly, the Court **DENIES** Defendant's Motion to Disqualify FeganScott LLC as Counsel for Plaintiff, [Dkt. 100].

SO ORDERED.

Dated:  16 JUN 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on
all ECF-registered counsel of record via
email generated by the Court's ECF system.