UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TROYCE MANASSA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03172-RLY-MJD |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFF'S MOTION TO COMPEL**

This matter is before the Court on Plaintiff's Motion to Compel Discovery. [Dkt. 98.] The motion is fully briefed, and the Court held a hearing on the motion on June 16, 2022. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion.

**I. Background**

Plaintiff's allegations in this case are thoroughly set forth in Judge Young's Entry on Defendants' Motion to Dismiss, [Dkt. 42], and the Court will not repeat them in detail here. Suffice it to say that, since 1965, the NCAA has imposed some kind of academic eligibility requirements on the student-athletes at NCAA member schools. The details of those requirements have been revised numerous times over the decades. Plaintiff alleges that "[w]ith each new eligibility requirement, there was significant evidence that Black student-athletes were being disproportionately affected." *Id.* at 5 (citing [Dkt. 1] at ¶¶ 112, 116, 119, 123, and 126-27).

In 2004, the NCAA instituted the Academic Performance Program ("APP") that, after a revision in 2011, remains in place today. As Judge Young described it, under the APP,

> [f]or the first time, teams as opposed to individual student-athletes were subject to sanctions. The key components of the APP are two metrics: the Graduation Success Rate ("GSR") and the Academic Progress Rate ("APR"). The GSR is the NCAA's calculation of student graduation rates, including transfer students. The APR is a team-based measurement of eligibility, retention, and graduation. (*Id.*). Each student-athlete who receives an athletic scholarship earns one point for continuing enrollment and one point for remaining academically eligible pursuant to NCAA guidelines. The team's total points are divided by points possible and multiplied by 1000, resulting in the APR.

*Id.* (citing [Dkt. 1] at ¶¶ 134, 135). The failure of a team to achieve the requisite APR can result in a variety of penalties, including a ban on the team participating in postseason play. Plaintiff alleges that the APP discriminates against teams at Historically Black Colleges and Universities ("HBCUs") based on race, noting, *inter alia*, that HBCU teams are 43 times more likely to receive a postseason ban under the APP rules than teams at predominantly white institutions. The crux of Plaintiff's claim is that "[t]he NCCA's [sic] adoption and continued enforcement of the APP, including its penalty structure and postseason access bans, together with the NCAA's prior academic propositions and reforms, represent a pattern or practice of intentional discrimination against Black student-athletes at HBCUs on the basis of race." [Dkt. 1 at ¶ 9.]

Plaintiff Troyce Manassa played basketball at Savannah State University, an HBCU, during the 2015/2016 and 2016/2017 seasons. During his second season, Savannah State was banned from postseason play pursuant to the APP. Plaintiff seeks to represent a nationwide class defined as follows: "All Black student athletes who participated in Division I HBCU athletic teams that were subjected to a postseason access ban from the 2010-11 school year through the

date of class certification, including but not limited to those teams listed in Appendix A." *Id.* at ¶ 213.

## II. The Requests for Production at Issue

Plaintiff moves to compel Defendant to provide complete responses to Plaintiff's Requests for Production Nos. 2, 3, 46, 49, and 51.  These requests, and Defendant's responses thereto, read as follow:

> 2. Documents sufficient to show the organizational structure of NCAA's committee(s), employee(s), agent(s), and division(s) responsible for creating, approving, implementing, reviewing, evaluating, analyzing, administering, and enforcing academic requirements, including the Academic Performance Program.
>
> *Defendant's Response:*
>
> The NCAA objects to the extent the term "academic requirements" is vague, ambiguous, subject to multiple interpretations, overly broad and unduly burdensome.  The NCAA also objects to this Request's characterization of the roles and responsibilities of the alleged "committee(s), employee(s), agent(s), and division(s)" of the NCAA.  Subject to and without waiver of the foregoing objections, the NCAA directs Plaintiff to the Division I Manuals, the Division I Committee on Academics Policies and Procedures, and the Division I Committee on Academics Operating Manuals.  The NCAA reserves the right to supplement and/or amend this response to the extent needed, as discovery progresses.
>
> 3. Documents sufficient to identify all third parties retained by the NCAA to review, evaluate, or analyze academic requirements, including the Academic Performance Program.
>
> *Defendant's Response:*
>
> The NCAA objects to the extent the term "academic requirements" is vague, ambiguous, subject to multiple interpretations, overly broad and unduly burdensome.  The NCAA further objects to the extent it seeks information neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence by asking for the identity of third parties who may have provided services

