UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TROYCE MANASSA, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | )  No. 1:20-cv-03172-RLY-MJD ) |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., | ) ) ) |
| Defendants. | ) ) |

**ORDER ON PLAINTIFF'S MOTION TO COMPEL**

This matter is before the Court on Plaintiff Troyce Manassa's Motion to Compel Defendant's Production of Data Underlying the Academic Performance Program and Its Predecessor Programs. [Dkt. 149.] For the reasons and to the extent set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

**I.  Background and Applicable Law**

The Court set forth Plaintiff's allegations in this case in its ruling on Plaintiff's first motion to compel, [Dkt. 115], and will not repeat them here.

The Court also set forth the applicable law in its prior ruling, and that has not changed:

The law applicable to discovery disputes such as this one is well-settled and has been summarized by the Court as follows:

> A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or provides evasive or incomplete responses. Fed. R. Civ. P. 37(a)(2)-(3). The burden "rests upon the objecting party to show why a particular discovery request is improper." *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006). This burden cannot

be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *Burkybile v. Mitsubishi Motors, Corp.*, 2006 WL 2325506, at *6 (N.D. Ill. August 2, 2006) (internal citations omitted). Moreover, in considering matters of proportionality, Rule 26(b) directs courts to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

When a party raises objections to discovery requests, the objecting party bears the burden to explain precisely why its objections are proper given the broad construction of the federal discovery rules. *In re Aircrash Disaster Near Roselawn, Inc. Oct. 31, 1994*, 172 F.R.D. 295, 307 (N.D. Ill. 1997); see also *Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 478 (N.D. Ind. 2009). Thus, general objections to discovery requests that merely recite boilerplate language without explanation do not meet this burden, and courts within the Seventh Circuit consistently overrule them or entirely disregard such. See *Novelty, Inc. v. Mountain View Mktg.*, 265 F.R.D. 370, 375 (S.D. Ind. 2009) ("'general objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all—and will not be considered"); *Burkybile*, 2006 WL 2325506, at *9 (overruling boilerplate objections made generally and without elaboration). . . . As other Seventh Circuit district courts have noted, "[m]aking general objections is a dangerous practice, as the party who offers such general objections runs the risk of having them summarily denied." *Avante Int'l Tech., Inc. v. Hart Intercivic, Inc.*, 2008 WL 2074093, at *2 (S.D. Ill. 2008). . . . Further, when the objecting party raises nonspecific, boilerplate objections without clearly explaining how the request is objectionable, courts should overrule the objections in favor of broad discovery, pursuant to the federal rules. *Novelty*, 265 F.R.D. at 375 (holding that boilerplate objections without explanation are deemed waived); *McGrath v. Everest Nat. Ins. Co.*, 625 F.Supp.2d 660, 671 (N.D. Ind. 2008) (staying the objecting party must specify why the discovery request is improper); *In re Aircrash*, 172 F.R.D. at 307 (noting that the federal discovery rules should be construed liberally and broadly).

> *Barker v. Kapsch Trafficcom USA, Inc.*, 2020 WL 3618945, at *1 (S.D. Ind. July 1, 2020). In addition,
>
>> [a] party resisting discovery on the basis of undue burden must show with specificity that the discovery requests a[t] issue are objectionable. *See, e.g. Fair Oaks Dairy Farms*, 2012 WL 3138108 at *3 ("Dairy Farms has not pointed to a single discovery request that it alleges would be overly burdensome. . . . Dairy Farms simply states that the discovery would be burdensome and expensive without greater detail. The insufficiencies are fatal to its request."); *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum LLC*, 2007 WL 1164970 at *4 (N.D. Ind. Apr. 18, 2007) (quotation omitted) ("[I]f a party is to resist discovery as unduly burdensome, it must adequately demonstrate the nature and extent of the claimed burden by making a specific showing as to how disclosure of the requested documents and information would be particularly burdensome."). This showing typically requires affidavits or other evidence supporting a party's assertions of burden. *See, e.g., Jenkins v. White Castle Mgmt. Co.*, 2014 WL 3809763 at *2 (N.D. Ill. Aug. 4, 2014) ("What is required is affirmative proof in the form of affidavits or record evidence."); *Burton Mech. Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 233 (N.D. Ind. 1992) ("An objecting party must specifically establish the nature of any alleged burden, usually by affidavit or other reliable evidence.").
>
> *Whole Woman's Health All. v. Hill*, 2019 WL 10886889, at *3 (S.D. Ind. Oct. 7, 2019).

