UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TROYCE MANASSA, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | |
| v. | Case No. 1:20-cv-03172-RLY-MJD |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| *Defendant*. | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY AND EXPERT REPORTS OF DR. BERNARD R. SISKIN

# I.    INTRODUCTION

Plaintiff has retained Dr. Bernard R. Siskin to conduct a statistical analysis of the Academic Performance Program ("APP") to determine whether the APP discriminates against black student-athletes at Division I ("DI") Historically Black Colleges and Universities ("HBCU") athletic teams by imposing postseason penalties on teams that fail to satisfy a certain academic threshold (the "APR").[1] *See* Ex. 1, Expert Report in Support of Class Certification dated January 13, 2023 ("Siskin Report") ¶ 4. Despite acknowledging that Plaintiff brings race discrimination claims under 42 U.S.C. §§ 1981 and 1985, *id.* ¶ 3, Dr. Siskin conducted an unadjusted statistical disparate impact analysis that purports to identify a statistically-significant difference in the rate of postseason penalties between HBCU and non-HBCU teams without regard for the racial makeup of each team. *See* Ex. 2, Excerpts from Deposition of Dr. Siskin ("Siskin Dep.") at 65:4–9; 66:2–9, 11–14; 71:1–24. Despite failing to control for any significant non-discriminatory factors that could explain any statistical disparity in the rate of postseason penalties between HBCU and non-HBCU teams, Dr. Siskin concludes—with no reliable, scientific basis—that the statistical differences he allegedly identified are due to "the unique mission of the HBCUs." Ex. 1, Report ¶ 22. Although Dr. Siskin analyzes neither the proposed Liability Class nor the proposed Injunctive Relief Class, nor isolates the effect of race, if any, on the rate of postseason penalties, he concludes that "a generally accepted methodology exists for conducting quantitative analysis of the APP to determine, on a Class-wide basis, whether the APP discriminates against Class members." Ex. 1,

---

[1] As explained in the NCAA's Response in Opposition to Plaintiff's Motion for Class Certification [Dkt. No. 194] ("Defendant's Opposition to Class Certification"), the APR is a term-by-term measure of eligibility, retention and graduation of student-athletes who have received institutional financial aid based in any degree on athletic ability during the academic term in question. The APR is measured on a team basis with each student in the APR cohort able to earn an "eligibility" point if they are academically eligible per their school's eligibility standards to compete the following academic term, and a "retention" point if they return as a full-time student the next academic term. At the start of each academic year, each team's APR is calculated by adding the total points earned by the student-athletes in the team's cohort, dividing that number by the total points possible, then multiplying by 1000 to achieve the final APR (*i.e.*, points earned/points possible x 1000).

Siskin Report ¶ 46. As demonstrated below, Dr. Siskin's analyses and the opinions derived therefrom are unreliable and suffer from many fundamental errors that render his testimony inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**First**, Dr. Siskin's testimony should be excluded because it is irrelevant, unhelpful, and does not fit this case. The class §§ 1981 and 1985 claims—which require proof of intentional discrimination—"cannot be supported by proof of disparate impact." *Franklin v. City of Evanston*, 384 F.3d 838, 848 (7th Cir. 2004); *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996). Yet all Dr. Siskin offers the Court is an inapplicable and irrelevant disparate impact analysis. Ex. 2, Siskin Dep. at 65:4–9; 66:2–9, 11–14; *see generally*, Ex. 1, Siskin Report & Ex. 3, Rebuttal Report dated March 13, 2023 ("Rebuttal Report"). Dr. Siskin's analysis is not helpful because it wholly ignores the but-for causation element of the class § 1981 claims, which must be accounted for during the Court's class certification inquiry. *See Santiago v. City of Chicago*, 19 F.4th 1010, 1017 (7th Cir. 2021).

**Second**, Dr. Siskin's testimony should be excluded because it is unreliable. Dr. Siskin's methodology is fundamentally flawed because his statistical analysis does not relate to the proper population. His entire analysis is focused on HBCU teams—regardless of their racial makeup—rather than the individual black student-athletes on those teams (*i.e.*, the putative class members). On top of that, Dr. Siskin analyzes the wrong teams by focusing on teams that earned a postseason penalty rather than the teams to which a postseason penalty was applied (*i.e.*, the teams comprised of the putative class members).

**Third**, Dr. Siskin's testimony is unreliable because he failed to follow a reliable scientific method in reaching his opinions. Specifically, Dr. Siskin failed to conduct a proper multiple

regression analysis or account for any non-discriminatory explanatory variables that may have caused or contributed to any statistical disparity in postseason penalties between HBCU and non-HBCU teams. Although Plaintiff may claim that a regression analysis is not required because Dr. Siskin is analyzing disparate impact, this is not a disparate impact case. By failing to account for proper variables, Dr. Siskin has failed to exercise the degree of care that a statistician would use in his scientific work outside of the courtroom. *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

***Finally***, Dr. Siskin's testimony suffers from serious analytical gaps. He ignores the differences among HBCUs and the various factors that can cause a team to incur postseason penalties. He ignores the differences among non-HBCUs and includes schools like Harvard and Yale as comparators to HBCUs. Dr. Siskin concludes that the disparity in postseason penalties between HBCUs and non-HBCU is due to the "unique mission of the HBCUs," yet he has no reliable, scientific basis for this conclusion. *See* Ex. 1, Siskin Report ¶ 22. He oversimplifies the APP process for determining postseason ineligibility and concludes—without actually analyzing any individual black student-athletes—that a "generally accepted methodology exists" for determining on a class-wide basis whether the APP discriminates against putative class members based on race. *Id.* ¶ 46; *see* Ex. 2, Siskin Dep. at 70:21–24; 139:1–140:3; 265:16–21. Because Dr. Siskin's testimony is irrelevant, unhelpful, and unreliable, his Report, Rebuttal Report, and testimony are inadmissible and should be excluded. And because Plaintiff's Motion for Class Certification [Dkt. No. 177] ("Plaintiff's Motion") is wholly dependent upon Dr. Siskin's unreliable and inadmissible testimony, Plaintiff's Motion should be denied as well.

## II.     LEGAL STANDARD

Rule 702 and the principles set forth in *Daubert* and its progeny govern the admissibility

of expert testimony. *Bowman for J.B. v. Int'l Bus. Machines Corp.*, No. 1:11-cv-0593, 2013 WL 12290828, at *2 (S.D. Ind. Aug. 16, 2013) (Young, J.). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. "The proponent of the expert testimony bears the burden of demonstrating that the testimony meets each of those elements." *Affinity Mut. Ins. v. Thacker Air Conditioning-Refrigeration-Heating, Inc.*, No. 3:16-cv-279, 2019 WL 2174121, at *3 (N.D. Ind. May 20, 2019).

