UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TROYCE MANASSA,<br>individually and on behalf of all others<br>similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03172-RLY-MJD |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC<br>ASSOCIATION, | ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR ATTORNEY FEES**

On February 3, 2023, the Magistrate Judge granted in part and denied in part

Plaintiff Troyce Manassa's Motion to Compel.  He also authorized Manassa to "file a

motion seeking fees with regard to the portions of this motion on which Plaintiff

prevailed" pursuant to Federal Rule of Civil Procedure 37(a)(5)(C).  (Filing No. 157 at

18).  Following briefing by the parties, the court held that a fee award was appropriate

and ordered Manassa to submit detailed billing statements, accompanied by an affidavit,

in support of those fees.  Manassa has done so, and the motion for fees is ripe for ruling.

In total, Manassa seeks an award of $145,897.50 in attorney fees.  The NCAA objects to

the reasonableness of the requested fees and proposes that Manassa be awarded no more

than $54,266.25.  For the reasons set forth below, the court awards Manassa

$108,225.50.

1

## I.      Factual Background

Manassa's First Amended Complaint sought to certify class actions against the National Collegiate Athletic Association ("NCAA") on behalf of current and former Black student-athletes at Historically Black Colleges and Universities ("HBCUs").  He alleged the NCAA discriminated against Black student-athletes at HBCUs through the design and implementation of its Academic Performance Program ("APP").  The APP penalizes NCAA teams, including by banning them from post-season competition, if the team members fail to meet certain academic performance indicators.  Manassa alleged that HBCUs were 43 times more likely to receive a post-season ban than predominately white institutions.  Accordingly, he brought civil rights claims under Section 1981 and Section 1985(3).[1]

The motion for attorney fees addressed by this order stems from Manassa's partially successful second motion to compel, which requested the court compel the NCAA to produce four categories of information: (1) Penalty Data, (2) Database Information, (3) Paskus's Data and Model, and (4) Limited-Resource Institutions ("LRIs") Information.  (*See generally* Filing No. 157, Order on Sec. Mot. Compel).  The court granted the motion in part and denied it in part.  Specifically, the court granted Manassa's motion as to the Penalty Data; denied Plaintiff's request for Database Information as premature; denied Plaintiff's request for Paskus's Data and Model because the nature of the dispute was not clear; and granted Plaintiff's request for LRI

---

[1] On October 19, 2023, the court granted the NCAA's motion for summary judgment on Manassa's claims and denied his motion for class certification.  (Filing No. 297).

Information.  (*Id.* at 14–18).  For context, the court reiterates from its previous Order on Plaintiff's Motion for Attorney Fees the details of the categories and the reasons for the court's rulings below.

### A.    Penalty Data

The first category of documents Manassa sought was "Penalty Data," which refers to "[i]nformation and data about penalties for each team during the relevant time period (including the penalty level and any filters or waivers applied for, appealed, granted, or denied)."  (Filing No. 149-1 at 2).  The NCAA offered to produce penalty-related data for all teams in all sports at all Division I ("DI") HBCUs, regardless of whether they received a post-season penalty; all teams in all sports at all DI LRIs, regardless of whether they received a post-season penalty; and all teams in all sports at all DI schools that received a post-season penalty.  (Filing No. 150 at 15).  The NCAA's offer would have provided information for between 5,000 and 7,000 teams during the relevant period.  (*Id.*). Ultimately, after more discovery disputes, the NCAA produced "hundreds of thousands" of PDF documents containing penalty-related data.  (*Id.* at 12).

The NCAA did not dispute, however, that it maintained a database with additional responsive information.  (Order on Sec. Mot. Compel at 5–7).  For example, the NCAA's proposal did not include DI teams that did not receive a post-season penalty and were not HBCUs or LRIs.  (*See* Filing No. 150 at 14–15).  Thus, any non-HBCU, non-LRI school that qualified for a post-season penalty but was granted a waiver would not be included in the NCAA's unilaterally selected non-random sample.  In other words, the NCAA potentially left out highly relevant comparators for Manassa's case.

3

Naturally, Manassa wanted the data from the teams that were left out.  The NCAA contended that providing data for all teams in all sports at all DI schools—roughly 67,000 teams—would be unduly burdensome and not proportional to the needs of the case.  (*Id.*).  Yet, the NCAA "provided no information at all regarding what the actual burden of producing the additional information sought by Plaintiff would be."  (*Id.* at 8).