3

unrelated to the facts and claims alleged in the lawsuit. The NCAA objects to this Request's characterization of third parties being retained to "review" the Academic Performance Program, and objects to this portion of the Request as overbroad and unduly burdensome. The NCAA additionally objects to this Request to the extent it seeks confidential and/or proprietary information of either the NCAA or any third party. The NCAA will only produce such information, to the extent the production is permitted by law and the third party, subject to the Stipulated Protective Order. Subject to and without waiver of the foregoing objections, the NCAA responds that it will produce nonprivileged documents that identify those involved in the development or implementation of the Academic Performance Program if any are identified through a reasonable search, subject to the foregoing objections. The NCAA reserves the right to supplement and/or amend this response to the extent needed, as discovery progresses.

46. All research, studies, analyses, or reviews conducted by you or on your behalf or of which you are aware relating to:

> a. DI member institutions' performance under NCAA academic requirements, including the APP;
> b. the performance of HBCUs versus other DI member institutions under NCAA academic requirements, including the APP;
> c. the effects and/or impact of NCAA academic requirements, including the APP, upon:
>> i. Division I member institutions and their teams;
>> ii. DI HBCUs and their teams;
>> iii. DI Predominantly White Institutions (PWIs) and their teams;
>> iv. DI Black student-athletes;
>> v. DI Black student-athletes at HBCUs;
>> vi. DI Black student-athletes at PWIs; and/or
>> vii. DI white student-athletes at PWIs.

*Defendant's Response:*

The NCAA objects to this Request to the extent it seeks the production of documents and/or data not in the possession or control of the NCAA. The NCAA objects to this request as overbroad and duly burdensome because it requests "[a]ll research studies, analyses, or reviews" without limitation in date, and related to categories not relevant to the claims and facts alleged in this lawsuit. The NCAA objects to this Request to the extent it seeks the production of publicly available information equally available to Plaintiff, and as overbroad and unduly burdensome on that basis. The

>NCAA further objects to this Request to the extent it is an improper attempt to obtain personal documents or information concerning student-athletes who are non-parties to this lawsuit, have not consented to the production of the requested materials, and whose privacy interests may be implicated by the production of the requested material.  Subject to and without waiving the foregoing objections, the NCAA responds that it directs Plaintiff to publicly available documents and information including, but not limited to, those located within the "Shared NCAA Research Data" website (https://www.ncaa.org about/resources/research/data-sharing) and its subpages, and that is publicly available within the "Division I Academic Progress Rate (APR)" website (https://www.ncaa.org/about/resources/research/division-i-academicprogress-rate-apr) and its subpages.  Further, the NCAA responds that it will produce nonprivileged documents in its possession, custody, or control related to specific research regarding the effects and/or impact of the APP on Division I HBCU teams and/or on Division I Black student-athletes if any are identified through a reasonable search, subject to the foregoing objections.  The NCAA reserves the right to supplement and/or amend this response to the extent needed, as discovery progresses.

49.  All documents relating to any investigations, allegations, grievances, or complaints, whether formal or informal, public or private, relating to Division I academic requirements and programs, including, but not limited to, the APP.