[Dkt. 115 at 7-9.] As in the prior ruling, "[t]hese legal principles guide the Court's consideration of the parties' arguments with regard to the instant motion." *Id.* at 9.

## II. Discussion

In the instant motion, Plaintiff seeks to compel Defendant to produce four categories of documents, which he says are responsive to twelve of his document requests (Nos. 18, 19, 20, 22-27, 31, 32, and 46) and one of his interrogatories (No. 10). The parties' arguments are addressed, in turn, below.

3

### A. Defendant's "Procedural" Arguments

Defendant argues that Plaintiff's motion should be denied for four "procedural reasons." Defendant's first argument is, in its entirety:

> [T]he Motion (and the documents or information it seeks) is largely disconnected from the specific discovery requests it served. It largely fails to cite particular requests for production that seek, with specificity, the information it now wants. Instead, it generically references twelve separate requests for production of documents and a single interrogatory.

[Dkt. 150 at 10.] This undeveloped argument falls far short of engaging the Court's attention. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Next, Defendant argues that the motion should be denied because it "relies almost exclusively on document requests for 'any and all documents' or 'any and all data' which, as the NCAA stated in its objections to these specific requests, is inherently overbroad." [Dkt. 150 at 10] (citing several cases for the proposition that such "any or all" requests are overly broad).[1] While "any and all" requests certainly have the potential for being overly broad—and while narrow requests are certainly preferable when they are feasible—a request is not overly broad simply because a request is prefaced by "any and all." What makes a request overly broad is what follows "any and all."[2] It is not a "procedural" defect to serve "any and all" requests, and

---

[1] While this is a distinction without a difference, the Court notes that, in fact, none of the document requests at issue actually include the term "any and all"; rather, each of them begins with the word "all."

[2] For example, a request to a hospital for "any and all documents relating to plaintiff's surgery on X date" would not be overly broad and, in fact, would be no different than a request for "documents relating to plaintiff's surgery on X date," which, of course, seeks **all** such documents.

Defendant's suggestion that the motion to compel should be denied on that basis alone is wholly without merit.

Next, Defendant argues that "the Motion is largely unsupported by legal or factual authority. *See* Motion at 8-12. The Motion repeatedly makes assertions that are not corroborated or supported by anything in the Jung Declaration (which itself is largely unsupported)." *Id.* at 11. Again, this, without more, does not aid the Court in resolving the instant motion. It is unclear why Defendant chose to include this as a separate, "procedural" argument, rather than noting those assertions that should have been supported and were not when addressing Plaintiff's arguments.

The same is true of Defendant's final argument, which is that Plaintiff "ignores the lack of proportionality at issue here." *Id.* The proportionality of the discovery sought in Plaintiff's motion is Defendant's main substantive argument; it is unclear why Defendant also chose to raise it—in a perfunctory manner—as a separate, "procedural" argument.

### B. Penalty Data

The first category of documents Plaintiff seeks in the instant motion is "[i]nformation and data about penalties for each [Division 1] team during the relevant time period (including the penalty level and any filters or waivers applied for, appealed, granted, or denied)." [Dkt. 149-1 at 4.] There is no question that this information is sought in Plaintiff's Document Requests Nos. 23 and 31, which seek "[a]ll documents relating to APP penalties imposed upon member institutions and/or teams" and "[a]ll analyses regarding any requested, granted, denied, and/or applied APP waivers, exceptions, reconsiderations, filters, and appeals." *Id.* at 5.