"The Seventh Circuit has set forth a three-step analysis for determining whether expert testimony is both relevant and reliable: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand the evidence or determine a fact in issue." *Bowman for J.B.*, 2013 WL 12290828, at *2 (citing *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). "Rule 702 and *Daubert* require the judge to act as a vigorous gatekeeper to ensure the reliability of expert testimony." *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019). This obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

"If an expert's report or testimony is critical to class certification, a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Bowman for J.B.*, 2013 WL 12290828, at *2 (citation

omitted). The Seventh Circuit has held that if the expert's testimony is "decisive for the motion for class certification," it is critical and any *Daubert* motion must be decided first. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Here, Plaintiff's reliance on Dr. Siskin's opinions falls squarely within the degree of reliance that the Seventh Circuit has held is "critical" for class certification. *Compare Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 814–15 (7th Cir. 2010) (holding expert testimony on which plaintiffs "relied heavily" and that "form[ed] the basis of [their] theory" was "critical"), *with* Memorandum in Support of Plaintiff's Motion for Class Certification [Dkt. No. 178-1] at 19 ("Plaintiff will prove that the NCAA intended to discriminate on the basis of race with class-wide statistical and circumstantial evidence . . . ."). Plaintiff's Motion does not merely rely upon Dr. Siskin's opinion, but is wholly dependent upon it. Therefore, if the Court finds any potential merit to Plaintiff's Motion (which it should not because Plaintiff has failed to satisfy the requirements of Rule 23(a) and 23(b)), this Motion must be decided first. *See Am. Honda Motor Co.*, 600 F.3d at 816 ("[T]he district court must perform a full *Daubert* analysis before certifying the class if the situation warrants.").[2]

### III.    ARGUMENT & AUTHORITIES

**A.    Dr. Siskin's testimony is irrelevant, unhelpful, and does not fit this case.**

The Court should exclude Dr. Siskin's testimony because it is not relevant to Plaintiff's §§ 1981 and 1985 intentional discrimination claims. "In determining the relevance of proposed expert opinions, the court must ensure that it will 'assist the trier of fact to understand the evidence or determine a fact in issue.'" *Bowman for J.B.*, 2013 WL 12290828, at *7 (quoting *Daubert*, 509 U.S. at 591). In other words, the "testimony must 'fit' the issue to which the expert is testifying."

---

[2] Of course, Plaintiff's class certification Motion is so fatally defective that it should be denied regardless of the Court's ruling on the NCAA's challenges to Dr. Siskin's irrelevant and unreliable testimony. In that case, this Motion would become moot.

*Id.* (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)); *see, e.g.*, *Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (excluding expert testimony where the expert relied on an assumption not based in evidence and the testimony did not fit the facts of the case). "Expert testimony that 'does not relate to any issue in the case is not relevant, and . . . non-helpful'" and must be excluded. *Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp. 3d 965, 971 (N.D. Ind. 2020) (quoting *Daubert*, 509 U.S. at 591). Testimony may be irrelevant and unhelpful where, as here, the purported expert applies the wrong legal standard in reaching his conclusions. *See, e.g.*, *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 745 (N.D. Ill. 2009) ("Having applied the incorrect legal standard in formulating damages under the CFAA, Davis will not be permitted to testify on the topic."); *Medicines Co. v. Mylan Inc.*, No. 11-cv-1285, 2014 WL 1227214, at *6 (N.D. Ill. Mar. 25, 2014) ("Because Mr. Fammia's opinions rest on an inaccurate theory of commercial success, his methodology is faulty and his opinions will not assist the trier of fact. Accordingly, the Court grants Mylan's motion to exclude his expert opinions.").[3]

### 1.   Dr. Siskin's disparate impact analysis is irrelevant and unhelpful because §§ 1981 and 1985 claims cannot be supported by proof of disparate impact.

Dr. Siskin's disparate impact analysis and the opinions derived therefrom do not fit this litigation because Plaintiff's §§ 1981 and 1985 claims "cannot be supported by proof of disparate impact." *Franklin*, 384 F.3d at 848; *see also Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991), *opinion supplemented on denial of reh'g*, 963 F.2d 929 (7th Cir. 1992)

---

[3] *See also, e.g.*, *Pelican Int'l, Inc. v. Hobie Cat Co.*, No. 3:20-cv-02390, 2023 WL 2130379, at *5 (S.D. Cal. Feb. 10, 2023) ("Because Dr. Sanders failed to apply the proper legal test in rendering her . . . opinions . . . those opinions are irrelevant, unreliable, and would mislead the jury.") (cleaned up); *AAMP of Florida, Inc. v. Automotive Data Solutions, Inc.*, No. 8:13-cv-2019, 2015 WL 12843845, at *9 (M.D. Fla. Oct. 8, 2015) (excluding expert opinions that were "based on an incorrect legal standard"); *YETI Coolers, LLC v. RTIC Coolers, LLC*, No. 15-cv-597, 2017 WL 429210, at *2 (W.D. Tex. Jan. 28, 2017) ("Courts will exclude expert testimony when it relies on an incorrect legal standard.").

("[P]roof of disparate impact does not support section 1981 liability since intentional discrimination is required."); *Majeske*, 94 F.3d at 311 ("Disparate impact alone does not satisfy the pleading requirements for either § 1983 or § 1985(3)."); *Tyler v. Capstone Logistics, LLC*, No. 121-cv-02137, 2022 WL 799097, at *3 (S.D. Ind. Mar. 16, 2022) ("§ 1981 disparate impact claim [was] a legal non-starter"); *Davidson v. Citizens Gas & Coke Util.*, 470 F. Supp. 2d 934, 939 (S.D. Ind. 2007) ("Inasmuch as a recovery under § 1981 requires a showing of wrongful intent, a disparate impact claim is not available under that statute."). "A § 1981 claim 'reaches only *intentional* discrimination' against [a] particular plaintiff." *Haynes v. Indiana Univ.*, 902 F.3d 724, 735 (7th Cir. 2018) (emphasis added); *Gen. Bldg. Contractors Ass'n, Inc. v. Pa.*, 458 U.S. 375, 396 (1982) (§ 1981 liability requires proof of intentional discrimination). Thus, to prevail, each putative class member will need to present evidence that the NCAA engaged in intentional discrimination as to him or her specifically. *See, e.g.*, *Pryor v. Nat'l Collegiate Athletic Ass'n*, No. 00-3242, 2004 WL 1207642, at *3 (E.D. Pa. Mar. 4, 2004) (plaintiffs could not "get around the argument that in order to establish liability, a plaintiff must prove by a preponderance of the evidence that *as to him or her specifically*, the defendant engaged in intentional discrimination") (emphasis added).

Dr. Siskin readily admits that his statistical analysis is focused exclusively on disparate impact, not intentional discrimination or disparate treatment:

> Q:    So I think you've already testified, but you basically conducted a disparate impact analysis here; right?
> A:    Correct.
>   *  *  *
> Q:    You haven't conducted a disparate treatment analysis; correct?
> A:    That's correct.
>   *  *  *
> A:    And it doesn't describe disparate treatment between individual student athletes on HBCU teams versus student athletes on non-HBCU teams; correct?

A:      That's correct.