The NCAA also took the position that it was not obligated to produce the data in the computer-readable form Manassa requested.  First, the NCAA argued that Manassa claimed he was entitled to all the raw data in the NCAA's database.  That argument was refuted by the next sentence in the NCAA's brief, which acknowledged that Manassa would accept the information in "Excel, CSV, or other computer-readable form."  (Filing No. 150 at 15 (quoting Filing No. 149-1 at 9)).  In fact, Manassa's offer to take the raw data and have his own experts compile reports was intended to alleviate the burden on the NCAA.  (Order on Sec. Mot. Compel at 9).  Second, the NCAA argued that Manassa's assertions regarding the manner in which the data could be produced were unsupported, but it again failed to articulate any specifics to rebut Manassa's assertions.  (*Id.* at 9–10).[2]  Third, the NCAA contended Manassa had not previously requested the data in any particular format.  The instructions to Manassa's document requests and the parties' stipulations regarding discovery demonstrated otherwise.  (*Id.* at 10–11).

---

[2] For example, the NCAA gestured at a concern for protecting the personal health information contained in the raw data.  However, it did not "address the feasibility of producing the raw data along with the necessary internal coding information, with or without first removing irrelevant data, like personal health information."  (Order on Sec. Mot. Compel at 10).

Finally, the NCAA claimed it had produced the information as it was kept in the ordinary course of business.  The court noted: "This is simply not the case."  (*Id.*).  The information requested by Manassa is maintained by the NCAA in a relational database—not in PDF files as it was produced.  (*Id.*).  Accordingly, the court granted Manassa's motion as it related to Penalty Data.

### B.    Database Information

The second category of information Manassa sought was information about the NCAA's database that would be necessary if the NCAA chose to produce its Penalty Data in raw data.  The court denied Manassa's motion as premature as it related to Database Information because it was not yet clear in what format the NCAA would produce the Penalty Data.  (*Id.* at 12).  However, the court noted the NCAA would be required to produce the Database Information if it chose to produce the Penalty Data in raw data. (*Id.*).  Ultimately, the NCAA did produce the raw data, but there was a dispute as to whether it produced all the Database Information, leaving the court "unsatisfied with Defendant's compliance with its discovery obligations."  (Filing No. 170, Minute Entry).

### C.    Thomas Paskus's Data and Model

Thomas Paskus is a research analyst employed by the NCAA who published a report analyzing key metrics behind the APP (the "Paskus Study").  Manassa sought the data Paskus relied on and other information necessary to understand his methodology. The court found the nature of the discovery dispute regarding the Paskus Study unclear. (Order on Pls.' Sec. Mot. Compel at 12–13).  The court explained:

If, in fact, there are documents that relate to the Paskus Study that are responsive to Plaintiff's document requests that have not yet been produced, Defendant is obligated to produce them. But it is entirely unclear that such is the case. If what Plaintiff actually wants is for Defendant to specifically identify which documents Paskus relied on, or for Defendant to explain Paskus's methodology in a way that is not made clear in any document, the Court agrees with Defendant that that is beyond the scope of Plaintiff's broad discovery requests.

(*Id.* at 13). Because Manassa had not demonstrated that the NCAA failed to fulfill its discovery obligations with respect to the Paskus Study, his motion to compel was denied on that issue. (*Id.*).

### D. Limited Resource Institutions Information

Finally, Manassa sought information related to LRIs, which have access to certain penalty waivers that other institutions do not have. He requested through an interrogatory that the NCAA explain how it determines whether an institution is an LRI and identify the institutions categorized as an LRI. (Filing No. 149-3, Interrogatory No. 10). The NCAA's response to this interrogatory pointed to a document it later admitted was not relevant. (Order on Sec. Mot. Compel at 14). It then attempted to cite another document responsive to Manassa's requests, which contained multiple references to a formula the NCAA uses to determine LRI status. (*Id.* at 15–16). Manassa requested the formula, but the NCAA refused to provide it.

The court found the NCAA's refusal to provide the formula "surprising." (*Id.* at 16). Similarly, the court found the NCAA's response that it could not locate a document containing the exact formula "baffling" because the interrogatory sought an answer to a question (what the formula is), not the production of documents. (*Id.*). Without the

formula or an admission that no formula exists, the NCAA's response to the interrogatory was incomplete. (*Id.*). The court therefore granted Manassa's motion to compel the production of LRI Information; however, the court only compelled the production of such information for a period of four years prior to the adoption of the current LRI filter in 2009 because Manassa did not explain how data before 2005 was relevant. (*Id.* at 17–18).