>*Defendant's Response:*

>The NCAA objects to this Request's characterization of the existence of documents related to the NCAA and discrimination.  The NCAA objects to this Request as overbroad, unduly burdensome, and calling for speculation because it does not identify what entity is associated with making and/or conducting the alleged investigations, grievances, or complaints, listed in this Request.  The NCAA objects to the extent the term "complaints" is vague, ambiguous and subject to multiple interpretations.  The NCAA also objects to this Request to the extent it seeks information neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence by broadly seeking documents unrelated to the Plaintiff or the putative class members, and unrelated to the alleged facts and claims at issue in this lawsuit.  The NCAA also objects to this Request as overbroad, and unduly burdensome, because it seeks the production of "[a]ll" the documents broadly listed in this Request, without tailoring this Request to documents relevant to the claims, facts, and parties at issue in this lawsuit.  The NCAA also objects to this Request to the extent it seeks the production of

personal documents or information concerning student-athletes who are non-parties to this lawsuit, have not consented to the production of the requested materials, and whose privacy interests may be implicated by the production of the requested material.  The NCAA objects to this Request as overbroad and unduly burdensome because it seeks documents without any limitation as to the time period.  The NCAA objects to this Request to the extent it impermissibly seeks legally-protected information including, without limitation, confidential or proprietary information or information protected by the attorney-client privilege, the work-product doctrine and/or any other applicable privilege.  Subject to and without waiving the foregoing objections, the NCAA responds that it is currently unaware of any investigations of the NCAA related to the APP. Moreover, to the extent "complaints" is intended to mean a lawsuit filed in state or federal court, the NCAA responds that it is not aware of any complaints filed against it related to the APP other than the subject lawsuit.  The NCAA reserves the right to supplement and/or amend this response to the extent needed, as discovery progresses.

51. All documents relating to the application of NCAA academic requirements to Savannah State University, including, but not limited to, application of the APP and its penalty structure.

*Defendant's Response:*

The NCAA objects to this Request as overbroad, and unduly burdensome, because as phrased it seeks the production of "[a]ll" the documents broadly listed in this Request, without tailoring this Request to documents relevant to the claims, facts, and parties at issue in this lawsuit.  The NCAA objects to this Request to the extent it impermissibly seeks legally protected information including, without limitation, confidential or proprietary information or information protected by the attorney-client privilege, the work-product doctrine and/or any other applicable privilege.  The NCAA objects to the extent the term "complaints" is vague, ambiguous and subject to multiple interpretations.  The NCAA also objects to this Request to the extent it seeks the production of publicly available information equally available to Plaintiff, and as overbroad on that basis.  Subject to and without waiving the foregoing objections, the NCAA responds that it directs Plaintiff to publicly available documents and information including, but not limited to, those located within the publicly available information attached as Exhibit 2 to the Amended Requests for Admissions served on Mr. Manassa.  Further, the NCAA responds that it will produce non-privileged documents in its possession, custody, or control related to Savannah State University and the

application of the APP from 2010-2020 if any are identified through a reasonable search, subject to the foregoing objections. The NCAA reserves the right to supplement and/or amend this response to the extent needed, as discovery progresses.

[Dkt. 98-1 at 2-7.]

As a result of the meet-and-confer process, Plaintiff agreed to limit Request No. 49 to "'the APP, its predecessors and components' instead of 'including, but not limited to, the APP' but without a date limitation." What Plaintiff means by the APP's "predecessors" (hereinafter referred to as the "Prior Programs") are academic eligibility rules or programs that were instituted in or about 1965; 1973; 1986 (Proposition 48); 1990 (Proposition 42); and 1992 (Proposition 16), as well as changes that were made to the various programs in 1995, 2003, and 2011. [Dkt. 98-1 at 11.]