Defendant has provided some, but not all, of the information sought by Plaintiff. It has provided, in PDF format, "hundreds of thousands of pages of penalty-related data" for "all

5

HBCU schools, regardless of whether they have received a post-season penalty; all teams from [Low Resource Institution] schools, regardless of whether they have received a post-season penalty; and all teams from any other Division I school which received a post-season penalty." [Dkt. 150 at 12-13.]  This information has been provided in the form of "numerous different kinds of reports" which Defendant describes as "all the kinds of reports that the NCAA compiles related to whether any team at any DI school 'was penalized, the level and nature of the penalty, and information about any filters or waivers.'" *Id.* at 13.  Defendant has also directed Plaintiff to publicly available reports, which Defendant states "contain substantial information about what filters were applied for and granted or denied" and "allow[] the user to search what penalties, if any, including but not limited to loss of access to postseason competition, a team might have received." *Id.* at 14.[3]

The dispute between the parties is two-fold.  First, Defendant's response to the instant motion makes it clear that there is "penalty-related information" regarding Division I teams that Defendant has not yet produced.  Plaintiff wants this additional information, and Defendant does not believe it should be required to produce it.[4]  Second, Plaintiff wants all of the penalty-related information to be produced not as .pdf files, but "in Excel, CSV, or other computer-readable form, along with the Database information [] needed to compile it if produced in raw form." [Dkt. 149-1 at 10.]

---

[3] Defendant does not state that these public reports and/or Defendant's production include comprehensive information regarding "any requested, granted . . . and/or applied APP waivers, exceptions, reconsiderations, filters, and appeals" that resulted in the decision not to impose penalties, which is information clearly encompassed by Plaintiff's requests.
[4] Defendant points to the multitude of documents it has already produced and argues that that information is more than sufficient for Plaintiff's needs, but it does not refute the fact that there is additional responsive information contained in its database that has not yet been produced.

Defendant's only substantive argument that it should not be required to produce the information Plaintiff seeks is that doing so would be "unduly burdensome and not proportional to the needs of the case." [Dkt. 150 at 14.] But Defendant does not provide any support for this assertion. Defendant does not dispute Plaintiff's assertion that the information Plaintiff seeks is contained in an Oracle database maintained by Defendant ("the APP Portal").[5] Defendant's only argument regarding burden and proportionality related to producing information from this database is the following:

> Plaintiff demands production of penalty-related information about all teams for all schools within Division I. Motion at 6. This amounts to approximately 67,000 teams during the class period even though the putative class is only 150 HBCU teams. Casey Decl., ¶26. Producing information about approximately 446 teams for every team that is in the putative class is entirely disproportionate to the needs of the case and unduly burdensome. *Id.* at ¶¶26-27. Plaintiff claims that he is entitled to all teams in all sports at all DI schools as comparators. Motion at 7 n.2. However, every team in every sport in all of DI is not necessary to create valid comparisons. Plaintiff is not entitled to such a broad swath of information in order to make valid comparisons in support of his theory.
>
> The NCAA proposed in July 2022 that it would produce penalty-related data for all teams in all sports at all DI HBCUs, regardless of whether they received a post-season penalty; all teams in all sports at all DI LRIs, regardless of whether they received a post-season penalty; and all teams in all sports at all DI schools that received a post-season penalty. *See* Casey Decl., ¶¶6, 25-27. That would provide penalty-related information for at least approximately between 5,000 and 7,000 teams during the class period. *Id.*, ¶¶25-27. While even that seems excessive, it is certainly much more proportional to the needs of the case here and less unduly burdensome. At the time, Plaintiff's counsel stated they were "amenable to Defendant's production proposal." *Id.*, ¶8. Plaintiff has the burden to demonstrate that the discovery is proportional to the needs of the case. *Sanchez*, 2019 WL 6696295, at *2. Producing penalty-related information about approximately

---

[5] The Court recognizes that Plaintiff states that "[m]ost, but not all" of the information it seeks is maintained in the APP Portal. [Dkt. 149-1 at 8.] However, as Plaintiff has agreed to accept the raw data from the APP Portal as Defendant's response, and as Plaintiff has made no specific argument regarding any additional information that it seeks, this Order deals only with information contained within the APP Portal.