Ex. 2, Siskin Dep. at 66:2–5, 7–9; 66:22–67:1. Because "§ 1981 claims[] require a showing of discriminatory treatment and cannot be supported by proof of disparate impact," *Franklin*, 384 F.3d at 848, Dr. Siskin's testimony does not speak to any relevant issue that the Court will need to decide at the class certification stage—*i.e.*, whether the class § 1981 claims (or the derivative § 1985 claims) can be proven on a class-wide basis. Indeed, "[a]s a general matter, Seventh Circuit case law holds that statistical analysis is ill suited for proving causation in disparate treatment cases." *Bingham v. Raytheon Tech. Servs. Co., LLC*, No. 1:13-cv-00211, 2014 WL 6388756, at *3 (S.D. Ind. Nov. 14, 2014); *see Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) (noting that "statistical evidence, standing alone, is generally insufficient to prove intentional discrimination"); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997) ("We have held statistics are improper vehicles to prove discrimination in disparate treatment (as opposed to disparate impact) cases. . . . "[s]tanding virtually alone . . . statistics cannot establish a case of individual disparate treatment."); *Johnston v. Amax Coal Co.*, 963 F. Supp. 758, 767 (S.D. Ind. 1997) (same); *Jordan v. Evans*, No. 15-C-5907, 2019 WL 4278179, at *5 (N.D. Ill. Sept. 9, 2019) ("[G]eneral statistical evidence is an improper vehicle to prove disparate treatment.") (cleaned up); *but see E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 325 (7th Cir. 1988) ("Multiple regression analyses, designed to determine the effect of several independent variables on a dependent variable, which in this case is hiring, are an accepted and common method of proving disparate treatment claims."). Thus, Dr. Siskin's testimony—which is based on a statistical disparate impact analysis—is irrelevant and unhelpful.[4] FED. R. EVID. 702.

---

[4] This is not the first time Dr. Siskin's testimony has not fit the case or applied the wrong law. In *LaVelle v. State Farm Mut. Auto. Ins. Co.*, the court granted defendant's motion to exclude Dr. Siskin's testimony because his regression model was based on an erroneous legal standard and thus was neither reliable nor helpful. No. 16-1082, 2019 U.S. Dist. LEXIS 110510, at *10 (U.S.D.C. Jan. 24, 2019).

2. **Dr. Siskin's analysis wholly ignores the but-for causation element of the class § 1981 claims, which must be accounted for during the Court's class certification inquiry.**

Dr. Siskin's statistical analysis does not account for the differences among HBCUs, HBCU teams, or individual student-athletes. *See* Ex. 2, Siskin Dep. at 70:21–24; 92:15–93:9; 139:1– 140:3; 266:1–8, 10; 275:1–5, 7–18. He contends that because the "[t]he APR methodology does not differentiate how it scores based on the race of the athlete, the sport of the athlete, or whether the athlete is at a HBCU," it is acceptable to treat all HBCUs and all black student-athletes as fungible for the purpose of deciding whether a workable class-wide methodology exists for determining the discriminatory impact, if any, of the APP on putative class members. *See* Ex. 3, Rebuttal Report at 11, 14–15. This approach is problematic and unhelpful because in order to prevail on a § 1981 claim, a plaintiff "must initially plead and ultimately prove that, ***but for race***, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added); *Mir v. State Farm Mut. Auto. Ins. Co.*, 847 F. App'x 347, 350 (7th Cir. 2021) ("When bringing a § 1981 race-discrimination claim, a plaintiff must initially plead and ultimately prove that, ***but for race***, he would not have suffered the loss of a legally protected right.") (emphasis added). Dr. Siskin's analysis ignores this critical element because he does not account for, among other things, whether: (i) a team actually played in the postseason despite a penalty; (ii) a team received a postseason penalty for institutional or other reasons unrelated to the team's APR score; (iii) a student-athlete was injured and otherwise unable to play regardless of any postseason penalty; (iv) a team would have even qualified to play in the postseason absent a penalty; or (v) differences in how individual conferences approached postseason competition. *See* Ex. 2, Siskin Dep. at 78:5–13; 82:20–25; 83:2–8; 85:10–13, 15–20; 264:24–265:9; 265:16–21; 267:11–13, 15–18. Although Dr. Siskin

admits that a variety of reasons, independent of a team's APR score, can cause a student-athlete or a team not to play in the postseason, he accounts for none of those reasons in his analysis. *Id.* at 84:20–22, 24; 85:8–13, 15; 90:24–91:2, 4–17; 92:25–93:9; 175:19–25; *see Mister v. Illinois Cent. Gulf R. Co.*, 832 F.2d 1427, 1431 (7th Cir. 1987) ("Plaintiffs' statistical work leaves much to be desired. The plaintiffs' expert used no independent variables other than race. He assumed, in other words, that all applicants are identical in every respect except race. This is not necessarily true.").

Because he ignores the but-for causation element of the class claims, Dr. Siskin cannot reliably conclude that "trial for the findings about liability in this matter would resolve the liability issue for all class members without their individualized participation." Ex. 3, Rebuttal Report at 5. His analysis is not helpful because it ignores a fundamental component of the liability inquiry, which cannot be ignored at the certification stage. According to the Seventh Circuit, the elements of the underlying claims must be accounted for in the Court's class certification analysis. *See Santiago*, 19 F.4th at 1017 ("The Supreme Court has noted that '[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.'") (quotation omitted); *Rock v. Nat'l Collegiate Athletic Ass'n*, No. 112-cv-01019, 2016 WL 1270087, at *6 (S.D. Ind. Mar. 31, 2016) ("[I]n evaluating class certification, the court must take into consideration the substantive elements of the plaintiff's cause of action, inquire into the proof necessary for the various elements, and envision the form that trial on the issues would take."). Given that Dr. Siskin ignores the elements of the underlying claims, his testimony is not helpful and should be excluded.

**B.     Dr. Siskin's testimony is unreliable because it is based on a flawed methodology and suffers from wide analytical gaps.**

Even if the Court finds that Dr. Siskin's testimony is relevant and helpful (which it is not), his testimony should still be excluded because it is unreliable. FED. R. EVID. 702. Dr. Siskin

"cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method" and have "sufficient factual underpinnings." *Bowman for J.B.*, 2013 WL 12290828, at *3 (citations omitted); *see Allgood v. Gen. Motors Corp.*, No. 1:02-cv-1077, 2006 WL 2669337, at *3 (S.D. Ind. Sept. 18, 2006) ("The court must determine that the data support an admissible expert's opinion by more than merely the say-so of the expert."). "An opinion becomes speculative when too wide an analytical gap exists between the data and the opinion provided." *Allgood*, 2006 WL 2669337, at *3.

Courts use the following non-exclusive factors to evaluate the reliability of an expert's methodology:

> (1) Whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has been met with general acceptance.

*Bowman for J.B.*, 2013 WL 12290828, at *3 (citing *Daubert*, 509 U.S. at 593–94). "[T]his is not a definitive checklist as the court is free to 'fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it.'" *Id.* (quoting *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002)). Among other things, the Court may also consider "[w]hether the expert has adequately accounted for obvious alternative explanations," and "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." FED. R. EVID. 702 advisory committee's notes to 2000 amendments (citing cases). Importantly, the *Daubert* standard "applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Bowman for J.B.*, 2013 WL 12290828, at *3 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)); *see, e.g., In re: Zoloft (Sertraline*

*Hydrocloride) Prods. Liability Litig.*, No. 12-md-2342, 2015 WL 7776911, at *11 (E.D. Penn. Dec. 2, 2015) (excluding statistician's report and testimony because his subjective reliance and observations "[were] not based upon any reliable statistical or scientific method").