### E.    Proposed Fee

In his opening brief, Manassa sought $108,322.50, representing the lodestar amount for meet and confers and other pre-motion work, the opening brief for the motion to compel, the reply brief for the motion to compel, and the opening brief for the present motion for attorney fees. (Filing No. 166-1, First Clark Decl. ¶ 10). The following table shows how that total was calculated:

| Name & Role | Rate | Hours (Meet & Confer, Pre-Motion Work) | Hours (Opening Brief) | Hours (Reply Brief) | Hours (Fee Brief) |
|---|---|---|---|---|---|
| FEGAN SCOTT LLC | | | | | |
| **Beth Fegan** Managing Member | $ 950 | 2.10 | 0.75 | 1.50 | 1.88 |
| **Melissa Clark** Counsel | $ 800 | 33.85 | 9.28 | 20.33 | 4.88 |
| **Ling Wang** Associate | $ 550 | 12.90 | 10.93 | 8.63 | 11.50 |
| **Wendy Purcell** Paralegal | $ 250 | 0.00 | 0.38 | 4.13 | 0.00 |
| **Mary Dugan** Paralegal | $ 250 | 0.00 | 0.00 | 0.60 | 0.00 |
| MAY JUNG | | | | | |
| **Je Yon Jung** Partner | $ 950 | 16.20 | 2.45 | 2.33 | 2.50 |
| TOTAL | | | | | |
| | Total Hours | 65.05[1] | 23.78[2] | 37.5[3] | 20.75[4] |
| | Total Fees | $ 51,560.00[5] | $ 16,562.50[6] | $ 25,818.75[7] | $ 14,381.25[8] |
| | | Total Lodestar Requested | | | **$108,322.50**[9] |

(*Id.*).  The footnotes in the table indicate the amount that was discounted due to Manassa's partial success on the motion to compel.  In time entries where Manassa was unable to separate out time specific to the issues he prevailed on, Manassa reduced counsel time by 25%, reflecting his judgment that he prevailed on two of the four categories sought and that the majority of counsel's time was spent in pursuit of the Penalty Data.  (*Id.* ¶¶ 14–20).

In addition, Manassa seeks $15,940 in connection with his reply to the motion for attorney fees.  (Filing No. 175-1, Sec. Clark Decl. ¶ 6).  The following table represents Manassa's calculation of the lodestar amount for his reply brief:

| Name & Role | Rate | Hours (Reply Brief) |
|---|---|---|
| FEGAN SCOTT LLC | | |
| **Beth Fegan** Managing Member | $ 950 | 1.1 |
| **Melissa Clark** Counsel | $ 800 | 13.2 |
| **Ling Wang** Associate | $ 550 | 2.5 |
| **Wendy Purcell** Paralegal | $ 250 | 0 |
| **Mary Dugan** Paralegal | $ 250 | 0 |
| **Alissa Giler** Paralegal | $ 250 | 8.8 |
| MAY JUNG | | |
| **Je Yon Jung** Partner | $ 950 | .8 |
| | Total Hours | 26.4 |
| | Total Fees | $15,940 |

(*Id.*).

8

In an Order dated September 1, 2023, the court found Manassa was entitled to an award of attorney fees because the NCAA's objections to Manassa's discovery requests regarding the Penalty Data and the LRI Information were not substantially justified.  Fed. R. Civ. P. 37(a)(5)(C); *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) ("Substantially justified" means there was a "genuine dispute.").  Because Manassa's counsel did not submit detailed billing statements with its motion for fees, the NCAA was unable to provide specific objections to certain aspects of Manassa's proposed fee award. Therefore, the court ordered Manassa's counsel to provide detailed billing statements for the NCAA's review, with appropriate redactions, accompanied by an affidavit in support of the accuracy of that record.  Additional briefing followed, which prompted Manassa to file a supplemental reply brief.  (*See* Filing No. 299).  Manassa seeks $21,635 in connection with that brief.  The following table represents Manassa's calculation of the lodestar amount for his supplemental reply brief:

| Title | Hours | Rate | Fees |
|-------|-------|------|------|
| Counsel | 20.1 | $800 | $ 16,080 |
| Staff Attorney | 7.8 | $350 | $ 2,730 |
| Paralegal | 11.3 | $250 | $ 2,825 |
| | | | |
| TOTAL | 39.2 | | $ 21,635 |

(Filing No. 299-1, Third Clark Decl. ¶ 8).  In total, Manassa seeks $145,897.50 for 212.68 hours of work.