### III. Applicable Law

The law applicable to discovery disputes such as this one is well-settled and has been summarized by the Court as follows:

> A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or provides evasive or incomplete responses. Fed. R. Civ. P. 37(a)(2)-(3). The burden "rests upon the objecting party to show why a particular discovery request is improper." *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006). This burden cannot be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *Burkybile v. Mitsubishi Motors, Corp.*, 2006 WL 2325506, at *6 (N.D. Ill. August 2, 2006) (internal citations omitted). Moreover, in considering matters of proportionality, Rule 26(b) directs courts to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

> When a party raises objections to discovery requests, the objecting party bears the burden to explain **precisely** why its objections are proper given the broad construction of the federal discovery rules. *In re Aircrash Disaster Near Roselawn, Inc. Oct. 31, 1994*, 172 F.R.D. 295, 307 (N.D. Ill. 1997); *see also Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 478 (N.D. Ind. 2009). Thus, general objections to discovery requests that merely recite boilerplate language without explanation do not meet this burden, and courts within the Seventh Circuit consistently overrule them or entirely disregard such. *See Novelty, Inc. v. Mountain View Mktg.*, 265 F.R.D. 370, 375 (S.D. Ind. 2009) ("'general objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all—and will not be considered"); *Burkybile*, 2006 WL 2325506, at *9 (overruling boilerplate objections made generally and without elaboration). . . . As other Seventh Circuit district courts have noted, "[m]aking general objections is a dangerous practice, as the party who offers such general objections runs the risk of having them summarily denied." *Avante Int'l Tech., Inc. v. Hart Intercivic, Inc.*, 2008 WL 2074093, at *2 (S.D. Ill. 2008). . . . Further, when the objecting party raises nonspecific, boilerplate objections without clearly explaining how the request is objectionable, courts should overrule the objections in favor of broad discovery, pursuant to the federal rules. *Novelty*, 265 F.R.D. at 375 (holding that boilerplate objections without explanation are deemed waived); *McGrath v. Everest Nat. Ins. Co.*, 625 F.Supp.2d 660, 671 (N.D. Ind. 2008) (staying the objecting party must specify why the discovery request is improper); *In re Aircrash*, 172 F.R.D. at 307 (noting that the federal discovery rules should be construed liberally and broadly).

*Barker v. Kapsch Trafficcom USA, Inc.*, 2020 WL 3618945, at *1 (S.D. Ind. July 1, 2020). In addition,

> [a] party resisting discovery on the basis of undue burden must show with specificity that the discovery requests a[t] issue are objectionable. *See, e.g. Fair Oaks Dairy Farms,* 2012 WL 3138108 at *3 ("Dairy Farms has not pointed to a single discovery request that it alleges would be overly burdensome. . . . Dairy Farms simply states that the discovery would be burdensome and expensive without greater detail. The insufficiencies are fatal to its request."); *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum LLC,* 2007 WL 1164970 at *4 (N.D. Ind. Apr. 18, 2007) (quotation omitted) ("[I]f a party is to resist discovery as unduly burdensome, it must adequately demonstrate the nature and extent of the claimed burden by making a specific showing as to how disclosure of the requested documents and information would be particularly burdensome."). This showing typically requires affidavits or other evidence supporting a party's

assertions of burden.  *See, e.g., Jenkins v. White Castle Mgmt. Co.,* 2014 WL 3809763 at *2 (N.D. Ill. Aug. 4, 2014) ("What is required is affirmative proof in the form of affidavits or record evidence."); *Burton Mech. Contractors, Inc. v. Foreman,* 148 F.R.D. 230, 233 (N.D. Ind. 1992) ("An objecting party must specifically establish the nature of any alleged burden, usually by affidavit or other reliable evidence.").

*Whole Woman's Health All. v. Hill*, 2019 WL 10886889, at *3 (S.D. Ind. Oct. 7, 2019).  These legal principles guide the Court's consideration of the parties' arguments with regard to the instant motion.

## IV.  Discussion

Plaintiff argues that

> Defendant's boilerplate, invalid, and unspecified objections should be stricken and/or overruled.  In addition, Defendant should be compelled to produce all responsive documents related to Plaintiff's specific discovery requests 2, 3, 46, 49, and 51, including, but not limited to, all of the NCAA's academic requirement programs.

[Dkt. 98-1 at 13.]  The parties' arguments with regard to the motion are addressed, in turn, below.