7

> 67,000 teams when the putative class is only approximately 150 teams is disproportionate to the needs of the case and unduly burdensome.

[Dkt. 150 at 14-15.] The purpose of a relational database is to make large amounts of data accessible and usable; the mere fact that thousands of teams' data are involved does not necessarily translate into an undue burden.[6] Defendant has provided no information at all regarding what the actual burden of producing the additional information sought by Plaintiff would be. As set forth at length above, this, alone, dooms Defendant's burden argument. *See Whole Woman's Health All.*, 2019 WL 10886889, at *3 (citing numerous cases).

As to proportionality, while Defendant correctly cites *Sanchez v. City of Fort Wayne*, 2019 WL 6696295, at *2 (N.D. Ind. Dec. 9, 2019),[7] as stating that the moving party has the burden of demonstrating proportionality, the Court disagrees with that proposition in cases, like this one, in which the non-moving party argues that the burden or expense of production outweighs the likely benefit of the discovery. In such cases, only the non-moving party knows what that burden or expense will be, and therefore the non-moving party must provide that information to the Court in order to support its proportionality argument. *See Hum. Rts. Def. Ctr. v. Jeffreys*, No. 18 C 1136, 2022 WL 4386666, at *3 (N.D. Ill. Sept. 22, 2022) (rejecting undue burden and proportionality objection because "Defendants do not offer any specifics or even an estimate of the burden involved in producing" the discovery at issue) (citing Fed. R. Civ.

---

[6] To the extent that it was more burdensome to generate individual reports and produce them as PDF files, that was a burden created by Defendant's choice to produce the information in that manner rather than electronically.

[7] The Court notes that the implication of Defendant's citation to *City of South Bend Indiana v. Illinois Union Ins. Co.*, 2017 WL 9856736, at *1 (S.D. Ind. Dec. 8, 2017, (Dinsmore, M.J.), that the undersigned stated in that case that the non-moving party has the burden of demonstrating proportionality is misleading. That case states only that "the burden of demonstrating **relevance** is on the party seeking discovery."

8

P. 26(b)(1), Advisory Committee Note to 2015 Amendment (explaining that the 2015 amendment regarding proportionality was not "intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional") and *Heraeus Kulzer, GmbH, v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011) ("A specific showing of burden is commonly required by district judges faced with objections to the scope of discovery.")). Defendant has failed to do so here. Plaintiff is entitled to all of the penalty information it seeks, to the extent that information is contained in the APP Portal.

With regard to producing the information in computer-readable format, as Plaintiff requests, Defendant argues that the "Plaintiff further claims that he is entitled to all of the APP portal's 'raw data' as well as the database's code 'needed to compile it if produced in raw form.'" [Dkt. 150 at 15] (quoting [Dkt. 149-1 at 9]). That is a mischaracterization of Plaintiff's argument. In fact, Plaintiff argues only that he is entitled to receive the information in a computer-readable format, something that Defendant acknowledges in the next sentence of its brief. Plaintiff has "offered to take the raw APP Data and have his own experts compile the reports" if that would reduce the burden of production on Defendant. [Dkt. 149-1 at 9.] Defendant further complains that "Plaintiff relies on his own unsupported assertions about the manner in which this [producing computer-readable data] could be accomplished," [Dkt. 150 at 16], but nowhere does Defendant rebut those assertions or provide any information about what the actual burden would be. The only information provided by Defendant is contained in the declaration attached to its response brief, which states:

> In November 2022, counsel for the NCAA had multiple discussions and communications with the NCAA's Associate Director of Software Development, who is the lead developer of the NCAA's internal APP portal, regarding the portal's characteristics in order to communicate that to Plaintiff's counsel and to answer Plaintiff's counsel's questions about the database. Based on those