    **1.**    **Dr. Siskin's methodology is fundamentally unreliable because his statistical analysis does not relate to the proper population.**

        **i.**    **Dr. Siskin's statistical analysis is focused on HBCU teams—regardless of their racial makeup—rather than individual black student-athletes.**

In instances where statistical evidence is used in discrimination cases, the Seventh Circuit has held that "statistical comparisons must involve the proper community or group when making the statistical comparison." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 830 (7th Cir. 2014); *Bennett*, 295 F.3d at 697 (7th Cir. 2002) ("[P]roperly identifying the relevant labor market is the key ingredient in proving Title VII discrimination through the use of statistics.") (quoting *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 302 (7th Cir. 1991)); *see also Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006) ("The statistics must, however, relate to the proper population."). For example, in *Downing v. Abbott Labs.*, plaintiff brought Title VII and § 1981 race and sex discrimination claims against her former employer. 48 F.4th 793, 801–02 (7th Cir. 2022). The district court excluded plaintiff's "statistical evidence of a decline in the number of African-American employees at Abbott Molecular between 2012 and 2015," *id.* at 802, "because they did not account for employees who, rather than being forced out or terminated, left for other reasons, retired, or transferred to other positions in Abbott." *Id.* at 807. The Seventh Circuit affirmed, explaining that while "[s]tatistical evidence may help an individual employee with a Title VII claim show that racial discrimination was an employer's standard operating procedure, [] those statistical comparisons must involve a proper group." *Id.* Because plaintiff's statistical evidence did not identify how many African-American employees simply left the

company to pursue other positions as opposed to leaving involuntarily, the statistical evidence did not involve the proper group and was properly excluded. *Id.* at 808.

Similarly, here, Dr. Siskin's statistical analysis should be excluded because he fails to analyze the proper group—black student-athletes participating in DI athletics at HBCUs—or compare them to similarly-situated non-black student-athletes. *See* Ex. 2, Siskin Dep. at 67:11–16; 67:19–68:1 (Dr. Siskin testifying that he did not analyze whether the APP has a disparate impact on black student-athletes versus non-black student athletes across all DI schools or whether the APP has a disparate impact on black student-athletes versus non-black student-athletes at HBCU schools specifically). Dr. Siskin recognizes that the putative Liability Class includes "[a]ll Black student-athletes who participated in Division I HBCU athletic teams that were subjected to a postseason access ban from the 2010-11 school year through the date of class certification." Ex. 1, Siskin Report ¶ 2. He then concludes that "a generally accepted methodology exists for conducting quantitative analysis of the APP to determine, on a Class-wide basis, whether the APP discriminates against Class members." *Id.* ¶ 46. ***Yet he never actually analyzed the effect of the APP on individual black student-athletes at HBCUs—i.e., the actual class members.*** *See* Ex. 2, Siskin Dep. at 70:21–24. Instead, Dr. Siskin's analysis is focused solely on HBCU ***teams*** regardless of the racial makeup of those teams:

> Q:  So you're looking at HBCU teams regardless of the actual racial makeup of those teams?
> A:  Correct.

*Id.* at 71:1–24; *see also id.* at 168:2–169:2 (Dr. Siskin confirming that his analysis did not differentiate between the black student-athletes on HBCU teams and the non-black student-athletes on the same team); *id.* at 215:21–24 (admitting that he did not analyze any particular team to

determine its racial composition).[5] Dr. Siskin acknowledges about 10 to 12% of student-athletes on HBCU teams are white and that the APP process "affects a team" and impacts all of its members regardless of race. *Id.* at 71:8–12, 14–19. Yet he compares those HBCU teams to non-HBCU teams, again without any regard for race:

> Q:    So teams from non-HBCUs are all one group regardless of whether they have no black student athletes, some black student athletes or even all black student athletes; right?
> A:    Correct.

*Id.* at 73:13–18; *see also id.* at 187:15–188:17; 189:3–19 (confirming that his analysis compares HBCU teams to non-HBCU teams). He even admits that he was no idea what percentage of black student-athletes are on the non-HBCU teams he identifies in his Report:

> Q:    Do you have any idea what percentage of non-HBCU teams – what – what percentage of black players are on the non-HBCU teams identified in Table 1?
> A:    No.

*Id.* at 74:14–18.

The fundamental flaw in Dr. Siskin's opinion that a class-wide methodology exists for determining whether the APP discriminates against class members—*i.e.*, black student-athletes on HBCU teams—based on their race is that he analyzed black and white student-athletes ***together in a single category.*** He never actually isolates the effect of race, if any, on the rate of postseason penalties, nor does he study the actual class members. He simply compares HBCU teams (without regard for race) with non-HBCU teams (again without regard for race) and, based on this fundamentally flawed methodology, concludes that "the APP has a large disparate impact against

---

[5] Focusing on HBCU ***teams*** is fundamentally the wrong inquiry and renders Dr. Siskin's disparate impact analysis unreliable because neither a HBCU nor a HBCU team is a protected class. *See, e.g.*, *Randall v. Rolls-Royce Corp.*, 742 F. Supp. 2d 974, 981 (S.D. Ind. 2010), *aff'd*, 637 F.3d 818 (7th Cir. 2011) ("To establish a prima facie case of disparate impact, the specific [discriminatory] practice allegedly responsible for such statistical disparities must first be identified, after which a Plaintiff must establish a causal connection between the specified [discriminatory] practice and the disparity by offering statistical evidence of a kind and scope sufficient to show the disparate impact ***on those in the protected group***.") (emphasis added).

HBCU teams and its predominately Black student-athlete class members."[6] Ex. 1, Siskin Report ¶ 47. But given that Dr. Siskin's statistical analysis does not actually account for race or even analyze the proper group—*i.e.*, members of the putative class—his opinions regarding the alleged disparate impact of the APP on class members or the purported class-wide methodology for establishing liability in this intentional race discrimination case are inherently unreliable.

   **ii.**   **Dr. Siskin identifies and analyzes the wrong teams.**

   To make matters worse, Dr. Siskin has analyzed the wrong teams altogether by focusing exclusively on teams that earned a postseason penalty rather than teams that were actually banned from postseason play (*i.e.*, the teams that would include members of the putative class). *See* Ex. 2, Siskin Dep. at 77:8–78:3. This is a critical distinction because under the APP structure, teams who earned a postseason penalty do not consist of the same student-athletes that were on the teams when the postseason penalty was applied. *See* Ex. 4, Class Certification Report of R. Garrison Harvey ("Harvey Report") ¶ 16. This is because an APP postseason penalty is applied to a team two seasons ***after*** the penalty is earned (a point Dr. Siskin concedes in his Rebuttal Report). *Id.*; *see* Ex. 3, Rebuttal Report at 3–4. And in some cases, the penalty might not be applied at all. Ex. 4, Harvey Report ¶ 21.[7]

   Dr. Siskin acknowledges that the difference between earned and applied is relevant to who is part of the putative class. Ex. 2, Siskin Dep. at 237:25–238:6 (Q: "Well so, it is relevant for who are the actual student athletes that are in the class; correct?" A: "Oh, correct."); Ex. 3, Rebuttal

---

[6] Dr. Siskin's underlying assumption that HBCUs are "almost exclusively Black," *id.* ¶ 22, is wrong because according to Howard University, "13 HBCUs nationwide are now at least 20 percent White." Ex. 4, Harvey Report ¶ 165 (citing HOWARD UNIVERSITY NEWS SERVICE, Demographics at HBCUs Changing, More Whites Enrolling, *available at* [Demographics at HBCUs Changing, More Whites Enrolling – Howard University News Service (hunewsservice.com)](hunewsservice.com)). Dr. Siskin has no reliable basis for treating HBCU status as a "proxy for race." *See* Ex. 2, Siskin Dep. at 98:19–99:1.