## II.    Legal Standards

In calculating reasonable attorney fees, the court is guided by the Supreme Court's decision in *Hensley v. Eckerhart*, 461 U.S. 424 (1983).  Under *Hensley*, the court first

multiplies the number of hours plaintiff's attorneys reasonably expended in the litigation by their reasonable hourly rates. *Id.* at 433. This figure is known as the "lodestar." *Spegon v. Cath. Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999). The court may then adjust the lodestar calculation based on a variety of factors, including the degree of success the plaintiff has obtained. *Hensley*, 461 U.S. at 436. The party seeking an award of attorney fees bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed. *Spegon*, 175 F.3d at 550. A trial court's determination of a reasonable fee award is reviewed under the "highly deferential abuse of discretion standard." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011).

## III.   Discussion

The NCAA objects to both parts of Manassa's lodestar calculation. They challenge the hourly rates sought by the four attorneys who scheduled time on the motion to compel and motion for attorney fees, and they challenge the amount of time devoted to those motions. In addition, the NCAA argues Manassa's "limited success" warrants a 40 percent reduction in the lodestar amount. The court begins with Manassa's attorneys' proposed hourly rates.

### A.   Hourly Rates

The hourly rates sought by Manassa's attorneys and paralegals from Fegan Scott LLC are as follows: Beth Fegan, managing member, $950; Melissa Clark, counsel, $800; Ling Wang, associate, $550; Lisa Fish, staff attorney, $350; Wendy Purcell, paralegal, $250; Alissa Giler, paralegal, $250; and Mary Dugan, paralegal, $250. (First Clark Decl. ¶ 10; Sec. Clark Decl. ¶ 6; Filing No. 299-1, Third Clark Decl. ¶ 10). He also seeks an

hourly rate of $950 from Je Yon Jung, a partner at May Jung LLC.  (*Id.*).  Fegan[3] and

Jung have over 25 years of experience practicing law; Clark has over 15 years of

experience; Wang has over 5 years of experience, and Purcell and Dugan have, according

to Clark, "many years of experience."  (First Clark Decl. ¶¶ 3–7).

The NCAA did not pose any objection to the rates for paralegals Dugan ($250),

Giler ($250), and Purcell ($250), nor to the hourly rate of staff attorney Fish ($350).

Therefore, the court accepts those rates as reasonable.

As for Fegan, Jung, Clark, and Wang, the NCAA argues their rates are "exorbitant"

because they are much higher than the rates charged by attorneys in the Southern District

of Indiana and are "unsupported" because they are substantiated only by Clark's self-

serving declaration.[4]

The Seventh Circuit has defined a reasonable hourly rate as one that is "derived

from the market rate for the services rendered."  *Pickett,* 664 F.3d at 640 (quoting *Denius*

*v. Dunlap,* 330 F.3d 919, 930 (7th Cir.2003)).  The rate that an attorney actually

charges—and receives—from paying clients "for comparable work is 'presumptively

appropriate' to use as the market rate."  *People Who Care v. Rockford Bd. of Educ.,* 90

F.3d 1307, 1310 (7th Cir. 1996) (quoting *Gasman v. Unisys Corp.,* 986 F.2d 1146, 1150

(7th Cir. 1993)).  In this case, Manassa's attorneys do not have fee-paying clients because

---

[3] Based on the distribution pages from Manassa's briefs, Fegan is based in Chicago, Illinois; Jung is based in Orange County, California; Clark is based in New York, New York; and Wang is based in Minneapolis, Minnesota.
[4] Clark's declaration states: "In my opinion, the hours expended, the hourly rates, and the total expenses sought are reasonable."  (First Clark Decl. ¶ 28).

they maintain a contingency fee practice.  Consequently, they must offer "the next best evidence" of their market rate: that is, "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fees awards the attorney has received in similar cases." *Pickett,* 664 F.3d at 640 (quoting *Spegon,* 175 F.3d at 555).

There is a preference in the Seventh Circuit "for third party affidavits that attest to the billing rate of comparable attorneys" over evidence of fee awards counsel has received in similar cases.  *Id.* (citing *Spegon*, 175 F.3d at 556).  Manassa did not submit third-party affidavits; instead, he submits the declarations in support of Fegan's, Clark's, and Wang's billing rates filed in other cases.  (Filing No. 175-4 (*In re Tiktok, Inc., Consumer Priv. Litig.*, MDL No. 2948 (N.D. Ill.); Filing No. 175-5 (*In re: Port Antitrust Litig.*, Civil No. 18-1776 (D. Minn.); Filing No. 175-6 (*In re NCAA Student-Athlete Concussion Inj. Litig.*, MDL No. 2492 (N.D. Ill.)).  In his supplemental reply, Manassa adds *Zakikhani v. Hyundai Motor Co.*, Case No. 8:20-cv-01584-SB-JDE, 2023 WL 4544774 (C.D. Cal. May 5, 2023) to the list.  As for Jung, the court scoured the record to find support for her hourly rate.  The court found only Clark's declarations wherein she opines that the hourly rates advanced by counsel (including Jung) are "reasonable."  (First Clark Decl. 28; Third Clark Decl. ¶ 21).