### A. Meet-and-Confer Requirement

As an initial matter, Defendant argues that Plaintiff satisfied the meet-and-confer requirement of Local Rule 37-1 only with respect to Request No. 49, and therefore the Court should not consider Plaintiff's motion with regard to the remaining requests addressed therein. This issue has been mooted by the fact that the Court gave the parties the opportunity to further confer with one another during the hearing on the instant motion to attempt to resolve the instant motion, and, after doing so, the parties reported that their efforts were unsuccessful.

### B. Relevance and Proportionality

Defendant argues that the information Plaintiff seeks about the Prior Programs is not relevant to Plaintiff's claim that the APP is discriminatory and that, even if it were relevant, it would not be discoverable on proportionality grounds. Plaintiff, relying on *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), argues that

> [t]here is no question that the NCAA academic program requirements throughout its history, sequence of events leading up to the creation, implementation, and abandonment of each, and departures from its normal procedural and substantive requirements are all established and important factors related to the preponderance of circumstantial evidence establishing intentional discrimination.

[Dkt. 98-1 at 12.] The Court finds unpersuasive Plaintiff's argument that *Arlington Heights* compels a finding that the extremely broad discovery he seeks is appropriate.

#### 1. The *Arlington Heights* decision

*Arlington Heights* involved an allegation that the denial of a petition to rezone a parcel of land was racially discriminatory. Specifically, the Metropolitan Housing Development Corporation ("MHDC") had unsuccessfully petitioned to rezone the parcel from a single-family classification to a multiple-family classification so that it could build townhouses for low- and moderate-income tenants. The MHDC and other plaintiffs filed suit, alleging that the zoning decision violated the Fourteenth Amendment's Equal Protection Clause.[1] Specifically, because 40% of the Chicago-area residents who would qualify to become tenants of the proposed townhouses were Black, the plaintiffs argued that denial of the rezoning petition would

---

[1] The plaintiffs also alleged that the decision violated the Fair Housing Act. The Supreme Court did not address that claim, but rather remanded that issue to the Court of Appeals.

disproportionately affect Black residents and have the effect of continuing residential segregation in the village. The Seventh Circuit Court of Appeals found that "the 'ultimate effect' of the denial was racially discriminatory, and that the refusal to rezone therefore violated the Fourteenth Amendment." *Arlington Heights*, 429 U.S. at 254.

> The Supreme Court reversed. It first noted that it had recently held in another case that
>
> official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

*Id.* at 264-65 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). The decision did not have to "rest[] solely on racially discriminatory purposes"; rather, "invidious discriminatory purposes" had to be "a motivating factor" for the decision.[2] *Id.* at 265-66.

The Supreme Court noted that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

---

[2] Defendant points out that, unlike the claims in *Arlington Heights*, the "motivating factor" standard does not apply to the claims in this case; rather, to succeed in this case, Plaintiff must prove but-for causation. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("All the traditional tools of statutory interpretation persuade us that § 1981 follows the usual rules, not any exception. To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). This distinction, Defendant argues, makes *Arlington Heights* inapplicable to this case. The Court disagrees. The Supreme Court in *Arlington Heights* specifically identified "subjects of proper inquiry in determining whether racially discriminatory intent existed," *Arlington Heights*, 429 U.S. at 268, and, as Defendant recognizes, Plaintiff must prove discriminatory intent in this case as well. *See* [Dkt. 106 at 15] ("Plaintiff's Section 1981 and 1985 claims 'reach[] only intentional discrimination' against a particular plaintiff.") (citing *Haynes v. Indiana University*, 902 F.3d 724, 735 (7th Cir. 2018) (footnote omitted).