9

> discussions and communications, it is my understanding that the APP portal is a secure relational database and its backend raw data is only displayed intelligibly when reports are generated from the portal (like those reports the NCAA produced) because among other things, absent generated report format, the data hosted on the portal consists of a series of approximately 300 tables that require application of the NCAA's specific coding in order to be comprehensible. Simply providing the raw data to Plaintiff's counsel would be meaningless because, to build a report like those that the NCAA has already produced, requires collecting and presenting the data from various subsets of these tables as dictated by the database's internal coding that prescribes where data is collected from and how it is presented meaningfully in report form. Providing the raw data (or providing access to the database) also raises concerns that information, like personal health information, for example, that should not be disseminated could be accessed. It also simply creates overall data security issues that can be entirely avoided by producing the responsive information in report form as the NCAA has done.

[Dkt. 150-1 at ¶ 35.] But this says nothing about the burden or expense of producing the data in the reports Defendant has already produced in computer-readable format, such as an excel file, rather than in .pdf format. It also says nothing about the burden or expense of running the reports for the remaining Division I schools and producing that data in a computer-readable format. Nor does it address the feasibility of producing the raw data along with the necessary internal coding information, with or without first removing irrelevant data, like personal health information.[8] All of this information is necessary to support a finding of undue burden and disproportionality based on that burden.

Finally, Defendant argues that Plaintiff "does not point to any request that seeks the production of penalty-related information in any particular format as he now demands." [Dkt. 150 at 16.] However, the instructions to Plaintiff's document requests provide that

> [a]ll documents that exist in electronic format are to be produced in their native format, or in another mutually agreeable format that provides Plaintiffs with all metadata associated with such electronic documents and allows Plaintiffs to

---

[8] This information also could be protected by means of the protective order that has been entered in this case. [Dkt. 63.]

>search and organize such electronic documents in a manner that is as effective and efficient as that enjoyed by the producing party.

[Dkt. 155-1 at 5.] "Document" is defined in the instructions to include "any and all forms of recorded information . . . including . . . all files, documents, databases, e-mails, and other data maintained in computer-readable form." *Id.* at 3. In addition, the parties' stipulation regarding discovery of electronically stored information requires the parties to "produce documents collected from databases or other structured databases in a reasonably useable format" and provides for the production of ESI "in native format on a showing of good cause. [Dkt. 127 at 5.] The only court order on the issue states: "Unless otherwise agreed by the parties or ordered by the Court, all electronically stored information will be produced in its native format." [Dkt. 49 at 2.]

Defendant also claims that it "has produced this information 'as they are kept in the ordinary course of business,' and in the most straight-forward way it can, by producing the reports that the NCAA normally creates when dealing with APP issues, *i.e.*, reports like sport detail reports, penalty progression reports, and the waivers and adjustment reports." *Id.* (citing Casey Decl., [Dkt. 150-1] at ¶¶29-32). This is simply not the case. Defendant maintains the information at issue in a relational database, not in .pdf files. Plaintiff is entitled to receive the information in a useable format as he has requested—that is, in Excel, CSV, or another computer-readable format. Plaintiff's motion to compel is thus **GRANTED** as to this issue.

### C. Database Information

The second category of information sought by Plaintiff in the instant motion consists of information about the structure of the APP Portal that Plaintiff needs to be able to use the raw data contained in that database as readily as Defendant. Plaintiff will, of course, require this

information if Defendant chooses to produce the raw data to fulfill its obligation to produce the penalty information discussed above. However, the information will be irrelevant if Defendant chooses to produce the penalty information in a computer-readable format instead of raw data. Accordingly, Plaintiff's motion to compel this information is **DENIED** as premature. However, if Defendant chooses to produce raw data, it will have to produce this information as well.