[7] For example, from at least 2014 to 2017, the Southwestern Athletic Conference ("SWAC") allowed its teams to compete in postseason conference championships despite any APP postseason ineligibility. *See id.* ¶¶ 27, 220–22; *see also* Ex. 5, Declaration of Charles McClelland ("McClelland Decl.") ¶¶ 17–18.

Report at 4 ("[T]he Class is comprised of those student-athletes who were on the team when the ban was applied."). Thus, by using incorrect teams and incorrect rosters in his disparate impact analysis, Dr. Siskin has necessarily produced inaccurate, irrelevant, and unreliable results that are not reflective of the putative class. Due to his own unreliable analysis, Dr. Siskin does not even know how many teams that he identified as earning a postseason penalty actually played in their postseason conference tournaments:

> Q:     So whether the – whether a particular team actually played in the postseason isn't part of your analysis here in Table 1; correct?
> A:     To the extent that somebody was banned and the ban was not enforced, I mean, it wasn't waived, they were banned, but they played. To the extent that that occurred, it's not accounted for in this process.
> Q:     Okay. Do – do you have any sense for how many teams out of these 114 teams actually played in their, for example, their postseason conference tournaments?
> A:     No.

Ex. 2, Siskin Dep. at 78:5–19. Because Dr. Siskin's statistical analysis and the opinions derived therefrom are inaccurate and based on the wrong population, the Court should exclude his unreliable testimony.[8] *Downing*, 48 F.4th at 807–08; *Matthews*, 759 F.3d at 830; *see, e.g.*, *Bennett*, 295 F.3d at 697 (in employment discrimination case, rejecting expert's statistical analysis as unreliable where expert failed to control for persons not only qualified, but also interested in positions); *see also Allgood*, 2006 WL 2669337, at *11 (expert's methodology of cherry-picking environmental samples was unreliable because "samples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured"); *Menasha Corp. v. News America Marketing In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (excluding journalist's survey in part because he failed to gather responses

---

[8] This is not the first time Dr. Siskin's testimony has been based on flawed data. *In Robertson v. Valley Communications Center*, the court excluded Dr. Siskin's unreliable testimony because his opinions were based on a "fundamentally flawed" survey. 490 P.3d 230, 238 (Wash. App. 2021).

from a representative sample of the target population); *Varner v. Dometic Corp.*, No. 16-22482, 2022 WL 2307025, at *4-6 (S.D. Fla. Feb. 2, 2022) (excluding expert who surveyed the wrong population and evaluated demand for the wrong product and whose market simulation was methodologically unsound because it was based on flawed inputs).

### 2.    Dr. Siskin did not follow a reliable scientific method in reaching his opinions.

"The first and most significant *Daubert* factor is whether the proffered opinion has been subjected to the scientific method." *Bowman for J.B.*, 2013 WL 12290828, at *4 (examining an economist's use of the scientific method in his research) (quotation omitted). As demonstrated below, Dr. Siskin failed to follow a reliable scientific method in reaching his opinions because he failed to perform a proper regression analysis[9] to account for critical explanatory variables such as a HBCU's resources, institutional issues, focus on academic and APP compliance activities, coaching turnover, the number of transfer student-athletes, whether the HBCU is a Limited Resource Institutions ("LRI"), etc. By ignoring these important non-discriminatory variables, Dr. Siskin has failed to exercise the degree of care that a statistician would use in his scientific work outside of the courtroom. *See Sheehan*, 104 F.3d at 942. Dr. Siskin's testimony is therefore unreliable and should be excluded.

> ### i.    Dr. Siskin's statistical analysis is unreliable and inadmissible because he failed to conduct a proper regression analysis or account for any non-discriminatory explanatory variables that may have caused or contributed to any statistical disparity in postseason penalties between HBCU and non-HBCU teams.

According to the Federal Judicial Center's Reference Manual on Scientific Evidence ("FJC Manual"), "[m]ultiple regression analysis can be a source of valuable scientific testimony in

---

[9] A multiple regression analysis is "a commonly accepted method of statistical analysis for examining the effect of independent variables on a dependent variable." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999).

litigation. However, when inappropriately used, regression analysis can confuse important issues while having little, if any, probative value." NATIONAL RESEARCH COUNCIL. (2011). *Reference Manual on Scientific Evidence: Third Edition*. Washington, DC: The National Academies Press, at 308. The FJC Manual explains that "[r]egression analysis has been used most frequently in cases of sex and race discrimination . . ." because:

> Multiple regression analysis is sometimes well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables. Multiple regression typically uses . . . several explanatory variables to assess the statistical data pertinent to these theories. In a case alleging sex discrimination in salaries, for example, a multiple regression analysis would examine not only sex, but also other explanatory variables of interest, such as education and experience.

*Id.* at 305–06. The FJC Manual warns that "[f]ailure to develop the proper theory, failure to choose the appropriate variables, or failure to choose the correct form of the model can substantially bias the statistical results." *Id.* at 312.

The Seventh Circuit has held that "a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537–38 (7th Cir. 1997); *see Sheehan*, 104 F.3d at 942 (expert report that failed "to make any adjustment for variables bearing on the decision whether to discharge or retain a person . . . other than [alleged discrimination]" was not "admissible under the standard of *Daubert*"); *Griffin v. Bd. of Regents of Regency Universities*, 795 F.2d 1281, 1290 n.16 (7th Cir. 1986) ("Multiple regression analysis is likely to be inappropriate unless . . . the model includes all of the major variables likely to have an effect on the dependent variable."); *see also, e.g.*, *Bingham*, 2014 WL 6388756, at *4–5 (statistical analysis and testimony that did "not account for any of [defendant's] legitimate, nondiscriminatory factors" was "no probative evidence

18

supporting [plaintiff's] age discrimination claim" and was inadmissible under Rule 702 and *Daubert*); *Daniels v. Fed. Reserve Bank of Chicago*, No. 98 C 1186, 2005 WL 6202341, at *2 (N.D. Ill. Apr. 15, 2005) (excluding expert report that did "not break down any characteristics of the employees other than race, sex, and age" or even "make the most elementary comparisons"); *Janes v. Chicago Bd. of Educ.*, No. 00 C 6128, 2002 WL 31557619, at *7–*8 (N.D. Ill. Nov. 18, 2002) (excluding statistical probability opinion that was methodologically unsound and unhelpful because it failed to take into account other potential variables that may have contributed to hiring decisions besides the age of applicants).[10] Statistical analyses derive their relevance in discrimination cases not from simply showing that disparities exist, but from suggesting that disparities exist because of discrimination. *See Schuster v. Lucent Techs., Inc.*, No. 00-C-5228, 2001 WL 1230645, at *7 (N.D. Ill. Oct. 12, 2001), *aff'd*, 327 F.3d 569 (7th Cir. 2003) (report showing that the odds of plaintiff randomly being selected for termination were less than 1.28% was "completely immaterial to any issue in the case" because the issue was not whether plaintiff was selected at random, but whether he was selected because of discrimination); *Werede*, 2005 WL 2124553, at *4 (explaining that for statistical data to create an inference of discrimination, "the statistics must show a significant disparity and eliminate non-discriminatory explanations for the disparity"). Thus, statistical analyses that fail to control for key non-discriminatory variables