As an initial matter, *In re Tiktok* and *In re Port Antitrust Litigation* are not helpful. In *In re Tiktok,* Fegan submitted a supplemental declaration in support of plaintiffs' petition for attorney fees for purposes of a consumer class action settlement involving data privacy.  (Filing No. 175-4).  Fegan, as Co-Lead Class Counsel, asked for a fee rate

12

of $950 for herself, $800 for Clark, and $250 for Purcell.  (*Id.*).  In a memorandum opinion approving the settlement, the district court held that Class Counsel were entitled to one-third of the settlement amount, reasoning that "a flat percentage fee award of one-third of the net common fund is typical in other data privacy settlements" and "is routine for class action settlements in similarly complex fields."  *In re Tiktok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 941 (N.D. Ill. 2022).  Because they were awarded a flat fee, the court did not address the reasonableness of counsels' specific billing rates.[5]  In *In re Pork Antitrust Litig.*, Case No. 18-1776 (D. Minn.), Manassa points only to a declaration in support of attorney fees reflecting a 2022 billing rate of $550 for attorney Wang.  (Filing No. 175-5).  There is no evidence in the present record that the court accepted Wang's $550 billing rate as a reasonable market rate.

On the other hand, *Zakikhani* and *In re Concussion Litigation* provide some evidence of Fegan's, Clark's, and Wang's market rates.  *Zakikhani* involved a class action settlement against Hyundai.  In a memorandum opinion accepting the settlement, the district court noted that the hourly rates for the various firms involved "range[d] from $225–$400 for paralegals, $350–$550 for associates and staff attorneys, $550–$850 for of counsel, and $625–$1,285 for partners."  *Zakikhani*, 2023 WL 4544774, at *9; (*see also id.*, Case No. 8:20-cv-01584-B-JDE, Filing No. 134-2 (declaration dated March 20,

---

[5] To be fair, the district court did "cross-check" the lodestar by dividing the flat fee by the lodestar amount, which resulted in a multiplier of 2.04 ($29,279,203.44 (proposed award)/$14,324,394.90 (loadstar)). 617 F. Supp. 3d at 943. Noting that "most multipliers fall within one and four," the court found that a 2.04 multiplier was reasonable for that case. *Id.* Critically, however, there was no discussion of the hourly rates or hours that comprised the lodestar.

2023, attesting to the hourly rates of Fegan ($1,000), Clark ($850), and Wang ($550))).

"Although some of the rates appear[ed] to be high," the district court "accept[ed] them in

light of Defendants' non-opposition and the fact that this is not a common fund case and

so the attorneys' fees will not reduce the benefits Class Members will receive under the

settlement." *Zakikhani*, 2023 WL 4544774, at *9.

    *In re NCAA Student-Athlete Concussion Injury Litigation* involved another class

action settlement approval, this time against the NCAA. 332 F.R.D. 202 (N.D. Ill. 2019).

There, the district court's analysis on the reasonableness of class counsel's rates is found

in a footnote, where the court noted in conclusory fashion that rates charged by

Settlement Class Counsel were "consistent with current market rates for similar legal

services." *Id.* at 222 n. 19 ("Settlement Class Counsel has submitted declarations

attesting to their current billing rates, and Co- Lead Counsel has provided the effective

blended rates for each firm. *See* Pet. Fees, Expenses, & Incentive Awards at 8–9, ECF

No. 327.  The Court finds that these rates are consistent with current market rates for

similar legal services.").  Fegan, who was part of the Co-Lead Counsel team, filed a

declaration in that case on January 13, 2017, representing that her hourly rate was $735.

(*See* Filing No. 175-6 at 5–6).  Although this award is from 2017, the court is cognizant

of the fact that "hourly fees increase over time, both because of inflation and because of

the increasing skill and reputation of the attorney." *Fox ex rel. Fox v. Barnes*, No. 09 C

5453, 2013 WL 4401802, at *3 (N.D. Ill. Aug. 15, 2013).