11

> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. See *Lane v. Wilson*, [307 U.S. 268 (1939)]; *Griffin v. School Board*, 377 U.S. 218 . . . (1964); *Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala.), *aff'd per curiam*, 336 U.S. 933 . . . (1949); *cf. Keyes v. School Dist. No. 1, Denver, Colo.*, [413 U.S. 189, 207 (1973)]. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. *Reitman v. Mulkey*, 387 U.S. 369, 373-376 . . . (1967); *Grosjean v. American Press Co.*, 297 U.S. 233, 250 . . . (1936). For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
>
> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. See *Tenney v. Brandhove*, 341 U.S. 367 . . . (1951); *United States v. Nixon*, 418 U.S. 683, 705 . . . (1974); 8 J. Wigmore, Evidence § 2371 (McNaughton rev. ed. 1961).
>
> The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.

*Arlington Heights*, 429 U.S. at 267-68 (footnotes omitted). The Court summarized its consideration of the relevant evidence as follows:

> The impact of the Village's decision does arguably bear more heavily on racial minorities. Minorities constitute 18% of the Chicago area population, and 40% of the income groups said to be eligible for Lincoln Green. But there is little about the sequence of events leading up to the decision that would spark suspicion. The area around the Viatorian property has been zoned R-3 since 1959, the year when Arlington Heights first adopted a zoning map. Single-family homes surround the 80-acre site, and the Village is undeniably committed to single-family homes as its dominant residential land use. The rezoning request progressed according to the usual procedures. The Plan Commission even scheduled two additional hearings, at least in part to accommodate MHDC and permit it to supplement its presentation with answers to questions generated at the first hearing.

> The statements by the Plan Commission and Village Board members, as reflected in the official minutes, focused almost exclusively on the zoning aspects of the MHDC petition, and the zoning factors on which they relied are not novel criteria in the Village's rezoning decisions. There is no reason to doubt that there has been reliance by some neighboring property owners on the maintenance of single-family zoning in the vicinity. The Village originally adopted its buffer policy long before MHDC entered the picture and has applied the policy too consistently for us to infer discriminatory purpose from its application in this case. Finally, MHDC called one member of the Village Board to the stand at trial. Nothing in her testimony supports an inference of invidious purpose.
>
> In sum, the evidence does not warrant overturning the concurrent findings of both courts below. Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision.

*Arlington Heights*, 429 U.S. at 269-70 (footnotes omitted).

### 2. Application of *Arlington Heights* to this case

Plaintiff bases his argument that the information he seeks about the Prior Programs, going back to at least 1965, is "highly relevant to the determination of discrimination," [Dkt. 98-1 at 12], on the "factors" set out in *Arlington Heights*. However, the fact that the Supreme Court identified certain categories of evidence as relevant to the issue of whether a particular action was discriminatory does not mean that all such evidence, without temporal limitation, is discoverable. Certainly, the relevance of prior actions taken by an organization fades over time; an action taken a few years ago, perhaps involving the same people and occurring in the same societal context, is far more likely to be relevant to an examination of the intent of the organization's present actions than actions taken decades ago. Nothing in *Arlington Heights* or

the cases relied on therein[3] suggests that the "historical background" going back almost sixty years that Plaintiff seeks is discoverable.

This is precisely the type of situation that the principle of proportionality is meant to address. Defendant explains that

> many documents concerning non-APP programs, including those spanning the 1960s through 1990s, are in paper form in offsite storage locations. Locating, reviewing, and producing these documents would be incredibly time-consuming, expensive, and burdensome, as it would require approximately at a minimum 20 contract review attorneys to spend two forty-hour work weeks reviewing the documents, which would cost up to one-hundred thousand dollars ($100,000).