### D. Thomas Paskus's Data and Model

Thomas Paskus is a research analyst employed by Defendant who published research in 2012 entitled *A Summary and Commentary on the Quantitative Results of Current NCAA Academic Reforms* ("Paskus Study"). The Paskus Study contains the statement that "two key APP metrics are correlated: 'The 930 [Academic Progress Rate (APR) average] . . . predicts on average about a 50% GSR [Graduation Success Rate].'" [Dkt. 149-1 at 12.] According to Plaintiff,

> [t]hat correlation has been used by the NCAA to justify its APR cutoff score of 930, i.e., to assign penalties when teams fall below that score. The score disproportionately impacts students at HBCUs. Paskus's research acknowledged this to some extent, in noting that HBCUs "in some cases have actually regressed in their APRs" for factors including "resource, support services, admissions profiles, mission, contest scheduling, high rates of administrative turnover, and early exemption from APR penalties."

*Id.* In the instant motion, Plaintiff seeks "the data relied on in the Paskus Study" and "production of the methodology underlying the Paskus Study—i.e., the methodology used to reach Paskus's conclusion—including, the model used, its structure, the variables in the model, and any other information necessary to understand Paskus's methodology." *Id.* at 13.

The precise nature of the dispute between the parties with regard to the Paskus information is unclear. Defendant searched Paskus's files when responding to Plaintiff's discovery requests and has "produced eleven draft or final versions of studies or

12

papers that Mr. Paskus authored, and 370,881 pages of documents of which Mr. Paskus was one of the custodians (including numerous documents which came from Mr. Paskus's OneDrive)." [Dkt. 150 at 19-20.] Defendant also has determined, after "reasonable investigation," that "the primary information relied on in connection with the 2012 article" consists of a "squad level file" and "individual level files," which have been produced to Plaintiff. *Id.* at 20. In addition, Defendant has now been ordered to produce the universe of penalty information contained in the APP Portal.

In his reply brief, Plaintiff states that "Paskus's quantitative analysis was performed with some underlying but yet-to-be-disclosed model or methodology that supports the numbers, graphs, and conclusions in the published research." [Dkt. 155 at 16.] If, in fact, there are documents that relate to the Paskus Study that are responsive to Plaintiff's document requests that have not yet been produced, Defendant is obligated to produce them. But it is entirely unclear that such is the case. If what Plaintiff actually wants is for Defendant to specifically identify which documents Paskus relied on, or for Defendant to explain Paskus's methodology in a way that is not made clear in any document, the Court agrees with Defendant that that is beyond the scope of Plaintiff's broad discovery requests.

Plaintiff has not demonstrated that Defendant has failed to fulfill its discovery obligations with regard to documents relating to the Paskus Study. If Plaintiff believes that to be the case, or wishes information beyond what is contained in the responsive documents, Plaintiff should conduct targeted discovery with regard to that information. Plaintiff's motion to compel is **DENIED** as to this issue.

13

### E. Limited Resource Institutions Information

As explained by Plaintiff, "Limited Resource Institutions (LRIs) have access to certain APP filters, i.e., penalty waivers, that other institutions do not have." [Dkt. 1491-1 at 14.] Accordingly, in Interrogatory No. 10, Plaintiff asks Defendant to "[e]xplain how the NCAA determines whether an institution and/or team is a 'Limited Resource Institution' and identify the institutions categorized as LRI along with the applicable year(s) of such designation." [Dkt. 149-3 at 13-14.] Defendant's response to Interrogatory No. 10 states:

> The NCAA objects to the extent the terms "Limited Resource Institution" and "LRI" are not defined, and therefore, this Interrogatory is vague, ambiguous and overbroad. Subject to and without waiving the foregoing objections, and without conceding the relevancy, materiality, and/or admissibility of any information referenced or disclosed hereunder, and without prejudice to the right to object to further Interrogatories, the NCAA responds as follows:
>
> The NCAA directs Plaintiff to the Division I Committee on Academics Policies and Procedures produced titled "Limited-Resource Institutions" in accordance with Federal Rule of Civil Procedure 33(d), *see e.g.*, MAN0000000842. The NCAA also directs Plaintiff to the spreadsheet at MAN0000015780, which identifies Limited-Resource Institutions from 2009 onward. The NCAA reserves the right to supplement and/or amend this response to the extent needed, as discovery progresses.