---

[10] Other jurisdictions have reached similar conclusions. *See, e.g.*, *Bickerstaff*, 196 F.3d at 448–50 (affirming trial court's exclusion of a regression analysis that failed to account for factors commonly considered in evaluating salary and a statistical analysis that did not account for nondiscriminatory explanations for observed disparities); *Forte v. Liquidnet Holdings, Inc.*, No. 14-cv-2185, 2015 WL 5820976, at *8 (S.D.N.Y. Sept. 30, 2015) (granting defendant's motion to exclude plaintiff's expert's report because the analysis "fail[ed] to control for any possible confounding variables that could potentially provide a nondiscriminatory explanation for the observed compensations discrepancies, including tenure, position, or organizational level"); *E.E.O.C. v. Bloomberg L.P.*, No. 07-cv-8383, 2010 WL 3466370, at *9 (S.D.N.Y. Aug. 31, 2010) ("[C]ourts have repeatedly held that statistical analyses that fail . . . to control for any nondiscriminatory explanations are inadmissible.") (citing cases); *Werede v. Allright Holdings, Inc.*, No. Civ. A 03-cv-01167, 2005 WL 2124553, at *4 (D. Colo. Sept. 2, 2005) ("The Tenth Circuit has consistently . . . den[ied] admissibility of simple statistical comparisons where the evidence did not focus on eliminating non-discriminatory explanations for any disparity.") (citing cases).

may be "so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986).

Here, Dr. Siskin did not do a regression analysis and instead opted to perform simple unadjusted "statistical disparate impact analysis" that does not account for any explanatory variables bearing on whether a HBCU team or black student-athlete on such a team did not play in postseason competition due to racial discrimination or for some other non-discriminatory reason. *See* Ex. 3, Rebuttal Report at 15. Critically, Dr. Siskin did not examine any individual HBCUs to determine whether there were any non-discriminatory reasons that may have caused their teams to receive postseason penalties:

> Q:    Have you taken a look at any individual HBCUs to understand some of the non-APR reasons why they may have received postseason penalties? I mean, we – we've talked generically about it, but have you looked at what happened with Southern and its unusable data?[11]
>        *        *        *
> A:    No.
> Q:    Have you looked at the University of Arkansas Pine Bluff and its lack of institutional control?
> A:    Their – no. . . .

Ex. 2, Siskin Dep. at 266:1–8, 9, 12–15. Although he acknowledges that there are differences among each HBCU's experience with receiving postseason penalties, *id.* at 174:25–175:3, Dr. Siskin did not examine any pertinent trends among HBCUs, or the differences among HBCUs:

> Q:    You haven't looked at factors that might explain the difference between some HBCUs that received penalties and other HBCUs that received no penalties; correct?
> A:    Correct. . . .
>        *        *        *
> Q:    So you haven't looked at, for example, why nine schools had – never had a team that had an APR penalty and some other schools had many more?

---

[11] Beginning in 2013 until May 2015, all teams at Southern University were ineligible for postseason competition starting with the 2013-2014 Winter championships due to the school's failure to provide usable academic data to the NCAA. Ex. 4, Harvey Report ¶¶ 30–31. Although the institutional penalty was unrelated to the APR, Southern University is responsible for 25% of all postseason penalties among all HBCUs with DI sports during the proposed Liability Class period. *Id.* ¶ 125. Dr. Siskin's analysis does not account for this.

A:     No.
     *      *      *

Q:     Have you examined why some schools have gotten better over time in terms of their overall APR scores while other schools have not?

A:     Not yet.

Q:     Okay. Have you examined why some schools had penalties and then stopped getting them?

A:     Not yet.
     *      *      *

Q:     And at this stage anyways, you haven't examined why the HBCUs that have never received a postseason penalty had a different experience with the APP than those HBCUs that did receive penalties; right?
     *      *      *

A:     Correct. I would not have, to the extent that there are HBCU factors other than common factor, which affects the HBCUs and makes them less likely, that lowers the probability you're going to find a disparate impact.

Q:     Okay. And conversely, you haven't examined why some schools have so many more penalties than other HBCU schools; right?

A:     Correct.

*Id.* at 140:17–21; 141:7–11; 267:1–9; 275:1–5, 7–18. Nor did he investigate the unique characteristics of any particular institution:

Q:     So you – but so you didn't look at things like, you know, the university's operating budget to see if that correlates to APR scores?

A:     No.

Q:     Or the size of the endowment?

A:     No.

Q:     Or the number of academic support staff?

A:     No. . . .
     *      *      *

Q:     So you have not looked at institution-specific factors to see if that correlates to or contributes to a statistically significant difference between HBCUs and non-HBCUs?

A:     It's not being taken in consideration in the process, no . . . .

*Id.* at 123:2–11; 125:4–10; *see also id.* at 206:14–18, 20–23; 208:7–10 (Dr. Siskin acknowledging that he did not consider admissions criteria such as incoming SAT scores or GPAs); *id.* at 208:18–21 (admitting that he did not try to correlate graduation rates to anything other than the distinction between HBCUs and non-HBCUs). Dr. Siskin merely concludes—***without examining any of the above explanatory variables***—that the statistical differences in the rate of postseason penalties

between HBCU and non-HBCU teams are due to "the unique mission of the HBCUs and its effect on attracting students and student-athletes, which are almost exclusively Black." Ex. 1, Siskin Report ¶ 22; *see also* Ex. 3, Rebuttal Report at 9 (concluding—without any reliable scientific basis—that that the remedial mission of HBCUs results lower graduation rates at HBCUs). But according to SWAC Commissioner Dr. Charles McClelland, "[m]any HBCU institutions have experienced challenges with APR scores and Postseason Penalties because of resource constraints." Ex. 5, McClelland Decl. at 4. Some HBCUs have devoted more resources to their academic and APP compliance activities, resulting in overall higher APR scores. *Id.* ¶¶ 22–25 (describing efforts made by Texas Southern University to improve the APR scores of its student-athletes). Coaching turnover and the number of transferring student-athletes, among other factors, can also affect a team's ability to earn retention points and increase its APR score. *See id.* ¶¶ 34–35. Even Dr. Siskin admits that "[t]here are multiple other causes which could impact the likelihood of an HBCU team being subject to a postseason ban, such as whether it is an LRI, how remedial the students it attracts are, or simply chance." Ex. 3, Rebuttal Report at 13. Yet he ignores all of these (and other) non-discriminatory factors that may explain why some HBCU teams received postseason penalties during the proposed class period. His statistical analysis is therefore not "the product of reliable principles and methods," FED. R. EVID. 702, and is wholly inadequate to isolate the effect (if any) of race or the "unique mission" of HBCUs on the rate of APP postseason penalties. *See Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 559 (7th Cir. 2001) ("Statistical evidence must also take into account nondiscriminatory explanations.") (cleaned up); *Am. Homeland Title Agency, Inc. v. Robertson*, 348 F. Supp. 3d 852, 866 (S.D. Ind. 2018), *aff'd*, 930 F.3d 806 (7th Cir. 2019) (failure to control for alternative causal variables rendered expert's

testimony "unreliable and thus excludable as tendered," which "simply does not support an inference of discrimination").