    Ultimately, the court must "arrive at its own determination as to a proper fee."

*Spegon*, 175 F.3d at 557 ("While hourly rates awarded to counsel in similar cases are

evidence of an attorney's market rate, 'each court should certainly arrive at its own determination as to a proper fee.'") (quoting People *Who Care*, 90 F.3d at 1312). To assist the court with that determination, the court turns to the declaration of the NCAA's lead attorney, Brian Casey, a partner at Barnes & Thornburg LLP who has practiced law for over 30 years. *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by defendant's attorneys provide a useful guide to rates customarily charged in this type of case."). Casey avers that the rates charged by Barnes' attorneys on this case "conform with the reasonable rates of the local legal market[6] for cases like this." (Filing No. 172-1, Casey Decl. ¶¶ 3–4). They are: $735 for Casey; $462 for Chisara Ezie-Boncoeur, a partner who has practiced law for nine years; and $455 Ilana Zelener, an associate who has practiced for over six years. (*Id.* ¶ 3).

Given the court's experience and knowledge of billing practices in class actions, Fegan's, Clark's, and Wang's years of experience handling class action litigation, the hourly rates approved in *Zakikhani* and *In re Concussion Litigation*, and the hourly rates Barnes actually charges for cases like this, the court, in its discretion, finds the following hourly rates are appropriate: Fegan ($850), Clark ($700), and Wang ($500).

---

[6] Manassa responds in conclusory fashion that his attorneys are entitled to higher rates than those in the Southern District of Indiana because "national—not local—rates apply to high-risk, nationwide cases like this one." (Filing No. 299, Suppl. Reply at 7). Manassa may be right. *Jeffboat, LLC v. Dir., Off. of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009) (explaining that in circumstances where the "subject matter of the litigation is one where the attorneys practicing it are highly specialized," the relevant community of attorneys of similar ability and experience may be the "community of practitioners" in the national legal market). But he has not submitted any evidence of what a reasonable national rate for a case like this would be.

Jung's hourly rate is unsupported by fee awards she has received in similar cases or by a third-party affidavit.  Clark's testimony that Jung's hourly rate is "reasonable" is conclusory and of no assistance to the court.  Accordingly, the court must arrive at a reasonable market rate for Jung based on only two facts gleaned from Clark's first declaration: Jung is named partner at May Jung and has 25 years of experience practicing law.  (First Clark Decl. ¶ 5).  Based on those facts, the court, in its discretion, determines Jung's reasonable hourly rate is $750.

### B.    Hours Charged

In determining the appropriate number of hours to award for a fee request, the court should exclude hours that are excessive, redundant, or otherwise unnecessary, "just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434.  Put simply, a party seeking fees should exercise "billing judgment." *Id.*  "Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended." *Spegon*, 175 F.3d at 552 (quoting *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998)).  This means that the hours an attorney would not charge to his or her client should not be billed to an adversary. *Id.* (citing *Hensley*, 461 U.S. at 434).

Manassa's counsel spent approximately 65 hours on meet-and-confer conferences and pre-motion work; 24 hours on the opening motion to compel and brief; 38 hours on the reply brief; 21 hours on the opening motion for fees and related brief; 30 hours for the rely brief; and 39 hours on the supplemental reply brief.  (First Clark Decl. ¶10; Sec. Clark Decl. 6; Third Clark Decl. ¶ 8).  The NCAA seeks to exclude 36.2 hours for

16

internal conferences and communications between Manassa's counsel; 22.1 hours for overstaffing the present motions and briefs; and 54.5 hours for insufficiently detailed time entries. (*See* Filing Nos. 291-1, 291-2 & 291-3). The NCAA also argues that Manassa is not entitled to any fees for the time spent on additional briefing ordered by the court, and that his

counsels' fees should be reduced in the aggregate by 40% to account for his limited success on the motion to compel.

### 1. Internal Communications

The court begins with the NCAA's first objection regarding the fees associated with internal communications amongst Manassa's counsel.

Courts may award fees for inter-office communications so long as the time spent communicating is "reasonably expended." *Tchemkou v. Mukasey*, 517 F.3d 506, 511–12 (7th Cir. 2008). In fact, the Seventh Circuit has recognized that "[t]he practice of law often, indeed usually, involves significant periods of consultation among counsel." *Id.* at 511. This is because "[t]alking through a set of authorities or seeking advice on a vexing problem is often significantly more efficient than one attorney's trying to wade through the issue alone." *Id.* at 511–12. To ensure that the amount of time billed to internal communications was "reasonably expended," attorneys should "identify explicitly the subject matter of their discussions." *Id.* at 512.