---

[3] Three of the four cases cited as examples of "historical background . . . reveal[ing] a series of official actions taken for invidious purposes" each looked to relatively recent prior official actions—two relating to school segregation and the other relating to voting requirements—that were previously found by a court to have been discriminatory. *See Lane*, 307 U.S. 268 (considering fact that the voting registration statue at issue was passed in response to the Supreme Court invalidating a state constitutional provision the prior year); *Griffin v. School Board*, 377 U.S. 218 (considering a series of actions taken in response to the decision in *Brown v. Board of Educ.* ten years earlier, culminating in the action at issue in the case); *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. at 207 ("[A] finding [by the district court] of intentional segregation as to a portion of a school system is not devoid of probative value in assessing the school authorities' intent with respect to other parts of the same school system."). In the fourth, *Davis v. Schnell*, 81 F. Supp. 872, the court considered "[t]he history of the period immediately preceding the adoption of the Boswell Amendment," an amendment to the Alabama state constitution involving voter registration, including statements made by those instrumental in the amendment's passing. Similarly, neither of the cases cited as examples of considering "[t]he specific sequence of events leading up the challenged decision" supports Plaintiff's argument. *Reitman v. Mulkey*, 387 U.S. 369, involved a 1964 state constitutional amendment; in finding that the amendment authorized racial discrimination in the housing market, the Court looked at "past efforts by the California Legislature to regulate such discriminations" going back to 1959 and determined that the amendment was passed by ballot initiative in response to those efforts. And in *Grosjean v. Am. Press Co.*, 297 U.S. 233, a case involving the constitutionality of a special tax on newspapers and other publications, the "history and circumstances" examined by the Court were those "which antedated and attended the adoption of the abridgement clause of the First Amendment," not that related to the passing of the tax.

[Dkt. 106 at 14] (citing Declaration of Ray J. Biederman, [Dkt. 106-2]). The Court agrees with Defendant that this expense and the others set forth in the declaration are simply not proportional to the needs of this case, especially given the diminishing relevance of the older information sought.

    This finding of disproportionality is further supported by the reasons given by Plaintiff for seeking the extensive historical information. Plaintiff quite reasonably argues that "[t]he reasons for the NCAA's changes to its academic requirements from serial individual student-athlete requirements to an aggregated team metric, with substantial impact on HBCUs, are highly relevant to the circumstantial evidentiary framework related to intentional discrimination." [Dkt. 109 at 8.] But Defendant does not dispute that Plaintiff is entitled to discovery relating to the reasons why it implemented the APP and chose to make the APP the way it is. The dispute is over whether Plaintiff is entitled to broad discovery relating to the circumstances surrounding the adoption and implementation of each of the Prior Programs. When given the opportunity to explain why all of this information is material to Plaintiff's case during the hearing, Plaintiff's counsel again emphasized the need for information about why Defendant designed the APP the way it did and what information Defendant had regarding the success or failure of the Prior Programs when it implemented those programs. Plaintiff's counsel argued that the historical information about the development of, implementation of, and decision to change each Prior Program is relevant to Plaintiff's claims because it will show whether those Prior Programs were consistent with and successful at furthering Defendant's stated goals regarding the academic success of student athletes. Again, however, while the extremely broad definition of relevance for discovery purposes may be satisfied, Plaintiff has been unable to articulate how the broad,

15

decades-old historical information about the Prior Programs that he seeks is proportional to the needs of this case. The Court finds that it is not.

The question remains regarding the proper temporal limitation for the document requests at issue. The development of a new NCAA program does not occur overnight, and it is likely that events that occurred and information obtained by the NCAA in the years leading up to its implementation of the APP informed its decisions relating to that program. Accordingly, the Court determines that Plaintiff is entitled to full and complete responses to the document requests at issue going back to January 1, 1998, regardless of what particular program the responsive documents might relate to. This will give Plaintiff the type of historical and background information he seeks regarding the creation and adoption of the APP, without requiring Defendant to expend a disproportionate amount of resources to comply. Defendant, of course, would characterize this as almost a quarter century's worth of documents, but, in fact, it only encompasses approximately five years prior to the creation of the APP, and Defendant itself argues that "a period of three-to-five years before and after the alleged discriminatory event" is an appropriate time period for discovery in a discrimination case. *See* [Dkt. 106 at 13] (citing numerous cases). While Defendant argues that the "alleged discriminatory event" here is the postseason ban on Plaintiff's team in 2017, given Plaintiff's theory of the case, the Court finds it more appropriate to consider the creation and adoption of the APP, which was initiated in April