[*Id.* at 14.] In its response to the instant motion, Defendant recognizes that the example page it cites, MAN0000000842, is not actually relevant to the interrogatory, and states that it intended to cite to MAN0000001026. That page contains the following information regarding how LRI status is determined:

14

> **Limited-Resource Institutions**
>
> The Committee on Academics recognizes limited-resource institutions as in need of additional accommodations within the APP. Specific institutional characteristics are reviewed annually to identify LRIs: (1) Per capita Pell Grant dollars received (to assess neediness of student-body); (2) Per capita institutional spending (to determine the neediness of the institution); and (3) Per capita athletics spending (to assess neediness of the athletics department). Institutions with the most limited resources, ranking in the bottom 15 percent, have access to a mission filter to avoid loss of access to postseason competition. This filter is only available the first time a team from an LRI loses access to postseason competition. Institutions in the bottom 15 percent, excluding Subdivision institutions, will have access to LRI filters to avoid loss of access to postseason competition and APP penalties. These filters can be used twice over five years beginning in 2016-17. *(Adopted: 07/09. Revised: 10/11. Effective: 10/11. Revised: 4/16. Effective: 4/16.)*
>
> Written notification will be provided annually by the staff to institutions ranking in the bottom 15 percent based on institutional resources and to institutions no longer within the 15th percentile. *(Adopted: 07/09. Revised: 10/11. Effective: 10/11.)*

[Dkt. 150-17 at 3.]

As Plaintiff points out, the same document—that is, the document cited by Defendant in response to Interrogatory 10—also contains the following statements:

> **Limited-Resource Institutions**
> **NCAA Division I Academic Progress Rate Improvement Review**
>
> In October 2015, the NCAA Division I Committee on Academics elected to amend application of the NCAA Division I Academic Performance Program filters for limited-resource institutions. These filters allow teams at limited-resource institutions to avoid APP penalties and loss of access to postseason competition.
>
> For the purpose of these filters, limited-resource institutions will be defined as teams in the bottom 15 percent of all NCAA Division I member institutions in resources, excluding all Football Bowl Subdivision institutions, using a formula that considers (1) per capita Pell Grant dollars received (to assess the need of the student body; (2) per capita institutional spending (to assess the need of the institution); and (3) per capita athletic spending (to assess the need of the athletics department). FBS institutions/teams shall not be eligible for these filters regardless of resource level. The filters impact both access to postseason competition and Level-One and Level-Two penalties.

[Dkt. 155-3 at 2], and

> **Limited-Resource Institutions' Access to Filters**
>
> Limited-resource institutions can access filters to avoid APP penalties and loss of access to postseason competition provided the institution has submitted an APR Improvement Plan that meets established criteria. Limited-resource institutions are defined as teams in the bottom 15 percent of all Division I member institutions in resources (using the same formula the NCAA Division I Committee on Academics uses for other purposes), excluding all Football Bowl Subdivision institutions.

[Dkt. 155-4 at 2.] Both of those statements reference a "formula" that Defendant uses to determine LRI status. Not surprisingly, Plaintiff wants to know what that formula is. What is surprising is that Defendant takes the position that it is not required to provide that information.