Dr. Siskin claims in his Rebuttal Report that he was not required to perform a proper regression analysis because his analyses "related to disparate impact." Ex. 3, Rebuttal Report at 8. But as demonstrated above, "a disparate impact claim is not available under [§ 1981]." *Davidson*, 470 F. Supp. 2d at 939 ("We previously granted partial summary judgment in Citizen's favor with respect to any claim of disparate impact pursued under 42 U.S.C. § 1981. Inasmuch as a recovery under § 1981 requires a showing of wrongful intent, a disparate impact claim is not available under that statute."). Thus, for Dr. Siskin's statistical analysis to be relevant and reliable in this § 1981 case, he would have had to conduct a disparate treatment analysis, which he recognizes "often involves more complex analyses, such as a regression or multiple pools analysis." Ex. 3, Rebuttal Report at 8; *see also* Ex. 2, Siskin Dep. at 66:2–5, 7–9; 66:22–67:1 (Dr. Siskin admitting that he did not perform a disparate treatment analysis). A statistical analysis in a disparate treatment or intentional discrimination case that does not account for non-discriminatory variables—like Dr. Siskin's unadjusted analysis here—is unreliable. *See Robertson*, 348 F. Supp. 3d at 866; *Bingham*, 2014 WL 6388756, at *4–5.

Tellingly, this is not the first time Dr. Siskin has performed faulty statistical analyses in a discrimination case. In *E.E.O.C. v. Sears, Roebuck & Co.*, the court found that Dr. Siskin's regression analyses suffered from "a myriad of flaws" and "could not be given any weight." *Id.* at 324. The court's major criticism was that the variables chosen by Dr. Siskin were too simplified and that the most important variables were omitted. *Id.* at 326–27. The court also found that his analyses were based on "inaccurate and incomplete data." *Id.* at 350. The Seventh Circuit affirmed the district court's findings that Dr. Siskin's regression analyses "did not accurately reflect Sears'

complex, nondiscriminatory decision-making processes" and that they were "so flawed that they lacked any persuasive value." *Id.* at 348–51.[12]

Dr. Siskin has repeated these same mistakes here by analyzing the wrong population and failing to account for appropriate non-discriminatory variables that could explain the statistical disparity in postseason penalties he found between HBCU teams and non-HBCU teams. After analyzing Dr. Siskin's Report, statistician Mr. Robert Garrison Harvey explains that:

> Dr. Siskin's analyses oversimplify the issues to teams that either earned or did not earn a postseason penalty — He posits a binary hypothesis, suggesting there are only two possible outcomes, namely "banned" and "not banned." Dr. Siskin never attempts to measure the impact or effect of any postseason penalty, nor does he choose to include the data that would allow such an analysis.

Ex. 4, Harvey Report ¶ 145. Accordingly, Dr. Siskin's statistical analysis is methodologically unsound and cannot possibly support an inference that, but for race, Plaintiff or any putative class member would not have been subject to a postseason penalty. Nor does his analysis in any way demonstrate that any of the elements of the class claims can be proven on a class-wide basis. Thus, the Court should exclude Dr. Siskin's unreliable reports and testimony.[13]

> ii.     **Dr. Siskin's statistical analysis is unreliable because he failed to exercise the degree of care that a statistician would use in his scientific work outside of the courtroom.**

The objective of Rule 702's reliability requirements is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

---

[12] Dr. Siskin's statistical evidence was also deemed insufficient to establish a prima facie case of disparate impact in *Carpenter v. Boeing* where he again failed to account for critical variables. *See* 456 F.3d at 1198–99 ("The Siskin Study, however, did not incorporate the CBA's eligibility requirements in its analysis. . . . It did not account for whether women worked on the "machine" or were in the "crew," "position," or "shop" to which the overtime was assigned. This failure can skew the results.").

[13] Exclusion is particularly appropriate because Dr. Siskin had the ability to investigate and analyze other variables, but he simply chose not to. *See Janes*, 2002 WL 31557619, at *6 (excluding statistical analysis opinion where expert had data "that would have permitted an analysis of the relevant labor market," but failed to do so).

relevant field." *Kumho Tire*, 526 U.S. at 152; *People Who Care*, 111 F.3d at 537 (explaining that *Daubert* requires that "the methods used by the expert to derive his opinion satisfy the standards for scientific methodology that his profession would require of his out-of-court research"). The Seventh Circuit has recognized that a statistician's failure to appropriately account for explanatory variables and to simply "equat[e] a simple statistical correlation to a causal relation" "indicates a failure to exercise the degree of care that a statistician would use in his scientific work, outside of the context of litigation." *Sheehan*, 104 F.3d at 942 (statistician's failure to correct for any potential explanatory variables other than age rendered his statistical study inadmissible); *see also People Who Care*, 111 F.3d at 537–38 (7th Cir. 1997) (achievement gap study prepared for school desegregation case that failed to measure factors like poverty, the educational attainments of a student's parents, and the extent of parents' involvement in a student's upbringing was inadmissible under *Daubert*). In *Bingham v. Raytheon Tech. Services Co., LLC*, plaintiff's expert performed a statistical analysis from which he concluded that the defendant's layoffs had an adverse impact on employees aged fifty-five and over. 2014 WL 6388756, at *1. However, the expert's analysis failed to account for any non-discriminatory factors like salary grade, duties, department, geography, job knowledge, or length of service. *Id.* at *4. This Court excluded the expert's report under Rule 702 and *Daubert* because a statistical analysis in a discrimination case must account for non-discriminatory variables. *Id.* at *4–*5.

Other courts have reached similar conclusions. In *Werede v. Allright Holdings Inc.*, for example, plaintiff's expert prepared a regression analysis purporting to connect variations in employees' compensation to their race and national origin. 2005 WL 2124553 at *2. The analysis did not control for non-discriminatory factors such as the employees' skill, education, and experience. *Id.* The court held that the absence of non-discriminatory variables "render[ed] any

inference from the regression analysis unreliable," reasoning that the "methodology as applied here would not be accepted by the scientific community and would not be based upon peer review." *Id.* at *5.

Similarly, here, Dr. Siskin's statistical analysis does not account for any non-discriminatory factors such as an institution's resources, focus on academic and APP compliance activities, coaching turnover, the number of transferring student-athletes, and institutional issues and penalties, among other things. "As Dr. Siskin admitted [in *Sears*], if variables are poorly specified or defined, or if important variables are left out, the analysis can lead to the wrong conclusion." *E.E.O.C. v. Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1304 (N.D. Ill. 1986), *aff'd*, 839 F.2d 302 (7th Cir. 1988). Because Dr. Siskin's methodology in this case deviates from that which a statistician would apply in his own scientific work outside the courtroom, it fails to satisfy *Daubert*'s reliability requirements and should be excluded.  *See Sheehan*, 104 F.3d at 942.

### 3.    Dr. Siskin's testimony suffers from serious analytical gaps.

A district court may properly exclude expert testimony under *Daubert* if it "concludes that there is simply too great an analytical gap between the data and opinion proffered such that the opinion amounts to nothing more than the *ipse dixit* of the expert." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) (cleaned up). Here, the Court should exclude Dr. Siskin's testimony because it is suffers from serious analytical gaps.