After reviewing the NCAA's objections to Manassa's counsels' billing records, (*see* Filing No. 291-1), the court finds the amount of time Manassa's counsel spent on internal conferences and email communications was reasonable. For example, the NCAA takes

issue with a September 8, 2022, time entry from Clark which states: "Correspond with L. Wang, B. Achua, B. Fegan re meet and confer with NCAA re data issues." (Filing No. 291-1 at 1). It argues the entry for 0.1 hours is duplicative of Lang's 0.1 entry on the same date that reads: "Emails from B. Achua, M. Clark, B. Fegan re: today's meet and confer with defense counsel re data issues." (*Id.*). These charges are not duplicative; Clark billed for the time spent corresponding with counsel, and Lang billed for time spent reading that correspondence. Moreover, Manassa did not seek reimbursement for the time incurred by Achua and Fegan. The NCAA also takes issue with time billed by several attorneys for team meetings. For example, on November 17, 2022, both Fegan and Clark billed 0.6 hours for a "team status and strategy call." (*Id.* at 2). Based on entries immediately before and after these specific entries, this call involved discovery issues, including "data issues" with the NCAA. (*Id.*). These entries are not duplicative; counsel may discuss important discovery issues amongst themselves. The entries are also sufficiently detailed to identify the subject matter of the call, as are the other entries identified by the NCAA in Filing No. 291-1. In sum, the time Manassa's counsel billed for internal communications was reasonably expended. Therefore, the NCAA's objection is overruled.

### 2.    Overstaffing

The NCAA also objects to the number of "timekeepers" billing for drafting the motion to compel and related briefs. (*See* Filing No. 291-2). A review of the time records reflects that most of the attorney time on the motion to compel and briefs was billed by Clark, a partner, and Wang, an associate. (First Clark Decl. ¶ 10; Sec. Clark

Decl. ¶ 6; Third Clark Decl. ¶ 10).  Fegan and Jung, the two senior partners from different firms, spent very little time reviewing the briefs and discussing strategy.  (Filing No. 291-2).  The total number of timekeepers (8) is also a bit misleading; not every timekeeper billed time on every brief.  Accordingly, the court finds the motion and briefs were appropriately staffed, and the NCAA's objection is overruled.

### 3.    Insufficiently Detailed Time Entries

The NCAA complains that Manassa's counsels' time was not sufficiently detailed to allow the court to determine whether they are related to the motion to compel.  It presents these as examples:

- "Email w/ M. Clark re edits to letter to defense counsel re discovery issues"
- "Correspondence w/ L. Wang re: letter to defense counsel regarding discovery disputes."
- "Revise draft discovery letter; attend call with co-counsel re strategy; correspondence re materials for expert"
- "Review letter to defense counsel regarding discovery issues"
- "Call w/ L. Wang re: discovery strategy"

(Filing No. 291-3 at 1–2).  The court disagrees.  Manassa's counsel has represented that the billing records submitted are related to the motion to compel and attorney fee motion. (Filing No. 286, Fegan Aff. ¶ 3; First Clark Decl. ¶ 8).  Moreover, when the billing records are read in context, it is evident they related to those motions.  (*See* Filing No. 286-1, billing related to underlying meet-and-confer discussions, motion to compel, and initial fee motion); Filing No. 286-2, billing related to fee reply).

Regarding the specific objections in the bullet-points above, four of them are dated August 19, 2022, or August 23, 2022, and relate to a discovery dispute letter to the

19

NCAA.  That letter was sent to the NCAA on August 23, 2022.  (*See* Filing No. 150-4).
There is no question that the letter relates to the motion to compel.

Regarding the fifth entry dated November 16, 2023, which states "Call w/ L.
Wang re: discovery strategy," numerous other entries that day reflect counsel was dealing
with the data issues underlying the motion to compel.  (Filing No. 291-3 at 1).  Notably,
counsel had a meet-and-confer with defense counsel that day.  (Filing No. 286-1 at 7).

In sum, the court has reviewed the other entries to which the NCAA objects, (*see*
Filing No. 291-3), and finds they are adequately detailed.  Its objection to the sufficiency
of the detail in counsels' time entries is overruled.

### 4.    Time Billed for Additional Briefing

The NCAA's next objection relates to the additional briefing ordered by the court,
for which Manassa seeks $21,635 in attorney fees.