16

2002, as the starting point, as it was the adoption of that program that Plaintiff alleges culminated in the postseason bans experienced by Plaintiff and the other members of the putative class.[4]

### C. Defendant's Objections

As noted above, the Court determines that Plaintiff is entitled to complete and unequivocal responses to the document requests at issue going back to January 1, 1998, regardless of what programs those documents might relate to.  "Complete and unequivocal responses" means in part responses that are not subject to Defendant's boilerplate "General Objections and Reservation of Rights" that preface Defendant's responses to the discovery requests.  To be clear, Defendant may not withhold any document responsive to the requests at issue based on these general objections, or any other objections, with the exception of Defendant's definitional objections found in ¶¶ 7-8, which the Court finds to be appropriate.  *See, e.g., Novelty, Inc. v. Mountain View Mktg.*, 265 F.R.D. 370, 375 (S.D. Ind. 2009) ("'[G]eneral objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all—and will not be considered.").

In addition to these general objections, Defendant has made specific objections to each of the document requests at issue.  While all of those objections are hereby overruled within the context of the temporal limitation set forth herein, the Court will address several of those objections specifically.

First, as to Request No. 3, Defendant objects

---

[4] During the hearing, Defendant effectively admitted the propriety of this time period by admitting it has already produced documents going back to 1998, thereby acknowledging the relevance of that information.

> to the extent it seeks confidential and/or proprietary information of either the NCAA or any third party. The NCAA will only produce such information, to the extent the production is permitted by law and the third party, subject to the Stipulated Protective Order.

[Dkt. 98-1 at 2-3.] The fact that something will only be produced subject to a protective order that already has been entered in the case is not a proper objection. More importantly, however, Defendant's obligation to produce responsive documents is not dependent on the permission of a third party. If Defendant has concerns regarding the confidentiality of a third party's documents, Defendant or the third party must file a motion for protective order with regard to those documents; Defendant may not simply refuse to produce them.

Similarly, as to Requests Nos. 46 and 49, Defendant

> objects to this Request to the extent it is an improper attempt to obtain personal documents or information concerning student-athletes who are non-parties to this lawsuit, have not consented to the production of the requested materials, and whose privacy interests may be implicated by the production of the requested material.

*Id.* at 4, 6. Again, Defendant may not unilaterally withhold responsive documents based on the possible privacy rights of third parties; while the documents in question may be produced pursuant to the confidentiality protective order if appropriate, absent an agreement with Plaintiff, Defendant must produce all responsive documents.

Next, as to Request Nos. 46 and 51, Defendant objects "to the extent it seeks the production of publicly available information equally available to Plaintiff, and is overbroad and unduly burdensome on that basis." *Id.* at 4, 7. Again, that bald assertion is not a proper objection and therefore is overruled.

Finally, as to Request Nos. 49 and 51, Defendant lodges the following objection:

> The NCAA objects to this Request to the extent it impermissibly seeks legally-protected information including, without limitation, confidential or proprietary information or information protected by the attorney-client privilege, the work-product doctrine and/or any other applicable privilege.

*Id.* at 6, 7. To the extent Defendant withholds any responsive document as privileged, it must, of course, produce an appropriate privilege log. As already noted, Defendant may not unilaterally withhold any other responsive document because it is "legally protected"; all such documents must either be produced (subject to the Stipulated Protective Order if appropriate) or be logged if appropriate.

### V. Conclusion

For the reasons set forth above, Plaintiff's Motion to Compel Discovery [Dkt. 98], is **GRANTED IN PART** and **DENIED IN PART**. Defendant shall provide complete and unequivocal responses to Plaintiff's Document Requests Nos. 2, 3, 46, 49, and 51, from January 1, 1998, to the present, without regard to which academic eligibility program the documents relate to.

SO ORDERED.

Dated: 23 JUN 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.