There is simply no question that, without explaining what the formula is, Defendant's response to Interrogatory No. 10 is incomplete. The idea that a formula exists is not something invented by Plaintiff; it is explicitly referenced in the very document Defendant produced in response to Interrogatory No. 10. Defendant has simply not answered the question of how it "determines whether an institution and/or team is a 'Limited Resource Institution'"—the question asked in the interrogatory—with the requisite level of specificity. Defendant's statement in its response to the instant motion that "after a reasonable search, [it] has not located documents that provide an 'exact formula,'" [Dkt. 150 at 22], is baffling, as an interrogatory does not seek the production of documents but rather the answer to a question. If, as its own manual states, Defendant used a "formula" to determine which institutions were defined as LRIs each year, Defendant is required to explain what that formula was each year. If its manual is incorrect when it states that such a formula was used, Defendant is required to so state, under oath, in its interrogatory response. Formula or no, Defendant is required to explain how the determination of which institutions were defined as "LRIs" was made—that is, how the general criteria

identified in the manual are applied to arrive at a list of LRIs.  Defendant has failed to do so; accordingly, its response to Interrogatory No. 10 is incomplete.

The parties also disagree as to the proper temporal scope of Interrogatory No. 10.  Defendant has only identified those institutions defined as LRIs starting in 2009.  Plaintiff points to the Court's ruling on the prior motion to compel, in which the Court ordered Defendant to provide "full and complete responses to the document requests going back to January 1, 1998," [Dkt. No. 115 at 18-19], and argues that "[i]f the NCAA identified LRIs prior to 2009, it should identify those institutions and any formulas used (as well as the calculations) to so designate." [Dkt. 149-1 at 15.]  Interrogatory No. 10 was not at issue in the prior motion to compel, however, and the reasons for requiring the discovery at issue in that motion to include documents dating back to January 1998 do not necessarily apply to the information sought in Interrogatory No. 10.  Plaintiff argues that

> pre-2009 LRI information is relevant, including, e.g., information about how LRIs were treated and how the APP impacted them before the LRI filter was enacted, what led to the adoption of the LRI filter, and how APP predecessor programs treated HBCUs relative to other similarly resourced institutions. (Notably, all but two HBCUs are LRIs).  This information is exactly the type of historical and background information related to the adoption of components of the APP that the Court has already ruled is appropriate.

[Dkt. 155 at 18.]  The Court is unconvinced.  Unlike the discovery at issue in the prior motion to compel, which related directly to the development and historical reasons for the APP, which is the allegedly discriminatory program at the heart of this case, Plaintiff has not explained how the identification of LRIs all the way back to 1998 is relevant, when the filter that may be used by LRIs was adopted in 2009.  However, the Court finds that the LRI information for a period of four years prior to the adoption of the filter is relevant, so that Plaintiff may compare how LRIs were identified prior to the filter with how they have been identified since.

Plaintiff's motion to compel is **GRANTED** with regard to Interrogatory No. 10, to the extent that Defendant shall respond to the interrogatory using the relevant time period of 2005 to the present and shall provide a complete response to the interrogatory as defined above.

### III.  Conclusion

For the reasons set forth above, Plaintiff's motion to compel, [Dkt. 149], is **GRANTED IN PART** and **DENIED IN PART**.   Specifically, Plaintiff's motion is **GRANTED** to the extent that Defendant shall produce the following **within fourteen days of the date of this Order**:

1. All "[i]nformation and data about penalties for each [Division 1] team during the relevant time period (including the penalty level and any filters or waivers applied for, appealed, granted, or denied)" that is contained in the APP Portal.  This information shall be produced in Excel, CSV, or another computer-readable format.  If Defendant chooses to produce the raw data from the APP Portal, Defendant also shall provide Plaintiff with all necessary information about the structure of the database to allow Plaintiff to use the data in the same manner as Defendant is able to use it.

2. A full and complete response to Interrogatory No. 10, as discussed above, for the time period of 2005 to the present.

Plaintiff's motion to compel is **DENIED** in all other respects.

Pursuant to Federal Rule of Civil Procedure 37(a)(5)(C), the Court, in its discretion, declines to award attorney fees to Defendant with regard to this motion; Plaintiff may file a motion seeking fees with regard to the portions of this motion on which Plaintiff prevailed.

SO ORDERED.

Dated:  3 FEB 2023

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

18

Distribution:

Service will be made electronically on all ECF-registered counsel of record via email generated by the Court's ECF system.