Most fundamentally, Dr. Siskin's rudimentary analysis compares HBCUs against non-HBCUs. *See* Ex. 1, Siskin Report at Tables 1 & 2. By analyzing the data this way, Dr. Siskin groups all HBCUs together and treats them as fungible. There are, however, important differences among HBCUs that may contribute to the overall APR scores of their teams. *See* Ex. 5, McClelland Decl. ¶¶ 21–35 (identifying multiple non-race related factors, including resource constraints and

administrative and compliance matters, that may impact a team's APR performance). For one thing, the financial resources among HBCU institutions differ greatly. *See* Ex. 4, Harvey Report ¶ 157. For example, the endowment varies at HBCUs with Howard University ($800M) and Hampton ($380M) at the higher end, followed by North Carolina A&T State University ($157M), Florida A&M ($119M), Tennessee State University ($91M), and Jackson State University ($60M). *Id.* At the lowest end of the endowment spectrum are Savannah State University ($10M), Southern University ($10M), South Carolina State University ($4.5M), and Mississippi Valley State ($2.85M). *Id.* Dr. McClelland has testified that many HBCUs have experienced challenges with APR scores and postseason penalties because of resource constraints. Ex. 5, McClelland Decl. ¶¶ 20–26. Dr. Siskin's analysis—which treats all HBCUs the same—suggests that resources are immaterial.

The differences among HBCUs do not stop at resources. During the proposed class period, six HBCUs never received a postseason penalty, including North Carolina Central University, University of Maryland Eastern Shore, Tennessee State University, South Carolina State University, Jackson State University, and Bethune-Cookman University. Ex. 4, Harvey Report ¶ 156. On the other side of the spectrum, one HBCU—Southern University—is responsible for more than 25% of all HBCU postseason penalties during the class period. *Id.* And across all 24 HBCUs, three HBCUs—Southern University, Alabama A&M University, and Howard University—are responsible for over 45% of all postseason penalties at HBCUs during the proposed class period. *Id.* By treating all HBCUs the same, Dr. Siskin has created a wide analytical gap between the underlying data and his conclusions because the reality is that all HBCUs are unique and the reasons why Southern University, for example, received a disproportionate number of postseason penalties differs from why any other HBCU teams received postseason penalties in

any given year. Dr. Siskin's overbroad conclusion that this is all due to "the unique mission of the HBCUs" is nothing but his *ipse dixit*. *C.W. ex rel. Wood*, 807 F.3d at 837.

A similar flaw in Dr. Siskin's analysis is that he groups all non-HBCUs together and treats them as fungible. For example, Princeton University, Harvard University, Stanford University, and Yale University are lumped in with other non-HBCU schools in a single category. *See* Ex. 4, Harvey Report ¶ 160 (criticizing Dr. Siskin's inclusion of Princeton, Harvard, Stanford, and Yale as comparators to HBCUs). Dr. Harvey explains that this is problematic because "[i]n addition to being among the top ranked Universities in the country, these institutions also have enormous endowments and resources: Harvard ($53B), Yale ($42B), Princeton ($37B), and Stanford University ($38B)." *Id.* Yet Dr. Siskin treats all non-HBCUs as the same and proceeds to find a statistically-significant difference between HBCUs and non-HBCU with respect to postseason penalties, APR scores, and graduation rates. Dr. Siskin assumes these differences are caused by the unique mission of the HBCUs but fails to present any reliable analysis to justify his conclusion or explain the basis for including outlier schools like Harvard, Yale, Princeton, and Stanford University as comparators to HBCUs. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005), *amended*, No. 01 C 9389, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005) (explaining that experts must make comparisons between "apples and apples" rather than "apples and oranges"). This is yet another example of an analytical gap that renders Dr. Siskin's opinions unreliable.

Moreover, Dr. Siskin claims that a "generally accepted methodology exists" for determining on a class-wide basis whether the APP discriminates against class members. Ex. 1, Siskin Report ¶ 46. Yet as explained above, Dr. Siskin never analyzed the individual class members or controlled for race. Ex. 2, Siskin Dep. at 70:21–24; 139:1–140:3; 265:16–21

(testifying that he analyzed HBCU teams, not individual student-athletes). Thus, any purported class-wide methodology advanced by Dr. Siskin applies to HBCU teams (and all student-athletes on those teams, regardless of race) and not to black student-athletes at HBCUs (the actual class members). Moreover, he has simply compared HBCU teams (regardless of racial composition) with non-HBCU teams (regardless of racial composition). *See* Ex. 2, Siskin Dep. at 73:13-18.

Finally, Dr. Siskin's opinion that class-wide methodology exists for determining liability is premised on the assumption that "[t]he APR scores every team the same way." Ex. 3, Rebuttal Report at 11. This is an oversimplification of the APP process because a lot more than the raw APR score is involved in determining whether a team will receive a postseason penalty. As explained in the NCAA's Response in Opposition to Plaintiff's Motion for Class Certification [Dkt. No. 194], the DI Committee on Academics applies "multiple levels of analysis to identify institutions or teams that are ineligible for postseason competition." Dkt. No. 194-2, Declaration of Binh Nguyen ¶ 21. "This multi-level analysis involves consideration of, among other things, each team's multiyear APR, if the team/school is new to Division I, whether any postseason access filters were applied, whether the school sought any adjustments or exceptions to the APR calculation, whether the school sought any relief for APR points lost by individual student-athletes on the team, whether the school applied for a waiver of the penalty, and whether the waiver was denied and why." *Id.* Dr. Siskin ignores all of these factors. Accordingly, Dr. Siskin's claim that his unadjusted statistical analysis of HBCU teams that earned a postseason penalty—without regard for the racial makeup of each team or the APP's multi-level analysis—reveals a class-wide methodology for analyzing the allegedly discriminatory impact of the APP on individual black student-athletes at HBCUs reveals an analytical gap that renders his testimony unreliable and inadmissible.

## IV.   CONCLUSION

For the foregoing reasons, Dr. Siskin's statistical analysis and the opinions derived therefrom are irrelevant, unhelpful, and unreliable. His testimony is inadmissible under Rule 702 and the reliability requirements of *Daubert* and its progeny. Accordingly, the NCAA respectfully requests that the Court grant Defendant's Motion to Exclude the Testimony and Expert Reports of Dr. Bernard R. Siskin in its entirety. In addition, the NCAA urges the Court to deny Plaintiff's Motion for Class Certification because it is wholly dependent upon Dr. Siskin's unreliable and inadmissible testimony.

DATED: May 3, 2023                          Respectfully submitted,

**BARNES & THORNBURG LLP**

*/s/ Brian E. Casey*
Brian E. Casey
brian.casey@btlaw.com
V. Chisara Ezie-Boncoeur
cezie@btlaw.com
201 S. Main Street
South Bend, IN  46204
Telephone: (574) 233-1171
Facsimile: (574) 237-1125

- and -

Victor D. Vital
victor.vital@btlaw.com
*Admitted Pro Hac Vice*
Alicia Raines Barrs
Alicia.Rainesbarrs@btlaw.com
Ilana Zelener
Ilana.Zelener@btlaw.com
*Admitted Pro Hac Vice*
2121 N. Pearl Street, Suite 700
Dallas, TX 75201-2469
Telephone: (214) 258-4200
Facsimile: (214) 258-4199

***Counsel for Defendant the NCAA***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document

has been filed using this court's ECF system on all counsel of record on May 3, 2023.

<u>*/s/ Brian E. Casey*          </u>
Brian E. Casey