In Manassa's original attorney fee motion, he did not submit any detailed time and
billing entries describing the time and tasks for which he sought reimbursement.  (*See*
Filing No. 166, Motion for Attorney Fees).  The NCAA contacted Manassa's counsel and
asked for those records.  (Filing No. 172-1, Email to counsel dated 2/27/23 ("Please send
us the time entries with descriptions that have the fees you're requesting reimbursement
of.")).  Manassa refused, stating they "reflect work product," (*id.*), and offered to provide
detailed billing records to the court for an in-camera review, (First Clark Decl. ¶ 29 ("At
the Court's request, Plaintiff will submit the detailed billing records underlying this
analysis for the Court's in camera review.")).  In its Order finding a fee award was
appropriate, the court rejected Manassa's in-camera approach, stating "the NCAA is

entitled to analyze [counsels' billing records] so that it can support its arguments" on the reasonableness of counsels' hourly rates and time expended on the motions at issue, and ordered counsel to file "detailed time and billing statements, with appropriate redactions, accompanied by an affidavit supporting the accuracy of that record." (Filing No. 277 at 14). The filing of the time and billing records prompted more briefing, including Manassa's supplemental reply for which he seeks the additional attorney fees. (Third Clark Aff. ¶ 8). The court agrees with the NCAA; this additional briefing would not have been required had Manassa's counsel submitted their time and billing records with their initial motion for attorney fees. Therefore, the NCAA's objection is sustained. Manassa is not entitled to $21,635 in attorney fees associated with the supplemental reply.

### 5.   25% Discount on Fees

Lastly, the NCAA objects to Manassa's 25% discount on time counsel was "unable to separate out . . . specific to the issues he has prevailed on." (Motion for Fees at 8). The NCAA argues that since "the unsuccessful arguments were approximately 40% of [Manassa's] motion," the court should reduce his fee award by 40%. (Filing No. 300, Resp. to Pl.'s Supp. Reply at 10).

In addition to the discounted time entries, Manassa's counsel represents that they excluded expert expenses they incurred related to the NCAA's delay in producing Penalty Data in computer-readable form and some of the time spent reviewing NCAA-produced documents. (First Clark Decl. ¶¶ 26–27). Having reviewed the motion to compel and the order granting the same, the court finds Manassa's 25% discount on time entries to

21

account for the unsuccessful portions of the motion to compel was reasonable.  The NCAA's objection is overruled.

### 6. Total Hours Reasonably Expended

As just discussed, the court finds Manassa is entitled to the hours counsel reasonably expended in meet and confers and other pre-motion work, the motion and briefs associated with the motion to compel, and the motion for attorney fees and reply brief.  Manassa is not entitled to the 39.2 hours associated with his supplemental reply brief.  Accordingly, the number of hours reasonably expended by Manassa's counsel is 173.48.

## IV.  Conclusion

For the reasons explained above, the court **GRANTS in part** and **DENIES in part** Manassa's Motion for Attorney Fees (Filing No. 166). The court finds Manassa is entitled to $108,225.50 in attorney fees, calculated as follows:

| Name | Rate | Hours (Meet-and-Confer, Pre-motion work) | Hours (Motion to Compel Brief) | Hours (Reply Brief) | Hours (Fee Motion) | Hours (Fee Reply) | Total Hours | Fee Awarded |
|---|---|---|---|---|---|---|---|---|
| **Fegan Scott LLC** | | | | | | | | |
| Beth Fegan | $850 | 2.10 | 0.75 | 1.50 | 1.88 | 1.1 | 7.33 | $6,230.50 |
| Melissa Clark | $700 | 33.85 | 9.28 | 20.33 | 4.88 | 13.2 | 81.54 | $57,078.00 |
| Ling Wang | $500 | 12.90 | 10.93 | 8.63 | 11.50 | 2.5 | 46.46 | $23,230.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wendy Purcell | $250 | 0 | .38 | 4.13 | 0 | 0 | 4.51 | $1,127.50 |
| Mary Dugan | $250 | 0 | 0 | 0.60 | 0 | 0 | 0.60 | $150.00 |
| Alissa Giler | $250 | 0 | 0 | 0 | 0 | 8.8 | 8.8 | $2,200.00 |
| **May Jung LLC** | | | | | | | | |
| Je Yon Jung | $750 | 16.20 | 2.45 | 2.33 | 2.50 | 0.8 | 24.28 | $18,210.00 |
| **Total** | | 65.05 | 23.78 | 37.50 | 20.75 | 26.40 | 173.48 | **$108,225.50** |

**SO ORDERED** this 5th day of February 2024.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.